# CONFIDENTIAL OFFERING MEMORANDUM,
# DISCLOSURE STATEMENT AND CONSENT SOLICITATION STATEMENT

**If you are a holder of <u>the Debt Claims (as defined herein)</u>,**
against Yueting Jia, an individual resident in the United States, then this document is an <u>Exchange Offer</u> and
a <u>Solicitation of Votes</u> on a Prepackaged Plan of Reorganization
under Chapter 11 of the United States Bankruptcy Code

**Disclosure Statement for a Prepackaged Plan of Reorganization
under Chapter 11 of the United States Bankruptcy Code**

**Dated October 10, 2019**

_____

The Exchange Offer (as more particularly described below) made pursuant to this confidential offering memorandum, disclosure statement, and consent solicitation statement (collectively, this "Offering Memorandum"), will expire at 5:00 p.m., Beijing Time, on November 8, 2019, unless extended, postponed, or earlier terminated by the offeror, Yueting Jia, an individual in the United States (herein, "YT"). In this Offering Memorandum, this expiration date and time, as may be extended, postponed, or earlier terminated by YT, in his sole discretion, is referred to as the "Expiration Date." In addition, votes to accept or reject the Prepackaged Plan (as more particularly described below) must be received on or before the Expiration Date.

The Exchange Offer is being made in reliance upon an exemption from the registration requirements under the Securities Act of 1933, as amended, or the Securities Act. The proposed Restructuring (as defined herein) will be accomplished through one of two alternatives: (i) a series of out-of-court transactions that are referred to herein as the "Consensual Restructuring" or (ii) a prepackaged plan of reorganization under chapter 11 of the U.S. Bankruptcy Code that is referred to herein as the "Prepackaged Plan." The beneficial interests in the Trust (the "Trust Interests") being offered are beneficial interests in a liquidating trust (the "Trust") to be formed in connection with the restructuring described below, including the Consensual Restructuring and the Prepackaged Plan (as defined herein) (herein, "Restructuring"). The Trust Interests have not been registered with or approved or disapproved by the Securities and Exchange Commission, or the SEC, or any state securities authority, nor has the SEC, any state securities authority or any similar authority or any court passed upon the accuracy or adequacy of the information contained in this Offering Memorandum or upon the merits of the Restructuring. Any representation to the contrary is a criminal offense. This Offering Memorandum does not constitute an offer to any person in any jurisdiction in which the Exchange Offer would be unlawful, and the Exchange Offer is not being made to, and tenders will not be accepted from, holders of the Debt Claims (as defined herein) in jurisdictions in which the Exchange Offer or acceptance thereof would constitute a violation of the securities or blue sky laws of that jurisdiction. **In addition, YT reserves the right to commence a chapter 11 case and pursue the Prepackaged Plan at any time.**

The Trust Interests have not been registered under the Securities Act and may not be offered or sold in the United States or to U.S. persons unless the Trust Interests are registered under the Securities Act, or an exemption from the registration requirements of the Securities Act is available, and any hedging transactions involving the Trust Interests may not be conducted unless in compliance with the Securities Act.

_____

**The Restructuring described in this Offering Memorandum involve risks. See "Risk Factors."**

_____

**Questions and requests for assistance or for additional copies of this Offering Memorandum, the Letter of Transmittal and Ballot (as more particularly described below), and any other required documents (including any applicable ballots) may be directed to Epiq Corporate Restructuring, LLC, at tabulation@epiqglobal.com (please reference "YT" in the subject line). This Offering Memorandum and the accompanying materials are being sent to holders of Debt Claims as of October 9, 2019.**

There is no public market for the securities offered hereby, and no such public market is expected to develop in the future.  The Trust Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable state securities laws, and as permitted under the 2019 Creditor Liquidating Trust Agreement to be entered into by and among YT, FF Top Holding Ltd. a British Virgin Islands Company ("FF Top"),and the other parties thereto (the "Trust Agreement").  For example, neither the Trust Interests nor any interest therein may be offered or sold if, in the opinion of legal counsel to the Trust, the Trust could be treated as an association or publicly-traded partnership taxable as a corporation within the meaning of Section 7704 of the Internal Revenue Code as a result of such offer or sale or if the offer and sale might not satisfy an exemption to the registration requirements under the Securities Act and applicable state securities laws.  As a result, you should be aware that you may be required to bear the financial risks of the Trust Interests for an indefinite period of time.

---

The information presented in this Offering Memorandum was prepared and furnished solely for your use in connection with the Restructuring (as outlined below).

This Offering Memorandum (together with any amendments or supplements and any other information that may be furnished to you by YT) includes or may include certain statements, estimates, and forward-looking projections with respect to the anticipated future performance or the performance of Smart King Limited, a Cayman Islands company (the "Company"), and the industry in which the Company operates.  Such statements, estimates, and forward-looking projections reflect various assumptions that may or may not prove to be correct and involve various risks and uncertainties.

This Offering Memorandum does not purport to be all inclusive or to contain all of the information that you may desire in investigating the proposed transactions described herein, YT, or the Company.  You must rely on your own examination of such proposed transactions, YT, the Company, and the terms of the Restructuring, including the merits and risks involved in making an investment decision with respect to the securities offered hereby or approving the Restructuring.  You should not construe any statements made in this Offering Memorandum as investment, tax, accounting, or legal advice.  Prior to making an investment decision regarding the Trust Interests offered hereby or approving the Restructuring, you should consult with your own investment, tax, or other advisors, accountants and legal counsel, if any, and carefully review and consider this entire Offering Memorandum.

This Offering Memorandum summarizes portions of certain documents, including, without limitation, the Trust Agreement, the Prepackaged Plan, the Letter of Transmittal and Ballot, and other documents (each as defined in this Offering Memorandum).  The summaries of such documents are not intended to be complete or to contain all of the information included in such documents, and are qualified in their entirety by the full text of those documents, copies of which are attached to this Offering Memorandum or available by request as set forth herein.

---

This Offering Memorandum does not constitute an offer to sell to, or a solicitation of an offer to buy from, anyone in any state or in any other jurisdiction in which such an offer or solicitation is not authorized.  Except as otherwise expressly indicated, this Offering Memorandum speaks only as of the date indicated above.  Neither the delivery of this Offering Memorandum nor any sale made hereunder shall, under any circumstances, create an implication that there has been no change in YT's affairs after the date indicated above.

No one has been authorized to give any information or make any representations in connection with the Restructuring other than the information contained in this Offering Memorandum, and, if such information or representations are given, it must not be relied upon as having been authorized by YT, the Company or any person affiliated with either of them. If you wish to obtain any additional information, please contact the individuals listed under "Additional Information."

Any additional information or representations given or made in connection with the Restructuring, whether oral or written, are qualified in their entirety by the information set forth in this Offering Memorandum, including, but not limited to, the risk factors set forth in this Offering Memorandum. See "Risk Factors." The securities offered hereby are suitable only for sophisticated investors and require the financial ability and willingness to accept the high risks and lack of liquidity in an investment in the Trust Interests. You must be prepared to accept such risks for an indefinite period of time.

––––––––––––––––

The information contained in this Offering Memorandum is confidential and proprietary and is being submitted to you solely for your confidential use with the express understanding that, without the prior express written permission of YT, you will not release this Offering Memorandum or discuss the information contained in this Offering Memorandum, including the fact that a possible securities offering is being considered, or make reproductions of or use this Offering Memorandum for any purpose other than evaluating a potential investment in the securities offered hereby.

––––––––––––––––

This Offering Memorandum is a disclosure statement with respect to the Prepackaged Plan and has not been approved by any court, although YT reserves the right to seek such approval subsequent to the offering pursuant to the Prepackaged Plan.

This Offering Memorandum may not be relied on for any purpose other than to determine whether to participate in the Consensual Restructuring or vote to accept or reject the Prepackaged Plan. Nothing herein shall constitute an admission for legal or evidentiary purposes. Nothing herein is a waiver of any right YT may have in any jurisdiction.

––––––––––––––––

To the extent set forth in this Offering Memorandum, YT reserves the right, in his sole discretion and for any reason, to accept or reject some or all of any prospective investments in the securities offered hereby or to allot to you less than the number of securities that you desire to receive. None of YT, the Company, or the Trustee (as defined herein) will have any liability to any investor or recipient of this Offering Memorandum in the event that any of these actions are taken.

––––––––––––––––

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................. 1

FORWARD-LOOKING STATEMENTS ......................................................................................... 2

SUMMARY ....................................................................................................................................... 3

THE CONSENSUAL RESTRUCTURING ....................................................................................... 9

BACKGROUND OF YT AND THE RESTRUCTURING ............................................................. 14

THE PREPACKAGED PLAN ........................................................................................................ 16

THE COMPANY ............................................................................................................................ 34

OTHER ASSETS OF YT ............................................................................................................... 47

RISK FACTORS ............................................................................................................................. 48

TENDERING AND VOTING PROCEDURES .............................................................................. 76

TOTAL CLAIMS AGAINST YT AND PROJECTED CLAIMS AGAINST YT .......................... 80

SUMMARY OF SELECTED FINANCIAL INFORMATION ....................................................... 81

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS .............................................. 83

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS OF THE COMPANY ..................................................................... 85

SUMMARY OF TRUST ASSETS ................................................................................................. 95

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MEMBERS OF THE
BOARD ............................................................................................................................................ 97

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE CONSENSUAL
RESTRUCTURING AND THE PREPACKAGED PLAN ............................................................ 100

INVESTOR SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS ................ 104

ADDITIONAL INFORMATION .................................................................................................. 107

<u>EXHIBITS</u>

<u>Exhibit A</u>        Trust Agreement Term Sheet

<u>Exhibit B</u>        Prepackaged Plan

**This Offering Memorandum is confidential, is intended solely for the purposes stated herein, and may not be reproduced or redistributed by the recipients, in whole or in part, nor may any of its contents be disclosed to anyone other than the parties to whom it is distributed, except as expressly authorized hereby. Unless the context otherwise indicates, all references to the "Company" in this Offering Memorandum refer to Smart King Limited, a company organized under the laws of the Cayman Islands, and its subsidiaries.**

## INTRODUCTION

YT is providing this Offering Memorandum on a confidential basis, in connection with a proposed Restructuring relating to the Debt Claims, for use solely by the holders thereof outstanding as of October 9, 2019.

The proposed Restructuring will be accomplished through one of two alternatives: (i) a series of out-of-court transactions that are referred to herein as the "Consensual Restructuring" or (ii) a prepackaged plan of reorganization under chapter 11 of the U.S. Bankruptcy Code that is referred to herein as the "Prepackaged Plan." In order to effect the Consensual Restructuring, as described in greater detail in this Offering Memorandum and upon the terms and subject to the conditions described in this Offering Memorandum, YT is:

- offering to exchange any and all rights related to the Debt Claims, including any right to receive payment for principal, interest thereon, and any penalties related thereto (in each case, whether or not accrued) and other amounts thereon or otherwise, for a number of Trust Interests to be determined; in this Offering Memorandum, this offer to exchange the Debt Claims for Trust Interests is referred to as the "Exchange Offer;" and

- seeking a release by the holders of the Debt Claims of YT, his wife Wei Gan, and certain other persons, in each case in any capacity, and in any and all jurisdictions, from a broad range of claims and liability, as further described in "The Consensual Restructuring—Release."

In order to effect the Prepackaged Plan, if necessary, as described in greater detail in this Offering Memorandum, YT is additionally soliciting votes of the holders of the Debt Claims to accept or reject the Prepackaged Plan to effectuate the transactions described in this Offering Memorandum in the event that the Consensual Restructuring is not completed for any reason. In this Offering Memorandum, the date on which it is anticipated that the Prepackaged Plan may be consummated is herein referred to as the "Effective Date." **In addition, YT reserves the right to commence a chapter 11 case and pursue the Prepackaged Plan at any time.**

In this Offering Memorandum, the Restructuring collectively refers to the effects of the transactions summarized above, whether accomplished by means of the Consensual Restructuring or through the confirmation and effectuation of the Prepackaged Plan. See "Risk Factors" for a discussion of important factors that should be considered in connection with the Restructuring.

The record date for determining ownership of the Debt Claims for the purposes of voting to accept or reject the Prepackaged Plan is October 9, 2019; only holders of the Debt Claims as of the close of business on such record date may vote to accept or reject the Prepackaged Plan.

Participation in the Exchange Offer and the casting of votes to accept or reject the Prepackaged Plan requires strict compliance with the tendering and voting procedures described in this Offering Memorandum. See "Tendering and Voting Procedures." Parties wishing to participate in the Consensual Restructuring or vote to accept or reject the Prepackaged Plan must return the appropriate paperwork to Epiq Bankruptcy Solutions, LLC (the "Exchange Agent"), by 5:00 p.m. Beijing Time on November 8, 2019, unless extended, postponed, or earlier terminated by YT in his sole discretion.

**Reservation of Right to Withdraw or Amend Consensual Restructuring and Prepackaged Plan**

To the fullest extent permitted by applicable law, YT reserves the right to withdraw or amend the Exchange Offer, the Consensual Restructuring (or any part of the Consensual Restructuring), or the Prepackaged Plan (or any part of the Prepackaged Plan), before or after the Expiration Date.

## FORWARD-LOOKING STATEMENTS

This Offering Memorandum contains "Forward-Looking Statements." All statements other than statements of historical facts included in this Offering Memorandum regarding YT's or the Company's operations, financial position, plans, and business strategy, and statements regarding the industry in which the Company operates, may constitute forward-looking statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "intend," "estimate," "anticipate," "believe," or "continue" or the negative thereof or variations thereon or similar terminology. Although the expectations reflected in such forward-looking statements are believed by YT to be reasonable at this time, YT can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from such expectations are disclosed in this Offering Memorandum, including, without limitation, in conjunction with the forward-looking statements included in this Offering Memorandum under "Risk Factors." All subsequent written and oral forward-looking statements attributable to YT, the Company or the Trust, or persons acting on his or their behalf are qualified in their entirety by these cautionary statements.

Although stated with particularity, the potential or hypothetical returns information included in this Offering Memorandum, under the heading "Consensual Restructuring—The Exchange Offer—Other Matters Affecting the Trust: Hypothetical Scenarios," is unaudited and is based on a variety of generalizations, estimates, and assumptions. Such generalizations, estimates, and assumptions are considered reasonable by YT, although they may prove to have been incorrect or unfounded; further, they are inherently subject to significant economic, competitive, tax, and other uncertainties beyond the control of YT or the Company. There can be no assurance that the pro forma results will be realized, and actual results may vary materially and adversely from those projected.

## SUMMARY

*This summary highlights selected information contained elsewhere in this Offering Memorandum. This summary does not contain all of the information that you should consider before making an election to participate in the Restructuring. Before deciding to participate, you should read this entire Offering Memorandum, including the section entitled "Risk Factors" and the other documents attached as exhibits to this Offering Memorandum.*

*YT is proposing to satisfy his debts by contributing all his legally recognized personal assets (other than those assets that have been frozen or seized in China) to the Trust as "Trust Assets," meaning:*

- *YT's economic rights to 40.8% of the Company's equity consisting of 147,048,823 Class B ordinary shares currently owned by FF Top, representing 10% of the Company's equity interest; and*

- *a preferred distribution right in connection with 30.8% of the Company's equity interest (owned through Pacific Technology Holding LLC ("Pacific Technology") and collectively beneficially owned by YT and the management through the Partnership Program (described herein)), which will entitle him to a priority distribution of up to US$815.7 million (subject to certain adjustments), right after the return of capital to the management, a special distribution of 10% of the remaining amounts and thereafter, a normal distribution of 20% of the balance owned by Pacific Technology. The remaining equity of the Company is owned by Season Smart Limited ("Season Smart"), an affiliate of Evergrande Health Industry Group, and the option holders and Class A ordinary shareholders under the Company's equity incentive plan.*

*If the Company is unable to obtain additional financing needed to execute on its business plan, there may be very limited value available after the satisfaction of the Company's debts. YT hopes to facilitate the Company's financing efforts by addressing his debt through the Restructuring, and to continue working to maximize the value of the Company thereby creating value for his creditors. See "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company."*

### The Company

The Company was founded with the vision to disrupt the traditional automotive industry and create a shared intelligent mobility ecosystem that empowers everyone to move, connect, breathe and live freely.

The Company is a pre-revenue development stage global technology company headquartered in Los Angeles, California, with additional development activities and operations in China that designs and manufactures next-generation, zero-emission smart electric vehicles and mobility ecosystem with a view to carving out a dual-market strategy and having manufacturing capabilities and operations in both the U.S. and China, the two largest electric vehicle markets. The Company has designed a new mobility platform that integrates clean energy, intelligent design, internet vehicle connectivity and artificial intelligence functionality to create a seamless user experience, and has assembled a global team of automotive and technology experts and innovators to achieve its goal of redefining mobility.

Over the last four years, the Company has developed a portfolio of intellectual property, established its proposed supply chain and completed several pre-production vehicles for the FF 91. To date, significant capital has been deployed for research and development associated with its electric vehicles; corporate planning, administration and development; and investment in key property and equipment. The Company revealed its first vehicle model, the FF 91, in January 2017 and is endeavoring to complete the testing and validation, and begin the manufacture and delivery of the FF 91 to the market. The design of the FF 91 incorporates clean, intelligent, connected and shared technologies.

### Background

Because of YT's significant relationship to the Company, YT believes that it is imperative to consummate the Restructuring as swiftly as possible in order to enable the Company to obtain the necessary financing and reestablish normal relations with its suppliers and other parties that do business with YT and/or the Company. If the

Restructuring is not consummated in a timely manner, YT believes that the value of his interest in the Company, which is his primary asset and the basis for the settlement of claims in respect of the Debt Claims, will be substantially reduced and may even lose its entire value. If, as a result of not being able to consummate the Restructuring in a timely manner, the Company's business is not able to once again pursue its business plan, it is likely that it will not be able to continue as a going concern, it may be forced to liquidate its remaining assets and/or initiate bankruptcy proceedings, and the value of YT's interest in the Company will be greatly reduced or eliminated. See "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company."

For a more complete description of factors leading to the Restructuring, see "Background of YT and the Restructuring."

The Restructuring is proposed to be consummated through one of two alternatives, both of which require the support and approval of YT's creditors:

- ***The Consensual Restructuring***.  The Consensual Restructuring consists of the Exchange Offer and the other transactions described in "The Consensual Restructuring."

- ***The Prepackaged Plan***.  Concurrently with the Exchange Offer, YT is soliciting votes for the Prepackaged Plan, which may be implemented if the Consensual Restructuring is not able to be completed.  **For additional information, see "The Prepackaged Plan," which includes both a summary and a detailed description of the Prepackaged Plan.  Please read "The Prepackaged Plan" section of this Offering Memorandum and the Prepackaged Plan attached hereto as <u>Exhibit B</u> in their entirety, as your rights will be affected by the Prepackaged Plan if it is filed with and confirmed by the Bankruptcy Court regardless of whether you respond to this Offering Memorandum.  All capitalized terms used in this Offering Memorandum and not defined will have the meanings assigned to them in the Prepackaged Plan.**

> **YT WILL <u>NOT</u> IMPLEMENT THE CONSENSUAL RESTRUCTURING UNLESS <u>AT LEAST</u> 90% OF THE OUTSTANDING PRINCIPAL AMOUNT OF THE DEBT CLAIMS ARE VALIDLY TENDERED IN CONNECTION WITH THE EXCHANGE OFFER.**

YT is seeking to undertake the Consensual Restructuring in order to avoid the significant expense and time necessary to complete an in-court restructuring, and the potential impact such costs and time delays will have on the value of his assets to be contributed to the Trust as part of the Exchange Offer.  In order to undertake the Consensual Restructuring, YT is making the Exchange Offer to the holders of the Debt Claims as summarized below under the heading "Summary of the Exchange Offer."  Assuming that 90% of the holders of the Debt Claims agree to participate in the Exchange Offer, it is expected that the transactions and the other actions described in "The Consensual Restructuring" will be consummated promptly after completion of the voting period described herein. However, YT is also concurrently seeking the requisite approvals to implement the Prepackaged Plan, as summarized below, in the event that the Consensual Restructuring is not completed for any reason.  See "The Prepackaged Plan."  In addition, YT believes that the liquidation of his assets under chapter 7 would result in smaller distributions being made to holders of the Debt Claims than those provided for in the Consensual Restructuring or the Prepackaged Plan because of:

- the likelihood that his assets would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time;

- additional administrative expenses involved in the appointment of a trustee to oversee the bankruptcy case;

- the inability of the Company to obtain financing in the future for capital expenditures, working capital and other general corporate purposes if YT no longer has any ownership interest in the Company; and

- the additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation.

There can be no guarantee that YT will be successful in completing the Restructuring (whether by means of the Consensual Restructuring or the Prepackaged Plan), or that if the Restructuring is so completed, that the Company will continue as a going concern or that the Restructuring can prevent the insolvency, liquidation, and/or dissolution of the Company in the future.

If necessary support and approval to complete the Restructuring through one of the alternatives described above can be obtained, YT believes that the Company will be better positioned to obtain additional financing and once again pursue its business plan and capitalize on opportunities that are expected to arise.

## Summary of the Exchange Offer

| | |
|---|---|
| **The Exchange Offer** | As part of the Consensual Restructuring, YT is offering to exchange, upon the terms and subject to the conditions described in this Offering Memorandum and in the Letter of Transmittal, the Ballot and Release accompanying this Offering Memorandum (which are collectively referred to herein as the "Letter of Transmittal and Ballot"), the Debt Claims, including any and all rights related thereto (whether the right to receive payments for principal, interest (whether or not accrued), and other amounts thereon or otherwise), for consideration consisting of Trust Interests. *You are encouraged to read carefully the "Trust Agreement Term Sheet," a copy of which is attached as* <u>*Exhibit A*</u> *to this Offering Memorandum. This discussion is qualified in its entirety by reference to the full text of the Trust Agreement Term Sheet.* |
| | The delivery of the consideration described above in connection with the Exchange Offer will constitute satisfaction in full of all personal liability of YT related to all Debt Claims exchanged, whether for the payment of principal, interest thereon and any penalties related thereto (whether or not accrued), and other amounts in respect of all Debt Claims exchanged or as set forth below. Any holders that do not exchange their Debt Claims in the Exchange Offer will continue to hold their Debt Claims, the terms of which will remain unchanged, subject to the effects of the proposed Prepackaged Plan as described in "The Prepackaged Plan." |
| | The value of the Trust Interests will be necessarily tied to the value of its interests in the Company, and there can be no assurance as to the value of the Company, at this time or in the future. Furthermore, there is no expectation that a market for the Trust Interests will develop. Certain illustrative scenarios of the value of the Trust Interests under certain assumptions are provided in "Consensual Restructuring—The Exchange Offer—Other Matters Affecting the Trust: Hypothetical Scenarios ." |
| **Release** | Each holder of a Debt Claim that tenders its Debt Claim in the Exchange Offer shall be deemed to: |
| | • waive any and all rights with respect to such Debt Claim against YT for personal liability; and |
| | • release and discharge YT, his wife Wei Gan, and certain other persons, in each case in any capacity and in any and all jurisdictions, from a broad range of claims and liabilities, as set forth in the Letter of Transmittal and Ballot. |
| | See "The Consensual Restructuring—Release." |
| **Modification or Termination of the Exchange Offer; Conditions** | YT reserves the right to terminate the Exchange Offer or amend, modify or waive any terms of the Exchange Offer at any time prior to the consummation of the Exchange Offer, in his sole and absolute discretion, including in the event that less than 90% of the holders of Debt Claims exchange their Debt Claims pursuant to the Exchange Offer.  The closing of the Exchange Offer will be subject to certain conditions, which may be waived by YT, as described under "The Consensual Restructuring— The Exchange Offer—Conditions to the Exchange Offer." |
| **Trust Interests** | Holders of the Trust Interests will be entitled to certain limited voting and other rights and subject to certain obligations, as set forth in the Trust Agreement. |

The Trust Interests are not convertible into or exchangeable for shares of stock, properties or other securities of the Company or any other entity or person. For additional information, see Trust Agreement Term Sheet, a copy of which is attached as <u>Exhibit A</u> to this Offering Memorandum.

### Tendering and Voting Procedures

Participation in the Exchange Offer and the casting of votes to accept or reject the Prepackaged Plan requires strict compliance with the tendering and voting procedures described in the Letter of Transmittal and Ballot.

By accepting any consideration under the Consensual Restructuring or the Prepackaged Plan, each holder of a Debt Claim that tenders its Debt Claim in the Exchange Offer shall be deemed to have agreed to the release described in this Offering Memorandum.

### Right to Withdraw Consensual Restructuring and Prepackaged Plan

To the fullest extent permitted by applicable law, YT reserves the right to withdraw or amend the Exchange Offer, the Consensual Restructuring (or any part of the Consensual Restructuring), or the Prepackaged Plan (or any part of the Prepackaged Plan), before or after the Expiration Date.

### U.S. Federal Income Tax Considerations

*You should consult your tax advisor regarding the tax consequences of the Restructuring to you.* There are a number of U.S. federal income tax considerations, risks, and uncertainties associated with consummation of the Restructuring and acquiring and holding Trust Interests. For a general discussion of certain U.S. federal income tax consequences of the Restructuring, see "Certain Federal Income Tax Consequences of the Consensual Restructuring and the Prepackaged Plan" and "Risk Factors—General Risks Related to the Restructuring" and "Risk Factors— Certain Tax Risks Related to the Restructuring."

### Fees and Expenses

YT will pay all the expenses that are incurred by his representatives in connection with the Exchange Offer and the solicitation of votes on the Prepackaged Plan.

### Certain Relationships and Related Transactions

As part of the Restructuring, YT may receive benefits or compensation from the Company that are different than those generally received by the holders of Debt Claims. See "Certain Relationships and Related Transactions—Borrowings from Related Parties—Stock Incentive Plans."

### Additional Information

Questions and requests for assistance or for additional copies of this Offering Memorandum, the Letter of Transmittal and Ballot, or any other required documents may be directed to the Exchange Agent at Epiq Corporate Restructuring, LLC, at tabulation@epiqglobal.com (please reference "YT" in the subject line). You may also visit https://dm.epiq11.com/YT1 for additional information.

### Conventions that Apply to this Offering Memorandum

Unless otherwise indicated or the context otherwise requires, references in this Offering Memorandum to

- "Company" is to Smart King Limited, a company organized under the laws of the Cayman Islands, and its subsidiaries.

- "Debt Claim" is to any claim against YT (i) in connection with a consensual restructuring that arose prior to October 9, 2019, (ii) in connection with a Prepackaged Plan, and (iii) that is not an Administrative Expense Claim specified in sections 503(b) or 1129(a)(4) of the Bankruptcy Code, Priority Tax Claim specified in section 507(a)(8) of the Bankruptcy Code, Priority Non-Tax Claim under the Bankruptcy Code, or U.S. Secured Claim.

- "Effective Date" is to the date on which it is anticipated that the Prepackaged Plan may be consummated.

- "Evergrande" is to Evergrande Health Industry Group, a company incorporated in Hong Kong and publicly listed on the Hong Kong Stock Exchange.

- "Expiration Date" is to the date on which it is anticipated the Exchange Offer will expire, which is 5:00 p.m., Beijing Time, on November 8, 2019, unless and as may be extended, postponed, or earlier terminated by YT.

- "FF" is to Faraday & Future Inc., a company incorporated in the State of California and is Smart King Limited's indirectly wholly-owned subsidiary and main operating company in the United States.

- "FF Global" is to FF Global Partners LLC, a Delaware limited liability company.

- "JVA" is to a joint venture agreement entered into between the Company and The9 Limited, a Nasdaq-listed company, on March 24, 2019.

- "Letter of Transmittal and Ballot" is, collectively, to the Letter of Transmittal, the Ballot and Release accompanying this Offering Memorandum.

- "Restructuring" is to Consensual Restructuring and the Prepackaged Plan.

- "VIE" is to variable interest entity.

- "Vendor Trust" is to Faraday Vendor Trust established by the Company on April 29, 2019.

- "US$," "U.S. dollars," "USD," "$," and "dollars" are to the legal currency of the United States.

## THE CONSENSUAL RESTRUCTURING

The Consensual Restructuring transactions, including the Exchange Offer, are components of YT's plan to restructure claims that holders of the Debt Claims may have against him by means of a series of related transactions not involving a filing under the Bankruptcy Code. The purpose of the Consensual Restructuring is to provide a means of resolving such claims and creating an environment under which the Company can once again pursue its business plan. YT believes that if he is successful in completing the Consensual Restructuring, the Company may be able to obtain the necessary financing to execute its business plan (as discussed below), which will create value for the Trust Interests. The Consensual Restructuring involves many risks and you should carefully read the section of this Offering Memorandum entitled "Risk Factors." YT reserves the right to commence a chapter 11 case and pursue the Prepackaged Plan at any time.

Over the past several months, YT and his representatives have engaged in numerous discussions and negotiations with individual holders of the Debt Claims in an attempt to respond to his financial situation by restructuring his obligations to these parties. The Restructuring described in this Offering Memorandum (including the Consensual Restructuring and the Prepackaged Plan) is the culmination of those months of discussions and negotiations.

YT's ability to complete each part of the Consensual Restructuring is dependent upon the receipt of the necessary consents and approvals to complete each part of the Consensual Restructuring. In addition, the failure or inability to complete the Exchange Offer will result in the inability to complete the entire Consensual Restructuring and every part thereof. In such event, YT reserves the right to implement the Prepackaged Plan or to take such other actions as he, in his sole discretion, deems necessary or prudent.

If the transactions constituting the Consensual Restructuring are consummated, then, immediately following the consummation of the Consensual Restructuring:

- the Debt Claims will be exchanged for the consideration provided under the Exchange Offer

- YT will contribute all his legally recognized personal assets (other than those assets that have been frozen or seized in China) to the Trust as "Trust Assets," meaning:

YT's economic rights to 40.8% of the Company's equity consisting of (i) 147,048,823 Class B ordinary shares currently owned by FF Top, representing 10% of the Company's equity interest, and (ii) a preferred distribution right in connection with 30.8% of the Company's equity interest (owned through Pacific Technology and collectively beneficially owned by YT and the management through the Partnership Program (described herein)), which will entitle him to a priority distribution of up to US$815.7 million (subject to certain adjustment), right after the return of capital to the management, a special distribution of 10% of the remaining amounts and thereafter, a normal distribution of 20% of the balance owned by Pacific Technology. The remaining equity of the Company is owned by Season Smart, an affiliate of Evergrande, and the option holders and Class A ordinary shareholders under the Company's equity incentive plan.

The Consensual Restructuring is conditioned upon, among other things, 90% of the holders of the Debt Claims that are outstanding as of the record date electing to participate in the Exchange Offer. However, YT may, in his sole discretion, waive the requirement that 90% of the holders of the Debt Claims elect to participate in the Exchange Offer. Subject to the terms and conditions of the Exchange Offer, only holders of Debt Claims that have validly tendered their Debt Claims prior to the Expiration Date will be entitled to exchange their Debt Claims in the Exchange Offer.

### The Exchange Offer

As part of the Consensual Restructuring, YT is offering to exchange, upon the terms and subject to the conditions described in this Offering Memorandum and in the Letter of Transmittal and Ballot, the Debt Claims, including any and all rights related thereto (whether the right to receive payments for principal, interest thereon, or penalties related thereto (whether or not accrued), and other amounts thereon or otherwise), for consideration consisting of Trust Interests. Each holder of a Debt Claim that is eligible under applicable securities laws (either pursuant to Regulation S under the Securities Act or another available exemption thereunder) to receive the unregistered securities will receive Trust Interests based on the principal amount of the Debt Claims validly tendered by such holder pursuant to the Exchange Offer and accepted by YT, as more fully described herein. For additional information, see "Investor Suitability Requirements and Transfer Restrictions."

Any holders that do not exchange their Debt Claims in the Exchange Offer will continue to hold their Debt Claims, the terms of which will remain unchanged, subject to the effects of the proposed Prepackaged Plan, as described in "The Prepackaged Plan." In addition, each tendering holder of a Debt Claim shall be deemed to waive any and all rights with respect to its Debt Claim and to release and discharge YT, his wife Wei Gan, and certain other persons, in each case in any capacity and in any and all jurisdictions from a broad range of claims and liabilities, as set forth in the Letter of Transmittal and Ballot, as described below under the heading "Release."

**Exchange Offer Procedures**

The Expiration Date for the Exchange Offer will be 5:00 p.m., Beijing Time, on November 8, 2019, unless extended, postponed, or earlier terminated by YT. YT may change the Expiration Date for any reason in his sole and absolute discretion. If YT decides to change the Expiration Date, such change will be announced by means of personal service, facsimile, mail, overnight courier, or other permitted means no later than 9:00 a.m., Beijing Time, on the first business day after the scheduled expiration of the Exchange Offer.

A holder wishing to tender Debt Claims should follow the procedures described in "Tendering and Voting Procedures." Holders of Debt Claims desiring to participate in the Exchange Offer must complete, execute, and deliver the Letter of Transmittal and Ballot in accordance with the instructions included in the Letter of Transmittal and Ballot and this Offering Memorandum, and forward or hand deliver the Letter of Transmittal and Ballot, together with any other documents required to be delivered pursuant to this Offering Memorandum or the Letter of Transmittal and Ballot, to the Exchange Agent for the Exchange Offer at the address listed on the cover of the Letter of Transmittal and Ballot. Once a holder of a Debt Claim has completed, executed, and delivered the Letter of Transmittal and Ballot, that holder will not be permitted to withdraw such Debt Claim tendered or such holder's acceptance of the Prepackaged Plan, except as required by applicable law or as permitted by YT in his sole discretion.

After the expiration of the Exchange Offer and subject to the terms and conditions described in this Offering Memorandum and the Letter of Transmittal and Ballot, YT expects that all Debt Claims that have been properly tendered prior to the Expiration Date will be accepted. YT will not be obligated to accept any Debt Claims tendered for exchange after the Expiration Date. Delivery of the Trust Interests issued as consideration for validly tendered Debt Claims will be made promptly after acceptance of such validly tendered Debt Claims.

Questions regarding the Exchange Offer, including the procedures for tendering Debt Claims in the Exchange Offer, should be directed to the Exchange Agent at tabulation@epiqglobal.com (please reference "YT" in the subject line) or the address set forth in the Letter of Transmittal and Ballot.

**Modification or Termination of the Exchange Offer**

YT reserves the right to terminate the Exchange Offer or amend, modify, or waive any terms of the Exchange Offer at any time prior to the consummation of the Exchange Offer, in his sole and absolute discretion, including in the event that a sufficient number of the holders of Debt Claims do not exchange their Debt Claims pursuant to the Exchange Offer.

**Conditions to the Exchange Offer**

In order to participate in the Exchange Offer, holders of Debt Claims must complete, execute, and deliver to the Exchange Agent the Letter of Transmittal and Ballot, which includes a release of YT, his wife Wei Gan, and certain other persons, in each case in any capacity and in any and all jurisdictions, and any other required documents before the Expiration Date. In addition, the closing of the Exchange Offer will be conditioned upon the election by 90% of the holders of Debt Claims to exchange their Debt Claims in the Exchange Offer. YT may waive this condition in his sole and absolute discretion.

**Fees and Expenses**

YT will pay all the expenses that are incurred by his representatives in connection with the Exchange Offer. YT will not reimburse any of the holders of Debt Claims for their expenses.

**Trust**

*You are encouraged to read carefully the Trust Agreement Term Sheet, a copy of which is attached as Exhibit A to this Offering Memorandum. This discussion is qualified in its entirety by reference to the full text of the Trust Agreement Term Sheet.*

Immediately following the effectiveness of the Restructuring and lifting of any applicable limitations on the transfer of Trust Assets to the Trust, the Restructuring will, among other things, grant each holder of an Allowed Debt Claim (as defined in the Trust Agreement Term Sheet) or Late Filed Debt Claim (as defined in the Trust Agreement Term Sheet) a Trust Interest in the Creditor Trust (as defined in the Trust Agreement Term Sheet) or the Late Filed Debt Claims Reserve (as defined in the Trust Agreement Term Sheet), as applicable, based on the amount of such holder's claims as determined pursuant to the Trust Agreement Term Sheet.

The Trust will preserve, hold, manage, and maximize the Trust Assets for use in paying and satisfying the holders' claims upon the earlier to occur of (a) the consummation of a Liquidity Event (as defined in the Trust Agreement Term Sheet) or Distribution Event (as defined in the Trust Agreement Term Sheet) and (b) the termination of the Trust in accordance with the terms and conditions set forth in the Trust Agreement.

The completion of an initial public offering on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange with respect to the shares of outstanding capital stock of the Company or such other relevant listing vehicle, as applicable (an "IPO") will constitute a Distribution Event.

The decision as to when and how much of the Trust Assets to dispose of upon a Distribution Event shall be governed in accordance with Exhibit B to the Trust Agreement Term Sheet, and the Trustee shall, in accordance with instructions in compliance with such schedule, sell, transfer, or otherwise dispose of any securities that are listed (the "Marketable Securities") in one or more open market transactions, private placement, or derivative transactions. The proceeds shall be distributed in accordance with the Distribution Waterfall attached as Exhibit A to the Trust Agreement Term Sheet.

At any time upon YT's request, and subject to applicable securities law, the Trustee shall distribute the Marketable Securities in kind to the creditors in lieu of any cash distribution. The value of the Marketable Securities shall be the average closing trading price for the five (5) consecutive trading days immediately prior to the distribution.

**The Trust Interests**

Holders of Trust Interests will be entitled to certain limited voting and other rights and subject to certain obligations, as set forth in the Trust Agreement. The Trust Interests are not convertible into or exchangeable for any shares of stock, properties or other securities of the Company or any other entity or person. For additional

information, please review the Trust Agreement Term Sheet, a copy of which is attached as Exhibit A to this Offering Memorandum.

The Trust Interests are not registered under U.S. federal or state securities laws or the laws of any other jurisdiction, and there is no obligation or intention to register the Trust Interests under any such laws. The Trust Interests are not traded on any securities exchange, and there is no obligation or intention to apply for trading of the Trust Interests on any securities exchange. In addition, the Trust Interests are subject to significant restrictions on transfer and resale, as described in "Investor Suitability Requirements and Transfer Restrictions," as well as the terms and conditions of the Trust Agreement, on substantially similar terms as described in the Trust Agreement Term Sheet.

**Trustee**

On or after the Effective Date, the Debtor shall appoint one (1) trustee (the "Trustee") who shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Trust or to any person except for such of the Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction. In addition, the Trustee shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities, or expenses (including without limitation, attorneys' fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to the Trust Agreement or the affairs of the Trust (other than in respect of acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction). The Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance and engage independent legal counsel and financial advisors to assist with its evaluation of any matters with respect to the Trust, including any Liquidity Event.

Holders of Trust Interests will be represented by a committee that shall consist of a number of holders of Allowed Debt Claims (the "Creditor Trust Committee"), the responsibilities and governance of which are set forth in the Trust Agreement Term Sheet.

**Other Matters Affecting the Trust: Hypothetical Scenarios**

In order to align incentives of YT with the equity holders of the Company, including the holders of Trust Interests, the Company will enter into the 2019 Equity Incentive Plan with YT and certain key members of management, conditioned on the effectiveness of the Restructuring. See "The Company—2019 Equity Incentive Plan." The 2019 Equity Incentive Plan will provide equity consideration to YT based upon the Company valuation at the time of a Distribution Event as defined in the Trust Agreement. In addition, the Company is currently seeking Series B equity financing in the amount of US$850 million in order to proceed to production of FF91. The terms and conditions of the financing have not been determined. See "The Company—Company's Strategy."

In order to provide financing for the Restructuring, YT obtained a secured loan from Pacific Technology, an affiliate, in the amount of $2,126,343.99. In addition, in connection with the Tuts, YT expects to obtain additional financing. In addition, if YT files a chapter 11 case, YT may also be required to obtain debtor-in-possession financing. These loans may be repaid from a priority distribution by the Trust.

The recoveries under the Restructuring are dependent on the Company's value. In order to illustrate recoveries under different valuation scenarios of the Company, YT has prepared the following chart with the following assumptions:

- Series B equity financing will dilute equity interests by 33%;
- Company's IPO will dilute equity interests by 25%;
- Company's IPO will take place in the first quarter of 2021;
- Total amount of claims for distribution purposes is $2.33 billion; and
- The 2019 Equity Incentive Plan will be distributed in full (see "The Company—Company's Strategy—2019 Equity Incentive Plan").

12

The hypothetical figures set forth in the table below are estimates only and reflect various generalizations and assumptions by YT and management. Such estimates, generalizations, and assumptions are considered reasonable by YT and management, although they may prove to have been incorrect or unfounded; further, they are hypothetical estimates only and are inherently subject to significant economic, competitive, tax, and other risks and uncertainties beyond the control of YT or the Company, including those described in this Offering Memorandum under "Risk Factors– Risks Related to the Company and its Business that may Adversely Affect the Trust Interests," "Risk Factors– Risks Related to the Industry" and "Risk Factors– Risks Related to the Company's Operation in China."

| Distribution from Creditor Trust (Millions) | Company Value Under Different IPO Prices (Millions) | | |
|---|---|---|---|
| Aggregate Distribution | $5,000(Post series B) | $10,000(Post IPO) | $21,000(Post IPO) |
| Distribution to Creditors | $1,144 | $1,417 | $2,341 |
| Creditor Recovery Percentage | 49.10% | 60.82% | 100.47% |

As illustrated in the following table, the 2019 Equity Incentive Plan will result in various degrees of dilution, depending on the Company's future valuation:

| Company Value (in thousands) | $5,000 | $10,000 | $21,000 |
|---|---|---|---|
| Dilution | 2% (Post series B) | Additional 3% (Post IPO) | Additional 3% (Post IPO) |

### Release

**Upon the closing of the Consensual Restructuring, each holder of a Debt Claim that tenders its Debt Claims in the Exchange Offer shall be deemed, in general, to have forever released, waived, and discharged all claims and liabilities against YT, his wife Wei Gan, and certain other persons, in any and all jurisdictions, relating to the period of time on or prior to the closing of the Consensual Restructuring in any way relating to YT. This release also includes a waiver of unknown claims under Section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." The full text of the release is included in the Letter of Transmittal and Ballot (in the case of holders of Debt Claims). You should read this release in full and discuss its significance and impact on you with your legal advisor.**

For a summary of the release, waivers, and other items that will be relevant in the event that YT completes the Restructuring through the Prepackaged Plan, please see "The Prepackaged Plan—Release."

## BACKGROUND OF YT AND THE RESTRUCTURING

The majority of YT's debt today stems from his personal guarantees or money he borrowed personally on behalf of companies that he founded or led. YT took these loans for his previous companies in good faith to fund his vision. He is now trying to fashion a trust, backed by his ownership of the Company, to satisfy creditors, while still fulfilling the aspirations for the Company. His proposal, in short, is to align the interests of his creditors with the future of the Company, as his effort to bring the Company to its success while repaying his debt in full.

YT founded LeEco, the first internet-based TV streaming service in China. As founder of LeEco (formerly LeTV), he built a global technology company and led its expansion to include LeshiZhiXin, Le Vision Pictures, Le Sports, LeMobile, LeTV, and other companies. He took LeTV to a successful initial public offering on the GEM of Shenzhen Stock Exchange in 2010, and in 2014, Forbes China ranked him as the No. 1 CEO in the country. To meet the capital demands for such expansion, YT relied heavily on borrowing from commercial banks and other financial institutions, as it was relatively difficult for a publicly-traded company to issue new shares in China at such a time.

However, YT's businesses, including LeEco, required substantial investment in R&D and business expansion and hence never generated positive cash flows. He sold some of his businesses to an investor in early 2017 to generate cash and repay certain corporate debts. Afterward, as bank financing became increasingly difficult to obtain, in July 2017, one of YT's lenders, China Merchant Bank, issued a letter to LeEco demanding payment of nearly RMB30 million in interest, although LeEco had already paid more than half of the borrowed amount. When LeEco did not make the payment by the date demanded, China Merchant Bank froze YT's and LeEco's assets. Media coverage of LeEco's financial challenges negatively impacted discussions YT was having with other equity and debt investors, and creditors sued to recover the unpaid balance of their loans. The stock price of LeTV dropped severely, which significantly impacted the collateral value of YT's LeTV shares for his personal borrowing and guarantee. Some of YT's creditors have received judgments against him and his business ventures and are now seeking to recover on those judgments. Three of the creditors are Shanghai Lan Cai Asset Management Co., Ltd., Shanghai Qichengyueming Investment Partnership Enterprise, and Jinan Rui Si Le Enterprise Management Consulting Partnership. The Beijing Arbitration Commission issued an award in favor of Shanghai Lan Cai Asset Management Co., which a U.S. federal district court judge in California subsequently confirmed. The federal district court issued a writ of execution in Shanghai Lan Cai's favor and issued an injunction restraining YT from taking any action to transfer, conceal, reduce, or encumber personal assets, including YT's beneficial ownership interest in FF, held through FF Top, and YT's alleged beneficial interest in certain real estate owned by Ocean View Drive, Inc. YT is appealing the federal district court's judgment to the U.S. Court of Appeals for the Ninth Circuit.  Shanghai Qichengyueming Investment Partnership Enterprise is also seeking to enforce a foreign arbitral award issued against YT and Leview Holding Limited by the China International Economic and Trade Arbitration Commission. In July 2019, a federal district court in Los Angeles entered a consent judgment confirming the arbitral award entered in Shanghai Qichengyueming. A motion to amend the consent judgment is currently pending, and the court has not yet issued a writ of execution. Jinan Rui Si Le has commenced litigation in the Superior Court for the State of California, County of Los Angeles to enforce a judgment entered against YT and various affiliated entities in China by Intermediate People's Court of Jinan City, Shandong Province. The case is currently pending and the superior court has not entered judgment.

The Company, which is headquartered in California has already been listed as No. 4 on The Tech Tribune's 2019 US Best Tech Startups, and has filed 1,322 patents, 951 in China and 342 in the U.S. The Company has assembled a global team of automotive and technology experts and innovators. Over the last four years, the Company has established a supply chain and completed several pre-production models of the FF 91, the Company's first vehicle, which was revealed in January 2017. The Company continues to grow in China too. In March 2019, the Company entered into a 50-50 joint venture agreement with The9 Limited, a Nasdaq-listed company, to serve the market in China. The venture is to manufacture, market, sell and distribute another planned vehicle, the Icon V9, in China. In August 2019, the joint venture was incorporated in Hong Kong.

The Company has received approximately US$1.7 billion in funding—US$900 million from YT and other sources, and US$800 million from Season Smart, an affiliate of Evergrande. After a restructuring agreement with Evergrande, Season Smart owns 32% of the Company on a fully diluted basis. Evergrande had committed to inject another US$1.2 billion over the next two years, but on December 31, 2018, Evergrande and the Company reached a settlement and Evergrande was released from its obligation to make additional investment in the Company. As of

14

December 31, 2018, the Company had cash and restricted cash of approximately US$7.4 million, and a working capital deficit of US$579.1 million.

To launch the FF 91 and prepare for future expansion, the Company will need further financing. In April 2019, the Company entered into an agreement with Birch Lake Fund Management LP ("Birch Lake"), with US$15 million in the first tranche and US$45.0 million in the second. The Company intends to use a combination of equity financing and bridge debt financing to sustain and continue its operation and development, including (i) paying off its existing debts, many of which will mature soon, (ii) launching production of the FF 91 and further developing the FF 81, and (iii) preparing for future financings, which may include an initial public offering.

Since China Merchants Bank froze all the assets and operating accounts of YT and LeEco group (which were worth, at the time, substantially greater than the default amount) that directly led to the cash crunch and collapse of LeEco group, YT has repaid over US$3 billion worth of debts, with remaining assets that are yet to be disposed of and are estimated to be valued around US$1 billion. The Trust is comprised of all YT's personal assets in the United States.

To fulfill the obligations, address his personal debt issues and give every creditor an equal chance to be repaid, YT believes that the Consensual Restructuring is the most viable and least costly option. But, if the Consensual Restructuring cannot be consummated, he is soliciting acceptances to the Prepackaged Plan. He believes that soliciting acceptances of the Prepackaged Plan will allow him to restructure his financial affairs if the Consensual Restructuring cannot be consummated.

Upon completion of the Restructuring, YT will no longer hold his existing equity interest in the Company. Together with the Partnership Program (described herein) established by the Company, YT believes the Restructuring will lay out a solid foundation for the Company's success and maximize the value of the Company's equity assets, with the goal to address YT's direct, guarantor and indirect debts. YT has indicated his intent to continue to work with the team at the Company to achieve its strategic goals, and maximize the value of the Company's shares. In turn, the Trust would still have a stake in the future. The Trust will be controlled and managed by the Creditor Trust Committee and the Trustee. The Restructuring is intended to give creditors three layers of protection. First, they would still maintain their disposition right to all of YT's and other direct debtors' frozen Chinese assets. Second, the primary obligors and guarantors, aside from YT, would continue to be contractually obligated to fulfill their payment obligations. Third, all creditors will have a legal right to participate in the disposition of YT's assets and enjoy the relevant economic interest through the Trust.

If the conditions to the Consensual Restructuring are not satisfied and the Prepackaged Plan is not consummated, YT could be forced to liquidate his assets through chapter 7. This might lead to increased costs and expenses from fees payable to a trustee and professional advisors, the erosion in value of his personal assets, and the substantial increases in claims which would be satisfied on a priority basis. In light of this, YT has determined that confirmation of the Consensual Restructuring and Prepackaged Plan will provide each creditor with a recovery that is not less than it would receive in a liquidation under the Bankruptcy Code. YT believes that the values received by any creditor would diminish in any liquidation. It is also possible that litigation would ensue after a liquidation. This could significantly delay any distributions even further.

## THE PREPACKAGED PLAN

The Prepackaged Plan consists of a plan of reorganization under chapter 11 of Title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code"). If YT decides to implement the Prepackaged Plan, he will file a petition under the Bankruptcy Code. In this Offering Memorandum, YT is referred to as the "Debtor" in the context of such a petition and as the "Reorganized Debtor" following the Effective Date of the Prepackaged Plan. All capitalized terms used in this Offering Memorandum and not defined will have the meanings assigned to them in the Prepackaged Plan, a copy of which is attached to this Offering Memorandum as Exhibit B. The summary of the Prepackaged Plan included in this Offering Memorandum is qualified in its entirety by reference to the provisions of the Prepackaged Plan; to the extent there is any conflict between this Offering Memorandum and the Prepackaged Plan, the terms of the Prepackaged Plan shall govern.

YT has not commenced a case under chapter 11 of the Bankruptcy Code at this time. However, whether or not the Consensual Restructuring could be consummated with the required acceptances by the holders of the Debt Claims, YT may commence a chapter 11 case in order to restructure his financial affairs. This Offering Memorandum solicits acceptance of the Prepackaged Plan and contains information relevant to a decision to accept or reject the Prepackaged Plan.

Although every effort has been made to ensure that statements and information concerning YT set forth in this Offering Memorandum are complete and accurate, such statements and information have not been approved by a Bankruptcy Court as containing adequate information or otherwise satisfying the informational requirements for soliciting votes to accept or reject the Prepackaged Plan. Should YT proceed with the Prepackaged Plan, he intends to seek such approval from the Bankruptcy Court.

Neither the SEC nor any state securities commission has approved or disapproved this Offering Memorandum as it pertains to the Prepackaged Plan. Pursuant to the Prepackaged Plan, any rights issued under, pursuant to or in effecting the Prepackaged Plan, and the offering and issuance thereof by any party, including, without limitation, the Company, are exempt from section 5 of the Securities Act, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

Nothing in the Prepackaged Plan or this Offering Memorandum is or shall be deemed a waiver of any rights or defenses of YT under the Bankruptcy Code, all of which are reserved and preserved.

### Summary of Terms of the Prepackaged Plan

YT has prepared the Prepackaged Plan as an alternative method for effecting the Restructuring if the conditions to the completion of the Exchange Offer, including the tender by all holders of Debt Claims (which YT reserves the right to waive in his sole and absolute discretion), are not met or waived but the required acceptances to seek confirmation of the Prepackaged Plan are received. YT is therefore soliciting the vote of the holders of the Debt Claims (as described below) in favor of the Prepackaged Plan by circulating ballots for the Prepackaged Plan with this Offering Memorandum.

The Prepackaged Plan provides that (a) holders of Administrative Claims, Priority Claims, and U.S. Secured Claims will be entitled to payment of their Allowed Claims in full and (b) holders of Debt Claims will receive their pro rata share of the Trust Interests.

The value of the Trust Interests will be necessarily tied to the value of its interests in the Company, and there can be no assurance as to the value of the Company, at this time or in the future. There is no expectation that a market for the Trust Interests will develop. See "Consensual Restructuring—The Exchange Offer—Other Matters Affecting the Trust: Hypothetical Scenarios."

| | |
|---|---|
| **Classification of Claims** | The following list summarizes the classes of "Claims" (each a "Claim") under the Prepackaged Plan: |

Class 1: "Priority Non-Tax Claims" (*i.e., certain claims that would be entitled to priority under section 507(a) of the Bankruptcy Code*)

Class 2: "U.S. Secured Claims" (*i.e., claims secured by a valid, unavoidable, perfected, and enforceable lien on, or security interest in, property of YT located in the United States, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code*).

Class 3: "Debt Claims" (*i.e., any claim against YT that is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim*).

The classification and treatment for all classes are described in more detail under "The Prepackaged Plan—Classification and Treatment of Claims under the Prepackaged Plan." The allocation of Trust Interests under the Prepackaged Plan is set forth in "The Prepackaged Plan—Trust Interests Following the Prepackaged Plan."

| | |
|---|---|
| **Bar Dates** | The Bar Date(s) (the date(s) by which all Persons, including governmental units, asserting a Claim against YT must file a Proof of Claim against YT or be forever barred from asserting such Claim) will be fixed by order(s) of the Bankruptcy Court. |
| **Deadline for Filing Complaints to Determine Non-Dischargeable Debts** | Pursuant to Bankruptcy Rule 4007(c), a complaint to determine the dischargeability of a debt under section 523(c) of the Bankruptcy Code must be filed no later than 60 days after the first date set for the meeting of creditors under section 341(a) of the Bankruptcy Code, unless the Bankruptcy Court extends such deadline for cause at the request of a party in interest. |
| **Other Provisions** | |
| Acceptance of the Prepackaged Plan | As described in "The Prepackaged Plan," holders of Claims in Class 1 and Class 2 and Unimpaired and are deemed to accept the Prepackaged Plan. |

Claims in Class 3 (the Debt Claims) are Impaired and are thus entitled to vote to accept or reject the Prepackaged Plan; provided, however, that YT reserves the right to assert that any Class is deemed to accept or reject the Prepackaged Plan as a matter of law notwithstanding anything in the Prepackaged Plan to the contrary. Each holder of an Allowed Claim in Class 3 held as of the record date, October 9, 2019, shall be entitled to vote to accept or reject the Prepackaged Plan.

An Impaired Class of Claims shall have "accepted" the Prepackaged Plan if (i) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Prepackaged Plan and (ii) more than one-half in number (other than Claims held by any holder designated under section 1126(e) of the Bankruptcy Code) of the holders of such Allowed Claims actually voting in such Class have voted to accept the Prepackaged Plan. See "The Prepackaged Plan—Requirements for Prepackaged Plan Confirmation."

| | |
|---|---|
| Release by Holders of Claims | **Except as otherwise provided in the Prepackaged Plan, upon the effective date of the Exchange Offer or the Prepackaged Plan, as applicable, to the maximum extent permitted by applicable law, each Releasing Party, in consideration for the obligations of YT and the Reorganized Debtor under the Prepackaged Plan and the Exchange Offer, and the Trust Interests and Cash and other contracts,** |

17

instruments, releases, agreements, or documents to be delivered in connection with the Prepackaged Plan or the Exchange Offer, shall be deemed forever to release, waive, and discharge the Released Parties from personal liability in every jurisdiction from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of YT, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws or laws of any other jurisdiction or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) YT or the chapter 11 case; (ii) any action or omission of any Released Party with respect to any indebtedness under which YT is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, agent of, or advisor to, YT; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Prepackaged Plan; (v) the business or contractual arrangements between YT and any Released Party; (vi) the restructuring of Claims before or during the chapter 11 case and the solicitation of votes with respect to the Prepackaged Plan; and (vii) the negotiation, formulation, preparation, entry into, or dissemination of the Prepackaged Plan (including, for the avoidance of doubt, the Plan Supplement and all documents contained or referred to therein), the Disclosure Statement, or related agreements, instruments, or other documents; provided, however, that the Releasing Parties shall continue to dispose of the following assets through judicial authorities in the People's Republic of China ("PRC") to satisfy such Releasing Party's Claim through a mechanism that will be mutually agreed to by the parties: (x) assets that have already been collateralized by YT or any other Person or Entity; (y) assets that have already been pledged by YT or any other Person or Entity; and (z) assets or interests that YT, his wife Wei Gan, or any other Person or Entity own that have been seized, attached, or frozen by Chinese judiciary authorities. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Prepackaged Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Prepackaged Plan.

Within thirty (30) days of the Effective Date, each holder of a Debt Claim is obligated to (i) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against YT and his wife Wei Gan from the court or judicial authorities in all jurisdictions, including, but not limited to, the PRC, or commit or confirm with the judicial authorities that YT or his wife Wei Gan have fulfilled all their debt obligations or legal responsibilities and (ii) file and execute any documents requested by YT to evidence the above release. Unless and until a holder of a Debt Claim complies with the preceding sentence and all of their obligations under the Trust Agreement, such holder shall not be entitled to exercise any rights with respect to the Trust or receive any distributions from the Trust; provided, however, that YT reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein.

In connection with the releases above, the Releasing Parties hereby waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR

HER SETTLEMENT WITH THE DEBTOR." The Releasing Parties understand and acknowledges the significance and consequence of this waiver of section 1542 of the California Civil Code, as well as any other federal or state statute or common law principle of similar effect, and acknowledges that such waiver is a material inducement to and consideration for the property distributed to or retained by and the rights and benefits conferred upon the Releasing Parties under the Prepackaged Plan or the Exchange Offer.

By voting to accept the Prepackaged Plan, you are voting to accept the release provided for in the Prepackaged Plan. For more information, see "The Prepackaged Plan—Release" and "The Prepackaged Plan—Effects of Prepackaged Plan Confirmation."

Discharge of Claims | Except as otherwise specifically provided in the Prepackaged Plan, the distributions, rights, and treatment that are provided in the Prepackaged Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against YT, of any nature whatsoever, whether known or unknown, or against the assets or properties of YT that arose before the Effective Date. Except as expressly provided in the Prepackaged Plan, on the Discharge Date (and subject to its occurrence), and pursuant to section 1141(d)(5) of the Bankruptcy Code, entry of the Confirmation Order shall be deemed to act as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against YT and his assets, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Prepackaged Plan or is entitled to receive a distribution under the Prepackaged Plan, provided, however, that in no event shall occurrence of the Discharge Date discharge YT from any obligations remaining under the Prepackaged Plan as of the Discharge Date. Any default by YT with respect to any Claim that existed immediately prior to or on account of the filing of the chapter 11 case shall be deemed cured on the Discharge Date.

No later than five (5) business days after the occurrence of the Discharge Date, YT or the Reorganized Debtor, as applicable, shall file with the Bankruptcy Court a notice of the occurrence of the Discharge Date, and serve such notice on all creditors. In addition, following the occurrence of the Discharge Date, YT or the Reorganized Debtor, as applicable, shall file a motion seeking entry of an order of discharge after notice and a hearing, which motion (and the discharge) shall be granted upon a showing that YT has made all payments required under the Prepackaged Plan. Except as expressly provided in the Prepackaged Plan, any holder of a discharged Claim will be precluded from asserting against YT or any of his assets any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. Except as expressly provided in the Prepackaged Plan, and subject to the occurrence of the Discharge Date, the Confirmation Order will be a judicial determination of discharge of all liabilities of YT to the extent allowed under section 1141 of the Bankruptcy Code, and YT will not be liable for any Claims and will only have the obligations that are specifically provided for in the Prepackaged Plan. Notwithstanding the foregoing, nothing contained in the Prepackaged Plan or the Confirmation Order shall discharge YT from any debt excepted from discharge under section 523 of the Bankruptcy Code by a Final Order.

By voting to accept the Prepackaged Plan, you are voting to accept the discharge of YT provided for in the Prepackaged Plan. For more information, see "The Prepackaged Plan—Effects of Prepackaged Plan Confirmation."

Modification of the
Prepackaged Plan

YT reserves the right to alter, amend or modify the terms of the Prepackaged Plan or waive any conditions thereto, if and to the extent that he determines that such alterations, amendments, modifications, or waivers are necessary or desirable in order to consummate the Prepackaged Plan. Holders of Claims will receive such notice of such amendments, modifications, or waivers as may be required by applicable law. See "The Prepackaged Plan—Amendment or Modification of the Prepackaged Plan." It is also possible that the Bankruptcy Court could modify the terms of the Prepackaged Plan before confirming it. See "Risk Factors—Risks Related to the Prepackaged Plan." By voting to accept the Prepackaged Plan, you are consenting to such amendments as may be agreed to or imposed.

## Statement to Creditors

Please read this Offering Memorandum and the Prepackaged Plan completely and carefully. Although YT believes that the Consensual Restructuring is the most viable and least costly alternative to restructure his financial affairs, in the event the Consensual Restructuring cannot be consummated, YT is soliciting acceptances to the Prepackaged Plan pursuant to section 1126(b) of the Bankruptcy Code from holders of claims impaired under the Prepackaged Plan and entitled to vote thereon. YT believes that soliciting acceptances of the Prepackaged Plan is important in order to allow him the ability to restructure his financial affairs if the Consensual Restructuring cannot be consummated.

The form of the Prepackaged Plan is attached to this Offering Memorandum as Exhibit B. The following summaries of material provisions of the Prepackaged Plan do not purport to be complete and are subject, and are qualified in their entireties by reference, to all the provisions of the Prepackaged Plan, including the definitions therein of certain terms used below. Terms defined in the Prepackaged Plan and not otherwise defined herein will have the meanings ascribed thereto in the Prepackaged Plan and such definitions are incorporated herein by reference.

If the conditions to the Consensual Restructuring are not satisfied and the Prepackaged Plan is not consummated, YT will consider making a bankruptcy filing under chapter 11 of the Bankruptcy Code. However, YT may, in his discretion, choose to pursue other alternatives if either the Consensual Restructuring or the Prepackaged Plan is not consummated.

## Overview

The Prepackaged Plan is the primary component of a plan to restructure YT's financial affairs by means of a series of transactions involving a filing under chapter 11 of the Bankruptcy Code. The Prepackaged Plan is intended to create substantially the same economic effects as would have been provided if the Restructuring had taken place through the Consensual Restructuring, and relies on many of the same substantive documents, including the Trust Agreement.

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. The primary purpose of a chapter 11 reorganization case is to formulate and confirm a plan of reorganization as the vehicle for satisfying the holders of creditor claims against a debtor.

In connection with implementation of the Prepackaged Plan, YT presently intends that only YT (and not any of his affiliates, including the Company) would commence a chapter 11 case and be reorganized under the Prepackaged Plan.

The Prepackaged Plan is a plan of reorganization relating to YT that provides comparable treatment to comparably situated creditors of YT. The Prepackaged Plan provides specified distributions to the various classes of holders of claims against YT. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Prepackaged Plan. See "Requirements for Prepackaged Plan Confirmation" below. Many of these tests are designed to protect the interests of holders of claims who do not vote to accept the Prepackaged Plan but who will be bound by the provisions of the Prepackaged Plan if it is confirmed by the Bankruptcy Court.

### Solicitation of Votes on the Prepackaged Plan

YT hereby solicits from holders of Debt Claims votes to accept or reject the Prepackaged Plan under chapter 11 of the Bankruptcy Code. If, by the Expiration Date, holders of at least two-thirds in amount and more than one-half in number of Allowed Debt Claims have voted to accept the Prepackaged Plan, but YT has not received a sufficient number of acceptances for the Consensual Restructuring to be consummated, YT may, in his sole discretion, extend the time during which holders of such claims may vote or tender their claims for one or more additional periods and/or waive the condition that 90% of the Debt Claims be tendered. Additionally, prior to the Expiration Date, YT may, in his sole and absolute discretion, file a voluntary petition for relief under chapter 11 of the Bankruptcy Code and to use the acceptances solicited pursuant to this Offering Memorandum to seek as promptly as practicable confirmation of the Prepackaged Plan under chapter 11 of the Bankruptcy Code.

The Prepackaged Plan provides for three (3) Classes of Creditors, of which only Class 3 (Debt Claims) is entitled to vote on the Prepackaged Plan. Under the Bankruptcy Code, only those creditors who vote to accept or reject the Prepackaged Plan will be counted for purposes of determining acceptance or rejection of the Prepackaged Plan by any Impaired Class of Claims. The Prepackaged Plan could therefore be approved by significantly less than two-thirds in amount of outstanding Allowed Claims in Class 3 (Debt Claims) and significantly less than one-half in number of the holders of Allowed Claims in Class 3 (Debt Claims).

**UPON CONFIRMATION, THE PROVISIONS OF THE PREPACKAGED PLAN WOULD BE BINDING ON ALL OF YT'S CREDITORS REGARDLESS OF WHETHER SUCH CREDITORS VOTED TO ACCEPT THE PREPACKAGED PLAN.**

### Voting on the Prepackaged Plan

Under section 1126(b) of the Bankruptcy Code, a holder of a claim that has accepted or rejected a plan of reorganization before the commencement of a chapter 11 case will be deemed to have accepted or rejected the plan for purposes of confirmation of such plan under chapter 11 of the Bankruptcy Code if the solicitation of such acceptance or rejection is in compliance with any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such a solicitation, or, in the absence of any such law, rule, or regulation, if such acceptance or rejection was solicited after disclosure to such holder of "adequate information" (information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of YT and the condition of YT's books and records, including a discussion of the potential material Federal tax consequences of the plan to YT, any successor to YT, and a hypothetical investor typical of the holders of claims in the case, that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan). YT believes that this Offering Memorandum complies with the requirements of section 1126(b) for purposes of solicitation of acceptances or rejections of the Prepackaged Plan. For instructions on how to vote on the Prepackaged Plan, see "Tendering and Voting Procedures—Procedures for Holders of Debt Claims—Tender of Debt Claims and Delivery of Votes to Accept or Reject the Prepackaged Plan."

The solicitation of acceptances of the Prepackaged Plan will expire on the Expiration Date for the Consensual Restructuring. Votes on the Prepackaged Plan may only be withdrawn for cause (as determined by YT in his sole discretion) or as provided under applicable law. See "Tendering and Voting Procedures—Procedures for Holders of Debt Claims—Tender of Debt Claims and Delivery of Votes to Accept or Reject the Prepackaged Plan." YT reserves the right to amend the terms of the Prepackaged Plan or waive any conditions thereto if and to the extent YT determines that such amendments or waivers are necessary or desirable. YT will give holders of Claims notice of such amendments or waivers as may be required by applicable law. YT reserves the right to use acceptances of the Prepackaged Plan to confirm any amendment of the Prepackaged Plan so long as the amendment does not materially and adversely affect the rights of holders of Debt Claims. By voting to accept the Prepackaged Plan, you are consenting to such amendments as may be agreed to or imposed. In addition, YT reserves the right to use acceptances of the Prepackaged Plan received in this solicitation to seek confirmation of the Prepackaged Plan under any other circumstances, including the filing of an involuntary petition against YT.

### Requirements for Prepackaged Plan Confirmation

In order for the Prepackaged Plan to be confirmed, and regardless of whether all impaired classes of claims vote to accept the Prepackaged Plan, the Bankruptcy Code requires that the Bankruptcy Court determine that the Prepackaged Plan complies with the requirements of section 1129 of the Bankruptcy Code.  Section 1129 of the Bankruptcy Code requires for confirmation, among other things, that:

- except to the extent the Prepackaged Plan meets the "cram down" standards discussed below under the heading "Confirmation of the Prepackaged Plan without Acceptance By All Voting Classes," the Prepackaged Plan be accepted by each impaired class of claims by the requisite votes of holders of claims in such impaired classes;

- the Prepackaged Plan is feasible, which means there is a reasonable probability that YT will be able to perform his obligations under the Prepackaged Plan without the need for further financial reorganization (see "Feasibility of the Prepackaged Plan" below); and

- the Prepackaged Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, which requires that, with respect to each impaired class, each holder of a claim or interest in such class either (a) accepts the Prepackaged Plan or (b) receives or retains property of at least as much value pursuant to the Prepackaged Plan as such holder would receive or retain in a liquidation of YT under chapter 7 of the Bankruptcy Code (see "The Best Interests Test" below).

In addition, YT must demonstrate in accordance with section 1129 of the Bankruptcy Code that:

- the Prepackaged Plan is proposed in good faith;

- YT, in his capacity as plan proponent, and the Prepackaged Plan each comply with the Bankruptcy Code;

- payments for services or costs and expenses in connection with the chapter 11 case, or in connection with the Prepackaged Plan and incident to the chapter 11 case, have been approved by, or are subject to the approval of, the Bankruptcy Court as reasonable;

- all statutory fees have been or will be paid; and

- if the holder of an allowed unsecured claim objects to the confirmation of the Prepackaged Plan, the value of the property to be distributed under the Prepackaged Plan is not less than the projected disposable income of YT to be received during the 5-year period beginning on the date that the first payment is due under the Prepackaged Plan, or during the period for which the Prepackaged Plan provides payments, whichever is longer.

### Confirmation of the Prepackaged Plan without Acceptance by All Voting Classes

Section 1129(b) of the Bankruptcy Code provides for confirmation (or "cram-down") of a plan of reorganization even if the plan is not accepted or deemed accepted by all impaired classes of claims, as long as at least one impaired class of claims has voted to accept the plan and certain other requirements are met.

Under the cram-down provisions of the Bankruptcy Code, if a class of secured claims rejects the plan, the plan may still be confirmed if (a) the holders retain the liens securing their claims and receive cash payments totaling at least the amount of their claim, of a value, as of the effective date, of at least the value of the holders' interest in the estate's interest in such property, (b) the property is sold with the holders' liens attaching to the proceeds of the sale or (c) the holders realize the "indubitable equivalent of such claims."  If a class of unsecured claims rejects the plan, the plan may still be confirmed if the plan provides that (i) each holder of a claim included in the rejecting class receives or retains on account of that claim property that has a value, as of the plan's effective

date, equal to the allowed amount of that claim or (ii) the holder of any claim that is junior to the claims of the rejecting class will not receive or retain any property on account of such junior claim.

If Class 3 (Debt Claims) fails to accept the Prepackaged Plan by the requisite statutory majorities, YT reserves the right to propose any modifications to the Prepackaged Plan and to confirm the Prepackaged Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

### Confirmation of an Individual Chapter 11 Plan

The Prepackaged Plan is an individual plan under chapter 11 of the Bankruptcy Code. Section 1123(a)(8) of the Bankruptcy Code requires that an individual chapter 11 plan "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan." Further, section 1129(a)(15) of the Bankruptcy Code provides that if a creditor objects to confirmation of an individual chapter 11 plan, the plan may only be confirmed if:

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

YT will demonstrate that the value of his assets exceeds his projected disposable income and thus, section 1129(a)(15) of the Bankruptcy Code is satisfied because he has no disposable income. As part of this analysis, YT will show that his future earnings are not necessary for execution of the Prepackaged Plan.

### Feasibility of the Prepackaged Plan

The Bankruptcy Code requires that, in order to confirm the Prepackaged Plan, the Bankruptcy Court must find that confirmation of the Prepackaged Plan (or any other plan of reorganization) will not likely be followed by a liquidation of YT's assets or a need for further financial reorganization. For the Prepackaged Plan (or any other plan of reorganization) to meet the "feasibility test," the Bankruptcy Court must find that YT will be able to meet his obligations thereunder.

YT has analyzed his ability to meet his obligations under the Prepackaged Plan. YT believes, based on this analysis, that the Prepackaged Plan provides a feasible means of reorganization from which there is a reasonable expectation that, following the Confirmation Date, he will possess the resources to meet his obligations under the Prepackaged Plan. However, the Bankruptcy Court may not agree with such a determination or accept the forecasts or the assumptions underlying this determination.

### The Best Interests Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim either (i) accepts the Prepackaged Plan or (ii) receives or retains under the Prepackaged Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if YT's assets were liquidated under chapter 7 of the Bankruptcy Code. If all members of Class 3 (Debt Claims) accept the Prepackaged Plan, the best interests test does not apply with respect to that class.

The first step in meeting the best interests test is to determine the dollar amount that would be generated from the liquidation of YT's assets and properties in a liquidation of YT's assets under a chapter 7 bankruptcy case. The total amount available would be the sum of the proceeds from such a forced disposition of his assets by a chapter 7 trustee and the cash held by YT at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets (to the extent of the value of the collateral

securing such claims), the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the use of chapter 7 for the purposes of liquidation. Finally, the present value of the resultant residual balance (taking into account the time necessary to accomplish the liquidation) is allocated to creditors in the strict order of priority in accordance with section 726 of the Bankruptcy Code, which requires that no junior claim holder receive any distribution until all senior claim and interest holders are paid in full. The amounts so allocated can then be compared to the value of the property that is proposed to be distributed under the Prepackaged Plan on the Effective Date.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and interest holders in a chapter 11 case, including: the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and the substantial increases in claims that would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case, YT has determined that confirmation of the Prepackaged Plan will provide each creditor with a recovery that is not less than it would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code. Moreover, YT believes that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be further impaired as compared to the value of distributions under the Prepackaged Plan because such distributions in chapter 7 may not occur for a substantial period of time. For example, the distribution of the proceeds of the liquidation may be significantly delayed by the need to resolve all objections to claims and prepare for distributions. In the event that YT files for chapter 11 relief, YT will file a liquidation analysis with the Bankruptcy Court.

## Treatment of Administrative and Priority Tax Claims under the Prepackaged Plan

### Treatment of Administrative Expenses (Unimpaired)

Administrative Expense Claims are the costs and expenses of administration of the chapter 11 case described in sections 503(b) or 1129(a)(4) of the Bankruptcy Code and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving YT's Estate or operating YT's business interests; (ii) any indebtedness or obligations incurred or assumed by YT, as a debtor in possession, during the chapter 11 case; (iii) any compensation for professional services rendered and reimbursement of expenses incurred by a Professional retained by order of the Bankruptcy Court or otherwise Allowed pursuant to section 503(b) of the Bankruptcy Code; and (iv) any Administrative Expense Claims allowed by Final Order of the Bankruptcy Court in connection with the assumption of contracts or otherwise. Pursuant to the Prepackaged Plan, any fees or charges assessed against YT's Estate under section 1930, chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and will be paid in accordance with Article 13.1 of the Prepackaged Plan.

The Prepackaged Plan provides that except to the extent that an Administrative Expense Claim has already been paid during the chapter 11 case, the holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, or the Holder of an Allowed Administrative Expense Claim makes a Trust Election, and except as provided in Article 2.2 of the Prepackaged Plan, each holder of an Allowed Administrative Expense Claim against YT shall receive, in full and complete settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of such Allowed Administrative Expense Claim on the latest of (i) the Effective Date or as soon thereafter as reasonably practicable; (ii) 30 days after the date on which such Administrative Expense Claim becomes Allowed; (iii) the date on which such Administrative Expense Claim becomes due and payable in the ordinary course of YT's business in accordance with the terms and subject to the conditions of any agreements or understandings governing, or other documents relating to, such Allowed Administrative Expense Claim; and (iv) such other date as may be agreed to by such holder and YT or the Reorganized Debtor.

24

**Retained Professionals (Unimpaired)**

The Prepackaged Plan provides that the Reorganized Debtor shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Estate pursuant to sections 503(b)(2) – (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court in accordance with Article 2.2 of the Prepackaged Plan. Any final application for allowance of final compensation and reimbursement of expenses in the chapter 11 case must be filed and served in accordance with Article 2.2 of the Prepackaged Plan so that it is received no later than forty-five (45) days after the Effective Date.

For the avoidance of doubt, the immediately preceding paragraph will not affect any professional-service Entity that is permitted to receive, and YT is permitted to pay, without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of professional fees and expenses in the ordinary course of business (and in accordance with any relevant prior order of the Bankruptcy Court), the payments for which may continue notwithstanding the occurrence of confirmation of the Prepackaged Plan.

Except as otherwise specifically provided in the Prepackaged Plan, from and after the Effective Date, the Reorganized Debtor may, upon submission of appropriate documentation and in the ordinary course of business, pay the post-Effective Date charges incurred by the Reorganized Debtor for any Professional's fees, disbursements, expenses, or related support services without application to or approval from the Bankruptcy Court. On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional for fees and charges incurred from and after the Effective Date in the ordinary course of business without any notice to or approval of the Bankruptcy Court.

**Domestic Support Obligations (Unimpaired)**

On the Effective Date, YT shall make any payments to comply with any postpetition unfunded obligations on account of any Domestic Support Obligations, if any such obligations exist, as may be required for YT to be current with respect to such Domestic Support Obligations as of the Effective Date pursuant to section 1129(a)(14) of the Bankruptcy Code. After the Effective Date, YT shall timely make all payments on account of Domestic Support Obligations to the parties entitled to receive such payments, if any such obligations exist, in each case at the times and in the amounts required by the agreements and orders evidencing such Domestic Support Obligations, as such agreements may from time to time be modified in accordance with applicable law.

**Priority Tax Claims (Unimpaired)**

Priority Tax Claims consist of any Claims of governmental authorities of the kind entitled to a statutory priority in right of payment as specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, sales and use taxes, excise taxes, and withholding taxes.

The Prepackaged Plan provides that except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim against YT shall receive, in full and complete settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of such Allowed Priority Tax Claim on the latest of (a) the Effective Date or as soon thereafter as reasonably practicable; (b) 30 days after the date on which such Priority Tax Claim becomes Allowed; (c) the date on which such Priority Tax Claim becomes due and payable; and (d) such other date as may be mutually agreed to by and among such holder and YT or the Reorganized Debtor; provided, however, that the Reorganized Debtor shall be authorized, at his option, and in lieu of payment in full, in Cash, of an Allowed Priority Tax Claim as provided above, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

## Classification and Treatment of Claims under the Prepackaged Plan

The Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of

reorganization may place a claim of a creditor in a particular class only if such claim is substantially similar to the other claims of such class. YT believes that all claims have been appropriately classified in the Prepackaged Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Prepackaged Plan to be confirmed, YT likely will seek (i) to modify the Prepackaged Plan to provide for whatever reasonable classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the class or classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors could adversely affect the class in which such creditor was initially a member, or any other class under the Prepackaged Plan, by changing the composition of such class and the vote required for approval of the Prepackaged Plan. There can be no assurance that the Bankruptcy Court, in the event of a finding that a classification was inappropriate and requiring reclassification, would approve a plan of reorganization based upon such reclassification.

**EXCEPT TO THE EXTENT THAT MODIFICATION OF CLASSIFICATION IN THE PREPACKAGED PLAN ADVERSELY AFFECTS THE TREATMENT OF A CREDITOR AND REQUIRES RESOLICITATION, ACCEPTANCE BY ANY CREDITOR OF THE PREPACKAGED PLAN PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PREPACKAGED PLAN'S TREATMENT OF SUCH CREDITOR REGARDLESS OF THE CLASS AS TO WHICH SUCH CREDITOR IS ULTIMATELY DEEMED TO BE A MEMBER.**

The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its claim. YT believes the Prepackaged Plan complies with the standard of equal treatment. To the extent that the Bankruptcy Court finds that the Prepackaged Plan does not satisfy this standard, the Bankruptcy Court could deny confirmation of the Prepackaged Plan if the creditors affected do not consent to the treatment afforded them under the Prepackaged Plan.

Only classes that are "impaired" and are to receive or retain property under the Prepackaged Plan are entitled to vote to accept or reject the Prepackaged Plan. As a general matter, a class of claims is considered to be "unimpaired" under a plan of reorganization if (i) the plan does not alter the legal, equitable and contractual rights of the holders of such claims, (ii) the plan reinstates any accelerated claims, cures any defaults therein, compensates holders for certain damages and otherwise does not alter the legal, equitable and contractual rights of the holders or (iii) the plan pays the full amount of an allowed claim in cash. Under the Bankruptcy Code, holders of claims in an unimpaired class are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Conversely, if holders of claims are not proposed to receive any distribution under a chapter 11 plan, the affected class is presumed to have rejected the plan.

**Summary of Status of Claims**

The categories of Claims listed below classify Claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation and distribution pursuant to the Prepackaged Plan.

| CLASS | DESCRIPTION | VOTING STATUS |
|---|---|---|
| Class 1 | Class 1 consists of Priority Non-Tax Claims | Unimpaired – not entitled to vote |
| Class 2 | Class 2 consists of U.S. Secured Claims | Unimpaired – not entitled to vote |
| Class 3 | Class 3 consists of Debt Claims | Impaired – entitled to vote |

**Class 1 – Priority Non-Tax Claims (Unimpaired)**

Class 1 consists of all Priority Non-Tax Claims against YT. The Bankruptcy Code provides for priority payment of certain claims, subject to applicable limitations, including the following: allowed unsecured claims for wages, salaries, or commissions and; unsecured claims of individuals arising from deposits for the purchase or lease of property or the purchase of services for personal or family use.

The Prepackaged Plan provides that, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment or makes a Trust Election, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, at the option of YT and in full and complete settlement, release, and discharge of, and in exchange for, such Claim (i) payment in full in Cash; or (ii) other treatment rendering such Claim Unimpaired. Any Allowed Class 1 Claim not due and owing on the Effective Date shall be paid in full, in Cash, when it becomes due and owing.

Claims in Class 1 are Unimpaired. Holders of Claims in this Class are deemed to accept the Prepackaged Plan and are not entitled to vote thereon.

## Class 2 – U.S. Secured Claims (Unimpaired)

Class 2 consists of all U.S. Secured Claims against YT. The Bankruptcy Code provides that, subject to applicable limitations, an allowed claim that is secured by a lien on or security interest in property of the Estate located in the United States or that is subject to an allowed setoff is deemed to be a secured claim to the extent of the value of the property securing such claim and that any deficiency is deemed to be an unsecured claim.

The Prepackaged Plan provides that, except to the extent that a holder of an Allowed U.S. Secured Claim agrees to less favorable treatment or makes a Trust Election, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed U.S. Secured Claim shall receive, at the option of YT and in full and complete settlement, release, and discharge of, and in exchange for, such Claim (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim; (iii) reinstatement pursuant to section 1124 of the Bankruptcy Code; or (iv) other treatment rendering such Claim Unimpaired.

Claims in Class 2 are Unimpaired. Holders of Claims in this Class are deemed to accept the Prepackaged Plan and are not entitled to vote thereon.

## Class 3 – Debt Claims (Impaired)

Class 3 consists of all Claims against YT that are (a) not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim or (b) otherwise determined by the Bankruptcy Court to be a Debt Claim.

The Prepackaged Plan provides that, except to the extent that a holder of an Allowed Debt Claim agrees to less favorable treatment, each holder of an Allowed Debt Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange for, such Claim, its Pro Rata share of the Trust Interests, which distribution shall be made in accordance with Article 6.2 of the Prepackaged Plan.

*For additional detail regarding distributions to Class 3 (Debt Claims), you are encouraged to read carefully the Trust Agreement Term Sheet, a copy of which is attached as Exhibit A to this Offering Memorandum.*

Claims in Class 3 are Impaired. Holders of Claims in this Class are entitled to vote to accept or reject the Prepackaged Plan.

### Allowance of Claims

Under the Prepackaged Plan, an Allowed Claim is a Claim: (a) that has been listed by YT in the Schedules as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) as to which the deadline for objecting or seeking estimation has passed, and no objection or request for estimation has been filed; (c) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn, or denied by a Final Order; or (d) that is allowed pursuant to the terms of (i) a Final Order, (ii) an agreement by and among the holder of such Claim and YT or the Reorganized Debtor, as applicable, or (iii) the Prepackaged Plan. See "The Exchange Offer—Trust."

27

**Objections to and Estimation of Claims**

Except insofar as a Claim is Allowed under the Prepackaged Plan, YT or the Reorganized Debtor, as applicable, shall be entitled to object to Claims. No other Entity shall be entitled to object to Claims after the Effective Date. Any objections to Claims shall be served and filed on or before (a) the one-hundred eightieth (180th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as may be fixed by the Bankruptcy Court.

The Reorganized Debtor may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, except that the Reorganized Debtor may not request estimation of any non-contingent or liquidated Claim if YT's objection to such Claim was previously overruled by a Final Order, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**Payments and Distributions on Disputed Claims**

If an objection to a Claim is filed as set forth in Article 8.1 of the Prepackaged Plan, no payment or distribution provided under the Prepackaged Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

At such time as a Disputed Claim becomes an Allowed Claim or as soon as practicable thereafter, YT shall distribute to the holder of such Allowed Claim the property distributable to such holder pursuant to Article IV of the Prepackaged Plan; provided, however, that the timing of distributions to holders of Claims in Class 3 shall be governed in all respects by Article 6.2 of the Prepackaged Plan. To the extent that all or a portion of a Disputed Claim is Disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is Disallowed. Notwithstanding any other provision of the Prepackaged Plan, no interest shall accrue or be Allowed on any Claim during the period after the Petition Date, except to the extent that section 506(b) of the Bankruptcy Code permits interest to accrue and be Allowed on such Claim.

<u>**Release by Holders of Claims**</u>

Except as otherwise provided in the Prepackaged Plan, upon the effective date of the Exchange Offer or the Prepackaged Plan, as applicable, to the maximum extent permitted by applicable law, each Releasing Party, in consideration for the obligations of YT and the Reorganized Debtor under the Prepackaged Plan and the Exchange Offer, and the Trust Interests and Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Prepackaged Plan or the Exchange Offer, shall be deemed forever to release, waive, and discharge the Released Parties from personal liability in every jurisdiction from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of YT, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws or laws of any other jurisdiction or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) YT or the chapter 11 case; (ii) any action or omission of any Released

28

Party with respect to any indebtedness under which YT is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, agent of, or advisor to, YT; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Prepackaged Plan; (v) the business or contractual arrangements between YT and any Released Party; (vi) the restructuring of Claims before or during the chapter 11 case and the solicitation of votes with respect to the Prepackaged Plan; and (vii) the negotiation, formulation, preparation, entry into, or dissemination of the Prepackaged Plan (including, for the avoidance of doubt, the Plan Supplement and all documents contained or referred to therein), the Disclosure Statement, or related agreements, instruments, or other documents; provided, however, that the Releasing Parties shall continue to dispose of the following assets through judicial authorities in the PRC to satisfy such Releasing Party's Claim through a mechanism that will be mutually agreed to by the parties: (x) assets that have already been collateralized by YT or any other Person or Entity; (y) assets that have already been pledged by YT or any other Person or Entity; and (z) assets or interests that YT, his wife Wei Gan, or any other Person or Entity own that have been seized, attached, or frozen by Chinese judiciary authorities. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Prepackaged Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Prepackaged Plan.

Within thirty (30) days of the Effective Date, each holder of a Debt Claim is obligated to (i) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against YT and his wife Wei Gan from the court or judicial authorities in all jurisdictions, including, but not limited to, the PRC, or commit or confirm with the judicial authorities that YT or his wife Wei Gan have fulfilled all their debt obligations or legal responsibilities and (ii) file and execute any documents requested by YT to evidence the above release. Unless and until a holder of a Debt Claim complies with the preceding sentence and all of their obligations under the Trust Agreement, such holder shall not be entitled to exercise any rights with respect to the Trust or receive any distributions from the Trust; provided, however, that YT reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein.

### Waiver of Rights Under Section 1542 of California Civil Code

In connection with the release provided in Article 11.4(b) of the Prepackaged Plan, each holder of a Debt Claim shall be deemed to waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR. Holders of Debt Claims shall be deemed to understand and acknowledge the significance and consequence of their waiver of section 1542 of the California Civil Code, as well as any other federal or state statute or common law principle of similar effect, and shall be deemed to acknowledge that such waiver is a material inducement to and consideration for the property distributed to or retained by and the rights and benefits conferred upon each holder of a Debt Claim under the Prepackaged Plan.

**Exculpation and Limitation of Liability**

None of YT or Reorganized Debtor, or the direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents, or other professionals (whether current or former, in each case, in his, her, or its capacity as such) of YT or the Reorganized Debtor, or the Released Parties shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim, or any other party in interest in the chapter 11 case, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or direct or indirect affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the chapter 11 case, formulation, negotiation, preparation, dissemination, confirmation, solicitation, implementation, or administration of the Prepackaged Plan, the Plan Supplement and all documents contained or referred to therein, the Disclosure Statement, any contract, instrument, release or other agreement or document created or entered into in connection with the Prepackaged Plan, or any other pre- or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of YT or confirming or consummating the Prepackaged Plan (including the distribution of any property under the Prepackaged Plan); provided, however, that the foregoing provisions of Article 11.5 of the Prepackaged Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined

by a Final Order to have constituted willful misconduct, fraud, or gross negligence and shall not impact the right of any holder of a Claim, or any other party to enforce the terms of the Prepackaged Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Prepackaged Plan. Without limiting the generality of the foregoing, YT and YT's direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents and other professionals (whether current or former, in each case, in his, her, or its capacity as such) shall, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan. The exculpated parties have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Prepackaged Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or such distributions made pursuant to the Prepackaged Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such exculpating parties from liability.

**Injunctions**

All Persons or Entities who have held, hold, or may hold Claims (other than Claims that are reinstated under the Prepackaged Plan), and all other parties in interest in the chapter 11 case, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claim or Cause of Action released or settled hereunder, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against the Released Parties, YT, or the Reorganized Debtor, or in respect of any Claim or Cause of Action released or settled hereunder; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Released Parties, YT, or the Reorganized Debtor; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties, YT, or the Reorganized Debtor; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Released Parties, YT, or the Reorganized Debtor, or against the property or interests in property of YT or the Reorganized Debtor, on account of such Claims; or (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Prepackaged Plan; provided, however, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms hereof and the contracts, instruments, releases, and other agreements and documents delivered under or in connection with the Prepackaged Plan.

Upon entry of the Confirmation Order, all holders of Claims and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Prepackaged Plan. Each holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim, as applicable, pursuant to the Prepackaged Plan, shall be deemed to have consented to the injunction provisions set forth in Article 11.6 of the Prepackaged Plan.

By accepting distributions pursuant to the Prepackaged Plan, each holder of an Allowed Claim receiving distributions pursuant to the Prepackaged Plan will be deemed to have specifically consented to the injunctions and the release set forth in the Prepackaged Plan.

**Preservation of Claims and Rights to Settle Claims**

Except as otherwise provided in the Prepackaged Plan, or in any contract, instrument, or other agreement or document entered into in connection with the Prepackaged Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss all Claims, rights, Causes of Action, suits, and proceedings, including those described in the Plan Supplement (collectively, the "Retained Actions"), whether at law or in equity, whether known or unknown, that YT or his Estate may hold against any Entity (other than Claims, rights, Causes of Action, suits, and proceedings released pursuant to Article 11.4 of the Prepackaged Plan), without the approval of the

Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. For the avoidance of doubt, Retained Actions do not include any Claim or Cause of Action released pursuant to Articles 11.4 and 11.9 of the Prepackaged Plan. The Reorganized Debtor or his successor(s) may pursue such Retained Actions, as appropriate, in accordance with the best interests of the Reorganized Debtor or his successor(s) that hold such rights.

No Entity may rely on the absence of a specific reference in the Prepackaged Plan, the Plan Supplement, or the Disclosure Statement to any Retained Action against it as any indication that the Reorganized Debtor will not, or may not, pursue any and all available Retained Actions against it. The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Actions against any Entity. Unless any Retained Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Prepackaged Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Retained Actions for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Action upon, after, or as consequence of, confirmation or consummation of the Prepackaged Plan. For the avoidance of doubt, all Claims, Causes of Action, suits, and proceedings of YT that are not Retained Actions are waived as of the Effective Date.

## Certain Motions

In the event the chapter 11 case is filed in connection with the Prepackaged Plan, YT intends to file with the Bankruptcy Court certain motions to schedule a hearing date for the approval of this Offering Memorandum and confirmation of the Prepackaged Plan. In addition, YT intends to file motions permitting him to retain counsel and to continue the pre-petition retention agreements with bankruptcy counsel and special counsel and any other advisors to, or professionals retained by, YT, subject to the terms of their contracts. Lastly, YT intends to file a motion for an order establishing the Bar Date for filing proofs of claim. While YT will use his best efforts to obtain the approval of the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will grant any such approvals.

## Other Prepackaged Plan Provisions

### Retention of Jurisdiction by the Bankruptcy Court

The Prepackaged Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the chapter 11 case or the Prepackaged Plan, or (iii) that relates to the following: (1) the determination of any and all pending applications, adversary proceedings, and contested matters; (2) except as otherwise required by Article II of the Prepackaged Plan, to determine any and all objections to the allowance of Claims, including, without limitation, Claims arising from the rejection of Executory Contracts; (3) except as otherwise required by Article II of the Prepackaged Plan, the determination of the amount or legality of any state, local, or federal tax, any fine or penalty relating to any such tax, or any addition to any such tax pursuant to and in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (4) the determination of any and all applications for allowance of compensation and reimbursement of expenses; (5) the determination of any and all controversies and disputes arising under or in connection with the Prepackaged Plan, including (without limitation) in connection with the interpretation, implementation or enforcement thereof, and such other matters as may be provided for in the Confirmation Order; (6) the effectuation of payments under and performance of the provisions of the Prepackaged Plan; (7) entry of such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated; (8) the determination of YT's or the Reorganized Debtor's motion, if any, to modify the Prepackaged Plan in accordance with section 1127 of the Bankruptcy Code or to cure any defect or omission, or reconcile any inconsistency in the Prepackaged Plan or in any order of the Bankruptcy Court; (9) the issuance of such orders in aid of execution of the Prepackaged Plan to the extent authorized by section 1142 of the Bankruptcy Code; (10) the determination of such other matters as may be set forth in the Confirmation Order or as may arise in connection with the Prepackaged Plan or the Confirmation Order; (11) the hearing and determination of all Fee Applications; (12) entry of an order of discharge; (13) the exercise of any other jurisdiction not inconsistent with chapter 11 of the Bankruptcy Code; (14) the issuance of injunctions, provision of declaratory

relief, taking of such other legal, or equitable actions, or issuance of such other orders as may be necessary or appropriate to restrain interference with the Prepackaged Plan, YT, the Estate or its property, the Reorganized Debtor, Professionals, or the Confirmation Order; (15) the entry of a Final Decree closing the chapter 11 case; and (16) the enforcement of all orders previously entered by the Bankruptcy Court.

### Effects of Prepackaged Plan Confirmation

**Discharge**

Under the Prepackaged Plan, YT will obtain a discharge of all Claims that arose before the Effective Date of the Prepackaged Plan on the discharge date ("Discharge Date"). The Discharge Date is the date upon which the earlier of the following shall have occurred: (i) distribution of the Trust Interests to the holders of Allowed Debt Claims and (ii) all Allowed Claims shall have been paid under the Prepackaged Plan. No later than five (5) Business Days after the occurrence of the Discharge Date, YT or the Reorganized Debtor, as applicable, shall file with the Bankruptcy Court a notice of the occurrence of the Discharge Date, and serve such notice on all creditors. In addition, following the occurrence of the Discharge Date, YT or the Reorganized Debtor, as applicable, shall file a motion seeking entry of an order of discharge after notice and a hearing, which motion (and the discharge) shall be granted upon a showing that YT has made all payments required under the Prepackaged Plan. Notwithstanding the occurrence of the Discharge Date, YT will not be discharged from any of his obligations remaining under the Prepackaged Plan as of the date of its occurrence.

More specifically, the Prepackaged Plan provides that except as otherwise specifically provided in the Prepackaged Plan, the distributions, rights, and treatment that are provided in the Prepackaged Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against YT, of any nature whatsoever, whether known or unknown, or against the assets or properties of YT that arose before the Effective Date. Except as expressly provided in the Prepackaged Plan, on the Discharge Date (and subject to its occurrence), and pursuant to section 1141(d)(5) of the Bankruptcy Code, entry of the Confirmation Order shall be deemed to act as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against YT and his assets, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Prepackaged Plan or is entitled to receive a distribution under the Prepackaged Plan, provided, however, that in no event shall occurrence of the Discharge Date discharge YT from any obligations remaining under the Prepackaged Plan as of the Discharge Date. Any default by YT with respect to any Claim that existed immediately prior to or on account of the filing of the chapter 11 case shall be deemed cured on the Discharge Date.

**Vesting of Assets**

Except as otherwise provided in the Prepackaged Plan, as of the Effective Date, all property of the Estate, and any property acquired by YT or the Reorganized Debtor under the Prepackaged Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances and interests. On and after the Effective Date, YT may use, acquire, and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Prepackaged Plan and the Confirmation Order.

### Official Committee

Pursuant to section 1102(a) of the Bankruptcy Code, following the commencement of a bankruptcy proceeding under chapter 11 of the Bankruptcy Code, the U.S. Trustee may appoint a committee of creditors holding unsecured claims against YT and may appoint additional committees of creditors to assure the adequate representation of creditors in the chapter 11 case. If YT files the Prepackaged Plan, he expects to move to confirmation quickly so that the Prepackaged Plan may be confirmed prior to the formation of any official committee.

If appointed, each official committee may appear and be heard on any issue in the chapter 11 case and may also:

- consult with YT concerning the administration of the case;

- investigate the acts, conduct, assets, liabilities, and financial condition of YT, the operation of his business interests and the desirability of the continuance of such business interests, and any other matter relevant to the case or to the formulation of a plan of reorganization;

- participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan of reorganization formulated, and collect and file with the bankruptcy court acceptances or rejections of a plan of reorganization;

- request the appointment of a trustee or examiner; and

- perform such other services as are in the interest of those represented.

Ordinarily, the statutory committee of creditors appointed by the U.S. Trustee will include those persons willing to serve that hold the largest claims of the kinds represented on the committee. However, section 1102(b) of the Bankruptcy Code permits the U.S. Trustee to appoint, as the statutory committee, the members of any committee organized by creditors prior to the commencement of the bankruptcy proceedings pursuant to the Prepackaged Plan, if such committee was fairly chosen and is representative of the different kinds of claims to be represented in the chapter 11 case.

### Amendment or Modification of the Prepackaged Plan

The Debtor may alter, amend, or modify the Prepackaged Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After confirmation and prior to "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of the Prepackaged Plan, YT may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Prepackaged Plan, this Offering Memorandum, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Prepackaged Plan, by the filing of a motion, and, so long as the proposed modifications to the Prepackaged Plan are non-material, (i) notice need only be provided to the Persons listed on the Bankruptcy Rule 2002 service list, and (ii) the solicitation of all Creditors and other parties in interest shall not be required.

### Conditions to Effectiveness of the Prepackaged Plan

The effectiveness of the Prepackaged Plan is subject to, and conditioned upon, a number of items set forth in the Prepackaged Plan. As with all other material in this Offering Memorandum relating to the Prepackaged Plan, the following summaries of certain of the conditions to effectiveness of the Prepackaged Plan do not purport to be complete and are subject, and are qualified in their entirety by reference, to the Prepackaged Plan including all appendices and exhibits thereto.

Conditions to the effectiveness of the Prepackaged Plan include that the order of the Bankruptcy Court confirming the Prepackaged Plan will have been entered and not stayed.

In addition, YT will have (x) taken all steps necessary and performed all acts required by the Bankruptcy Code in order to confirm the Prepackaged Plan, (y) obtained an unstayed order from the Bankruptcy Court in connection with the adequacy of the disclosure information pursuant to which votes on the Prepackaged Plan were solicited, and (z) set the Effective Date to occur following the date of the Confirmation Order, unless such order has been stayed. The Debtor shall have the right to waive any of the conditions precedent set forth in Article X of the Prepackaged Plan at any time without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of the Prepackaged Plan.

## Alternatives to the Prepackaged Plan

### Liquidation under Chapter 7

YT has evaluated the effects of a liquidation of his assets in the chapter 11 case. In considering this alternative, he has taken into account the nature, status, and underlying values of his tangible and intangible assets, the ultimate realizable value of such assets, and the extent to which certain of his assets are subject to the liens and security interests of secured creditors.

If YT files bankruptcy, a liquidation analysis will be submitted to the Bankruptcy Court and made available to all creditors. YT believes that liquidation under chapter 7 would result in smaller distributions being made to holders of claims than those provided for in the Prepackaged Plan.

### Alternative Plan of Reorganization

If the Prepackaged Plan is not confirmed, YT (or if the period in which only YT may file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization or an orderly liquidation of assets. YT has explored numerous alternatives in connection with the extensive process of formulating and developing of the Prepackaged Plan. YT believes that the Prepackaged Plan, as described in this Offering Memorandum, enables creditors to realize the most value under the circumstances.

## THE COMPANY

*The discussion of the business of the Company and the electric vehicle industry below is qualified by, and should be read in conjunction with, the discussion of the risks related to the Company's business and its industry detailed elsewhere in this Offering Memorandum. This Offering Memorandum and related materials relate only to the proposed Consensual Restructuring or Prepackaged Plan of YT and do not relate to and should not be deemed to suggest that, the Company is seeking a consensual restructuring or bankruptcy at this time. Any information about the Company is provided solely to provide creditors of YT who are eligible to participate in the proposed Restructuring with information to assist them in evaluating the potential value in accepting Trust Interests in exchange for their Debt Claims and in final and complete settlement thereof. Although there is discussion in this Offering Memorandum about the Company (including its own distressed financial position and efforts to raise funds and business prospects), such information is based on information obtained by YT for use herein and solely relates to the proposed Consensual Restructuring or Prepackaged Plan of YT. The information about the Company is believed by YT to be reliable. No assurance can be made and such information only speaks as of the dates the information was available and there can be no assurance further changes have not occurred subsequent to such dates. Such information about the Company is solely the responsibility of YT.*

### Company Overview

The Company was founded with the vision to disrupt the traditional automotive industry and create a shared intelligent mobility ecosystem that empowers everyone to move, connect, breathe and live freely.

The Company is a pre-revenue development stage global technology company headquartered in Los Angeles, California and with additional development activities and operations in China that designs and manufactures next-generation, zero-emission smart electric vehicles and mobility ecosystem with a view to carving out a dual-market strategy and having manufacturing capabilities and operations in both the U.S. and China, the two largest electric vehicle markets. The Company has designed a new mobility platform that integrates clean energy, intelligent design, internet vehicle connectivity and artificial intelligence functionality to create a seamless user experience, and has assembled a global team of automotive and technology experts and innovators to achieve its goal of redefining mobility.

Over the last four years, the Company has developed a portfolio of intellectual property, established its proposed supply chain and completed several pre-production vehicles for the FF 91. To date, significant capital has

been deployed for research and development associated with its electric vehicles; corporate planning, administration and development; and investment in key property and equipment. The Company revealed its first vehicle model, the FF 91, in January 2017 and is endeavoring to complete the testing and validation and begin the manufacture and delivery of the FF 91 to the market. The design of the FF 91 incorporates clean, intelligent, connected and shared technologies.

Below is a simplified organizational chart for the Company and certain key subsidiaries as of the date of this Offering Memorandum, and before giving effect to any awards under the 2019 Equity Incentive Plan (as defined) or any other equity incentives or conversion of the securities:



* All ownership interests are 100% unless otherwise indicated.

(i) Includes the 10% interest of the Company to be transferred by FF Top to the Trust upon the completion of the Restructuring.

## Company's Strategy

The Company aims to capture high-value users through its transformative products, technologies and sharing platforms, while cultivating and growing its shared intelligent mobility ecosystem, to provide an ultimate user experience. In order to achieve its mission, the Company will continue to focus on the following initiatives:

### Secure Substantial Financing

Bringing a visionary electric vehicle to the market–from design to engineering to development to manufacturing–is capital intensive. The Company expects to continue to require significant capital and incur substantial costs in setting up, equipping and improving its manufacturing facility in Hanford, California to start production of the FF 91 and development of the FF 81. The Company intends to secure long-term financing in order to focus its resources on the execution of its business plan, while in the interim, obtaining new bridge debt financing to sustain its engineering efforts and operations. The Company intends to, and is currently seeking to, use a combination of equity financing and bridge debt financing to pay off its existing debts. See "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company—Liquidity and Capital Resources—Plan of Operations and Future Funding Requirements" for more detailed planned timeline and use of financing.

The Company has engaged Stifel, Nicolaus & Co. ("Stifel") to assist it in raising equity financing. With the assistance of Stifel, the Company is seeking to raise US$850 million through the issuance of Series B Preferred Shares (the "Series B Equity Financing"). The Company intends to close the Series B Equity Financing by January 2020. There can be no assurance that the Company will be able to complete the Series B Equity Financing, or any other financing, on a timely basis and/or on reasonable commercial terms, or at all.

**Kick-Start Production of the FF 91**

Bringing the FF 91 to the market is critical to sharing FF's vision with the world. FF has finished designing and engineering the FF 91 and has identified component sourcing for virtually all of the parts required for production of the FF 91, other than the front steering gear. The Company is currently preparing to execute a plan to refurbish its manufacturing facility in Hanford, California and obtain the equipment necessary to support the production of the FF 91. As of the date of this Offering Memorandum, 90% of the factory equipment was in the buy-off stage at the suppliers' facilities. The Company expects to start production of the FF 91 within nine months after completion of the Series B Equity Financing, and to deliver approximately 100 units to the market before the initial public offering of its shares (targeted for as early as early-to-mid-2021). Assuming the Series B Equity Financing can be completed, the Company intends to complete the build-out of the Hanford, California manufacturing facility, and once fully built-out, the Company estimates an annual production capacity at the Hanford, California manufacturing facility for the FF 91 of up to approximately 10,000 cars per year beginning in 2021. In order to ensure the beginning of the production of the FF 91 by its earliest start-date of October 2020, the Company has set the following target timeline, assuming it closes the Series B Equity Financing by January 2020:

- launch, as early as January 2020, the User Experience Program, or user-planning-to-user ("UP2U"), which is a process designed to involve users directly and loop in their feedback at all points of the product lifecycle, including design, research & development, manufacturing, communications, sales, after sales and charging;

- build out the Hanford, California manufacturing facility beginning no later than March 2020, or two months after the closing of the Series B Equity Financing;

- settle all payables due to suppliers and reengage such suppliers no later than April 2020; restart the FF 91 pre-production builds for final testing in April 2020, or three months after the closing of the Series B Equity Financing;

- complete testing and validation, including self-certification of United States Federal Motor Vehicle Safety Standards ("FMVSS") and National Highway Traffic Safety Administration ("NHTSA") bumper standards, compliance and manufacturing of the FF 91 in October 2020, or nine months after the closing of the Series B Equity Financing; and

- deliver the first 100 units of the FF 91 to the market until April 2021, or fifteen (15) months after the closing of the Series B Equity Financing.

**Develop Integrated Engineering and Manufacturing Capabilities**

The Company intends to build out its integrated electric vehicle manufacturing facility in Hanford, California to manufacture components that are critical to its intellectual property and production of the FF 91 and the FF 81, including inverter, electric motor and gearbox, battery pack and battery management system, and to conduct body assembly, paint operations, final vehicle assembly and end-of-line testing for the FF 91. The Company intends for its vehicle engineering and manufacturing teams to work alongside one another to streamline the feedback loop for rapid product enhancements and quality improvements.

In addition, as the Company views China as an important production base for its future products to be launched in China and an essential market for the Company's development and future growth, the Company is planning to build up its own manufacturing capability in China through its joint venture as part of the Company's dual-market strategy.

**Hire Talent**

In September 2019, the Company has hired a new global chief executive officer, a BMW AG veteran, Dr. Carsten Breitfeld, to facilitate bringing the Company's vision to fruition. Assuming the Company is able to complete the Series B Equity Financing, the Company intends to hire additional employees, particularly in the area of supply chain, user design and engineering, manufacturing and other function, to expand its talent pool and drive technological innovation.

**Sales Efforts**

The Company intends to establish an on-line and off-line sales network. The prospective buyer may place orders directly through the Company's mobile application or directly at the offline stores, and be serviced through the FF self-owned stores that the Company plans to establish in certain key markets or FF partnership stores that the Company plans to open with its franchise partners. The Company also intends to launch its User Experience Program, or UP2U as early as January 2020, so to engage prospective buyers and users.

**2019 Equity Incentive Plan**

In order to align incentives and reward YT and other key members of management in achieving the Company's strategic goals, it is anticipated that the Company will adopt a management incentive equity plan subject to the consummation of the Restructuring (the "2019 Equity Incentive Plan"). The board of directors of the Company may grant certain stock-based awards upon the achievement of financial targets upon a Distribution Event (as defined in the Trust Agreement). The total available equity awards under the 2019 Equity Incentive Plan will be as follows:

| Company Value (in thousands) | $5,000 | $10,000 | $21,000 |
|---|---|---|---|
| Dilution | 2% (Post series B) | Additional 3% (Post IPO) | Additional 3% (Post IPO) |

### Electric Vehicle Industry Overview

**The Electric Vehicle Industry in the U.S. and China**

The electric vehicle industry is poised to grow. According to the Electric Vehicle Outlook 2019 (the "BNEF Report"), a long-term forecast published annually by Bloomberg New Energy Finance ("BNEF"), electric vehicle sales are predicted to grow to 10 million vehicles worldwide by 2025 from 1.1 million vehicles in 2018, and then surge to 28 million vehicles by 2030, which represents 28% of all vehicles worldwide in 2030, and sales in China are expected to account for 48% and 34% of electric vehicle sales worldwide in 2025 and 2030, respectively. In addition, the BNEF Report estimates that, by 2040, 56% of light vehicle sales and 31% of medium commercial vehicles in China and the U.S., respectively, will be electric vehicles. The Company believes that due to its innovative nature and targeted luxury-market niche, it will be well-positioned to take advantage of the potential growth in the electric connected car markets in both the U.S. and China.

**Key Drivers for Global, US and China's Electric Vehicle Market Growth**

The Company believes that several factors will continue to drive growth in the electric vehicle market in the U.S. and China:

*Increasing environmental awareness and tightening emission regulations*

Environmental concerns have resulted in tightening emission regulations globally and there is a broad consensus that further emission reduction will require higher electrification of the automotive industry. The cost of regulatory compliance for internal combustion engine ("ICE") powertrains is rising sharply due to the natural

37

limitations of traditional ICE technologies. In response, global OEMs are aggressively shifting their strategies toward electric vehicles. Meanwhile, consumers have become more concerned about the impact of goods purchased, both on their personal health as well as on the environment. With more consumers realizing these benefits, zero emission transportation is becoming a popular and widely advocated urban lifestyle, which in turn is driving further development in the electric vehicle market.

### Decreasing Battery and Electric Vehicle Ownership Costs

The most expensive component of an electric vehicle is the battery, which the Company believes currently accounts for approximately 50% of the total vehicle cost. The average battery energy density is expected to increase on the back of continuous improvements in battery chemistries, higher material efficiencies, and better engineering, while large manufacturing capacity additions and technology improvements are expected to sustain falling costs. With improvements in battery technology, coupled with economies of scale enjoyed by battery suppliers, battery production costs (and hence the electric vehicle ownership costs) should continue to decrease. According to the BNEF Report, price parity between electric vehicles and ICE is expected to be reached by the mid-2020s in most vehicle segments, subject to variation between geographies.

### Strong Regulatory Push

An increasing number of countries have been encouraging the adoption of electric vehicle. For example, the Governor of the State of California issued an action plan to adopt zero-emission vehicles ("ZEVs"), which set a goal of 1 million ZEVs by 2020 and 5 million ZEVs by 2030. In China, strong regulatory push has been one of the strongest drivers of new energy vehicles ("NEVs") penetration. Since the publication of *New Energy Automobile Production Enterprises And Product Access Management Rules* by the Ministry of Industry and Information Technology ("MIIT") in 2009, which officially announced the promotion of the technical development of NEVs and encouragement of automobile manufacturers to invest in developing NEVs, the Chinese government has issued and implemented a series of policies and incentives to drive the NEV market growth, including national and local subsidies, taxation benefits and charging infrastructure construction. While the Chinese government announced in March 2019 that it is cutting subsidies for purchase of NEV and urged local governments to remove subsidies for NEV purchasing, the Chinese government encouraged subsidies to charging infrastructure construction. Nevertheless, the Chinese government continues to have electric vehicle adoption target under its vehicle mandate policy.

### Growth of Electric "Shared Mobility"

According to the BNEF Report, global shared mobility fleet (*i.e.*, ride-hailing and car-sharing) will contribute to 19% of the total kilometers traveled by passenger vehicles by 2040, an increase from less than 5% today, and due to electric vehicles' lower operating costs, electric vehicles are anticipated to account for over 80% of the shared mobility cars by 2040, which represents a leap from its current proportion as a percentage of total shared mobility cars of 1.8% as of today. However, at the same time, as vehicle consumers move to rely on shared mobility fleets and view transport as a service, such ride-hailing and car-sharing trends will cut into vehicle demand growth.

## Corporate History and Milestones

The Company was incorporated and founded as Faraday & Future, Inc. in the State of California in May 2014. Headquartered in Los Angeles, California, the Company was formed to design and develop smart electric vehicles and mobility ecosystem. In July 2014, the Company established LeSEE Automotive (Beijing) Co., Ltd. ("LeSee Beijing"), the Company's PRC operating entity, to commence its operation in China.

To facilitate global investment in the Company's business and operations in different jurisdictions, the Company established a Cayman Islands holding structure for the entities within the group. As part of the efforts, FF Global Holdings (now known as Smart Technology Holdings Ltd.) was incorporated on May 23, 2014 in the Cayman Islands, which owned and/or controlled 100% of the shareholding of all operating subsidiaries in the group, including FF. In March 2017, the Company established its wholly-foreign-owned entity ("WFOE"), FF Automotive

(China) Co., Ltd. As a part of a broader corporate reorganization, and for third-party investment, the Company was incorporated in the Cayman Islands in November 2017, as the parent company of Smart Technology Holding Ltd. To enable effective control over the Company's PRC operating entity and its subsidiaries, in November 2017 the WFOE entered into a VIE contractual arrangement with LeSee Beijing and LeSEE Zhile Technology Co., Ltd., who held 100% of LeSee Beijing. The VIE contractual arrangement enables the Company to exercise effective control over LeSee Beijing and its subsidiaries, to receive substantially all of the economic benefits of such entities, and to have an exclusive option to purchase all or part of the equity interests in LeSee Beijing.

**Evergrande Investment**

In November 2017, the Company received a commitment from Evergrande to inject US$2.0 billion, through its affiliate, Season Smart, in exchange for a 45% stake in the Company. Evergrande initially funded US$800 million in 2018, and the terms of the agreement provided that the remaining US$1.2 billion would be contributed by the end of 2019 and 2020. Prior to the November 2017 investment in the Company by Evergrande, the principal provider of debt and equity financing to the Company had been provided by entities controlled by or affiliated with YT. (See "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company—Liquidity and Capital Resources—Indebtedness").

On December 31, 2018, the Company and Evergrande entered into a restructuring agreement, pursuant to which Evergrande's equity interest in the Company was reduced to 32% and Evergrande was released from its obligation to make additional investments. In addition, the restructuring agreement provides that the Company may at any time before December 31, 2023 redeem, in part or in whole, the shares of the Company held by Evergrande at a predetermined redemption price. The restructuring agreement also provided that, among other matters, (i) each of Evergrande and the Company agreed to release each other and their respective affiliates from all claims each of them may have had against the other and to withdraw from or ceased all existing arbitration, litigation and other proceedings; (ii) Evergrande agreed that the Company could enter into new equity financing arrangements without Evergrande's approval so long as the valuation for such equity financing is not less than a specified threshold; and (iii) the parties agreed that Season Smart would no longer continue to invest in the Company; and (iv) Evergrande agreed to acquire, through Season Smart, Evergrande FF Holding (Hong Kong) Limited, which was previously a wholly-owned subsidiary of the Company and owned certain PRC assets of the Company. The VIE arrangement was terminated on the same day, and was reentered into in August 2019.

**Milestones**

Significant milestones in FF's development include the following:

- In 2015, the Company completed its first test mule car.

- In January 2016, the Company debuted the FF Zero 1 at the 2016 Consumer Electronics Show (CES). In January 2016, the Company obtained a U.S. patent for its proprietary power inverter, the "FF Echelon Inverter." In November 2016, the Company obtained an autonomous vehicle testing permit issued by the State of California, which allowed the Company to test self-driving vehicles on public roads with the presence of a safety driver.

- In January 2017, the Company revealed the FF 91, its ultra-luxury electric crossover vehicle, at CES 2017. FF 91's beta prototype set the fastest production-EV record at Pikes Peak International Hill Climb in 2017 with a time of 11:25.082.

- In November 2017, the Company entered into an agreement with Evergrande in connection with the Company's Series A financing, and in December 2017 and June 2018, respectively, the Company issued 65,926,748 Class A preferred shares and 404,661,487 Class A preferred shares to Evergrande, for gross proceeds of US$724.8 million.

- In November 2017, the Company closed its Series A financing and issued 818,181,818 Class A preferred shares (which was later reduced to and redesignated as 470,588,235 redeemable preference shares) in exchange for commitments to invest US$2 billion, of which US$800 million was funded.

- In August 2018, the Company completed its first pre-production build of the FF 91 in its manufacturing facility Hanford, California. The Company also started designing the FF 81 project in January 2018.

- In March 2019, the Company entered into a 50-50 joint venture agreement ("JVA") with The9 Limited, a Nasdaq-listed company ("The9"), to serve the market in China. The joint venture will engage in the business of manufacturing, marketing, selling and distributing the planned Faraday Future Icon V9 model electric vehicle in China. The9 will make capital contributions to the joint venture of up to $600 million in three equal installments, of which approximately US$400 million will be payable to the Company as licensing royalties and/or non-recurring engineering expenses, contingent on the fulfillment of specified funding conditions. The Company will contribute IP licenses, technical know-how, branding, land use rights in Moganshan in Zhejiang, China and an electric vehicle project to this joint venture. In September 2019, the joint venture with The9 was incorporated in Hong Kong.

- In April 2019, the Company entered into a multi-bridge senior bridge facility agreement with Birch Lake, with the first tranche consisting of $15 million secured term loan, and the second tranche consisting of approximately $45 million (in the form of a secured note issued to other note purchasers, with U.S. Bank National Association as note agent). The Company repaid the first tranche of the Birch Lake loan when the loan matured on September 30, 2019.

- On April 29, 2019, the Company established the Vendor Trust securing past due payables with its assets in exchange for the suppliers' continued support of the production of the FF 91.

## FF's Management

The following table sets forth information regarding FF's executive officers as of the date of this memorandum.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Yueting Jia | 45 | Founder and Chief Product and User Officer, Director |
| Dr. Carsten Breitfeld | 56 | Global Chief Executive Officer |
| Matthias Aydt | 62 | Vehicle Chief Engineer, Director |
| Jiawei Wang | 28 | VP of Global Capital Markets, Director |
| Chaoying Deng | 61 | VP of Government Affairs, Director |
| Chui Tin Mok | 44 | EVP of Global UP2U, Director |
| Jarret Johnson | 52 | Acting General Counsel, Secretary |

*Mr. Yueting Jia* is FF's founder and a director of the Company, and had served as the Chief Executive Officer since the Company's inception in 2014 until September 2019. Currently, Mr. Jia serves as the Company's Chief Product and User Officer, overseeing product definition, user experience and the overall implementation of the internet eco-system model. Prior to founding the Company, Mr. Jia founded several companies, including LeEco, which is a global technology company that converges culture, innovation and entertainment with an array of products that fit into a broad spectrum of lifestyles, and LeTV (Leshi Internet Information & Technology). Mr. Jia led the strategic direction and global expansion of LeEco, and brought LeTV to an initial public offering on the Shenzhen Stock Exchange in 2010. Prior to founding LeTV in 2004, Mr. Jia founded Shanxi Xi Bei Er Communication Technology Co., and Xbell Union Communication Technology (Beijing) Co. Mr. Jia received his master's degree in cooperation management from Shan Xi University.

*Dr. Carsten Breitfeld* has served as the Company's Global Chief Executive Officer since September 2019. Dr. Carsten Breifeld is a veteran in the automotive industry, and had served at positions with BMW Group for approximately 20 years and served as its Group Vice President and Head of the i8 Vehicle Program, which gave birth to the i8 luxury plug-in hybrid model. From April 2016 to April 2019, Dr. Breitfeld was the Chief Executive Officer and Chairman of the Board of BYTON, a Chinese electric vehicle startup cofounded by Dr. Breitfeld and having its operations in multiple countries. Dr. Breitfeld received his PHD degree in mechanical engineering from the University of Hannover.

*Mr. Matthias Aydt* has served as the Company's Vehicle Chief Engineer since July 2017 and a director of the Company since February 2019. Prior to joining the Company in July 2016, Mr. Aydt served as the vice president of Qoros Auto from 2015 to 2016, various positions at Magna Steyr from 2006 to 2014, including branch manager from 2011 to 2014 and head of project management from 2010 to 2011, managing director of IVM automotive, senior manager at Wilhelm Karmann, vice president at CTS Fahrzeug-Dachsystem GmBG and an engineer at Porsche. Mr. Aydt received his bachelor of science degree from Fachhochschule Ulm - Hochschule für Technik.

*Mr. Jiawei Wang* has served as the Company's Vice President of Capital Markets since May 2018, and the Company's director since December 2017. Prior to joining the Company, Mr. Wang co-founded Galaxy Global Inc. in September 2013 and worked as a private equity analyst at Knights Investment Group from December 2013 to February 2014. Mr. Wang received his bachelor degree in finance from Central University of Finance and Economics and his master degree in economics from New York University.

*Ms. Chaoying Deng* has served as the Company's Vice President of Government Affairs since November 2019, and the Company's director since December 2017. Prior to joining the Company in 2014, Ms. Deng serviced as the chief executive officer of Red Dragonfly Entertainment from November 2010 to 2014, vice president of business development at Pipeline Micro Inc. from March 2008 to July 2010, vice president and general manager of Quatum Leap Interactive from November 2006 to December 2007, the director of global accounts business at Fujitsu (China) Holdings Co., Ltd. from October 2001 to August 2007. Ms. Deng received her associate of science degree in electrical engineering from Northwest University of Engineering and master degree in business administration from Hawaii Pacific University.

*Mr. Chui Tin Mok* has served as the Company's Executive Vice President of UP2U since January 2019, and the Company's director since February 2019. Prior to joining the Company, Mr. Mok founded 18Financial Group Limited in July 2017. From December 2013 to July 2017, Mr. Mok served as the group chief marketing officer of LeEco from December 2013 to July 2017, global vice president of sales and marketing at Meizu Technology Co., Ltd. from September 2010 to October 2013, general manager at Skyway (Woow Digital) Technology Ltd. from March 2008 to September 2010. Mr. Mok received his higher diploma in building service engineering from Hong Kong Institute of Vocational Education, and his executive master degree in business administration from International Business Academy of Switzerland.

*Mr. Jarret Johnson* has served as the Company's Acting General Counsel since November 2018 and the Secretary of the Company since September 2018. Prior to joining the Company in May 2018, Mr. Johnson has served as the assistant general counsel at Toyota Financial Services from April 2003 to September 2017, and vice president and general counsel at USBX from October 2000 to April 2003. Mr. Johnson received his bachelor degree in industrial engineering and management from Oklahoma State University, and his Juris Doctor from Loyola Law School.

## Partnership Program

In order to ensure the sustainability of the Company's mission, vision and values, the Company established, as proposed by YT, a partnership program (the "Partnership Program") through FF Global in July 2019 in which management and certain employees participated as partners and contributed capital through FF Global, and collectively own 22.6% of the equity interests in the Company on a fully diluted basis (assuming the transfer of 147,048,823 Class B ordinary shares, representing 10% of the Company's equity interest to the Trust). The remaining equity of the Company is owned by Evergrande and the option holders and Class A ordinary shareholders under the Company's equity incentive plan. For more information, please read the section entitled "Security Ownership of Certain Beneficial Owners and Members of the Board."

41

The Company believes that the Partnership Program will set solid foundation for an advanced corporate governance structure and talent base, and will facilitate retaining and attracting global talent across industries. FF Global is managed by its committee, which is composed of managers elected or appointed by the partners. As of the date of this Offering Memorandum, FF Global had 26 partners. For more information on the relationship between FF Global, FF Top, and management's partnership and ownership interest, see "Security Ownership of Certain Beneficial Owners and Members of the Board."

## FF Products and Services

### FF 91

The FF 91, FF's flagship vehicle, is a high-performance premium electric crossover vehicle. The FF 91 was officially introduced at the 2017 CES. The Company has built pre-production vehicles for the FF 91 to support validation and testing, and completed the third stage of its FF 91 pre-production quality audits in September 2019. The Company aims to start production of the FF 91 within nine months after it completes the Series B Equity Financing, and plans to deliver approximately 100 cars to the market by the time of its planned initial public offering (targeted for as early as early-to-mid-2021).

The FF 91 represents a bold new breed of electric mobility that combines high performance, precise handling, the comfort of an ultra-luxury passenger vehicle, and a unique collection of intelligent internet features. It leverages the variable platform architecture ("VPA") structure designed and engineered in-house, which is a flexible powertrain system featuring a monocoque vehicle structure in which the chassis and body are an integrated form. This integrated platform provides measurable improvements in overall vehicle rigidity, safety and handling. It features a multi-motor configuration and an all-wheel drive system. With 3 electric motors (one in the front and two in the rear), the FF 91 is designed to be expected to produce 1,050 horsepower and 12,510 Newton meters (Nm) of torque to all four wheels, which enables the FF 91 to accelerate from zero to 60 mph in 2.39 seconds. In addition, the FF 91's all-wheel drive system offers greater traction, control and precise power distribution. This technology delivers superior acceleration and safety. It leverages rear-wheel steering for agile cornering, allowing drivers to confidently execute maneuvers.

The VPA that the FF 91 is built on also houses multiple modules of lithium ion and floor-mounted batteries, as well as FF's proprietary inverter, the FF Echelon Inverter. With the 130 kWh battery system, the FF 91 can achieve an estimated driving range of 378 miles on the EPA cycle and over 700 kilometers on the NEDC cycle. The FF 91 has the ability to charge up to a 200kW rate. The Company plans to provide commercial charging solutions in its self-owned stores and FF Partnership stores, however, for locations not covered by such establishment, the users will need to rely heavily on publicly accessible charging infrastructure.

The FF 91 aims to deliver a first-class user experience that emphasizes personalization. It is a connected device that contains a voice-first user interface and open ecosystem for applications, and offers an immersive audio, video and media experience. The connectivity is powered by Super Mobile AP (three 4G LTE modems) for high-throughput and continuous coverage. The artificial intelligence system can actively learn the preference, habits and routines of a user, who can connect to multiple ecosystems and multiple devices through its FF proprietary user ID.

For autonomous driving, the FF 91 will have 10 cameras, 13 radar sensors, and a dozen other sensors to allow the FF 91 to steer autonomously. The artificial intelligence system offers features like auto valet, which enables FF 91 to park itself after the driver has exited the vehicle. The Company has continued to devote substantial resources to autonomous driving research and development, and plans to equip the FF 91 with full auto-driving capabilities in the future. Powered by the FFCTRL app, drivers can also summon the vehicle from its parking spot or schedule a pick up at a desired time and location.

**FF 81**

The FF 81 is FF's second model, still in the design and engineering stage, aimed at the mainstream market. The Company has completed the design of the FF 81 and has conducted the second virtual assessment loop for the FF 81 design and engineering. The FF 81 is now in engineering stage and is not expected to launch until, at the earliest, the first quarter of 2022. Similar to the FF 91, the FF 81 is designed on FF's proprietary VPA with 60% commonality with the FF 91, which houses multi-motor set-up, a proprietary inverter and battery management systems. The FF 81's powertrain system is targeted to be designed to produce 700 horsepower, which will enable the FF 81 to accelerate from zero to 60 mph in 3.5 seconds. Outfitted with the 108 kWh battery system, the FF 81 is targeted to achieve an estimated driving range of 357 miles on the EPA cycle and approximately 660 kilometers on the NEDC cycle. The FF 81 is targeted to be designed with the ability to charge up to a 200kW rate.

The FF 81 aims to deliver a premium user experience that emphasizes personalization. The FF 81 will be designed to be a connected device that contains a voice-first user interface and open ecosystem for applications, and offers an immersive audio, video and media experience. The connectivity is powered by Super Mobile AP (three 4G LTE modems) for high-throughput and continuous coverage. The FF 81 is designed with integrated self-driving features and the pertinent hardware capability.

**Value-Added Service Offerings**

The Company aims to provide users a seamless driving experience, and to that aim, drivers of FF's electric vehicles will be able to access a full suite of innovative services, including, for example, an autonomous driving package, executive productivity package, in-car entertainment package and other customization packages.

## FF Technology

**Smart Driving Platform - VPA**

The Company believes one of its core technology competencies is its proprietary VPA. The VPA incorporates the powertrain, chassis and battery pack in an integrated structure. As an integrated structure, the chassis can be lengthened to allow various different battery configurations and options to fit into the platform. The modular design of the VPA allows multiple product types to be built upon this adaptable singular platform. The VPA structure enables scalable vehicle design and is designed to improve manufacturing flexibility as well as efficiency. It is also designed to reduce development time for future models leveraging the VPA, which should reduce the capital required for future models.

**Battery Pack**

The Company designed its battery packs to achieve high energy density while maintaining safety, reliability and long life. The Company's proprietary technology includes systems for high density energy storage, cooling, safety, modularity, efficiency (high charging capabilities) and electronics management. The Company's patented "string" battery design and integration results in battery pack high energy density of 172 Wh/kg. The Company's proprietary laser welding process allows welding of multiple cells simultaneously, which is designed to significantly reduce cycle time and manufacturing costs. All components, architecture and the battery management systems are designed and will be assembled in-house in the Hanford manufacturing facility. The Company entered into a supply agreement with LG Chem to produce battery cells with cell chemistry and physical features tailored to the Company's needs, while maintaining industry-standard 21700 form factor size.

**FF Echelon Inverter**

The inverter in the Company's electric vehicle powertrain governs the flow of high voltage electrical current throughout the vehicle and serves to power the electric motor to generate torque while driving and deliver energy into the battery pack while charging. The inverter converts direct current from the battery pack into alternating current to drive the induction and permanent magnet motors and provides "regenerative braking"

functionality, which captures energy from the wheels to charge the battery pack. The primary technological advantages of the Company's designs include the ability to drive large amounts of current in a small physical package with high efficiency and low cost. The charger charges the battery pack by converting alternating current (usually from a wall outlet or other electricity source) into direct current that can be accepted by the battery. The patented FF Echelon Inverter is designed to have a condensed number of transistors and fewer materials in order to enhance the inverter's overall stability and dependability.

### Integrated Electric Motor Drive Units

The Company designs and will assemble its electric motor drive units (including gearbox) in-house in the Hanford manufacturing facility. The electric drive units are fully integrated with the inverter, transmission and control unit to create a compact and efficient design. Depending on the power requirements of each model, the motors can be utilized individually or in parallel dual configurations. The combination of high-power and high-torque is expected to provide users with powerful driving force. The FF 91, equipped with the integrated electric drive units, is expected to deliver 1050 horsepower and 12,510 Newton meters (Nm) of torque.

### Internet, Artificial Intelligence and Computing

The Company utilizes industry-leading automotive grade dual Qualcomm Snapdragon 820A running full Android operating system on its vehicle. The Company's Internet Artificial Intelligence system is built on an enhanced Android Automotive code base and is upgraded with each release of Google's platform. The Company possesses software over-the-air capabilities which allow software and applications in the vehicle to be updated and upgraded wirelessly. The vehicle will be connected to the Company's information cloud at all times, and when there is a firmware or software update available, the Company's cloud will push an update message to the vehicle to notify the driver to schedule an update. Upgrades will be wirelessly downloaded to the vehicle, installed, and launched, including updates for firmware, operating systems, middleware and applications.

### Manufacturing

Once the Hanford, California manufacturing facility is fully built out, the Company intends to manufacture components that are critical to its intellectual property and production of the FF 91, including the inverter, electric motor assembly, battery modules and complete battery packs pack, and to conduct body assembly, paint operations, final vehicle assembly and end-of-line testing for the FF 91. Certain major systems, including steering systems, wheel, battery cells, seats, computer screens, thermal systems, chassis systems, and charging systems, will be purchased from suppliers. Assuming completion of the Series B Equity Financing in January 2020, the Company currently plans to target an annual production capacity at the Hanford, California manufacturing facility for the FF 91 of up to approximately 10,000 cars per year beginning in 2021, and to increase the targeted annual production capacity to an aggregate of 60,000 cars per year for the FF 91 and the FF 81 by end of 2022 and beyond, through additional capital spending, further expansion of the facility and adding additional shifts. For more information about the manufacturing facility, see the discussion below under the heading "Facilities."

### Sales and Delivery of Vehicle

As of the date of this Offering Memorandum, the Company has not yet sold, produced, or delivered any electric vehicles. The Company plans to sell its electric vehicles both online and offline. Prospective user will be able to place orders through the Company's mobile application, which is expected to be launched in December 2019.

The Company plans to establish an off-line sales network, consisting of self-owned stores in certain key markets, which may include Los Angeles, San Francisco, New York, Miami, Beijing, Shanghai etc., each of which will operate as an experiential showroom for the Company's electric model and will provide sales, aftersales, and charging services. In other areas, the Company intends to adopt a hybrid distribution model of direct sales and franchise, and to open FF partnership stores with franchise partners. The FF partnership stores will support the Company's online-to-offline sales model while also providing offline sales, vehicle service, vehicle delivery, charging service and other user operations.

## FF Suppliers

The Company seeks to partner with reputable international brands in North America, Europe and Asia, including, for example, LG Chem, which provides lithium-ion battery cells according to the Company's specifications. The Company has identified sources for virtually all of the components for the FF 91 and is in the process of sourcing the front steering gear of the chassis, the only remaining part of FF91 not yet having a production solution. The Company aims to obtain systems, components, raw materials, parts, manufacturing equipment and other supplies and services from suppliers which the Company believes to be reputable and reliable.

## Intellectual Property

The Company has significant capabilities in the areas of vehicle engineering, development and design, and has developed a number of proprietary systems and technologies. As of the date of this Offering Memorandum, the Company had filed over 1,425 patent applications with more than 425 patents issued in the United States, China and other jurisdictions. The Company intends to continue to file additional patent applications with respect to our technology.

## Facilities

The Company leases all of its facilities. The following table sets forth the location, approximate size, primary use and lease term of the Company's major facilities.

| Location | Approximate Size (Building) in Square Feet | Primary Use | Lease Expiration Date |
| --- | --- | --- | --- |
| Gardena, California | 146,765 | Global headquarters, research and development and office | March 4, 2019 – April 30, 2022 |
| Hanford, California | 1,000,000 | manufacturing | January 1, 2018 – December 31, 2027 |
| Beijing, China | 49,821 | Administration Services, research and development, strategic planning | January 15, 2018– December 14, 2021 |
| Shanghai, China | 5,963 | Engineering and research and development | October 1, 2019 – June 30, 2021 |

The Company anticipates that the phase 1 build out of its Hanford, California manufacturing facility will be financed by proceeds from issuance of shares in one or more private placement transactions, including the current effort to raise US$850 million in the Series B Equity Financing, and from debt financing. The following is the Company's planned operational timeline to build out the Hanford, California manufacturing facility into an integrated electric vehicle manufacturing facility for the FF 91 and the FF 81, assuming the Series B Equity Financing round closes in January 2020:

- build out the Hanford, California manufacturing facility beginning no later than March 2020, or two months after the closing of the Series B Equity Financing;

- settle all payables due to suppliers and reengage such suppliers no later than April 2020; restart the FF 91 pre-production builds for final testing in April 2020, or three months after the closing of the Series B Equity Financing;

- complete purchases of production equipment by July 2020;

- begin installation for paint shop in June 2020;

- begin installation for body shop in August 2020;

45

- begin production of the FF 91 in October 2020, or nine months after the closing of the Series B Equity Financing;

- complete installation of all equipment in January 2021;

- begin pre-production builds for the FF 81 in February 2021; and

- deliver  the first 100 units of the FF 91 to the market in April 2021, or fifteen (15) months after the closing of the Series B Equity Financing.

Once its phase 1 build-out is complete, the Hanford, California manufacturing facility will be 1,000,000 square feet and is expected to have the capacity to support a maximum production of 10,000 units per year. The Company plans to deliver approximately 100 cars to the market by the time of its planned initial public offering which is targeted for as early as early-to-mid-2021. Pending additional financing, which may be in the form of an initial public offering (targeted for as early as early-to-mid-2021), the Company plans to further expand the Hanford, California manufacturing facility to 1,600,000 square feet, and to bring the maximum capacity of the facility to 60,000 units by end of 2022, which could cover the production of the FF 91 and the initial production volume of the FF 81. The Company expects to further establish its manufacturing capacity in China to support ramp up of the FF 81 and future vehicles in 2023 and beyond.

## Legal Proceedings and Vendor Trust

The Company has been involved in litigation with contractors and suppliers due to cash constraints it has historically faced. As part of its financing efforts and to regain support from its contractors and suppliers, on April 29, 2019, the Company established the Vendor Trust securing past due payables up to US$150 million. The Vendor Trust is being managed by Force Ten Partners, as the vendor trustee. All obligations due under the Vendor Trust are collateralized by a first lien, with third payment priority, on substantially all of the Company's tangible and intangible assets. The Company intends to pay off the payables of the suppliers participating in the trust with equity financing that it intends to raise. The participating vendors agreed to not bring legal claims for the overdue payment and to continue to cooperate with the Company, and most of the vendors agreed to resume supply once the Company has secured additional funding. All participating vendors are required to forbear from exercising remedies on any payables not tendered to or accepted by the Vendor Trust. As of the date of this Offering Memorandum, vendors owed aggregate payables of approximately US$141.0 million have agreed to participate in the Vendor Trust, including several major vendors who have filed lawsuits against the Company. The Company estimates that the participating payables constitute all past due payables of approximately 80% of FF's suppliers, including all smaller vendors who are owed less than US$20,000. As of the date of this Offering Memorandum, litigation proceedings with five vendors who did not participate in the Vendor Trust were still pending.

**OTHER ASSETS OF YT**

Chinese authorities have frozen YT's personal assets located in China. Such assets include (i) approximately US$88,201.92 in deposits with various banks, such as China Citic Bank and China Merchants Bank Corporation; (ii) real estate in China worth approximately US$4,740,562.24; and (iii) equity interests worth approximately US$217,640,000 in various entities, such as Leshi Internet Information Technology (Beijing) Co., Ltd. and Leshi Holdings (Beijing) Ltd. The assets are subject to the claims against YT and his ownership of equity interests are subject to the creditor claims of those entities.

## RISK FACTORS

*Participating in the Restructuring (either through the Consensual Restructuring or the Prepackaged Plan), which entails an indirect investment in the Company, involves substantial risks. Before electing to participate in the Restructuring, you should carefully consider the risks described below and the other information contained elsewhere in this Offering Memorandum. If any of the following risks or other unforeseen events actually occur, the Company's business, its financial condition and the results of its operations, and therefore the value of the Trust Interests could be materially and adversely affected. Once you agree to participate in the Restructuring, your Trust Interest will entitle you to your respective portion of the beneficial interest in the Trust, which holds all of YT's economic interest in the Company as "Trust Assets." As a result, the value of the Trust Assets are entirely reliant on the value of the equity interests of the Company, which would be determined and affected by the Company's business, prospects financial condition and results of operations.*

### <u>General Risks Related to the Restructuring</u>

***If YT does not complete the Restructuring, he may seek protection under the Bankruptcy Code without a pre-approved plan of reorganization, which may adversely affect the value of his assets and the Company.***

If the Consensual Restructuring is not consummated and YT determines that he will be unable or is unwilling to implement the Prepackaged Plan, there is substantial likelihood that YT will seek, or will be forced to seek, protection under the Bankruptcy Code without a pre-approved plan of reorganization. If a case is filed under the Bankruptcy Code without having received sufficient acceptances to confirm the Prepackaged Plan, it is possible that (i) the case could be converted to a Chapter 7 bankruptcy, (ii) YT might remain under the jurisdiction of the Bankruptcy Court for an indeterminate amount of time, (iii) YT would bear a higher level of expenses than would be borne under a case with such prior acceptances, and (iv) the uncertainty regarding the ability of the Company to obtain necessary financing would likely be increased, which would adversely affect the value of the Company, and ultimately YT's assets and your interest in the Trust Interests. The solicitation of votes on the Prepackaged Plan, and any subsequent commencement of a bankruptcy proceeding, even in connection with the Prepackaged Plan, may also have adverse effects on YT's assets and the Company. In addition, due to uncertainties about YT's future, the Company may not be able to obtain financing on a timely basis and/or on reasonable commercial terms, or at all.

These concerns and effects typically become more acute when a bankruptcy case continues for a protracted period without indication of how or when the case may be completed.

***If YT does not complete the Restructuring, he may seek restructuring alternatives that result in less value to holders of claims against YT than they would receive pursuant to the Restructuring.***

If YT does not consummate the Restructuring, he may be required to pursue an alternative plan or plans of reorganization, either under the Bankruptcy Code or otherwise. There can be no assurance that YT would be able to effect any such alternative plan or reorganization or that any such alternative plan or reorganization would be on terms as favorable to the holders of claims against YT as the terms of the Restructuring. In addition, YT's creditors may take certain legal actions against YT, which could include foreclosure or liquidation of YT's assets. If a liquidation or protracted reorganization of YT were to occur, there is a substantial risk that the value of YT's assets (and ultimately the value of the Company) would be substantially eroded to the detriment of all stakeholders. If an alternative plan of reorganization could not be implemented, it is likely that YT would have to liquidate his assets, in which case it is likely that holders of claims against YT would receive less than they would have received pursuant to the Restructuring.

***If the Restructuring is delayed, the Company may not be able to obtain financing.***

After the Restructuring, the Company would need to obtain financing to provide it with the financial capacity necessary to fund its operations and proceed with its business plan. Securing financing for the Company is dependent upon a number of factors, some of which are beyond the Company's or YT's control. If the Restructuring is not completed on a timely basis, the Company may be unable to negotiate acceptable terms for such an arrangement. The challenges of obtaining financing would be exacerbated by adverse conditions in the general

economy and the volatility and tightness in the financial and credit markets. An inability to obtain financing on a timely basis and/or on reasonable commercial terms, or at all, could have an adverse effect on the Company's business, financial condition, and operating results or ability to continue as a going concern.

***The exchange of the Debt Claims for Trust Interests does not reflect any independent valuation of the Company.***

YT has not obtained or requested a determination from any third party as to the value of the Company or the Trust Interests. In particular, the future value of the Trust Interests, including the right to receive any distributions or other payments, will depend on YT's ability to complete the Restructuring, as well as the Company's ability to obtain the financing necessary to fund its operations and proceed with its business plan.

***YT may withdraw, amend, cancel, or delay the Restructuring in his sole and absolute discretion.***

To the fullest extent permitted by applicable law, YT reserves the right to withdraw, amend, cancel, or delay the Exchange Offer, the Consensual Restructuring (or any part of the Consensual Restructuring), or the Prepackaged Plan (or any part of the Prepackaged Plan), before or after the Expiration Date. The potential impact of any such action on the holders of Claims cannot presently be foreseen but may include a change in the economic impact of the Restructuring or could make it significantly less likely that YT will be able to complete the Restructuring. You will not have any right to vote on, or to be consulted in connection with, YT's decision regarding whether to withdraw, amend, cancel, or delay the Restructuring or any part thereof.

***The Company's future value, and therefore the value of your interest in the Trust is uncertain. The hypothetical figures set forth in the table under "Consensual Restructuring—Other Matters Affecting the Trust: Hypothetical Scenarios" are based on generalizations and assumptions that may not prove to be accurate.***

The hypothetical figures set forth in the table under the caption "Consensual Restructuring—The Exchange Offer—Other Matters Affecting the Trust: Hypothetical Scenarios" are estimates only and reflect various generalizations and assumptions by YT and management of the Company. Such estimates, generalizations and assumptions are considered reasonable by YT and management, although they may prove to have been incorrect or unfounded; further, they are hypothetical estimates only and are inherently subject to significant economic, competitive, tax, and other risks and uncertainties beyond the control of YT or the Company, including the additional risks set forth herein under "Risks Related to the Company and its Business that may Adversely Affect the Trust Interests," "Risks Related to the Industry" and "Risks Related to the Company's Operation in China." There can be no assurance that the hypothetical returns described in such will be realized, and actual results may vary materially and adversely from the hypothetical estimates set forth therein. To the extent the future value of the Company is materially less than described in the table, the value of your interest in the Trust will be negatively affected.

***There are a number of income tax considerations, risks, and uncertainties associated with the consummation of the Restructuring.***

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Consensual Restructuring and the Prepackaged Plan. You should carefully read the discussion set forth in this Offering Memorandum under the heading "Certain Federal Income Tax Consequences of the Consensual Restructuring and the Prepackaged Plan" regarding certain U.S. federal income tax consequences of the transactions proposed by the Consensual Restructuring and the Prepackaged Plan. Any person who would not be considered a Non-U.S. Holder under U.S. federal income tax rules and regulations should consult their own tax advisor.

*All interested parties are urged to consult their own tax advisors as to the U.S. federal, state, local, and non-U.S. tax consequences of the Consensual Restructuring and Prepackaged Plan.*

***Even if YT does not receive enough tenders of the Debt Claims and corresponding ballots to complete the Consensual Restructuring, there may nonetheless be sufficient votes to accept the Prepackaged Plan.***

The consummation of the Consensual Restructuring is conditioned upon, among other things, the receipt of valid tenders of 90% of principal amount of the Debt Claims outstanding immediately before the expiration of the Exchange Offer, subject to the waiver of such condition by YT in his sole discretion. If YT is not able to complete the Consensual Restructuring, he reserves the right to seek confirmation of the Prepackaged Plan by the Bankruptcy Court. To obtain approval of the Prepackaged Plan YT only needs to receive the affirmative votes from holders of at least two-thirds in dollar amount and more than one-half in number of those holders of Allowed Debt Claims.

If YT is not able to complete the Consensual Restructuring because holders of the Debt Claims fail to tender 90% of the outstanding principal amount of the Debt Claims (and YT does not waive this condition) or for any other reason, but YT receives the required votes to accept the Prepackaged Plan, YT will be entitled to seek confirmation of the Prepackaged Plan by the Bankruptcy Court. If the Prepackaged Plan is confirmed by the Bankruptcy Court, the terms of the Prepackaged Plan will bind all creditors (including the holders of Debt Claims) regardless of whether they voted for or against or did not vote at all on the Prepackaged Plan. Therefore, assuming the Prepackaged Plan satisfies the other requirements of the Bankruptcy Code for confirmation, the votes of a subset of Debt Claims could potentially bind all of the Debt Claims to the terms of the Prepackaged Plan.

***Holders of Debt Claims must follow the Exchange Offer procedures carefully in order to participate in the Exchange Offer.***

If holders of Debt Claims do not follow the procedures described in this Offering Memorandum and in the Letter of Transmittal and Ballot, they will not be eligible to exchange their Debt Claims pursuant to the Exchange Offer. YT will only accept Debt Claims that are timely and properly tendered. Holders of Debt Claims should allow sufficient time to ensure timely delivery of their Debt Claims, and should carefully follow the instructions on how to tender their Debt Claims set forth in the section entitled "Tendering and Voting Procedures" of this Offering Memorandum and in the Letter of Transmittal and Ballot. No one, including YT, is required to notify holders of Debt Claims of any deadlines, defects, or irregularities relating to the tender of their Debt Claims.

***Consideration paid to holders of Debt Claims may be voided as a preferential transfer.***

If YT were to become a debtor in a case under the Bankruptcy Code within ninety (90) days after the making of any distribution to or for the benefit of any holder of a Debt Claim (or within one year after the making of any such payment, with respect to any insiders specified in the Bankruptcy Code) and certain other conditions were met, such distribution, absent an applicable defense as provided by the Bankruptcy Code, could potentially be voided as a preferential transfer and, to the extent avoided, the value of such distribution could be recovered from such holder of a Debt Claim and possibly from subsequent transferees.

***In the future, YT may offer holders of Debt Claims that are not tendered in the Exchange Offer consideration different than that offered in the Exchange Offer.***

If YT elects in his sole discretion to waive the condition that requires 90% of the Debt Claims to be tendered in the Exchange Offer, YT may in the future offer different consideration than that offered in the Exchange Offer to holders of Debt Claims that are not tendered in the Exchange Offer through privately negotiated transactions or such other means as YT deems appropriate. Any such offer will occur upon such terms as YT may determine in his discretion, which may be more or less than the value of the Trust Interests being offered for the Debt Claims in the Exchange Offer, and could be for cash or other consideration.

**Risks Related to the Prepackaged Plan**

*The following Risk Factors assume that YT is unwilling or unable to complete the Consensual Restructuring and that he will have instead chosen to commence a case under chapter 11 of the Bankruptcy Code and to file the Prepackaged Plan.*

### The Prepackaged Plan May Not Be Confirmed

There is no assurance that the Bankruptcy Court will confirm the Prepackaged Plan. Even if all Classes vote to accept the Prepackaged Plan, the Bankruptcy Court could still decline to confirm the Prepackaged Plan if it finds that any of the statutory requirements for confirmation have not been met. Moreover, there can be no assurance that modifications to the Prepackaged Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Prepackaged Plan is not confirmed, it is unclear what distributions, if any, holders of Claims ultimately would receive with respect to their Allowed Claims.

### Failure to Consummate the Prepackaged Plan

The Prepackaged Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As the date of filing this Offering Memorandum, there can be no assurance that any or all of the conditions in the Prepackaged Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Prepackaged Plan will be confirmed by the Bankruptcy Court. Further, if the Prepackaged Plan is confirmed, there can be no assurance that the Prepackaged Plan will be consummated.

### The commencement of a bankruptcy case to implement the Prepackaged Plan could adversely impact the Company's business.

The Prepackaged Plan has been developed in an effort to avoid any material impact on the Company. YT also expects that the time he would be in bankruptcy would be short if the Prepackaged Plan is confirmed. YT expects that the Prepackaged Plan would be confirmed quickly, but there are always risks inherent in any such proceeding. If the Prepackaged Plan is not confirmed on a timely basis because of a challenge to the Prepackaged Plan or does not become effective because of a failure to satisfy the conditions to the effectiveness of the Prepackaged Plan, YT may be forced to operate in bankruptcy for an extended period while attempting to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case would involve additional expenses and increase both the probability and the magnitude of the disruption to the value of YT's assets as well as the Company's business operations. In addition, in a protracted bankruptcy proceeding, a creditor, official creditors' committee, or other party in interest may seek confirmation of an alternative, competing plan that may propose different and materially less advantageous treatment of creditors and other parties in interest.

### Risks Related to the Company and its Business that may Adversely Affect the Trust Interests

### The Company has substantial existing indebtedness and may incur substantial additional indebtedness in the future, and the Company may not be able to refinance its current borrowings on terms that are acceptable to it, or at all.

The Company has a substantial amount of indebtedness as disclosed herein, and may continue to incur additional indebtedness from time to time to support its operations. If the Company incurs additional debt, the risks that it faces as a result of its indebtedness and leverage could intensify. The substantial existing debt and the incurrence of any additional debt of the Company could:

- limit the Company's ability to satisfy its obligations under certain debt instruments, including the bridge facility agreements;

- in the event the Company is not able to renew or refinance existing indebtedness as it becomes, cause the Company to seek bankruptcy protection or enter into other insolvency proceedings;

51

- increase its vulnerability to adverse general economic and industry conditions;

- require it to dedicate a substantial portion of its cash flow from operations to servicing and repaying indebtedness, thereby reducing the availability of cash flow to fund its working capital, capital expenditures, and other general corporate purposes;

- increase its exposure to interest rate and exchange rate fluctuations;

- limit the Company's ability to borrow additional funds and impose additional financial and other restrictions on it; and

- increase the cost of additional financing.

Because the majority of the Company's indebtedness is short-term indebtedness, the Company may suffer a near-term liquidity problem if it is unable to refinance these borrowings as they become due. As of July 31, 2019, the Company's current liabilities amounted to US$734.3 million, with outstanding note payables of US$402.1 million to related-party lenders and third-party lenders, respectively. The Company has defaulted on some of the notes, and is currently in negotiation with such lenders for extensions or conversion of notes into equity. Several other notes will mature by the end of 2019. For example, the Company's secured note of US$45.0 million issued to certain purchasers pursuant to the note purchase agreement with U.S. Bank National Association will become due on October 31, 2019, to which the Company is seeking an extension from the lender. Certain of the notes entered into by the lenders and the Company provided an increasing interest rate per annum. There is no assurance that the Company will be able to obtain extensions, or renew certain notes in the future at commercially acceptable rates, or obtain sufficient alternative funding on reasonable terms, or at all, to settle the notes.

The commercial banks, financial institutions and individual lenders may have concerns in providing or renewing financing for the Company's operations, especially if a significant portion of their lending to the Company has not been repaid as of the date of this Offering Memorandum and may continue to remain outstanding for an indeterminate period of time. The United States and Chinese governments may also pass measures to tighten credit available in the markets. Any future monetary tightening measures as well as other monetary, fiscal and industrial policy changes by those governments could materially and adversely affect the Company's cost and availability of financing, liquidity and access to capital, and ability to operate its business. Unless the Company is successful in obtaining extensions, refinancing or waivers with respect to certain indebtedness that is or will come due in the near future, or that is currently in default, the Company is not expected to have sufficient liquidity to remain as a going concern. Furthermore, even if it is able to obtain such extensions, refinancing or waivers, the Company must be able to consummate the Series B Equity Financing or a similar financing by early 2020, or the Company will again face financing challenges that may call into question its ability to continue as a going concern. There can be no assurance that the Company will be able to obtain any such extensions, refinancing or waivers or consummate the Series B Equity Financing or similar financing on a timely basis or on reasonable commercial terms, or at all.

***The Company is operating, and will continue to operate, with a working capital deficit and has limited cash availability and liquidity, and if the Company cannot close equity financing as planned, there exist doubts and uncertainties as to its ability to continue as a going concern.***

The Company has been operating for the past one year under limited cash availability and liquidity. It incurred a net loss of US$477.8 million and US$103.1 million, respectively, in 2018 and during the seven months ended July 31, 2019, and had an accumulated loss of US$2.15 billion as of July 31, 2019. Given the Company's current limited cash availability and liquidity, there is a concern as to the Company's ability to pay its debts and liabilities as they come due and to continue as a going concern. For more information, see "Summary of Selected Financial Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company."

As the Company has substantial indebtedness in China and the United States, there are doubts and uncertainties about the Company's ability to service its existing debts and to continue its operations. The annual interest rates for the Company's borrowings from third party lenders generally varied from 8.99% to 13% as of

December 31, 2018, which may be raised in the event of default. In order to refinance its existing borrowings, the Company may need to borrow with even higher interest rates, if the Company cannot close equity financing as planned The doubts and uncertainties about the Company's ability to service its debts and continue its operations may result in concerns of its creditors, suppliers, customers and other counterparties, which could hinder the Company's ability to conduct operation in the ordinary course of business and to raise financing on a reasonable terms, which may result in the Company's inability to continue as a going concern.

From time to time, the Company pledged its properties in the United States as collateral for certain borrowings, which the Company has not fully paid off as of the date of this Offering Memorandum. For example, pursuant to the note purchase agreement dated April 29, 2019, entered into with U.S. Bank National Association and certain purchasers, and with Birch Lake as the agent and collateral agent, substantially all of the Company's tangible and intangible assets have been pledged as collateral. The Company's operations may be disrupted if it fails to pay off the borrowings and the creditors decide to take enforcement measures, which would materially and adversely affect the Company's business, results of operations, financial condition and future prospects.

Furthermore, the Company's ability to satisfy its outstanding and future debt and other obligations by its self-generated revenues may largely depend upon its planned commercialization and the performance of its electric vehicles, including the FF 91 and the FF 81, which are subject to the factors, including the Company's ability to secure fund, as well as factors which are beyond the Company's control, including general economic conditions, technological trends in the automotive industry and competitors in the EV electric vehicle markets by the time the electric vehicles are manufactured and sold.

***The Company has not commenced production of any model, and has not generated any revenue since its inception. There are uncertainties concerning its ability to develop, manufacture, market, sell and deliver electric vehicles of quality and appeal to customers, on schedule, and on a scale to achieve profitability.***

The Company is in its development stage. It has not generated revenue since its inception in 2014 and has not commenced production of any model as of the date of this Offering Memorandum. The Company's future business depends in large part on its ability to execute on its plans to develop, manufacture, market, sell and deliver its electric vehicles, including the FF 91, the FF 81 and other planned electric vehicle models that appeal to customers. In general, the Company's development, manufacturing and sale of its planned volume manufactured vehicle is subject to various risks, including those with respect to:

- the Company's ability to secure sufficient funding;

- the appropriate selection and design of the equipment to accurately manufacture the electric vehicles within specified design tolerances;

- compliance with environmental, workplace safety and similar regulations;

- channels to secure necessary components from suppliers on acceptable terms and in a timely manner;

- the Company's ability to attract, recruit, hire and train skilled employees;

- quality controls;

- the Company's ability to keep up with the technological development, estimated sales efforts, or after sale support, including charging;

- consumer expectations which are subject to change and affected by technological trends; and

- other delays and cost overruns.

Any of the foregoing risks could have a material adverse effect on the Company's business, prospects, results of operations and financial condition, and ability to continue as a going concern, and therefore the value of the Trust Interests.

***The Company may experience delays in realizing its projected timelines, cost and volume targets for the production and ramp of its FF 91 vehicle, which could harm its business, prospects, financial condition and operating results.***

The Company's current business depends in large part on its ability to execute on its plans to manufacture, market and sell the FF 91 vehicle on a scale that may achieve profitability. Historically, the Company has missed its planned timeline to produce the FF 91. The Company has not commenced production of the FF 91. Although the Company's plan is to start its production within nine months after it has completed its pending Series B Equity Financing, the commitment of any potential investors have not been secured and there is no assurance such financing will be obtained on a timely basis, on commercially reasonably terms, or at all. Assuming the Company secures necessary funding, the Company expects that its Hanford, California manufacturing facility will have the capacity to produce 10,000 units of the FF 91 beginning in 2021, while the Company expects to deliver 100 units to the market by the initial public offering of its shares (targeted for as early as early-to-mid-2021).

The Company has no experience to date in manufacturing vehicles, and in order to successfully produce a high volume of vehicles, the Company will need to complete the implementation and ramp of efficient and cost-effective manufacturing capabilities, processes and supply chains necessary to support the volumes that the Company is targeting. The FF 91 production plan has generally required and will require significant investments of cash and management resources.

The Company's production plan for the FF 91 is based on many key assumptions, including:

- that the Company obtains the necessary financing to complete its build-out plans;

- that the Company will be able to fully build out its Hanford manufacturing facility in a timely manner;

- that the equipment and processes which the Company has selected for FF 91 production will be able to accurately manufacture high volumes of FF 91 vehicles within specified design tolerances and with high quality;

- complete ramping high volume production of FF 91 at the Hanford manufacturing facility without exceeding the Company's projected costs and on its projected timeline;

- that the Company will be able to maintain suppliers for the necessary components on terms and conditions that are reasonably acceptable and that the Company will be able to obtain components on a timely basis and in the necessary quantities to support high volume production and the number of FF 91 reservations; and

- that the Company will be able to attract, recruit, hire, train and retain skilled employees, including employees on the production line, to operate its Hanford manufacturing facility for the FF 91.

If one or more of the foregoing assumptions turns out to be incorrect, the Company's ability to meet its FF 91 projections on time and at volumes and prices that are profitable, the number of FF 91 reservations, as well as the Company's business, prospects, reputation, operating results and financial condition, may be materially and adversely impacted. In any such event, the value of the Trust Interests could be materially impaired.

***It is expected that there would be further increases in the Company's costs and expenses which would result in continuing losses for at least the foreseeable future.***

The Company incurred a net loss of US$477.8 million and US$103.1 million, respectively, in 2018 and seven months ended July 31, 2019, and had an accumulated loss of US$2.15 billion as of July 31, 2019. The

Company has had net losses in each quarter since its inception, and will continue to incur operating and net losses each quarter until at least the time it begins significant deliveries of the FF 91, which is not expected to occur until 2021, and may occur later. There is no assurance that the FF 91, the FF 81 or other planned electric vehicles will be commercially successful, even when they are successfully manufactured. There is also no assurance that the Company is to ever achieve profitability.

The rate at which the Company will incur costs and losses in future periods from current levels may increase significantly, as the Company:

- continues to develop the FF 91, FF 81 and other planned electric vehicle models;

- develops and equips its manufacturing facility in Hanford, California to produce the FF 91, and secures manufacturing capabilities in China for the Company's planned electric vehicle to be manufactured and sold in China;

- builds up inventories of parts and components for the FF 91;

- develops and expands its design, development, maintenance, servicing and repair capabilities;

- opens offline FF self-owned stores; and

- increases its sales and marketing activities.

These efforts may be more expensive than the Company currently anticipates or these efforts may not result in increases in its revenues, which would further increase its losses. As the Company is seeking funding to realize its business operations plan based on its estimated capital requirements, any cost overrun that deviates from its estimate may materially and adversely affect the Company's business, prospects, financial condition and results of operations.

***The secured vendor trust program established by the Company may not fully resolve the disputes with its contractors and suppliers.***

On April 29, 2019, as part of its financing efforts and to regain support from its contractors and suppliers, the Company created a secured vendor trust program securing past due payables up to US$150 million with substantially all of its tangible and intangible assets. Participating vendors have the benefit of a first lien with third payment priority on assets of the Company and its affiliates, and are also entitled to certain interim distributions from the trust and interests. As of the date of this Offering Memorandum, vendors owed aggregate trade payable of US$141.0 million have agreed to participate in the trust, which the Company estimates to constitute all past due amounts for approximately 80% of the Company's suppliers. The Company intends to pay off the payables of the suppliers participating in the trust with the equity financing that it has raised. However, there is no assurance that the funding will be available. In the event that the Company fails to secure capital to pay off the payables in the vendor trust upon its maturity, and/or the vendors decide to enforce the collateral when the Company defaults, the Company's business and operations will be materially disrupted, and it will call into question whether the Company can continue as a going concern.

The Company believes the vendor trust will increase its contractors' and suppliers' confidence in it and secure their continued cooperation in the production of the FF 91. However, the vendor trust will not be able to satisfy the overdue payments from all suppliers. Although several major vendors that initiated proceedings against the Company have settled their respective claims by participating in the vendor trust, as of the date of this Offering Memorandum, litigation proceedings with five vendors who did not participate in the vendor trust remain pending. If the suppliers do not participate, or withdraw from, the vendor trust, the Company will continue to face uncertainty in its supply chains, risks of threatened legal or administrative proceedings and persistent liquidity problems. Most importantly, the Company may not be able to timely produce the FF 91 or launch the FF 81 or other electric vehicles as planned if certain key contractors and suppliers terminate their cooperation with the Company and the Company may not find alternatives with acceptable terms, if at all.

*The Company may have difficulties in attracting funding, and the production and ramp up of the FF 91 and the development of the FF 81 may be materially and adversely affected. As the Trust Interests derive their value from the value of the equity in the Company, the value of the Trust Interests may be materially impaired to the extent the value of the Company decreases.*

The Company operates in a capital intensive industry and requires a significant amount of cash to fund its operations. Particularly, the Company needs a substantive amount of funding for the production and ramp up of the FF 91 and to develop the FF 81, including for the capital expenditures related to the build out of its Hanford, California manufacturing facility. It also needs cash to repay its existing debts and borrowings, including secured senior debts, many of which will mature before the end of 2019.

There is no assurance that the Company will have sufficient cash flow or other financing available for its vehicle development and production, or that it will be able to achieve sufficient pre-sales, if any, to fund its business operations. The Company will need to secure external funding through one or more private placements of its equity securities, debt financing and/or initial public offering, the results of which cannot be assumed. If the Company is unable to obtain funding in a timely manner or on commercially acceptable terms, or at all, its business and operation may be materially and adversely affected, and may impact whether the Company can continue as a going concern.

The limited operating history and financial distress of the Company could create obstacles for the Company's current financing plans and its future plan to launch an initial public offering of its shares. The Company is currently seeking the Series B Equity Financing from investors for approximately US$850 million. In addition, the Company's business plan envisions another substantial equity raise, which could be in the form of an initial public offering within 15 months after the Series B Equity Financing is secured. While the Company is engaged in discussions with potential investors of the Series B Equity Financing as of the date of this Offering Memorandum, there are no commitments for additional funding and no assurance can be made as to whether funding will be available, and if so, how much and on what terms. There are uncertainties as to the timing, amount, terms and conditions of financing that the Company may be able to secure. Given the Company's current indebtedness and financial situation, it may be forced to accept financing terms, if any, with more stringent undertakings and covenants, which may materially and adversely restrict and affect the Company's business operations.

Furthermore, YT, the former chief executive officer and the current chief product and customer officer of the Company, has recently been the subject of negative press related to his debts and any investigation by the China Securities Regulatory Commission into the delisting from the Shenzhen Stock Exchange, of the shares of certain company where YT served as the chief executive offer. There is no assurance that such negative publicity, although not directly related to the Company, would not adversely affect the Company's ability to raise additional capital.

*The Company's issuance of convertible debt or equity securities, including pursuant to the Series B Equity Financing or 2019 Equity Incentive Plan, may dilute the Trust Interests held by you.*

The Company is planning to raise additional capital through the sale of equity and debt with convertible features, including pursuant to the Series B Equity Financing, and may continue to require additional capital through equity financing and/or sale of other equity-linked securities, including convertible debts. In addition, the Company is in negotiations seeking to cause certain lenders to convert their debts into equity of the Company. To the extent that the Company issues additional shares, including pursuant to the Series B Equity Financing, the ownership interest of its stockholders, including the Trust, will be diluted and will affect the value of the Trust Interests.

The Company has the 2018 Equity Plan and STI Plan (each as defined under "Certain Relationships and Related Transactions—Borrowings from Related Parties—Stock Incentive Plans," and proposes to adopt a 2019 Equity Incentive Plan. Shares or interests in the Company's equity issued under any of these plans will dilute the interest of the Trust in the Company and therefore the value of your Trust Interests.

*If the Company fails to comply with the undertakings and covenants under certain financial instruments or obtain consents or waivers in respect of any breach of these undertakings and/or covenants, its financial condition, results of operations and business prospects may be materially and adversely affected.*

Many financial instruments entered into by the Company impose extensive restrictions and stringent conditions, which could be burdensome if the Company fails to meet certain financial covenants contained therein, or to make the repayment when due and which may affect the Company's ability to raise additional capital. For instance, certain of the Company's credit facilities require the prior written consent of the lenders before the Company may undertake specified corporate actions or transactions, such as increasing debt financing, providing new guarantees, selling or disposing of major assets, pledging assets, amending certain corporate registration records, and engaging in certain related-party transactions.

If the Company is required to repay a significant portion or all of the existing indebtedness prior to their maturity or if the Company is unable to borrow additional amounts under existing credit facilities, the Company may lack sufficient financial resources to make these payments or to fund other cash requirements. The Company's lenders may also resort to judicial proceedings to enforce their rights or it may be necessary for the Company to seek bankruptcy protection or enter into other insolvency proceedings.

There is no assurance that the Company will be able to comply with the undertakings and covenants under its financial instruments or obtain consents or waivers in respect of any breach of these undertakings and/or covenants, if the Company fails to comply, there could be material adverse consequence to the Company with respect to its financial condition, results of operations and business prospects materially and adversely affected, or its ability to continue as a going concern.

*The Company has a limited operating history and faces significant entry barriers in the industry.*

The Company was founded in 2014 and has built several pre-production vehicles for the FF 91, and completed the third stage of the FF 91 pre-production quality audits in September 2019. Although the Company expects to start production of the FF 91 nine months after it completes the Series B Equity Financing, the commitment of the potential investors is not yet secured and the Company has no experience in mass production of electric vehicles. Even if the Company is able to secure funding, there is no assurance that it will be able to develop efficient, automated, cost-efficient manufacturing capabilities and processes, and reliable sources of component supply to meet the quality, price, engineering, design and production standards, as well as the production volumes required to successfully mass market the FF 91 and future vehicles.

Furthermore, even if the Company achieves the mass production of its electric vehicles, it faces significant barriers to entry in the electric vehicle industry, including, continuity in development and production of safe and quality vehicles, corporate reputation, customer base, marketing channels, pricing policies, management and talent, value-additive service packages and technological advancement. If the Company fails to address any or all of these risks and barriers to entry, its business and results of operation, and the value of the Trust Interests may be materially and adversely affected.

*The Company's business depends substantially on the continuing efforts of its key management as well as experienced and qualified personnel, and its business may be adversely affected if the Company is unable to hire or retain qualified employees.*

The Company's success depends substantially on the continued efforts of its executive officers and key employees. If one or more of its executive officers or key employees were unable or unwilling to continue their services with the Company, the Company may not be able to replace them easily, in a timely manner, or at all.

If any of the Company's executive officers or key employees terminates his or her services with the Company, the Company's business may be negatively affected. In addition, the Company may incur additional expenses to recruit, train and retain qualified personnel. The Company hired a new global chief executive officer in September 2019. However, there is no guarantee that the Company will be able to attract other qualified candidates to fill certain positions in the Company. The failure to do so may lead to difficulties in effectively executing the

Company's business strategies, and its business, prospects and results of operations could be materially and adversely affected. Furthermore, if any of the Company's executive officers or key employees joins a competitor or forms a competing company, it may lose know-how and key professionals and staff members.

***The Company may not be able to guarantee customers access to comprehensive charging solutions.***

The Company has not built any commercial charging infrastructure, and its customers will have to rely on publicly accessible charging infrastructure, which is generally considered to be insufficient, especially in China. Although the Company has developed its proprietary and patented battery pack system with leading battery energy density of 108kWh and high charging capability of up to 200kW, the Company may not have competitive advantages in terms of proprietary charging infrastructure or holistic charging solutions. Some competitors may provide charging services via self-owned charging infrastructure, battery swapping and charging trucks, which the Company may not be able to deliver.

The charging services the Company may provide could fail to meet the expectations and demands of the customers, who may lose confidence in the Company and its vehicles. This may also deter potential customers from subscribing to purchase the Company's vehicles. In addition, even if the Company has the ability to and plans to build its own charging infrastructure, it may not be cost-effective and the Company may face difficulties in finding proper locations and obtaining relevant government permits and approvals. To the extent the Company is unable to meet its customers' expectations or demand, or faces difficulties in developing comprehensive charging solutions, its reputation and business operations and thus the value of the Trust Interests may be materially and adversely affected.

***The joint venture contemplated by The9 and the Company may not be successful. The Company's cooperation with The9 and manufacturing partners or contractors could incur other risks.***

On March 24, 2019, the Company entered into the JVA with The9, an internet technology and gaming company based in Shanghai, China. Under the JVA, the Company will contribute to the joint venture, among other things, certain intellectual property licenses and its land use rights in Zhejiang, China to develop and manufacture an exclusive electric vehicle, the V9 MPV in China, and the right of first refusal for a second project. The9 will contribute US$600 million in funding to such joint venture, contingent upon the fulfillment of specified funding conditions, approximately US$400 million of which will be payable to the Company as licensing royalties and/or non-recurring engineering expenses. Each party owns a 50% stake in the joint venture and is entitled to 50% of the profits. The Company may develop the joint venture's manufacturing capabilities in China, but may also consider cooperating with third party contractors or manufacturing partners to carry out certain production tasks.

While the cooperation with The9 in the joint venture may accelerate the Company's time to market in China, this cooperation, together with the contemplated cooperation with manufacturing partners or third party contractors, may not be successful or profitable. It is currently expected that the joint venture may build its own manufacturing capability in China and start production beginning in 2022, which could divert the Company's managerial and other resources. In addition, collaboration with third parties for the manufacturing of vehicles may pose risks outside the Company's control, including the failure of the partners to meet agreed upon timelines, capacity constraints, infringement upon or unauthorized disclosure of the Company's patents, trademarks, know-how and other proprietary properties, negative publicity regarding the Company's partners or their business. Furthermore, there can be no assurance that the Company will successfully ensure that its manufacturing partners maintain quality standards, and any failure to do so could adversely affect customers' perceptions of the Company's self-manufactured electric vehicles.

To the extent the Company relies on any third party contractors or manufacturing partners, risks exist that the Company may be unable to enter into new agreements or extend existing agreements with such third-party contractors or manufacturing partners on terms and conditions acceptable to the Company, if at all, and therefore may need to contract with other third parties or significantly add to its own production capacity. There can be no assurance that in such event the Company would be able to partner with other third parties or increase its own production capacity to meet the production needs. The expense and time required to complete any transition, and to ensure that vehicles manufactured at facilities of new third party partners are built in compliance with the quality standards and regulatory requirements, may be greater than anticipated. Any of the foregoing could adversely affect

the Company's business, results of operations, financial condition and prospects, and thus the value of the Trust Interests.

***Government financial support, incentives and favorable policies for electric vehicle policies are subject to change. Discontinuation of any of the government subsidies or imposition of any additional taxes and subcharges could adversely affect the Company's financial condition and results of operations.***

The Company's PRC subsidiaries have received various financial subsidies from PRC government authorities, including subsidies in relation to the Company's patent application in China, and certain project-related subsidies. The government authorities may decide to change or discontinue certain financial subsidies, which could materially and adversely affect the Company's financial condition and results of operations.

In addition, government incentives, rebates, tax credits and other financial incentives available to purchasers of electric vehicles may expire, end when the allocated funding is exhausted or be reduced or terminated. For example, California implemented regulations phasing out a US$2,500 cash rebate on qualified electric vehicles for high-income consumers, which became effective in March 2016. China's central government has announced a phase-out schedule for the subsidies provided for purchasers of certain electric vehicles, which provides that the amount of subsidies provided to purchasers of certain new energy vehicles in 2019 and 2020 will be reduced by 20% as compared to 2017 levels. Competitors who have already rolled out their electric vehicles before the phase-out of these government incentives may be able to expand its customer base more effectively, which could place the Company at a competitive disadvantage.

According to a *Wall Street Journal* article published on September 26, 2019 which cited data from the Center for Strategic and International Studies, a U.S. think tank, in 2018, China spent US$58 billion on direct and indirect subsidies on new-energy vehicles, but in July 2019, the Chinese government drastically reduced subsidies on new-energy vehicles and will discontinue them in 2020. In addition, as the Chinese economy has experienced a slowdown, Chinese general vehicle sales witnessed its first decline in decades, a 3% decrease in 2018, followed by another 11% decline in the first eight months of 2019. The removal of government subsidies in China has already impacted consumer behaviors as well as sales of electric vehicles in China. For example, electric vehicles sales of China's largest seller of EVs, BYD Co., declined 23% in August 2019. The example shows that government subsidies will be critical to electric vehicle sales, and removal of such subsidies may materially and adversely affect the prospects, financial condition and results of operations of electric vehicle manufactures, including the Company.

***The construction and operation of the Company's manufacturing facilities in the United States and China subject to regulatory approvals and permits and may be subject to delays, cost overruns or may not produce expected benefits.***

The Company is developing its own manufacturing facilities in Hanford, California and, may develop its manufacturing facility with its partner The9, in China, which is expected to be ready for production in 2020 and 2022, respectively. Construction projects are subject to broad and strict government supervision and approval procedures, including but not limited to project approvals and filings, construction land and project planning approvals, environment protection approvals, pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities. Failure to obtain the relevant approvals or permits may subject the Company to penalties, fines or correction actions. In addition, the Company will need significant additional capital to fully build out these manufacturing facilities, which is subject to risks, including risks associated with the Company's ability to raise funds, investor confidence in the Company's future prospects, economics conditions. Any failure to complete these projects on schedule and within budget could adversely impact the Company's launch of the FF 91 and other vehicles and production capacity, which will in turn adversely and materially affect is business, financial condition, and results of operations.

***The FF 91 and other electric vehicles may not meet the expectations of customers.***

The Company's electric vehicles, including the FF 91, may, upon its delivery, not perform in line with customers' expectations. For example, the electric vehicles of the Company may not have the durability or longevity of other vehicles in the market, and may not be as easy and convenient to repair as other vehicles in the market. Any product defects or any other failure of these vehicles to perform as expected could harm the Company's reputation

and result in adverse publicity, lost revenue, delivery delays, product recalls, product liability claims, and significant warranty and other expenses, and could have a material adverse impact on the Company's business, financial condition, operating results and prospects.

In addition, the range of the Company's electric vehicles on a single charge depends on the function used, time and charging patterns as well as other factors. For example, a customer's use of his or her electric vehicle as well as the frequency with which he or she charges the battery can result in additional deterioration of the battery's life and functionality.

Furthermore, the electric vehicles may contain defects in design and manufacture that may cause them not to perform as expected or that may require repairs. The Company has limited data regarding the long-term performance of its systems and vehicles before mass production. There can be no assurance that the Company will be able to detect and fix any defects in the vehicles prior to their delivery to consumers. If any of the Company's vehicles fails to perform as expected, the Company may need to delay deliveries, initiate product recalls and provide servicing or updates under warranty at its own costs, which could adversely affect the Company's brand and could adversely affect its business, prospects and results of operations, and thus the value of the Trust Interests.

***The Company is significantly dependent on its suppliers, many of whom are the Company's single source for the components they supply.***

The FF 91 model incorporates over 2,000 purchased parts sourced from over 400 suppliers, many of whom are currently the Company's single source suppliers for the components they supply, and the Company expects it to be similar for any other vehicle the Company may produce. The supply chain exposes the Company to multiple potential sources of delivery failure or component shortages. Currently, the Company has not identified alternative sources for most of the single sourced components used in the FF 91. Generally, the Company does not maintain long-term agreements with these single source suppliers. For example, the Company's battery cell supplier helped develop the Company's customized battery cell, and is the sole source of the Company's battery cell used in its battery pack.

Historically, certain suppliers ceased supplying their components and initiated arbitration proceedings against the Company when the Company failed to make overdue payments, most of which have been settled through the Vendor Trust. As of the date of this Offering Memorandum, litigation proceedings with five vendors remain pending. For more information on the risks regarding the Vendor Trust and disputes with the Company's suppliers, see the discussion under the headings "The secured Vendor Trust program established by the Company may not fully resolve the disputes with its contractors and suppliers," and "The Company is subject to litigation risk which could adversely affect its reputation, business, financial condition and results of operations." Any disruption in the supply of components, whether or not from a single source supplier, could temporarily disrupt the Company's production until a satisfactory alternative supplier is found, which can be time-consuming and costly. There can be no assurance that the Company would be able to successfully retain alternative suppliers or supplies in a timely manner or on acceptable terms, if at all. Changes in business conditions, force majeure events, changes in regulatory framework and other factors beyond the Company's control could also affect the suppliers' ability to deliver components in a timely manner. Any of the foregoing could materially and adversely affect the Company's results of operations, financial condition and prospects.

***The Company's proprietary intellectual property may not be effectively protected despite its efforts.***

The Company has invested significant resources to develop its proprietary intellectual property. Failure to maintain or protect these rights could harm its business. As of July 31, 2019, the Company had more than 425 issued patents across components, technology and processes, and 975 pending patent applications pending in the United States, China and other jurisdictions. For the pending applications, there is no assurance that the Company will be granted patents pursuant to its applications. Even if such patent applications succeed and these patents are granted, it is still uncertain whether these patents will be contested, circumvented or invalidated in the future.

In addition, the rights granted under any issued patents may not provide the Company with meaningful protection or competitive advantages. The claims under any patents that issue from the Company's patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve

results similar to the Company's. It is also possible that the intellectual property rights of others could bar the Company from licensing and exploiting any patents that issue from the Company's pending applications. Numerous patents and pending patent applications owned by others exist in the fields in which the Company has developed and is developing its technology. These patents and patent applications might have priority over the Company's patent applications and could subject its patent applications to invalidation. Finally, in addition to those who may claim priority, any of the Company's existing or pending patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable. There is also no guaranty that the Company will be able to renew its patents upon expiration.

Furthermore, protection of Company's intellectual property rights in the different jurisdictions in which the Company operates may vary in their effectiveness. For example, implementation and enforcement of PRC intellectual property-related laws was historically deemed deficient and ineffective. Despite the Company's efforts to protect its proprietary rights, third parties may still attempt to copy or otherwise obtain and use the Company's intellectual property or seek court declarations that such third parties' intellectual property does not infringe upon the Company's intellectual property rights.

***The Company is subject to litigation risk which could adversely affect its reputation, business, financial condition and results of operations.***

The Company has been involved in claims and lawsuits in the ordinary course of its business, including litigation with its contractors and suppliers over the Company's past due payment. The Company has been making efforts to settle disputes with its suppliers and contractors with respect to such past due amounts. Such efforts included establishing a vendor trust secured by the Company's assets in April 2019. If the Company continues to encounter liquidity problems or if its liquidity problems worsen, the Company may face additional lawsuits with its suppliers and contractors, which could materially and adversely affect its reputation and business.

In addition, the Company is subject to litigation risks from third parties alleging infringement of their intellectual property, which could be time-consuming and costly, regardless of whether the claims have merit. Individuals, organizations and companies, including the Company's competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with the Company's ability to make, use, develop, sell or market its vehicles or components, and may bring claims alleging the Company's infringement of such rights. If the Company is found to have infringed upon a third party's intellectual property rights, not only may it be required to pay substantial damages, but it may also be required to cease sales of its vehicles, incorporate certain components into, or using vehicles or offering goods or services that incorporate or use the challenged intellectual property, seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms or at all, redesign the vehicles or other goods or services, establish and maintain alternative branding for the products and services, or alter its business strategy.

Furthermore, as protection of the Company's intellectual property rights is critical to the Company's success, the Company may need to resort to litigation to enforce its intellectual property rights if its rights are infringed, which could result in substantial costs and diversion of the Company's resources.

Regardless of whether the results of the legal or administrative proceedings are favorable to the Company, it could still result in substantial costs, negative publicity and diversion of resources and management attention, which could materially affect the Company's business, prospects, operating results and financial condition.

***The Company's vehicles are subject to motor vehicle standards, and the failure to satisfy such mandated safety standards would have a material adverse effect on its business and operating results.***

Motor vehicles are subject to substantial regulation under international, federal, state and local laws. Vehicles produced by the Company will be required to comply with the applicable product standards and regulations in its targeted markets. For example, the Company's vehicles in the U.S. will be subject to numerous regulatory requirements established by the NHTSA, including all applicable FMVSS. In addition, Company's vehicles sold in China must pass various tests and undergo a certification process and be affixed with the China Compulsory Certification, or the CCC, before delivery from the factory and sales, and such certification is also subject to periodic renewal.

The Company may incur significant costs in complying with these regulations and may be required to incur additional costs to comply with any changes to such regulations, and any failures to comply could result in significant expenses, delays or fines. The Company may also fail to obtain or renew the required certification for its vehicles, which may prevent the Company from delivering, selling or importing its vehicles, and therefore materially and adversely affect the Company's results of operations, financial condition and future prospects.

***The Company has granted, and may continue to grant options and other types of awards under its share incentive plan, which may result in increased share-based compensation expenses and dilute the value of your Trust Interests.***

The Company has reserved approximately 27.2% of its total share capital on a fully diluted basis for issuance of options and other types of awards under its share incentive plan. As of September 26, 2019, options to purchase an aggregate of 34,129,939 Class A ordinary shares of the Company had been granted and outstanding.

The Company believes the granting of share-based awards is of significant importance to its ability to attract and retain key management as well as experienced and qualified personnel, and it will continue to grant share-based compensation to employees in the future. As a result, the expenses associated with share-based compensation may increase, which may have an adverse effect on the Company's results of operations. In addition, grant of share-based compensation will dilute the ownership interest of its stockholders, and therefore indirectly affect the value of the Trust Interest held by you.

Furthermore, prospective candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. Thus, the Company's ability to attract or retain highly skilled employees may be adversely affected if the perceived value of the Company's equity or equity awards declined. Furthermore, there are no assurances that the number of shares reserved for issuance under the Company's share incentive plans will be sufficient to grant equity awards adequate to recruit new employees and to compensate existing employees.

***The Company's vehicles make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame.***

The Company partnered with a leading supplier in the development of customized lithium-ion battery cells. On rare occasions, lithium-ion cells can rapidly release the energy they store by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the Company has designed the battery management system in the battery pack to be actively and continuously monitoring all battery modules over the current, voltage and temperature conditions of the battery pack to prevent such incidents, a field or testing failure of its vehicles or other battery packs could occur, which could subject the Company to product liability claims, product recalls, or redesign efforts, and lead to negative publicity. Moreover, any failure of a competitor's electric vehicle or energy storage product may cause indirect adverse publicity for the Company and its products.

In addition, the Company will need to store a significant number of lithium-ion cells at its facilities. Any mishandling of battery cells may cause disruption to business operations and cause damage and injuries.

Any of the foregoing may materially and adversely affect the Company's results of operations, financial condition and prospects, and thus the value of the Trust Interests.

***The Company will depend on revenue generated from a single model of vehicles in the foreseeable future.***

The Company's business will initially depend substantially on the sales and success of the FF 91, which will, once successfully produced, be the Company's only volume-manufactured vehicle in the market in the foreseeable future. Historically, automobile customers have come to expect a variety of vehicle models offered in a manufacturer's fleet and that new and improved vehicle models would be introduced frequently. Although the Company has been planning its second model, the FF 81, it remains uncertain when the Company will have sufficient funds to complete the development, launch and production of the FF 81. Given that the Company's business will depend on the FF 91 for the foreseeable future, if the FF 91, once produced, is not well-received by the

market, the Company's business, prospects, financial condition and operating results could be materially and adversely affected.

***If the owners of the Company's vehicle customize it with aftermarket products, the vehicle may not operate properly, which may create negative publicity and could harm the Company's business.***

Automobile enthusiasts may seek to "hack" the Company's vehicles to modify their performance, which could compromise vehicle safety systems. The customers may also customize their vehicles after purchase with aftermarket products, which may compromise vehicle safety systems. Such modifications are out of the Company's control, and any unauthorized modifications could compromise the safety of the vehicles and cause injuries, which could result in adverse publicity, and negatively affect the Company's brand, reputation, business and operating results.

***If the Company fails to protect customer data and privacy, or fails to comply with various privacy and consumer protection laws to which the Company is subject, its reputation, financial condition and results of operations will be materially and adversely affected.***

The Company depends on information technology networks and systems to securely process, transmit and store electronic information. Any unauthorized disclosure of sensitive or confidential customer data, whether through cyber-attacks, system failure, employee negligence, fraud or misappropriation, could damage the Company's reputation and its business.

In addition, the failure by the Company to comply with federal, state or international privacy, data protection or security laws or regulations could result in regulatory or litigation-related actions against the Company, legal liability, fines, damages and other costs. Substantial expenses and operational changes may be required in connection with maintaining compliance with such laws, and in particular certain emerging privacy laws are still subject to a high degree of uncertainty as to their interpretation and application. For instance, the Cyber Security Law of the PRC, which was promulgated by the Standing Committee of the National People's Congress, or the SCNPC and became effective on June 1, 2017, requires that operators of key information infrastructures, which include, among others, public communications and information services and other important industries and fields, store, within the territory of China, personal information and important data gathered and produced during operations in China. Where such information and data need to be transmitted overseas based on commercial demand, a security assessment is required to be conducted in accordance with the measures formulated by the national cyberspace administration authority in concert with the relevant departments under the State Council. However, there are no detailed measures published on how such security assessments are to be conducted.

Although the Company has adopted security policies and measures, including encryption technology, to protect its proprietary data and customer's privacy, it may be required to expend significant resources to comply with data breach requirements if third parties improperly obtain and use the personal information of its customers or the Company otherwise experiences a data loss with respect to its customers' personal information. A major breach of the Company's network security and systems could have negative consequences for its business and future prospects, including possible fines, penalties and damages, reduced customer demand for its vehicles and harm to its reputation and brand.

***The Company may be subject to risks associated with autonomous driving technology.***

The FF 91 is designed with autonomous driving functionalities and the Company plans to continue its research and development efforts ("R&D") in autonomous driving technology. However, autonomous driving technologies are subject to risks and from time to time there have been accidents associated with such technologies. For example, in March 2018, Tesla indicated that its autopilot system was engaged at the time of a fatal accident and an Uber Technologies Inc. self-driving vehicle struck a pedestrian leading to a fatality. The safety of such technologies depends in part on user interaction and users may not be accustomed to using such technologies. To the extent accidents associated with the Company's autonomous driving systems occur, the Company could be subject to liability, government scrutiny and further regulation. Any of the foregoing could materially and adversely affect the Company's results of operations, financial condition and future prospects.

***The Company may become subject to product liability claims, which could harm its financial condition and liquidity if it is not able to successfully defend or insure against such claims.***

The Company may become subject to product liability claims, which could harm its business, prospects, operating results and financial condition. The automotive industry experiences significant product liability claims and the Company faces the inherent risk of exposure to claims in the event its vehicles do not perform as expected or experience a malfunction that results in property damage, personal injury or death. A successful product liability claim against the Company could result in a substantial monetary award while generating significant negative publicity. The Company's insurance coverage might not be sufficient to cover all potential product liability claims.

***The Company may be compelled to undertake vehicle recalls or take other actions, which could adversely affect its brand and financial condition.***

If the Company's vehicles are subject to recalls in the future, it may be subject to adverse publicity, damage to the brand and liability. The Company might from time to time, voluntarily or involuntarily, initiate vehicle recalls if any of its vehicles, including any systems or parts sourced from suppliers and contractors, prove to be defective or noncompliant with applicable laws and regulations. Such recalls, whether voluntary or involuntary or caused by systems or components engineered or manufactured by the Company or the suppliers and contractors, could require that the Company incur significant costs and could adversely affect the Company's brand, as well as its business, prospects, financial condition and results of operations and thus the value of the Trust Interests.

***The Company might not obtain and maintain sufficient insurance coverage, which could expose us to significant costs and business disruption.***

The Company may only obtain and maintain a limited liability insurance coverage for its products and business operations. A successful liability claim against the Company due to injuries suffered by the users of Company's vehicles or services could materially and adversely affect its financial condition, results of operations and reputation. In addition, the Company does not have any business disruption insurance. Any business disruption event could result in substantial cost and diversion of resources.

***Any financial or economic crisis, or perceived threat of such a crisis, including a significant decrease in consumer confidence, may materially and adversely affect the Company's business, financial condition and results of operations.***

The global financial markets experienced significant disruptions in 2008 and the United States, European and other economies went into recession. The recovery from the lows of 2008 and 2009 was uneven and the global financial markets are facing new challenges, including the escalation of the European sovereign debt crisis since 2011, the hostilities in the Ukraine and the economic slowdown in the Eurozone in 2014. It is unclear whether these challenges will be contained and what effects they each may have. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies that have been adopted by the central banks and financial authorities of some of the world's leading economies. Any prolonged slowdown in economic development might lead to tighter credit markets, increased market volatility, sudden drops in business and consumer confidence and dramatic changes in business and consumer behaviors.

Sales of high-end and luxury consumer products, such as the FF 91 and other electric vehicles of the Company, depend in part on discretionary consumer spending and are exposed to adverse changes in general economic conditions. In response to their perceived uncertainty in economic conditions, consumers might delay, reduce or cancel purchases of such electric vehicles and the Company results of operations may be materially and adversely affected.

***The Company faces risks related to natural disasters, health epidemics, terrorist attacks and other outbreaks, which could significantly disrupt our operations.***

The occurrence, especially in the regions and cities where the Company has business, of unforeseen or catastrophic events, including the emergence of a pandemic or other widespread health emergency, terrorist attacks

or natural disasters, could create economic and financial disruptions, lead to operational difficulties that could impair the Company's ability to manage its businesses, and expose its business activities to significant losses. The Company's management and other teams are based in the United States and China. The Company has a manufacturing facility in Hanford California, and may establish manufacturing facility in Zhejiang, China for certain future vehicle models. An unforeseen or catastrophic event in any of the regions mentioned above could adversely impact the Company's operations.

<u>**Risks Related to the Trust Interests**</u>

***The value of the Trust Interests you are entitled to may not fully satisfy the Debt Claims you released.***

The Trust Assets consist of all of YT's economic interest in the Company. The rest of the Company interests are owned by Season Smart, an affiliate of Evergrande, the management who participate in the Partnership Program, and the option holders and the Class A ordinary shareholders under the Company's equity incentive plan. Various factors, including but not limited to, market and economic conditions, the Company's business, operations, future prospects and financial conditions, the liquidity of the Trust Interests may affect the value of the Trust Interests you will receive, either upon transfer of the Trust Interests or upon disposition of the Trust Assets. There is no guarantee that the value of the Trust Interests you will receive will fully satisfy, or will not be substantially less than, the Debt Claim you released in exchange for your Trust Interests.

***The economic interest you may have in the Company through your ownership of Trust Interests will entitle you to claims on the Company that are subordinated to all creditors of the Company.***

Your Trust Interests will entitle you to indirect economic interests in the Company that are similar to the economic interests enjoyed by the Company's shareholders. As such, if the Company files for bankruptcy or is liquidated, or undergoes similar restructuring proceeding, creditors of the Company, including unsecured trade creditors, and any holders of preferred shares of the Company who have priority over the shares that the Trust holds, would have priority of payment over your claims as a holder of the Trust Interests. As of July 31, 2019, the indebtedness of the Company amounted to US$734 million, and such indebtedness is expected to continue to increase in the foreseeable future. As a result, there is no guaranty that the value of the Trust Interests you will receive will fully satisfy, or will not be substantially less than, the Claims you released in exchange for your Trust Interests.

***If you are a PRC resident, you may have to complete the foreign exchange registration with the SAFE in order to receive any payments distributed by the Trustee for your Trust Interests, failure of which may expose you to liability and penalties under PRC law.***

Pursuant to the SAFE Circular 37, PRC residents or entities are required to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes certain material events. PRC residents are PRC individuals, institutions and foreign individuals who have a habitual residence in the PRC due to economic interests.

As the Trust is located in the U.S., the Trust Assets consist of shares and economic interests of entities outside China, and payments from the disposition of or distribution related to the Trust Assets will be made in U.S. dollars, a PRC resident's holding of the Trust Interests may be deemed to be an overseas investment under the SAFE Circular 37. If you are deemed a PRC resident, you may have to complete the foreign exchange registration with your local SAFE branch and will need to update such registration if there is any material change to your controlled offshore special purpose vehicle holding the Trust Interests. Failure to do so may result in penalties and liability under PRC laws for evasion of applicable foreign exchange restrictions.

***There is no public market, and a trading market may not develop, for the Trust Interests, which could adversely affect the value and liquidity of the Trust Interests.***

The Trust Interests have not been, and will not be registered with the U.S. Securities and Exchange Commission or any state securities agency, and there is no existing market for the Trust Interests. Federal and state securities laws therefore restrict the sale or other transfer of the Trust Interests. If the Trust Interests are permitted to be traded under federal and state securities laws after their initial issuance, they may trade at a discount from their fair market value.

The Trust Interests will not be listed on any securities exchange or quoted on any automated dealer quotation system. A market may not develop for the Trust Interests and if a market does develop, it may not be sufficiently liquid for holders of the Trust Interests. If an active, liquid market does not develop for the Trust Interests, the market price and liquidity of the Trust Interests may be adversely affected.

The liquidity of the trading markets, if any, and future trading prices of the Trust Interests will depend on many factors, including, among other things, prevailing interest rates, the Company's operating results, financial performance and prospects, the market for similar securities and the overall securities markets, and may be adversely affected by unfavorable changes in any of these factors. Historically, the markets for equity securities of non-public companies such as the Company have been subject to disruptions that have caused substantial volatility in the prices of securities similar to the Trust Interests. The market for the Trust Interests may be subject to disruptions that could adversely affect the value of the Trust Interests regardless of the Company's operating results, financial performance or prospects. Any such disruptions may adversely affect the value of the Trust Interests.

***You will be subject to significant restrictions on the transfer of your Trust Interests under the Trust Agreement.***

Your ability to transfer your Trust Interests will be subject to significant restrictions under the Trust Agreement. Among other restrictions, a holder may not transfer its Trust Interests if such transfer could cause the Trust to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or if, in the opinion of legal counsel to the Trust, the Trust could be treated as an association or publicly-traded partnership taxable as a corporation within the meaning of Section 7704 of the Internal Revenue Code. This and other restrictions on transfer may prevent you from transferring your Trust Interests, see the Trust Agreement Term Sheet, a copy of which is attached as <u>Exhibit A</u> to this Offering Memorandum.

***The distribution of the Trust Assets may be delayed.***

The Trust has an initial term of six (6) years, which may be extended under certain circumstances up to an additional three (3) years. For example, the Creditor Trust Committee, composed of certain creditors and acting by the vote of a majority, may request to extend the initial term of the Trust. In addition, YT may also request to extend the initial term if the initial public offering of the Company's shares on New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange or other internationally recognized stock exchange has been completed within the initial term. The Trust will be dissolved upon the expiration of the initial period or extended period, as applicable, upon which the Trust Assets will be distributed to you based on the Trust Interests you hold. However, the Trustee may delay or defer the distribution of any proceeds received in respect of the Trust Assets if the Trustee determines that such deferral or delay is in the best interests of the holders of Trust Interests, including, among others, if the Trust or the Trust Assets are bound by an injunction, freeze order, judgement or similar order or proceeding affecting such distribution. Accordingly, the timing you will receive the distribution of the Trust Assets may be subject to change and may be delayed.

## Risks Related to the Industry

***The automotive market is highly competitive and subject to disruption. The Company may not be successful in competing in this industry.***

The automotive market in the United States and China is and will remain highly competitive. Many established and new automobile manufacturers such as Audi, BMW, Daimler, General Motors, Toyota and Volvo, as well as other companies, have entered or are reported to have plans to enter the alternative fuel vehicle market, including hybrid, plug-in hybrid and fully electric vehicles, as well as the market for self-driving technology and applications. By the time the Company has started delivering the FF 91, a substantial portion of the market share

might have already been taken by the major players. Many of the Company's current and potential competitors, particularly international competitors, have significantly greater financial, technical, manufacturing, marketing and other resources than the Company does and are able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products than the Company can.

In addition, automobile customers have historically expected car manufacturers to periodically introduce new and improved vehicle models. In order to meet these expectations, the Company may be required to introduce new vehicle models and enhance versions of then existing vehicle models in order to compete effectively. As of today, the Company has not produced its initial vehicle model and has limited experience in designing, testing and manufacturing electric vehicles.

Furthermore, there can be no assurance that the Company will be able to compete successfully in global and local markets. If the Company's competitors introduce new cars or services that surpass the quality or performance of the Company's vehicles at more competitive prices, the Company may be forced to attract customers at prices lower than planned which may not generate attractive rates of returns. Moreover, if the Company fails to capture evolving trends poised to disrupt the automotive market, it may not be able to compete successfully. For example, according to BNEF Report, global shared mobility fleet (*i.e.*, ride-hailing and car-sharing) will contribute to 19% of the total kilometers traveled by passenger vehicles by 2040. As vehicle consumers are moving to rely on shared mobility fleets and view transport as a service, the demand for individual-owned vehicles will likely decrease. In addition, consumers may move to transport-as-a-service ("TaaS"), a business model which will allow passengers to be served by on-demand autonomous vehicles owned by fleets in the future, as opposed to purchasing and owning the vehicle. If the Company's competitors are leaders in the development of autonomous driving technology, move to build up their respective TaaS fleets ahead of the Company, have the advantage of speed to market and capture the relevant market share, the Company may not be able to meet consumer demands and/or to compete successfully, which could materially and adversely affect its business, financial condition and results of operations.

***The electric vehicle industry and its technology are rapidly evolving. Developments in alternative technologies or improvements in the internal combustion engine may significantly reduce the demand for the Company's, or all, electric vehicles.***

The electric vehicle market is rapidly evolving and may not develop as the Company anticipates. The regulatory framework governing the industry is currently uncertain and may remain uncertain in the foreseeable future. In order to adapt to the developments in this market and the relevant technologies, the Company may need to modify its business model or change its services and solutions from time to time. These changes may not achieve expected results, which could have a material adverse effect on the Company's results of operations and prospects. Furthermore, the Company may be unable to keep up with changes in electric vehicle technology. Even if the Company is able to keep pace with changes in technology and develop new models, the vehicle models it may have launched before such technology changes could become obsolete more quickly than expected, which will reduce the Company's return on investment.

More importantly, developments in alternative technologies, such as advanced diesel, ethanol, fuel cells or compressed natural gas, or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect the electric vehicle industry as a whole, causing significant decrease in the total demand.

***The Company's development and future growth is dependent upon the demand for, and consumers' willingness to adopt, electric vehicles.***

Demand for electric vehicles may be affected by factors directly impacting automobile price or the cost of purchasing and operating automobiles such as sales and financing incentives, prices of raw materials, parts and components, cost of fuel and governmental regulations, including tariffs, import regulation and other taxes. Volatility in demand may lead to lower vehicle unit sales, which may result in further downward price pressure and adversely affect the Company's business, prospects, financial condition and operating results.

Other factors that may influence the adoption of alternative fuel vehicles, and specifically electric vehicles, include:

- perceptions about electric vehicle quality, safety, design, performance and cost, especially if adverse events or accidents occur that are linked to the quality or safety of electric vehicles, whether or not such vehicles are produced by us or other manufacturers;

- perceptions about vehicle safety in general, in particular safety issues that may be attributed to the use of advanced technology, including electric vehicle and regenerative braking systems;

- the limited range over which electric vehicles may be driven on a single battery charge and the speed at which batteries can be recharged;

- the decline of an electric vehicle's range resulting from deterioration over time in the battery's ability to hold a charge;

- concerns about electric grid capacity and reliability;

- the availability of new energy vehicles, including plug-in hybrid electric vehicles;

- improvements in the fuel economy of the internal combustion engine;

- the availability of service for electric vehicles;

- the environmental consciousness of consumers;

- access to charging stations, standardization of electric vehicle charging systems and consumers' perceptions about convenience and cost to charge an electric vehicle;

- the availability of tax and other governmental incentives to purchase and operate electric vehicles or future regulation requiring increased use of nonpolluting vehicles;

- perceptions about and the actual cost of alternative fuel; and

- macroeconomic factors.

Any of the factors described above may cause current or potential customers not to purchase electric vehicles from us or other manufactures. If customers are not willing to adopt electric vehicles in general, the market will not develop as the Company anticipates and its business, prospects, financial condition and operating results will be affected.

### Risks Related to the Company's Corporate Structure

***If the agreements that establish the structure for operating the Company's business in China are found not to be in compliance with the relevant PRC regulations, or if these regulations change in the future, the Company could be subject to severe penalties or be forced to relinquish its interests in those operations.***

The Company controls its operating entities in China through a set of contractual arrangements entered into among its WFOE, FF Automotive (China) Co., Ltd., its VIE and VIE's shareholders. These contractual arrangements, including equity pledge agreement, call option agreement, powers of attorney, certain exclusive operational service agreement and spousal consents, enable the Company to (i) exercise effective control over its VIE, and (ii) receive substantially all of the economic benefits of such VIE. As a result of these contractual arrangements, the Company has control over and is the primary beneficiary of such VIE and hence consolidates the VIE's financial results into its consolidated financial statements. See "The Company—Corporate History and Milestones" for further details.

Although similar VIE arrangements are commonly adopted in China, there are substantial uncertainties regarding the interpretation and application of the existing and future PRC laws, regulations and rules. In addition, it is uncertain whether any new PRC laws or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide. If the Company's ownership structure of its VIE, the VIE contractual arrangements and the Company's business of its PRC subsidiaries or variable interest entities are found to be in violation of any existing or future PRC laws or regulations, or the Company's PRC subsidiaries or VIE fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including:

- discontinuing or placing restrictions or onerous conditions on the Company's activities through any transactions between its WFOE and its VIE;

- imposing fines, confiscating the income from the WFOE or the VIE, or imposing other requirements with which the Company or its VIE may not be able to comply;

- requiring the Company to restructure its ownership structure or activities, including terminating the contractual arrangements with its VIE and deregistering the equity pledges of such VIE, which in turn would affect the Company's ability to consolidate, derive economic benefits from, or exert effective control over its VIE; or

- restricting or prohibiting the Company's use of funding to finance its business and activities in China.

The imposition of any of these penalties would result in a material and adverse effect on the Company's ability to conduct its business in China. If the Company loses its right to direct the activities of and receives economic benefits from its VIE due to any of these actions and the Company is not able to restructure its ownership structure and operations in China in a satisfactory manner, the Company's business operations in China may be significantly disrupted, which could materially and adversely affect the Company's business, financial condition and results of operations.

***The Company relies on contractual arrangements with its VIE and the VIE's shareholders to exercise control over its business in China which may not be as effective as direct ownership in providing operational control.***

The Company relies on contractual arrangements with its VIE and the VIE's shareholders to conduct its operations in China. These contractual arrangements may not be as effective as direct ownership in providing the Company with control over its VIE. For example, the VIE and its shareholders could breach their contractual arrangements with the Company by, among other things, failing to conduct their operations in an acceptable manner or taking other actions that are detrimental to the Company's interests.

If the Company had direct ownership of the VIE, the Company would be able to exercise rights as a shareholder to effect changes in the board of directors of the VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, with the current VIE structure, the Company relies on the performance by the VIE and the VIE's shareholders of their obligations under the contractual arrangements to exercise control over the VIE. The shareholders of the consolidated VIE may not act in the best interests of the Company or may not perform their obligations under these contractual arrangements. Such risks exist throughout the period during which the Company intends to operate its business in China through the contractual arrangements with the VIE. In order to enforce such arrangements, the Company may have to incur substantial costs and expend additional resources. In addition, as all of the Company's VIE contractual agreements are governed by PRC law and provide for the resolution of disputes through an arbitration in China, if any disputes relating to these contracts remain unresolved, the Company may have to enforce its rights under these contracts through the operations of PRC law and arbitration, litigation and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. If the Company is unable to effectively enforce these contractual arrangements, or if it suffers significant delay or face other obstacles in the process of enforcing these contractual arrangements, it may not be able to exert effective control over its variable interest entities, and the Company's ability to conduct its business in China may be negatively affected.

***The PRC regulations of loans and direct investment by offshore holding companies to PRC entities may delay or prevent the Company from using proceeds it receives from financing activities to make loans or additional capital contributions to its PRC subsidiaries.***

In 2015, the SAFE published the *Circular of the State Administration of Foreign Exchange on Reforming the Management Approach regarding the Settlement of Foreign Exchange Capital of Foreign-invested Enterprises*, or the SAFE Circular 19, which has come into effect since June 1, 2015. According to the SAFE Circular 19, foreign-invested enterprises are allowed to convert their registered capital from foreign exchange to Renminbi and apply such funds to equity investment within the PRC, conditioned upon the investment target's duly registration with local banks of such reinvestment and opening of a corresponding special account pending for foreign exchange settlement payment. Further, such conversion will be handled at the bank level and no approval by the SAFE is required. The SAFE Circular 19 prohibits foreign-invested enterprises from, among other things, using an Renminbi fund converted from its foreign exchange capital for expenditure beyond its business scope, investment in securities, providing entrusted loans, repaying loans between nonfinancial enterprises or purchasing real estate not for self-use. The SAFE promulgated the *Circular on Reforming and Standardizing the Foreign Exchange Settlement Management Policy of Capital Account*, or the SAFE Circular 16, effective on June 9, 2016, which reiterates some of the rules set forth in the SAFE Circular 19, but changes the prohibition against using Renminbi capital converted from foreign currency-denominated registered capital of a foreign-invested enterprise to issue Renminbi entrusted loans, to the prohibition against using such capital to issue loans to non-associated enterprises.

If the Company fails to comply with such regulations, its ability to capitalize the relevant PRC subsidiaries or fund their operations may be negatively affected, which could materially and adversely affect the liquidity of the relevant PRC subsidiaries or the Company's business, financial condition, results of operations and growth prospects.

***The shareholders of the VIE may have potential conflicts of interest with the Company, which may materially and adversely affect its business.***

The shareholders of the VIE may have potential conflicts of interest with the Company. These shareholders may breach, or cause the VIE to breach, or refuse to renew, the existing contractual arrangements the Company has with them and the VIE, which would have a material and adverse effect on the Company's ability to effectively control the VIE and receive economic benefits from them. For example, the shareholders may be able to cause the Company's agreements with the VIE to be performed in a manner adverse to the Company by, among other things, failing to remit payments due under the contractual arrangements to the Company in a timely manner. There is no assurance that any or all of these shareholders will act in the best interests of the Company or such conflicts will be resolved in the Company's favor. Currently, the Company does not have any arrangements to address potential conflicts of interest between these shareholders and the Company. If the Company cannot resolve any conflict of interest or dispute between the Company and these shareholders, it would have to rely on legal proceedings, which could result in disruption of the business and subject the Company to substantial uncertainties as to the outcome of any such legal proceedings.

***Contractual arrangements in relation to the VIE may be subject to scrutiny by the PRC tax authorities who may determine that the Company or the VIE owes additional taxes, which could negatively affect the Company's financial condition and the value of the Trust Interests.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. The Company could face material and adverse tax consequences if the PRC tax authorities determine that the VIE contractual arrangements were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust the income of the VIE in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by the VIE for PRC tax purposes, which could in turn increase their tax liabilities without reducing the WFOE's tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on the VIE for the adjusted but unpaid taxes according to the applicable regulations. The Company's financial position could be materially and adversely affected if the VIE's tax liabilities increase or if it is required to pay late payment fees and other penalties.

***The Company may lose the ability to use and enjoy assets held by the VIE that are material to the operation of the Company's business in China if the VIE goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

The VIE and their subsidiaries hold, and may in the future hold, certain assets that are material to the operation of the Company's business in China. Under the equity pledge agreement, without the Company's prior consent, the VIE's shareholders may not transfer its equity interests, create or permit the existence of any security interests or other encumbrance on its equity interests that may affect the Company's rights and interests, except for the performance of the call option agreement. However, if the VIE goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, the Company may be unable to continue some or all of its operations in China, which could materially and adversely affect its business, financial condition and results of operations. If the VIE undergoes a voluntary or involuntary liquidation proceeding, independent third-party creditors may claim rights to some or all of these assets, thereby hindering the Company's operations in China, which could materially and adversely affect its business and results of operations.

### Risks Related to the Company's Operations in China

***Changes in international trade policies, barriers to trade or the emergence of a trade war may dampen growth in China, the United States and other markets where the Company operates, and its business operations and results may be negatively impacted.***

The Company has business operations in the United States and China, and partners with international leading suppliers from North America, Europe and Asia, which may subject it to risks associated with international trade conflicts. The United States administration under President Donald J. Trump has advocated for greater restrictions on international trade in general, which has significantly increased tariffs on certain goods imported into the United States, particularly from China. President Trump has also taken steps toward restricting trade in certain goods. In response, China and other countries have similarly imposed tariffs, and may further take other retaliatory measures. The increasing tariff may impact the Company's raw material prices and therefore may have a negative impact on the Company's operations. In addition, the resulting escalation of trade tension may lead to volatility in the financial market, which may affect the Company's ability to raise capital, and could impact the purchasing power of the Company's potential customers.  Such changes could have an adverse effect on the Company's business, financial condition and results of operations.

***Changes in China's economic, political or social conditions or government policies could have a material and adverse effect on the Company's business and results of operations.***

A portion of the Company's future revenues are expected to be derived in China, and the Company has formed a joint venture with The9 to manufacture certain multi-purpose vehicles and conduct other activities in China. Accordingly, the Company's results of operations, financial condition and prospects would, to a certain extent, be influenced by economic, political and legal developments in China. China's economy differs from the economies of most developed countries in many aspects, including, but not limited to, the degree of government involvement, control level of corruption, control of capital investment, reinvestment control of foreign exchange, allocation of resources, growth rate and development level. For approximately three decades, the PRC government has implemented economic reform measures to utilize market forces in the development of the PRC economy. It is unclear whether and how the Company's current or future business, financial condition or results of operations may be affected by changes in China's economic, political and social conditions and in its laws, regulations and policies. In addition, many of the economic reforms carried out by the PRC government are unprecedented or experimental and are expected to be refined and improved over time. This refining and improving process may not necessarily have a positive effect on the Company's operations and business development.

***The legal system in China is not fully developed and there are inherent uncertainties that may affect the protection afforded to the Company.***

The Company's business and activities in China are governed by the PRC laws and regulations. The PRC legal system is generally based on written statutes. Prior court decisions may be cited for reference but have limited precedential value. Since 1979, the PRC legislation and regulations have significantly enhanced the protections

afforded to various industries in China. However, as these laws and regulations are relatively new and continue to evolve, interpretation and enforcement of these laws and regulations involve significant uncertainties and different degrees of inconsistency. Some of the laws and regulations are still in the developmental stage and are therefore subject to policy changes. Many laws, regulations, policies and legal requirements have only been recently adopted by the PRC central or local government agencies, and their implementation, interpretation and enforcement may involve uncertainty due to the lack of established practice available for reference. The effect of future legal developments in China, including the promulgation of new laws, changes in existing laws or their interpretation or enforcement, or the preemption of local regulations by national laws cannot be predicted. As a result, there are substantial uncertainties as to the legal protection available to the Company. Furthermore, due to the limited volume of published cases and the non-binding nature of prior court decisions, the outcome of the dispute resolution may not be as consistent or predictable as in other more developed jurisdictions, which may limit the legal protection available to the Company.

***The Company may be adversely affected by the complexity, uncertainties and changes in the PRC regulations on internet-related as well as automotive businesses and companies.***

The PRC government extensively regulates the internet industry and automotive industry, such laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

Several PRC regulatory authorities, such as the State Administration for Market Regulation, the National Development and Reform Commission, the Ministry of Industry and Information Technology and the Ministry of Commerce, oversee different aspects of the electric vehicle business, and the Company will be required to obtain a wide range of government approvals, licenses, permits and registrations in connection with its operations in China. For example, certain filings must be made by automobile dealers through the information system for the national automobile circulation operated by the relevant commerce department within ninety (90) days after the receipt of a business license. Furthermore, the electric vehicle industry is relatively immature in China, and the PRC government has not adopted a clear regulatory framework to regulate the industry.

There are substantial uncertainties regarding the interpretation and application of the existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet-related as well as automotive businesses and companies. Currently, the Company's VIE holds the necessary license for the Company's operations in China. There is no assurance that the Company will be able to obtain all the permits or licenses related to its business in China, or will be able to maintain its existing licenses or obtain new ones. In the event that the PRC government considers that the Company was or is operating without the proper approvals, licenses or permits, promulgates new laws and regulations that require additional approvals or licenses, or imposes additional restrictions on the operation of any part of its business, the PRC government has the power, among other things, to levy fines, confiscate the Company's income, revoke its business licenses, and require the Company to discontinue the relevant business or impose restrictions on the affected portion of its business. Any of these actions by the PRC government may have a material adverse effect on the Company's business and results of operations.

Considering its business arrangement and development plan, the Company has also set up the VIE structure and intends the VIE or its subsidiary to apply for the necessary government licenses as soon as practicable to conduct the relevant support operations in the near future. However, there is no guarantee that the Company's VIE or its subsidiary, will obtain such licenses due to uncertainties from PRC governmental authorities. The PRC government may enact new laws and regulations that require additional licenses, permits, approvals and/or registrations for the operation of any of the Company's existing or future business om China. As a result. there is no assurance that the Company will, through its VIE or PRC subsidiary, have all the permits, licenses, registrations, approvals and/or business license covering the sufficient scope of business required for its business in China or that it will be able to obtain, maintain or renew permits, licenses, registrations, approvals and/or business license covering sufficient scope of business in a timely manner or at all.

***The Company may be subject to penalties, including restrictions on the Company's ability to inject capital into its PRC subsidiaries, if the PRC resident shareholders or beneficial owners fail to comply with relevant PRC foreign exchange regulations.***

On July 4, 2014, the SAFE issued the *Circular on Several Issues Concerning Foreign Exchange Administration of Domestic Residents Engaging in Overseas Investment, Financing and Round-Trip Investment via Special Purpose Vehicles*, or the SAFE Circular 37. The SAFE Circular 37 requires PRC individuals, institutions and foreign individuals who have a habitual residence in the PRC due to economic interests, or collectively referred as the PRC residents, to register with the SAFE or its local branches in connection with their direct establishment or indirect control of an offshore special purpose vehicle, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests. In addition, such PRC residents must update their foreign exchange registrations with the SAFE when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC residents, name and operation term), increases or decreases in investment amount, share transfers or exchanges, or mergers or divisions. According to the *Circular on Further Simplifying and Improving the Administration of Foreign Exchange Concerning Direct Investment* released on February 13, 2015 by the SAFE, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under the SAFE Circular 37 from June 1, 2015.

If any shareholder holding interest in an offshore special purpose vehicle, who is a PRC resident as determined by the SAFE Circular 37, fails to fulfill the required foreign exchange registration with the local SAFE branches or its designated banks, the offshore special purpose vehicle may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions. The Company has requested all of its current shareholders and/or beneficial owners to disclose whether they or their shareholders or beneficial owners fall within the ambit of the SAFE Circular 37 and urged relevant shareholders, upon learning that they are PRC residents, to register with the local SAFE branch or its designated bank as required under the SAFE Circular 37. However, the Company may not be fully informed of the identities of all the shareholders or beneficial owners who are PRC residents, and it cannot provide any assurance that all of the shareholders and beneficial owners who are PRC residents will comply with the Company's requests to make, obtain or update any applicable registrations or comply with other requirements pursuant to the SAFE Circular 37 or other related rules in a timely manner. Any failure to comply with the relevant requirements could subject the Company's PRC subsidiaries and its shareholders or beneficial owners to penalties, which would limit the Company's ability to contribute additional capital to its PRC subsidiaries and negatively affect the Company's business operation in China.

***The Company may rely on dividends and other distributions on equity paid by its PRC subsidiaries to fund any cash and financing requirements it may have, and any limitation on the ability of the PRC subsidiaries to make payments to the Company could have a material and adverse effect on the Company's ability to conduct its business.***

The Company is a holding company, and may rely on dividends and other distributions on equity paid by the PRC subsidiaries for cash and financing requirements, including the funds necessary to service the Company's debts. Current PRC regulations permit the Company's PRC subsidiaries to pay dividends to the Company only out of their accumulated after-tax profits upon satisfaction of relevant statutory conditions and procedures, if any, determined in accordance with Chinese accounting standards and regulations. In addition, each of these PRC subsidiaries is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of its registered capital. Additionally, if the Company's PRC subsidiaries incur debts on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends or make other distributions to the Company.

Any limitation on the ability of the Company's PRC subsidiaries to pay dividends or make other distributions to the Company could materially and adversely limit its ability to grow, make investments or acquisitions that could be beneficial to the Company, or pay dividends or debts.

***Fluctuations in exchange rates between Renminbi and U.S. dollar could result in currency exchange losses.***

The Company's reporting currency and a substantial portion of its operating costs and expenses are denominated in U.S. dollars, while operating currency in China for the Company's PRC subsidiaries are denominated in Renminbi. Appreciation or depreciation in the value of Renminbi relative to U.S. dollar would affect the Company's financial results reported in U.S. dollar terms without giving effect to any underlying change in its

business, financial condition or results of operations. Renminbi may appreciate or depreciate significantly in value against U.S. dollar in the long term, depending on the fluctuation of the basket of currencies against which it is currently valued, or it may be permitted to enter into a full float, which may also result in a significant appreciation or depreciation of Renminbi against U.S. dollar.

The Company has not entered into any hedging transactions in an effort to reduce its exposure to foreign currency exchange risk. While it may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and the Company may not be able to hedge its exposure adequately or at all. In addition, the Company's currency exchange losses may be magnified by the PRC exchange control regulations that restrict its ability to convert Renminbi into foreign currency.

### Governmental control of currency conversion may limit the Company's ability to utilize its future revenues effectively.

The PRC government imposes controls on the convertibility of Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. Under existing PRC foreign exchange regulations, payments of current account items, such as profit distributions and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from the SAFE, by complying with certain procedural requirements. However, approval from or registration with appropriate governmental authorities is required where Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies.

Since 2016, the PRC government has tightened its foreign exchange policies again and stepped up scrutiny of major outbound capital movement. More restrictions and a substantial vetting process have been put in place by the SAFE to regulate cross-border transactions falling under the capital account. The PRC government may also restrict access in the future to foreign currencies for current account transactions, at its discretion. The Company expects to receive a portion of its revenues in Renminbi. If the foreign exchange control system prevents the Company from obtaining sufficient foreign currencies to satisfy its foreign currency demands, the Company may not be able to pay dividends or debts in foreign currencies to the shareholders or creditors.

### The Company may be deemed to be a PRC resident enterprise under the Enterprise Income Tax Law, or the EIT Law, and be subject to the PRC taxation on its worldwide income, which may significantly increase the Company's income tax expenses and materially decrease its profitability.

Under the EIT Law that took effect on January 1, 2008, enterprises established outside of China whose "*de facto* management bodies" are located in China are considered to be "resident enterprises" and will generally be subject to a uniform 25% corporate income tax on their global income (excluding dividends received from "resident enterprises"). In addition, a circular issued by the State Taxation Administration, or the SAT, on April 22, 2009 and amended on January 29, 2014 sets out certain standards for determining whether the "*de facto* management bodies" of an offshore enterprise funded by Chinese enterprises as controlling shareholders is located in China. Although this circular applies only to offshore enterprises funded by Chinese enterprises as controlling shareholders, rather than those funded by Chinese or foreign individuals or foreign enterprises as controlling shareholders (such as the company), the determining criteria set forth in the circular may reflect SAT's general position on how the "*de facto* management bodies" test should be applied in determining the tax resident status of offshore enterprises, regardless of how they are funded. Although the Company is not funded by Chinese enterprises as controlling shareholders, substantial uncertainties remain as to whether the Company or any of its non-PRC subsidiaries will be deemed a PRC resident enterprise for the EIT purposes. If the Company or any of its subsidiaries registered outside the PRC are to be deemed a "resident enterprise" under the EIT Law, the Company's income tax expenses may increase significantly, and its profitability could decrease materially.

### The Company's leased property interest in China may be defective, which could cause significant disruption to its business.

Under the applicable PRC laws and regulations, all lease agreements are required to be registered with the local housing authorities. The landlords of certain of the Company's leased premises in China may have not completed the registration of their ownership rights or these leases with the relevant authorities. Failure to complete

these required registrations may expose such landlords, lessors and the Company to potential monetary fines. If these registrations are not obtained in a timely manner, or at all, the Company may be subject to monetary fines or may have to relocate its offices, which will incur the associated losses and adversely affect the normal business operations.

### Certain Tax Risks Related to the Restructuring

***Tax Classification of the Trust for U.S. federal income tax purposes is subject to uncertainty.***

The Trustee intends to report the Trust as a "liquidating trust" under Treasury Regulation Section 301.7701-4(d) (a "Liquidating Trust"). In general, a Liquidating Trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a "pass-through" entity) of which the holders of beneficial interests in the trust are the owners and grantors. However, there is uncertainty as to the appropriate tax classification of the Trust. Thus, there is no assurance the Trustee's intended treatment of the Trust as a Liquidating Trust would withstand a challenge by the Internal Revenue Service (the "IRS"). If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and its creditor-beneficiaries could be different and potentially less favorable. See "Certain Federal Income Tax Consequences of the Consensual Restructuring and the Prepackaged Plan—U.S. Tax Classification of the Trust."

***U.S. federal income tax classification of the entities through which West Coast LLC indirectly owns its economic interest in the Company is subject to uncertainty.***

Each of the entities through which West Coast LLC, a Delaware limited liability company ("West Coast"), indirectly owns the stock of the Company are intended to be treated as "pass-through" entities for tax purposes. There is some uncertainty as to whether that will be the case due to an inadvertent election with respect to one of those entities that has since been withdrawn and late elections with respect to other entities. While that withdrawal and the late lections are believed to have been effective under published procedures, there is no assurance the IRS will agree. If any of the entities through which West Coast owns its economic interest in the Company were to be treated as a corporation for U.S. federal income tax purposes, the resulting adverse tax consequences could include corporate level taxes levied on any proceeds from the disposition of stock of the Company indirectly owned by West Coast LLC as well as potential taxes imposed on any distribution of such proceeds by such entity that are allocable to the holders. Such dividends could by subject to tax at a 30% tax rate (subject to reduction under an applicable treaty). See "Certain Federal Income Tax Consequences of the Consensual Restructuring and the Prepackaged Plan—U.S. Federal Income Tax Treatment of Holders—Tax Classification of West Coast Conduit Entities."

***The treatment of accrued but unpaid interest on a Debt Claim is uncertain.***

Holders of Debt Claims who receive Trust Interests as part of the Restructuring may have taxable ordinary income equal to the value of the Trust Interests they receive to the extent of any accrued and unpaid interest on the debt they hold that is extinguished or retired. YT intends to take the position that no portion of the Trust Interests received by a holder of Debt Claims in the Restructuring is allocable to accrued and unpaid interest or subject to withholding. However, this conclusion is not free from doubt, and it is possible that the IRS could assert that the value of any Trust Interest received by a holder should be allocated first to accrued and unpaid interest prior to allocating any portion of such amounts to principal. Such argument, if successful, would result in holders being required to report ordinary income on such value for U.S. federal income tax purposes. Holders of Debt Claims should carefully review the discussion set forth in this Offering Memorandum under the heading "Certain Federal Income Tax Consequences of the Consensual Restructuring and the Prepackaged Plan—U.S. Federal Income Tax Treatment of Holders—Accrued Interest on Debt Claims" and should discuss the potential for interest income and other possible tax consequences with their own tax advisors.

## TENDERING AND VOTING PROCEDURES

*This section describes the procedures that you must follow to participate in the Exchange Offer and to vote to accept or reject the Prepackaged Plan. Please read this entire section and carefully follow the instructions described below and in the ballot and other documents provided to you with this Offering Memorandum. If you have any questions or require additional copies of the ballot or any other document, please see the relevant contact information included in the ballot or see "Additional Information."*

**THE LETTER OF TRANSMITTAL AND BALLOT CONTAINS A RELEASE AND CERTAIN ACKNOWLEDGEMENTS. PLEASE REVIEW THIS RELEASE AND THESE ACKNOWLEDGEMENTS CAREFULLY. BY TENDERING DEBT CLAIMS OR CASTING A BALLOT IN FAVOR OF THE PREPACKAGED PLAN, SUCH HOLDERS ARE ACCEPTING THE RELEASE SET FORTH IN THE PREPACKAGED PLAN, THE OFFERING MEMORANDUM, AND THE LETTER OF TRANSMITTAL AND BALLOT AS DESCRIBED IN DETAIL THEREIN.**

By accepting any consideration under the Consensual Restructuring or the Prepackaged Plan, each holder of a Debt Claim that tenders its Debt Claims in the Exchange Offer shall be deemed to have agreed to the release described in this Offering Memorandum.

### Procedures for Holders of Debt Claims

**Tender of Debt Claims and Delivery of Votes to Accept or Reject the Prepackaged Plan**

The tender by a holder of a Debt Claim, and YT's subsequent acceptance of the tender, through one of the procedures described below will constitute an agreement between such holder and YT on the terms and subject to the conditions set forth in this Offering Memorandum and the Letter of Transmittal and Ballot. YT is not accepting partial tenders of the Debt Claims in the Exchange Offer. Therefore a holder wishing to validly tender any of its Debt Claims must tender all Debt Claims.

The Letter of Transmittal and Ballot sets forth the agreed temporarily Allowed Debt Claim Allocation Amount for voting purposes for each holder of a Debt Claim as of October 9, 2019. Acceptance of the Consensual Restructuring or the Prepackaged Plan by a creditor is an agreement to such Allowed Debt Claim Allocation Amount. Please note that distributions under the Creditor Trust are based on the Allowed Debt Claim Allocation Amounts and the Allowed Debt Claim Distribution Amounts, as defined in the Prepackaged Plan. YT reserves the right (on notice to such holder) to revoke the temporary allowance of such claim if such claim is not "Allowed" under the terms of the Prepackaged Plan. In such event, the holder would be required to have such claim temporarily allowed pursuant to Bankruptcy Rule 3018. YT reserves all rights with respect to the temporarily Allowed amount of any Debt Claim, notwithstanding the inclusion of the temporary Amount on any Letter of Transmittal and Ballot. *For additional information on the Allowed Debt Claim Allocation Amounts and the Allowed Debt Claim Distributions Amounts, you should read carefully the Trust Agreement Term Sheet, a copy of which is attached as Exhibit A to this Offering Memorandum.*

To validly tender Debt Claims and vote on the Prepackaged Plan, a holder must, on or before the Expiration Date deliver the completed and signed Letter of Transmittal and Ballot indicating acceptance or rejection of the Exchange Offer and/or the Prepackaged Plan, together with any other documents required by the instructions, to the Exchange Agent as set forth in the Letter of Transmittal and Ballot (and such documents must be received by the Exchange Agent no later than the Expiration Date).

If a holder of a Debt Claim does not provide a properly completed and duly executed original of the appropriate version of IRS Form W-8 as set forth in the Letter of Transmittal and Ballot, then such holder will not be eligible to receive Trust Interests in the Exchange Offer or pursuant to the Prepackaged Plan.

This Letter of Transmittal and Ballot sets forth the agreed temporarily Allowed Debt Claim Allocation Amount for voting purposes for each holder of a Debt Claim as of October 9, 2019. Acceptance of the Consensual Restructuring or the Prepackaged Plan by a creditor is an agreement to such Allowed Debt Claim Allocation

76

Amount. Please note that distributions under the Creditor Trust are based on the Allowed Debt Claim Allocation Amounts and the Allowed Debt Claim Distribution Amounts, as defined in the Prepackaged Plan. YT reserves the right (on notice to such holder) to revoke the temporary allowance of such claim if such claim is not "Allowed" under the terms of the Prepackaged Plan. In such event, the holder would be required to have such claim temporarily allowed pursuant to Bankruptcy Rule 3018. YT reserves all rights with respect to the temporarily Allowed amount of any Debt Claim, notwithstanding the inclusion of the temporary Amount on any Letter of Transmittal and Ballot.

*Each holder of a Debt Claim should read the instructions included in the Letter of Transmittal and Ballot carefully. Letters of Transmittal and Ballots should be sent to the Exchange Agent only (and not to YT or the Company).*

All questions as to the form of any documents, and the validity (including time of receipt) and acceptance of all tenders, will be determined by YT. YT reserves the absolute right to reject any or all tenders that are not in proper form or the acceptance of which would, in his opinion, be unlawful. YT also reserves the right to waive any defects, irregularities, or conditions of tender as to particular Debt Claims. YT's interpretations of the terms and conditions of the Exchange Offer (including the instructions in the Letter of Transmittal and Ballot) will be final and binding. Any defect or irregularity in connection with tenders must be cured within such time as YT shall determine, unless waived by him. Tenders of Debt Claims will not be deemed to have been made until all defects and irregularities have been waived by YT or cured. None of YT, the Exchange Agent or any other person will be obligated to give notice of any defects or irregularities in tenders, nor will YT or the Exchange Agent incur any liability for failure to give any such notice.

If any endorsement, bond power, power of attorney, or any other document required by the Letter of Transmittal and Ballot is signed by a trustee, executor, corporation, or other person acting in a fiduciary or representative capacity, the signatory should so indicate when signing and should submit proper evidence of the person's authority to so act upon YT's request, which evidence must be satisfactory to him in his sole discretion.

**THE METHOD OF DELIVERY OF LETTERS OF TRANSMITTAL AND BALLOTS AND ALL OTHER REQUIRED DOCUMENTS TO THE EXCHANGE AGENT IS AT THE ELECTION AND RISK OF THE TENDERING HOLDER. DELIVERY WILL BE DEEMED MADE ONLY WHEN ACTUALLY RECEIVED BY THE EXCHANGE AGENT. INSTEAD OF DELIVERY BY MAIL, IT IS RECOMMENDED THAT YOU SUBMIT YOUR LETTER OF TRANSMITTAL AND BALLOT THROUGH THE E-BALLOTING PORTAL OR USE AN OVERNIGHT OR HAND DELIVERY SERVICE. IF DELIVERY IS MADE BY MAIL, IT IS RECOMMENDED THAT YOU USE PROPERLY INSURED, REGISTERED MAIL WITH RETURN RECEIPT REQUESTED. IN ALL CASES, YOU MUST ALLOW SUFFICIENT TIME TO ASSURE TIMELY DELIVERY ON OR BEFORE THE EXPIRATION DATE.**

By executing the Letter of Transmittal and Ballot, and all other required documents, the holder of a Debt Claim acknowledges that risk of loss does not pass until receipt by the Exchange Agent of the Letter of Transmittal and Ballot, duly completed, dated, and executed, together with all accompanying evidences of authority and any other required documents in form satisfactory to YT. All questions as to the validity, form, eligibility (including time of receipt), acceptance, and withdrawal of Letters of Transmittal, Ballots, and all other required documents will be determined by YT in his sole discretion. YT's determination will be final and binding.

**Letter of Transmittal and Ballot; Representations, Warranties, and Covenants of Holders of Debt Claims**

The election to participate in the Exchange Offer and/or vote to accept the Prepackaged Plan by a holder of such Debt Claims on behalf of which the holder has tendered will, subject to the terms and conditions of the Exchange Offer and the Letter of Transmittal and Ballot, form a binding agreement to:

- irrevocably tender its Debt Claim and all rights related thereto (including, without limitation, any and all rights to receive payments of principal and/or interest thereunder or otherwise), and any and all claims in respect of or arising or having arisen as a result of such holder's status as a holder

of a Debt Claim tendered hereby, such that thereafter it shall have no contractual or other rights or claims in law or equity against YT or any Released Party.

- release and discharge YT, his wife Wei Gan, and certain other persons, in each case in any capacity and in any and all jurisdictions from a broad range of claims and liabilities (see "The Consensual Restructuring—Release"), and consent to distributions made in connection with the Restructuring; and

- have made certain representations and warranties to YT as set forth in the Letter of Transmittal and Ballot regarding such holder's title to the tendered Debt Claims and authority to tender such Debt Claims in the Exchange Offer.

**Acceptance by YT of Tenders of Debt Claim**

For purposes of the Exchange Offer, YT shall be deemed to have accepted Debt Claims tendered for exchange pursuant thereto when, as and if he gives oral or written notice to the Exchange Agent of his acceptance of such Debt Claims. Upon the terms and subject to the satisfaction or waiver of all of the conditions to the Exchange Offer, including the requirement that 90% of the outstanding Debt Claims be tendered, and assuming YT has not previously elected to terminate the Exchange Offer, which YT may do for any or no reason, in his sole and absolute discretion, YT will accept the Debt Claims that are properly tendered on or before the Expiration Date. YT intends to provide (or cause to be provided) documentation of the Trust Interests promptly thereafter.

In all cases, the delivery of documentation of the Trust Interests for Debt Claims that are accepted for exchange pursuant to the Exchange Offer will be made only after timely receipt by YT of a properly completed and duly executed Letter of Transmittal and Ballot and all other required documents. YT reserves the absolute right to waive any defects or irregularities in the exchange and any or all conditions of the Exchange Offer, including the requirement that 90% of the outstanding Debt Claims be tendered. If any proposed exchange by a holder of a Debt Claim is not accepted for any reason, YT or the Exchange Agent will provide written notification to such a holder as promptly as practicable after the expiration or termination of the Exchange Offer.

### Voting on the Prepackaged Plan Generally

In voting for or against the Prepackaged Plan, please use only the ballot or ballots sent to you with this Offering Memorandum. Votes cast to accept or reject the Prepackaged Plan will be counted by Class. Please read the voting instructions included with the ballot for a thorough explanation of voting procedures.

**IF YOU BELIEVE THAT YOU ARE A MEMBER OF A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE EXCHANGE AGENT AT EPIQ CORPORATE RESTRUCTURING, LLC, AT TABULATION@EPIQGLOBAL.COM (PLEASE REFERENCE "YT" IN THE SUBJECT LINE). THE EXCHANGE AGENT CANNOT PROVIDE YOU WITH LEGAL ADVICE. YOU MAY ALSO VISIT HTTPS://DM.EPIQ11.COM/YT1 FOR ADDITIONAL INFORMATION.**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 5:00 P.M., BEIJING TIME, ON NOVEMBER 8, 2019.** Unless otherwise directed in your solicitation package, mail your completed ballots to the Exchange Agent. **DO NOT RETURN BALLOTS TO YT.** A ballot that does not indicate an acceptance or rejection of the Prepackaged Plan will not be counted either as a vote to approve or a vote to reject the Prepackaged Plan. Additionally, you may not split your claims within a particular Class under the Prepackaged Plan either to accept or reject the Prepackaged Plan. Therefore, a ballot or a group of ballots within a Class received from a single creditor that partially rejects and partially accepts the Prepackaged Plan will not be counted.

Your vote is important. The Bankruptcy Code defines acceptance by a class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in that class that vote. **ONLY**

**THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE PREPACKAGED PLAN.  YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE PREPACKAGED PLAN.**

### Fees and Expenses

YT will pay all the expenses that are incurred by his representatives in connection with the Exchange Offer and the solicitation of votes on the Prepackaged Plan.  YT will not reimburse any of the holders of Debt Claims for their expenses.

## TOTAL CLAIMS AGAINST YT AND PROJECTED CLAIMS AGAINST YT

As discussed above in "Background of YT and the Restructuring," the majority of YT's debts stem from his personal guarantees for businesses that he operated in China. In connection with the Restructuring, YT has calculated his claims worth approximately $3.6 billion. Many of his creditors also assert contractual, judgment, or penalty interest under Chinese law. The claims against YT fall into four general categories: (i) unsecured direct claims against YT; (ii) direct claims against YT secured by his assets in mainland China; (iii) claims against YT based on guarantees of unsecured loans to other entities; and (iv) claims against YT based on guarantees of loans to other entities secured by such entities' assets in mainland China.

As of October 9, 2019, approximately $2.5 million of YT's approximately $3.0 billion of Debt Claims are secured claims, and approximately $2.3 billion are on account of guarantees. YT cannot estimate the amount that may be recovered from collateral or the primary obligors on account those claims.

The amount of claims for distribution purposes in the Trust will exclude interest accrued on, or penalties in respect of, any such indemnity and will also be reduced to the extent that the Holder of the Trust Interest receives payment from a primary obligor, recovers from collateral pledged to support direct obligations of the primary obligor, or the obligation of the primary obligor is otherwise satisfied, including by conversion of debt to equity.

# SUMMARY OF SELECTED FINANCIAL INFORMATION

The Company's consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States of America, or U.S. GAAP. The Company's historical results are not necessarily indicative of results expected for future periods, and information for interim periods is subject to year-end adjustments. You should read this Summary of Selected Financial Information section together with "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company" included elsewhere in this Offering Memorandum.

The following table presents the Company's selected consolidated statement of operations and comprehensive loss for the year ended December 31, 2018 and seven months ended July 31, 2019.

| | Year ended December 31, | Seven months ended July 31, |
|---|---|---|
| | 2018 | 2019 |
| | In thousands US$ | |
| **Selected Consolidated Statement of Operations and Comprehensive Loss** | | |
| **Operating Expenses** | | |
| Research and Development | 270,101 | 17,933 |
| Sales and Marketing | 16,906 | 2,818 |
| General and administrative | 170,480 | 60,009 |
| Total Operating Expenses | 457,487 | 80,760 |
| Loss from operations | 457,487 | 80,760 |
| Other income, net | 29,019 | 4.417 |
| Interest expense | 49,369 | 26,709 |
| Net loss | 477,837 | 103,052 |
| Other comprehensive loss | | |
| Foreign Currency translation | 4,082 | 2,276 |
| **Total comprehensive loss** | **481,919** | **100,776** |

The following table presents the Company's selected consolidated balance sheet data as of December 31, 2018 and July 31, 2019.

| | As of December 31, | As of July 31, |
|---|---|---|
| | 2018 | 2019 |
| | In thousands US$, except for shares data | |
| **Selected Consolidated Balance Sheet** | | |
| Total Current Assets | 73,560 | 73,102 |
| Assets Held for Sale | 29,038 | 29,038 |
| Property and equipment, net | 282,385 | 260,274 |
| Land use rights | 60,497 | 59,767 |
| Other noncurrent assets | 3,597 | 4,321 |
| **Total assets** | **420,039** | **397,464** |
| Current Liabilities | | |
| Accounts payable | 136,596 | 159,304 |
| Accrued expenses and other current liabilities | 140,188 | 172,520 |
| Related party notes payable | 315,700 | 310,757 |
| Notes payable | 60,168 | 91,325 |
| **Total current liabilities** | **652,652** | **734,305** |
| Capital leases, less current portion | 12,746 | 14,550 |
| Deferred rent, less current portion | 2,490 | 327 |
| Land use grant | 53,226 | 52,588 |
| **Total Liabilities** | **721,114** | **801,770** |
| Stockholder's deficit | | |
| Redeemable convertible preference shares, $0.00001 par value; 480,588,235 shares and 470,588,235 | 724,824 | 724,824 |

|  |  |  |
|---|---|---|
| shares authorized, issued and outstanding on December 31, 2018 and July 31, 2019, respectively; liquidation preference of $1,150,118 |  |  |
| Class B convertible preferred stock, $0.00001 par value; 600,000,000 shares authorized, 600,000,000 and 600,000,000 shares issued and outstanding on December 31, 2018 and July 31, 2019, respectively; liquidation preference of $1,466,400 | 924,149 | 924,149 |
| Additional paid-in capital | 131,514 | 92,701 |
| Accumulated other comprehensive loss | 2,291 | 24 |
| Accumulated deficit | 2,079,270 | 2,145,955 |
| **Total stockholders' deficit** | **301,075** | **404,306** |
| **Total liabilities and stockholders' deficit** | **420,039** | **397,464** |

The following table presents the Company's selected cash flow data for the year ended December 31, 2018 and the seven months ended July 31, 2019.

|  | Year Ended December 31, 2018 | Seven Months Ended July 31, 2019 |
|---|---|---|
|  | In thousands US$ | |
| **Selected Consolidated Cash Flows Data** |  |  |
| Net cash used in operating activities | (512,668) | (28,600) |
| Net cash (used in)/provided by investing activities | (194,910) | 7,435 |
| Net cash provided by financing activities | 519,074 | 27,300 |
| Effects of exchange rate changes on cash and restricted cash | (4,513) | - |
| Net decrease in cash and restricted cash | (193,017) | (586) |
| Cash and restricted cash at beginning of the year/period | 200,441 | 7,424 |
| Cash and restricted cash at end of the year/period | 7,424 | 6,838 |

## CERTAIN RELATIONSHIPS, RELATED TRANSACTIONS, AND FORMER AFFILIATES
### Contractual Arrangements with the Company's VIE and its Shareholders

See "The Company—Corporate History and Milestones."

### Restructuring Agreement with Evergrande

See "The Company—Corporate History and Milestones."

### Borrowings from Related Parties

**Stock Incentive Plans**

On February 1, 2018, the Company amended and restated its equity incentive plan originally adopted in 2015. Under the Smart King Ltd. Equity Incentive Plan (the "2018 Equity Plan"), the board of directors of the Company or the administrator of the 2018 Equity Plan may grant up to 300,000,000 nonqualified incentive stock options, restricted shares, unrestricted shares, restricted shares units, and other stock-based awards for Class A ordinary shares to employees, directors and consultants. As of the date of this Offering Memorandum, awards to purchase an aggregate amount of 205,791,717 Class A ordinary shares under the 2018 Equity Plan have been granted and were outstanding, and awards to purchase 34,129,939 Class A shares have been exercised.

On May 2, 2019, the Company adopted its Short-Term Incentive Plan ("STI Plan"), under which the administrator of the STI Plan (the "Administrator") may grant up to 100,0000,000 nonqualified incentive stock options, restricted shares, unrestricted shares, restricted shares units for Class B ordinary shares to employees, directors, and consultants. The options vest and become exercisable as determined by the Administrator. As the date of this Offering Memorandum, no awards had been granted under the STI Plan. See "Proposed Management Incentive Plan."

In order to align incentives of YT with the equity holders of the Company, including the holders of Trust Interests, the Company will enter into the 2019 Equity Incentive Plan with YT and certain key members of management, conditioned on the effectiveness of the Restructuring. See "The Company—2019 Equity Incentive Plan." The 2019 Equity Incentive Plan will provide equity consideration to YT based upon the Company valuation at the time of a Distribution Event as defined in the Trust Agreement.

As part of the Restructuring, YT may receive benefits or compensation from the Company that are different than those generally received by the holders of Debt Claims. See "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Company—Liquidity and Capital Resources—Indebtedness."

**Affiliate Notes Payable**

As disclosed in "Summary of Selected Financial Information," certain entities affiliated or formerly affiliated with YT or the Company have made loans to the Company. Most of these loans originated from transactions where the affiliate borrowed funds in Renminbi from a third party and then lent the funds to the Company in United States Dollars. In two instances, an affiliate borrowed from a third party lender and then lent to another affiliate, which then lent to the Company in US Dollars. Because of the obligations of each of these parties to repay the third party lenders as well as their financial creditors (and loans), neither YT nor the Company is expected to recover any value if and when the notes are repaid. In addition, Ocean View Drive Inc. ("Ocean View") lent $4.4 million to FF.

**Ocean View**

On November 9, 2007, YT established Success Pyramid Ltd ("Success") and paid $50,000 for 50,000 shares of Success, and in August 2014, YT established Ocean View, a California corporation wholly owned by Success. During 2014 and 2015, Ocean View purchased the real properties located at 7, 11, 15, 19, and 91 Marguerite Drive, Rancho Palos Verdes, California. To purchase the real properties located at 7, 11, and 15

Marguerite Drive, Ocean View borrowed and later repaid $12 million from Faraday & Future Inc. In connection with Ocean View's purchase of the real property located at 19 Marguerite Drive, YT borrowed $7.4 million from Shanghai Yuetian Ltd and contributed the same amount to Ocean View as paid-in capital. Additionally, in connection with the purchase of the real property located at 91 Marguerite Drive, Ocean View borrowed $7.5 million from LeSoar Holdings Limited ("LeSoar"), an entity previously controlled by YT. Over the past 4 years, Ocean View has refinanced its original loans and entered into certain transactions where it made loans to certain affiliated and non-affiliated entities. During this time, Ocean View made numerous loans totaling approximately $21.4 million to Faraday & Future Inc. to support its operations. Faraday & Future Inc. has paid down its debts to Ocean View and as of June 30, 2019, Faraday & Future Inc. owed Ocean View $4.4 million. On December 8, 2017, YT sold all his interests in Success for approximately $6.5 million. The total consideration consisted of a promissory note in the amount of approximately $2.4 million and assumption of YT's liabilities, including assumption of lease agreements, in the amount of approximately $4.1 million. In 2018, the purchaser of Success paid the full contract price of $6.4 million

At this time, the total assets of Ocean View include approximately US$27.9 million in real property and approximately US$27.3 million in loans receivable. Ocean View's liabilities total approximately $51.6 million.

**LeSoar**

LeSoar was established by a company controlled by YT in 2014 to hold investments. LeSoar obtained third-party financing to fund its certain investments. During 2017, LeSoar faced certain liquidity issues, and LeSoar's liabilities exceeded its assets. On October 20, 2017, LeSoar was sold for a nominal consideration.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF THE COMPANY

*The discussion of the Company's financial condition and results of operations below is qualified by, and should be read in conjunction with, the discussion of the risks related to the Company's business and the industry in which it operates is detailed elsewhere in this Offering Memorandum, and the section "Summary of Selected Financial Information" included elsewhere in this Offering Memorandum. The actual results and the timing of events in all forward-looking statements could differ materially from those anticipated as a result of various factors, including those set forth under "Risk Factors" and elsewhere in this Offering Memorandum.*

### Results of Operations

The Company is a development stage company and is currently developing its initial electric vehicle, the FF 91, which is not expected to be in production until nine months after the Company has completed its pending Series B Equity Financing (the commitment of any potential investors have not been secured), and has not yet generated revenues.

In 2018, the Company incurred operating expenses of approximately US$457.5 million, which consisted of R&D expenses of approximately US$270.1 million, general and administrative expenses of approximately US$170.5 million, and sales and marketing expenses of approximately US$16.9 million. For the seven months ended July 31, 2019, the Company incurred operating expenses of approximately US$80.8 million, which consisted of research and development expenses of approximately US$17.9 million, general and administrative expenses of approximately US$60.0 million, and sales and marketing expenses of approximately US$2.8 million.

In addition to the operating expenses, the Company incurred interest expenses in the aggregate of US$49.4 million and US$26.7 million in 2018 and for the seven months ended July 30, 2019, respectively.

### Research and Development Expenses

R&D expenses consisted primarily of payroll and overhead costs related to R&D personnel, materials consumed in development activities, third-party fees, and test equipment.

R&D expenses were mainly driven by the number of the R&D employees, the stage and scale of the vehicle development and development of technology. Since its inception, the Company has devoted substantial effort and capital resources to engineering, design and development of its variable platform architecture and the FF 91, its initial electric vehicle model, as well as its second generation variable platform architecture, VPA 2.0 and the FF 81, both of which are in their initial developing stage. The Company also invested in critical components of its electric powertrain technology, including the battery system, motor and charging system, and devoted substantial resources to develop its advanced driver assistance systems ("ADAS"), user experience design ("UI/UX"), and Internet of Vehicles ("IoV"). The Company expects its R&D expenses to increase in future periods as it hires additional R&D employees, starts production and ramp up of the FF 91 and fully develops VPA 2.0 and the FF 81. The Company also expects that the additional costs that it will incur in operating its Hanford, California manufacturing facility will further increase the R&D expenses until the start of production of the FF 91.

As of September 27, 2019, the Company had 305 employees working in R&D, 85 of which were on leave.

### General and Administrative Expenses

General and administrative expenses consisted primarily of personnel and facilities costs related to the Company's executive, finance, human resources, information technology and legal organizations, as well as fees for professional and contract services. The Company expects its general and administrative expenses to increase in future periods as the Company continues to grow its operations. The Company also expects that building out its planned Hanford, California manufacturing facility will further increase these expenditures until the start of production of the FF 91.

85

As of September 27, 2019, the Company had 79 employees working in general and administrative functions, 13 of which were on leave.

## Sales and Marketing Expenses

Sales and marketing expenses consisted primarily of personnel costs related to its sales and marketing department, marketing, incentives and advertising costs. The Company expects its sales and marketing expenses to increase in future periods as it introduces more vehicle models and offers additional services to its customers.

As of July 31, 2019, the Company had 20 employees working in sales and marketing functions, 7 of which were on leave.

## Interest Expenses

Interest expenses consisted of interest expenses with respect to the Company's indebtedness.

## Losses from Foreign Currency Translation.

The Company's reported currency is in US dollars, while the functional currency of the Company's subsidiaries and consolidated VIE were the respective local currencies, including Renminbi. The Company experienced exchange losses when it converted the weaker U.S. dollar into Euro and Yen to settle its invoices denominated in Euro and Yen, and converted the weaker Renmibi to settle its invoices denominated in U.S. dollars.

<u>**Liquidity and Capital Resources**</u>

Since inception, the Company has incurred cumulative losses from operations and had a net loss of US$477.8 million in the year ended December 31, 2018 and an accumulated deficit of US$2,079.3 million as of December 31, 2018. The principal sources of liquidity have been cash raised from the issuance of shares and borrowings from related parties and third parties.

In December 2017 and June 2018, the Company raised approximately US$101.5 million and US$623.3 million from issuance of 65,926,748 Class A preferred shares and 404,661,487 Class A preferred shares, respectively, to its third-party investor, Season Smart, an entity affiliated with Evergrande. See "The Company—Corporate History and Milestones." Prior to these fundraising activities, the principal sources of liquidity of the Company, including both debt and equity issuance, had been the entities controlled by or affiliated with YT.

As of December 31, 2018, the Company had cash and restricted cash of approximately US$7.4 million. The Company had a working capital deficit of US$579.1 million as of December 31, 2018 and is currently experiencing a critical liquidity shortfall and is required to raise additional funds of US$153 million to meet its anticipated working capital requirements and capital expenditures for the next 12 months so to fund its ongoing operations, continue research, development and design efforts and deliver the FF 91.

Unless the Company is successful in obtaining extensions, refinancing or waivers with respect to certain indebtedness that is or will come due in the near future, or that is currently in default, the Company is not expected to have sufficient liquidity to remain as a going concern. Furthermore, even if it is able to obtain such extensions, refinancing or waivers, the Company must be able to consummate the Series B Equity Financing or a similar financing by early 2020, or the Company will again face financing challenges that may call into question its ability to continue as a going concern. There can be no assurance that the Company will be able to obtain any such extensions, refinancing or waivers or consummate the Series B Equity Financing or similar financing on a timely basis or on reasonable commercial terms, or at all.

**Plan of Operations and Future Funding Requirements**

The Company plans to launch production of the FF 91 and plans to deliver approximately 100 units by its planned initial public offering (targeted as early as early-to-mid-2021). The Company continues to develop the FF81, and estimates that it will incur additional operating expenses and capital expenditures of approximately US$850 million during the next 18 months, which the Company plans to finance through proceeds received from issuance of shares in one or more private placement transactions. Such estimates are based on assumptions that may prove to be inaccurate.

The Company's future capital requirements will depend on many factors, including:

- the costs to build up the inventories of raw materials, parts and components;

- the timing and costs to develop manufacturing process and equip the manufacturing facility in Hanford, California;

- obtaining and maintaining adequate third party supplier relationships, and delivery of supplies and parts on a timely and cost-effective basis;

- the progress, timing and costs to complete software development of each of the FF 91 and the FF 81;

- the costs to manufacture each of the FF 91 and the FF 81 at the projected volume;

- consumer demand of the FF 91 and the FF 81;

- the progress, timing and costs to complete development of VPA 2.0;

- market perception of the Company;

- the costs to establish sales, marketing and distribution networks;

- the development of then-existing public charging infrastructure;

- the cost to develop capabilities to service consumers after sales;

- the costs for the operation and maintenance of the Company's information technology system and infrastructure; and

- the effect of competing technological and market developments.

For debt financing, the Company is seeking a new bridge secured debt financing of up to US$170 million, which will be senior to its existing debt and will have a favorable conversion feature to equity. Assuming the Company is successful in obtaining such financing, the Company intends to use these short-term convertible debt securities to sustain its operations and engineering efforts.

To the extent that the Company raises additional capital through the sale of equity or debt with convertible features, the ownership interest of its stockholders will be diluted upon issuance of shares, which will indirectly affect the value of the Trust Interest held by you. If the Company raises additional capital through the issuance of debt instruments, the Company's results of operations, cash flow and future prospects could be materially and adversely affected. If the Company is unable to raise additional funds through equity or debt financings when needed, it may be required to delay manufacturing of, or limit the volume to be delivered for, the FF 91, limit, reduce or terminate development and commercialization efforts of other electric vehicle models, or cease all operations and seek protection under insolvency proceedings. While the Company is engaged in discussions with potential investors as of the date of this Offering Memorandum, there are no commitments for additional funding and no assurance can be made as to whether funding will be available, and if so, how much and on what terms.

**Cash Flows from Operating Activities**

The Company continues to experience negative cash flows from operating activities as it develops its business. Cash flows from operating activities are significantly affected by the Company's cash investments to support its business development in the areas of R&D and selling, marketing and general and administrative expenses. The Company's operating cash flows are also affected by the Company's working capital needs to support growth and fluctuations in personnel-related expenditures, accounts payable and other assets and liabilities.

The Company's net cash used in operating activities was US$512.7 million for the year ended December 31, 2018. The largest component of the cash used during this period was a net loss of $477.8 million, which was further adjusted for a non-cash re-measurement of put option obligations of US$33.7 million held by the Company for shares of Easy Go Inc., an affiliate of YT. Significant operating cash outflows were primarily related to operating expenses of US$457.5 million and a decrease of accounts payable of approximately US$24.9 million.

The Company's net cash used in operating activities was US$28.6 million for the seven months ended July 31, 2019, which primarily consisted of a net loss of $103.1 million, as adjusted for non-cash items of US$74.5 million, which primarily consisted of (i) a depreciation expense of US$2.7 million and (ii) net increase in operating assets and liabilities of US$71.7 million, which primarily consisted of an increase in accrued expenses and other current liabilities of US$63.5 million, and an increase in accounts payable of US$13.6 million.

**Cash Flows from Investing Activities**

The Company continues to experience negative cash flows from investing activities as it develops its business. Cash flows from investing activities primarily related to purchase of property and equipment. Net cash used in investing activities was US$194.9 million for the year ended December 31, 2018. Net cash provided from investing activities was US$7.4 million for the seven months ended July 31, 2019, which consisted of net proceeds from sale of its headquarters located in Gardena, California.

**Cash Flows from Financing Activities**

Net cash provided by financing activities was US$519.1 million for the year ended December 31, 2018, primarily attributable to the proceeds from the issuance of redeemable preference shares (Class A shares) of US$500 million, proceeds from borrowings from related parties of US$36.1 million, and borrowings from third parties of US$33.8 million, partially offset by the repayment of borrowings from related parties and third parties of US$39.5 million.

Net cash provided by financing activities was US$27.3 million for the seven months ended July 31, 2019, primarily attributable to proceeds from borrowings from related parties and third parties of US$402.1 million.

**Capital Expenditures**

During the year ended December 31, 2018 and the seven months ended July 31, 2019, the Company made capital expenditures of US$222.0 million and US$12.4 million, respectively. During these periods, the Company acquired property, plant and equipment and intangible assets, which consisted primarily of molding and tooling, IT equipment, R&D equipment, and leasehold improvements, which consisted primarily of office spaces and the build-out of the Hanford, California manufacturing facility. The Company currently estimates that its capital expenditures for the next 15 months, including for improvements and installation of equipment for Hanford manufacturing facility, R&D, roll-out of its sales and service network and network of power solutions, will be approximately US$623.0 million, with approximately US$562.0 million incurred over the 12 months starting in January 2020. The Company expects to finance such capital expenditures over the next 15 months with from proceeds from issuance of shares in one or more private placement transactions, including the potential Series B Equity Financing.

**Indebtedness**

The table below sets forth certain details of the notes payable as of July 31, 2019.

| Lender | Principal Amount | Note Issue Date/ Maturity Date | Amount Outstanding |
|---|---|---|---|
| **HK entity (Affiliate of Company)[1]** | US$212.0 million | March 30, 2018/ December 31, 2019 | US$197.5 million; interest rate at 12% |
| **HK entity (Affiliate of Company)[2]** | US$66.9 million | March 30, 2018/ December 31, 2019 | US$66.9 million; interest rate at 12% |
| **U.S. entity (Affiliate of Company)[3]** | US$22.4 million | June 30, 2017/ December 31, 2018 | US$4.4 million; interest rate at 1.52% |
| **PRC individual (Former Affiliate)[4]** | US$0.7 million | Payable on demand | US$0.7 million, interest at 0% |
| **PRC entity** | US$4.37 million | April 17, 2017/ April 16, 2018 | US$4.37 million, currently in default with default interest rate at 18% |
| | US$4.37 million | April 17, 2017/ April 16, 2018 | US$4.37 million, currently in default with default interest rate at 18% |
| **PRC individual** | US$0.7 million | April 5, 2017/ October 2, 2017 | US$0.7 million, interest at 0%; currently in default |
| **PRC entity (Former Affiliate)** | US$28.9 million | December 2017 - July 2018/one year maturities, which have been extended to December 31, 2019 | US$28.9 million in the aggregate, 0% interest rate |
| **A US-based investment firm** | US$10.0 million | December 9, 2016/ October 15, 2019 | US$10 million; interest rate at 12% |
| **A US-based investment firm** | US$20.0 million | June 16, 2016/ December 31, 2019 | US$7.0 million; interest rate at 12% |
| **A US-based investment firm** | US$1.5 million | December 7, 2016/ December 31, 2019 | US$1.5 million; interest rate at 12% |
| **An individual Chinese lender** | US$3.5 million | April 23, 2017/ October 20, 2017 | US$3.5 million, interest at 9%, in default |
| **A US-based investment firm** | US$1.5 million | October 16, 2018/ December 31, 2019 | US$1.5 million, interest rate at 2.86% |
| **A US-based investment firm** | US$1.0 million | December 6, 2018/ December 31, 2019 | US$1.0 million, interest rate at 8.99% |
| **Other unsecured third-party borrowings** | US$4.4 million | No stated terms or maturity dates | US$9.2 million |

[1] See discussion in "Affiliate and Former Transactions."
[2] See discussion in "Affiliate and Former Transactions."
[3] See discussion in "Affiliate and Former Transactions."
[4] See discussion in "Affiliate and Former Transactions."

In addition to the loans described in the tables above, a loan in the principal amount of US$10.0 million was provided by Evergrande as part of the restructuring agreement entered into by the Company and Evergrande on December 31, 2018, which was drawn down in January 2019. The loan bears interest at an annual rate of 10% if repaid by June 30, 2019, and increases to 15% per annum thereafter. The loan matured on June 30, 2019 and the Company is currently in default. As of July 31, 2019, the full principal amount of US$10.0 million remained outstanding.

As shown in the above tables, the Company has defaulted on some of the notes, and several other notes will mature by the end of 2019. Certain notes charge a higher interest rate when in default. The Company is currently negotiating with the lenders for extensions of the loans. However, there is no assurance that any extensions will be granted. If the Company fails to pay off these notes when they become due or is unable to pay off those that are currently in default, such loans will continue to accrue interest, and the Company will incur additional losses, which could materially and adversely affect the Company's financial position and exacerbate the Company's liquidity problem.

### Arrangement with Birch Lake, US Bank National Association and Vendor Trust

On April 29, 2019, the Company entered into a term loan agreement for a principal amount of $15.0 million with BL Mobility Fundco, LLC, as the lender, and Birch Lake as the agent and collateral agent. The loan is guaranteed by the Company including several of the Company's subsidiaries in the U.S., the Cayman Islands, and Hong Kong, and is secured by a first lien on substantially all tangible and intangible assets of the borrowers and guarantors. Proceeds of the loan were used to pay down existing liabilities and fund the working capital needs of the Company. The loan bears interest at 15.50%, and a default rate of 21.50%. The loan is subject to a liquidation preference premium of up to 63.50% of the original principal amount, of which the borrowers have the right to convert 30% into equity interests of the Company. The loan matured and was paid off on September 30, 2019.

On April 29, 2019, the Company entered into a note purchase agreement ("NPA") with certain purchasers, U.S. Bank National Association as the notes agent, and Birch Lake as the collateral agent. The notes are guaranteed by the Company, including several of the subsidiaries in the U.S., Cayman Islands, and Hong Kong. The aggregate principal amount of notes that may be issued under the NPA is US$200.0 million. As of the date of this Offering Memorandum, a total of US$45.0 million of notes were issued at a 10% interest rate, and are collateralized by a first lien, with second payment priority, on substantially all tangible and intangible assets of the borrowers and guarantors. The notes mature on October 31, 2019, and the Company is seeking extension until the Company completes its next round of equity financing. In addition, the Company is currently seeking a new bridge financing, partly to pay off the existing notes. However, there is no assurance that any of the funding will be available on terms that are acceptable to the Company, or at all. In the event that the Company fails to obtain an extension, and/or fails to secure capital to pay off the note, and the lender decides to foreclose on the collateral, the Company's business and operations will be materially disrupted, as there is no assurance the Company can continue as a going concern.

On April 29, 2019, the Company established the Vendor Trust, under which a participating supplier could exchange its unsecured trade receivables for secured trust interests, on the condition that the supplier agrees to continue providing goods and services to the Company on agreed payment terms. As of September 24, 2019, suppliers with aggregate trade payables of US$141.0 million have participated in the trust. All obligations due under the Vendor Trust are collateralized by a first lien, with third payment priority, on substantially all tangible and intangible assets of the borrowers and guarantors. The Company intends to pay off the payables of the suppliers participating in the trust with the equity financing that it has raised. However, there is no assurance that the funding will be available, and if so, how much and on what terms. In the event that the Company fails to secure capital to pay off the payables in the Vendor Trust upon its maturity and/or the vendors decide to enforce the collateral when the Company defaults, the Company's business and operations will be materially disrupted, as there is no assurance the Company can continue as a going concern.

**Contractual Obligations**

The following table sets forth the Company's contractual obligations as of December 31, 2018.

| | Total | As of December 31, | | | | |
| | | 2019 | 2020 | 2021 | 2022 | 2023 and thereafter |
|---|---|---|---|---|---|---|
| | | | (in US$ thousands) | | | |
| Capital Lease obligations | 8,490 | 1,332 | 1,213 | 1,105 | 1,006 | 3,834 |
| Operating lease obligations | 6,580 | 2,443 | 3,067 | 1,070 | — | — |
| **Total** | 15,070 | 3,775 | 4,280 | 2,175 | 1,006 | 3,834 |

The Company has one capital lease in Hanford, California for equipment located at its main production facility. The capital lease obligations do not include commitments to purchase property and equipment including leasehold improvements, which the Company expects to incur in the of approximately US$104 million in order to fully build out the Hanford manufacturing facility to produce the FF 91. Operating lease obligations consisted primarily of non-cancelable office leases and automotive leases.

Other than those shown above, the Company did not have any significant capital and other non-indebtedness commitments, long-term obligations or guarantees as of December 31, 2018.

The Company entered into a purchase and sale agreement ("PSA") with Atlas Capital Investors V, LP. ("Atlas") on February 4, 2019, pursuant to which the Company sold its headquarters located in Gardena, California ("HQ") to Atlas for a sale price of US$29.0 million. On March 6, 2019, the Company and Atlas entered in to a single-tenant commercial/office lease (the "HQ Lease"), pursuant to which the Company leased the HQ from Atlas for a three-year term, with a rent payable of US$284,000 per month and an option to repurchase the HQ any time prior to the expiration of the HQ Lease for a purchase price equal to the greater of US$44.0 million or the fair market value of the HQ.

On March 24, 2019, the Company entered into the JVA with The9, pursuant to which the Company and The9 agreed to establish an equity joint venture in Hong Kong and its wholly-owned subsidiary in China, to engage in the business of manufacturing, marketing, selling and distributing a new electric vehicle in China. Under the JVA, the Company will contribute its land use rights for land located in Moganshan, China, certain IP licenses, technical know-how, and branding to the joint venture.

**Holding Company Structure**

The Company adopted a holding company structure, and the Company, is a holding company with no material operations of its own. All operations are conducted through the Company's U.S. subsidiaries and its VIEs and their respective subsidiaries in China. As a result, the Company's ability to pay dividends may depend upon dividends paid by its subsidiaries. The debt instruments entered into by these subsidiaries may restrict their ability to pay dividends to the Company.

In addition, the Company's wholly foreign-owned subsidiaries in China are permitted to pay dividends to the Company only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of the Company's subsidiaries and VIEs in China is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. In addition, any of the Company's wholly foreign-owned subsidiaries in China may allocate a portion of its after-tax profits based on PRC accounting standards to enterprise expansion funds and staff bonuses and welfare funds at its discretion, and its VIEs may allocate a portion of their after-tax profits based on PRC accounting standards to discretionary surplus funds at their discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. The Company's PRC subsidiaries have not paid dividends and will not be able to pay dividends until they generate accumulated profits

and meet the requirements for statutory reserve funds. Dividend distributions from the Company's U.S. subsidiaries will be subject to U.S. withholding tax. However, the Company's U.S. subsidiaries have not paid dividends in the past and the Company has no plans for its U.S. subsidiaries to pay dividends in the foreseeable future.

## Consolidation of Variable Interest Entities

The PRC government limits foreign ownership in PRC companies that operate in certain areas of business, including value-added telecommunication services, internet technology services (except e-commerce) or vehicle manufacturing of whole vehicles. Effective on July 29, 2018, the restrictions on foreign investment in new electric manufacturers were lifted.

In order to comply with these regulations, the Company control its entities in China through a set of contractual arrangements entered into among its WFOE, FF Automotive China, its VIE and VIE's shareholders. Pursuant to such contractual arrangements, FF Automotive China is obligated to absorb a majority of the risk of loss and receive a majority of the residual returns from the VIE's activities. Such arrangements also enable the Company to direct the activities that most significantly affect the economic performance of the VIE. Based on these contractual arrangements, the Company consolidates the VIE as required by the relevant rules, because the Company holds the variable interests of the VIE and is the primary beneficiary of the VIE.

## Control of the Holding Company Structure

The entity that sits above the Company's holding company structure is FF Global, which holds 80% of the issued and outstanding equity interests of Pacific Technology. The equity of FF Global is held by a group of 26 individuals comprised of various high-level employees of FF. A Committee of Managers, which includes the Managing Partner, oversees the day-to-day operations and manages the business and affairs of FF Global. Certain matters cannot be undertaken by FF Global without the consent of the Managing Partner, including, for example, nominating and approving officers of Pacific Technology, FF Top or FF Peak, which could have the effect of allowing the Managing Partner to effectively control decisions for the entities included within the Company's holding company structure. YT currently serves as the Managing Partner.

### Quantitative and Qualitative Disclosures about Market Risk

## Foreign Exchange Risk

The Company's reporting currency is U.S. dollars while its expenses are denominated in U.S. dollars, Renminbi. The Company has not used any derivative financial instruments to hedge exposure to foreign exchange risk. Although the Company's exposure to foreign exchange risks should be limited in general, the value of the Trust Interest will be affected by the exchange rate between U.S. dollars and Renminbi because a substantial portion of the Company's operating costs and expenses is effectively denominated in Renminbi, while the Company's shares and the value of Trust Interest will be denominated in U.S. dollars.

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. In July 2005, the PRC government changed its decades-old policy of pegging the value of Renminbi to the U.S. dollar, and Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between Renminbi and the U.S. dollar in the future. To the extent that the Company needs to convert U.S. dollars into Renminbi for its operations, appreciation of Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount the Company receives from the conversion. Conversely, if the Company decides to convert Renminbi into U.S. dollars for business purposes, appreciation of the U.S. dollar against Renminbi would have a negative effect on U.S. dollars received from the conversion.

### Interest Rate Risk

The Company has not been exposed to material risks due to changes in market interest rates, and the Company has not used any derivative financial instruments to manage its interest risk exposure. The Company expects rising or falling interest rates may have a material impact on its financial condition unless uncertainty about the direction and timing of interest rate changes materially affects the level of borrowing and lending activity in the economy.

### Taxation

### Cayman Islands

The Company is incorporated in the Cayman Islands. The Cayman Islands currently have no form of income, corporate or capital gains tax and no estate duty, inheritance tax or gift tax. There are no other taxes likely to be material to the Company levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or, after execution, brought within, the jurisdiction of the Cayman Islands.

### United States Income Tax

The Company is subject to taxation and files income tax returns with the U.S. federal government and the States of California and Oregon.

As a result of losses incurred, the Company had immaterial income taxes for the year ended December 31, 2018. The recorded provision for income taxes differs from the expected provision for income taxes based on the federal statutory tax rate of 21% primarily due to the valuation allowance against deferred tax assets. The Company had net deferred tax assets of approximately US$117.0 million as of December 31, 2018, which were comprised primarily of net operating loss and R&D carryforwards of US$83.0 million, impairment of property and equipment of US$21.0 million, and, to a lesser extent, temporary differences related to depreciation, accruals and stock-based compensation. The Company recognized a full valuation allowance of US$117.0 million as of December 31, 2018 since, in the judgment of management, given the Company's history of losses, the realization of these assets was not considered more likely than not. The valuation allowance increased by US$34.0 million for the year ended December 31, 2018.

The Company had U.S. federal R&D tax credit carryforwards of US$3.7 million and state R&D tax credit carryforwards of US$4.2 million as of December 31, 2018. The U.S. federal R&D tax credits will begin to expire in 2035, and the state tax credits do not expire and can be carried forward indefinitely.

As of December 31, 2018, the Company had U.S. federal and foreign net operating loss carryforwards of US$195.5 million and US$136.8 million, respectively. The U.S. federal and foreign net operating losses will begin to expire in 2034 and 2019, respectively. The U.S. federal net operating loss carryforwards of US$115.4 million generated after the effectiveness of the Tax Cuts and Jobs Act may be carried forward indefinitely, subject to the 80% taxable income limitation on the utilization of the carryforwards. The U.S. federal net operating loss carryforwards of US$80.0 million generated prior to December 31, 2017 may be carried forward for 20 years. In accordance with *Internal Revenue Code Section 382* ("Section 382") and *Section 383* ("Section 383"), a corporation that undergoes an "ownership change" (generally defined as a cumulative change (by value) of more than 50% in the equity ownership of certain stockholders over a rolling three-year period) is subject to limitations on its ability to utilize its pre-change Net Operating Losses ("NOLs") and R&D tax credits to offset post-change taxable income and post-change tax liabilities, respectively. The Company's existing NOLs and R&D credits may be subject to limitations arising from previous ownership changes, and the ability to utilize NOLs could be further limited by Section 382 and Section 383 of the Code. There is a strong possibility that the current Restructuring, together with other changes in the direct and indirect ownership of the Company preceding the Restructuring or in the future, could result in an ownership change under Section 382 and Section 383 of the Code.

As of December 31, 2018, the 2017 and 2016 tax years remained subject to examination for each jurisdiction. In accordance with *ASC 740-10, Income Taxes - Overall*, the impact of an uncertain income tax position on the income tax return must be recognized at the largest amount that is more likely than not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will not be recognized if it

has less than a 50% likelihood of being sustained. The Company had no material uncertain tax positions at December 31, 2018. At December 31, 2018, there were no interest or penalties related to uncertain tax positions.

**PRC**

Generally, the Company's PRC subsidiaries are subject to enterprise income tax on their taxable income in China at a statutory rate of 25%. The enterprise income tax is calculated based on the entity's global income as determined under PRC tax laws and accounting standards.

The Company has not yet offered products and services or generated any revenue and therefore is not subject to value-added tax or subcharges on value-added tax payments

Dividends paid by the Company's PRC subsidiaries in China to the Company's Hong Kong subsidiaries will be subject to a withholding tax rate of 10%, unless the relevant Hong Kong entity satisfies all the requirements under the Double Taxation Avoidance Arrangement and receives approval from the relevant tax authority. If the Company's Hong Kong subsidiaries satisfy all the requirements under the tax arrangement and receive approval from the relevant tax authority, then the dividends paid to the Hong Kong subsidiaries would be subject to withholding tax at the standard rate of 5%. The above-mentioned approval requirement was abolished on November 1, 2015, but a Hong Kong entity is still required to file application package with the relevant tax authority, and settle the overdue taxes if the preferential 5% tax rate is denied based on the subsequent review of the application package by the relevant tax authority.

If the Company or any of its subsidiaries outside of China were deemed to be a "resident enterprise" under the PRC Enterprise Income Tax Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25%.

Under the PRC Enterprise Income Tax Law, R&D expenses incurred by an enterprise in the course of carrying out R&D activities that have not formed intangible assets are included in the profit and loss account for the current year. In addition to deducting the actual amount of R&D expenses incurred, an enterprise is allowed an additional 75% deduction of such amount in calculating its taxable income for the relevant year. For R&D expenses that have formed intangible assets, the tax amortization is based on 175% of the costs of the intangible assets.

# SUMMARY OF TRUST ASSETS

*The following section describes some of the rights of holders of Trust Interests after the consummation of the Restructuring. You are encouraged to read carefully the Trust Agreement Term Sheet, a copy of which is attached as Exhibit A to this Offering Memorandum.*

## The Trust Assets

### Smart King Shares

Under the Fourth Amended and Restated Articles of Association (the "Articles"), the Company is authorized to issue (i) 400,000,000 Class A ordinary shares, (ii) 100,000,000 Class B ordinary shares, (iii) 470,588,235 Redeemable Preference Shares, and (iv) 600,000,000 Class B preferred shares. Upon any transfer of Class B preferred shares to a third party, such shares convert to Class B ordinary shares. As of the date of this Offering Memorandum, all of the issued and outstanding Class B preferred shares were held by FF Top and all of the issued and outstanding Redeemable Preference Shares were held by Season Smart. The rights, privileges and preferences of the Company's ordinary and preferred Shares are as follows:

### Voting

Holders of Class A Ordinary Shares do not have any voting rights, while: (i) holders of Class B Ordinary Shares are entitled to one vote per share; (ii) holders of Redeemable Preference Shares are entitled to 0.5625 votes per share; and (iii) holders of Class B Preferred Shares are entitled to ten votes per share. The holders of shares which are entitled to voting rights vote on matters together as a single class. Season Smart has approval rights over certain matters as set forth in the Articles, including (a) any amendments to the Articles which would have an adverse effect on the rights, preferences or privileges attached to Redeemable Preference Shares; (b) the issuance of any Redeemable Preference Shares to any person; (c) the entering into any related party transaction prior to a qualified financing that is not on arm's length terms; (d) the issuance of equity securities of any Company subsidiary (subject to enumerated exceptions); and (e) the issuance of any equity securities of the Company at a price below a certain minimum price or that have a senior liquidation preference to Redeemable Preference Shares.

### Dividends

There is no obligation under the Articles for the board of directors of the Company to declare dividends, and holders of Preferred Shares do not have any accrued rights in the case no dividends are declared. The board of directors of the Company also cannot declare, pay or set aside any dividends unless and until all Redeemable Preference Shares have been redeemed and paid in full. Dividends declared by the board of directors of the Company are not cumulative.

### Liquidation

In the event of a dissolution or winding up of the Company, the holders of ordinary shares and preferred shares shall be paid out by the Company in accordance with the following waterfall. First, holders of Redeemable Preference Shares shall have all of their Redeemable Preference Shares redeemed and paid in full. Second, holders of Class B preferred shares shall be paid their liquidation preference amount as set forth in the Articles. Third, to the extent that the Company has surplus assets remaining after redemption of all Redeemable Preference Shares and payment of the requisite amounts to the Class B preferred shareholders, holders of Class B Ordinary Shares shall be entitled to payment out of such surplus assets.

### Redemption

The Company has a call option with respect to the Redeemable Preference Shares upon issuance of a redemption notice within the five year period beginning on December 31, 2018. The Company is required to redeem all Redeemable Preference Shares upon any dissolution, winding up, liquidation, insolvency, declaration of bankruptcy or change of control of the Company. Ordinary shares are not redeemable.

*Conversion*

Immediately prior to any initial public offering of the equity of the Company (an "IPO"), holders of Redeemable Preference Shares have the option to convert their Redeemable Preference Shares into the class of shares that will be held by the public shareholders of the Company following the IPO. The number of such shares held by holders of Redeemable Preference Shares that have elected to convert their Redeemable Preference Shares shall be the number that would result in such holders owning the same percentage ownership of the Company on a fully diluted basis that such holders owned immediately prior to the conversion.

## West Coast Interests

YT retains the economic interest with respect to all of the membership interests of West Coast.  YT, through West Coast, has a preferred distribution right in connection with 30.8% of the Company's equity interest, which is collectively owned by YT and the management through the Partnership Program. Such right will entitle him to a priority distribution of up to US$815.7 million (subject to certain adjustment), right after the return of capital to the management, a special distribution of 10% of the remaining amounts and thereafter, a normal distribution of 20% of the balance owned by Pacific Technology. The remaining equity of the Company is owned by Evergrande and the option holders and Class A ordinary shareholders under the Company's equity incentive plan. For more information, please read the section entitled "Security Ownership of Certain Beneficial Owners and Members of the Board."

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS
AND MEMBERS OF THE BOARD[5]**

Except as specifically noted, the following table sets forth information with respect to the beneficial ownership of the equity securities of the Company as of the date of this Offering Memorandum by:

- each of the Company's directors and executive officers; and

- each person known to the Company owning beneficially more than 5% of its ordinary shares.

The calculations in the tables below are based on 1,104,718,174 ordinary shares on an as-converted basis (one-for-one) outstanding as of the date of this Offering Memorandum and immediately after the completion of this Restructuring, comprised of (i) 34,129,939 Class A ordinary shares, 470,588,235 redeemable preference shares and 600,000,000 Class B preferred shares, as of the date of this Offering Memorandum, and (ii) 34,129,939 Class A ordinary shares, 470,588,235 redeemable preference shares, 452,941,177 Class B preferred shares and 147,058,823 Class B ordinary shares immediately after the completion of this Restructuring.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, the shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security are included. These shares, however, are not included in the computation of the percentage ownership of any other person.

The following table presents share ownership of the Company as of the date of this Offering Memorandum.

|  | | | | Shares Beneficially Owned As of the Date of this Offering Memorandum | | | |
|---|---|---|---|---|---|---|
|  | Class A Ordinary Shares | Redeemable Preference Shares | Class B Preferred Shares | Total ordinary shares on an as converted basis | % | % of aggregate voting power*** |
| **Directors and Executive Officers**:\*\* | | | | | | |
| Yueting Jia [1] | — | — | 120,000,000 | 120,000,000 | 10.86 | 19.15 |
| Jerry Wang [2] | — | — | 58,704,000 | 58,704,000 | 5.31 | 9.37 |
| Tin Mok [3] | — | — | 25,152,000 | 25,152,000 | 2.28 | 4.01 |
| Matthias Aydt [4] | — | — | 47,328,000 | 47,328,000 | 4.28 | 7.55 |
| Chaoying Deng [5] | — | — | 26,784,000 | 26,784,000 | 2.42 | 4.28 |
| Jarret Johnson [6] | — | — | * | * | * | * |
| **All Directors and Executive Officers as a Group** | | | 755,132,235 | 755,132,235 | 25.76 | 45.42 |
| **Principal Shareholders:** | | | | | | |
| FF Top Holding Ltd. [7] | — | | 600,000,000 | 600,000,000 | 54.31 | 95.77 |
| Season Smart Limited [8] | — | 470,588,235 | — | 470,588,235 | 42.60 | 4.23 |

Notes:
\*      Less than 1% of our total outstanding shares.
\*\*     The business address of all the directors and executive officers is 18455 S Figueroa St, Gardena, CA 90248.
\*\*\*    Class A ordinary shares are not entitled to vote. One redeemable preference share is entitled to 18/32 vote. One Class B preferred share is entitled to 10 votes.

(1) Represents the economic interests in the Class B preferred shares indirectly held by West Coast, which is 100% owned by Lian Bossert. YT has entered into a nominee agreement with Ms. Bossert pursuant to which Ms. Bossert is the record owner of all the membership interests in West Coast and has all the voting rights associated with such membership interests. YT retains the economic interest with respect to all of the membership interests of West Coast. West Cost holds all of the issued and outstanding preferred units, representing 20% of the total outstanding units of Pacific Technology. Pacific Technology holds 100% equity interest of FF Peak Holding Limited, a British Virgin Islands Company ("FF Peak"), which then holds 100% equity interest of FF Top. Prior to the consummation of the Restructuring, FF Top owns 600,000,000 Class B preferred shares of the Company.

West Coast will receive dividends, distributions or other economic interests from Pacific Technology according to the following waterfall:

First, all distributions will be made to FF Global, which holds 100% of the common units, representing 80% of the total outstanding units of Pacific Technology, until FF Global recovers its capital contribution plus an interest of 8% per annum;

Second, all distributions will be made to West Coast until the aggregate amount shall be equal to $815,677,548.47, subject to certain adjustment, plus an interest of 8% per annum, subject to certain adjustments;

Third, 10% of the remaining distributions shall go to West Coast;

Lastly, the remaining amount shall be distributed among FF Global and West Coast based on their membership interest.

(2) Represents the 58,704,000 Class B preferred shares directly held by FF Top, in which Mr. Jerry Wang indirectly owns interest through Mr. Wang's 12.23% membership interest in FF Global. FF Global is the managing member of Pacific Technology, which indirectly holds 100% of the equity interest in FF Top.

(3) Represents the 25,152,000 Class B preferred shares directly held by FF Top, in which Mr. Tin Mok indirectly owns interest through Mr. Mok's 5.24% membership interest in FF Global. FF Global is the managing member of Pacific Technology, which indirectly holds 100% of the equity interest in FF Top.

(4) Represents the 47,328,000 Class B preferred shares directly held by FF Top, in which Mr. Aydt indirectly owns interest through Mr. Aydt's 9.86% membership interest in FF Global. FF Global is the managing member of Pacific Technology, which indirectly holds 100% of the equity interest in FF Top.

(5) Represents the 26,784,000 Class B preferred shares directly held by FF Top, in which Ms. Deng indirectly owns interest through Ms. Deng's 5.58% membership interest in FF Global. FF Global is the managing member of Pacific Technology, which indirectly holds 100% of the equity interest in FF Top.

(6) Represents the Class B preferred shares directly held by FF Top, in which Mr. Johnson indirectly owns interest through his membership interest in FF Global. FF Global is the managing member of Pacific Technology, which indirectly holds 100% of the equity interest in FF Top.

(7) Represents the 600,000,000 Class B preferred shares held by FF Top and its 100% indirect holding company Pacific Technology. Pacific Technology is managed by FF Global as the managing member. FF Global has 26 members, all being the management or employees of the Company. FF Global is governed and managed by its committee (the "Committee"). Mr. Yueting Jia, who is not a member of FF Global, serves as one of the managers on the Committee, and is the Managing Partner of FF Global who has veto rights over various corporate actions of the FF Global. Mr. Yueting Jia can only be removed from being the Managing Partner by his appointing member with cause, and such removal and filling of the vacancy in connection therewith, by YT's appointing member, does not require approval of the Committee. FF Global transacts business and acts by the decisions of the Committee, which are determined by the affirmative approval of the majority of the managers who are present and vote on the matter, subject to the veto rights of the Managing Partner over certain matters.

(8) Season Smart Limited was a wholly-owned subsidiary of Evergrande.

The following table presents share ownership of the Company immediately after the Restructuring.

| | | | | Shares Beneficially Owned Immediately after the Restructuring | | | |
|---|---|---|---|---|---|---|---|
| | Class A Ordinary Shares | Class B Ordinary Shares | Redeemable Preference Shares | Class B Preferred Shares | Total ordinary shares on an as converted basis | % | % of aggregate voting power** |
| **Directors and Executive Officers:** | | | | | | | |
| Jerry Wang | — | — | — | 44,315,764 | 44,315,764 | 4.01 | 8.97 |
| Tin Mok | — | — | — | 18,987,294 | 18,987,294 | 1.72 | 3.84 |
| Matthias Aydt | — | — | — | 35,728,000 | 35,728,000 | 3.23 | 7.23 |
| Chaoying Deng | — | — | — | 20,219,294 | 20,219,294 | 1.83 | 4.09 |
| Jarret Johnson | — | — | — | * | * | * | * |
| **All Directors and Executive Officers as a Group** | | | | 124,214,588 | 124,214,588 | 11.24 | 25.14 |
| **Principal Shareholders:** | | | | | | | |
| FF Top Holding Ltd. | — | — | — | 452,941,177 | 452,941,177 | 41.00 | 91.67 |
| Season Smart Limited | — | — | 470,588,235 | | 470,588,235 | 42.60 | 5.36 |
| Trust (1) | — | 147,058,823 | | (1) | 147,058,823 | 13.31 | 2.98 |

Notes:
*       Less than 1% of our total outstanding shares.
**      Class A ordinary shares is not entitled to vote. One Class B ordinary share is entitled to one vote. One redeemable preference share is entitled to 18/32 vote. One Class B preferred share is entitled to 10 votes.


(1) YT and FF Top have undertaken to transfer 147,058,823 Class B preferred shares (which will be converted automatically into Class B ordinary shares upon transfer) and all of YT's economic interest in West Coast to the Trust once the injunctions or other court orders expired or are lifted and all other conditions are met.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
## THE CONSENSUAL RESTRUCTURING AND THE PREPACKAGED PLAN

The following discussion summarizes certain material U.S. federal income tax consequences applicable to the Trust and the holders of Trust Interests ("Holders"). This summary is based on the Internal Revenue Code, the Treasury Regulations promulgated thereunder (whether final, temporary, or proposed), administrative rulings, and judicial decisions, all as in effect on the date hereof. Each of the foregoing authorities is subject to change, which change could apply with retroactive effect and could affect the accuracy of the statements and conclusions set forth in this discussion. Neither YT nor the Trust will request a ruling from the IRS as to the U.S. federal income tax consequences to YT, the Trust or the Holders. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions described in this summary.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential U.S. federal income tax considerations that may apply to a Holder. This summary does not take into account the individual facts and circumstances of any particular Holder that may affect the U.S. federal income tax consequences to such holder, including specific tax consequences to a holder under an applicable tax treaty. In addition, this summary does not address the U.S. federal alternative minimum, U.S. federal estate and gift, U.S. state and local, or non-U.S. tax consequences of the Trust or the ownership of the Trust Interests.

This discussion assumes that each Holder is a non- U.S. person (a "Non-U.S. Holder"). For this purpose, a Non-U.S. Person means a person or entity that is not:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or any subdivision thereof;

- an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source;

- a partnership (or an entity or arrangement treated as a partnership for U.S. federal income tax purposes); or

- a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the Trust and one or more U.S. persons have the authority to control all substantial decisions of the Trust, or (2) the Trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes.

Any person who would not be considered a Non-U.S. Holder under U.S. federal income tax rules and regulations should consult their own tax advisor.

This discussion also assumes that the income of the Trust will consist solely of gains from the sale of Company stock and interest on short-term debt instruments or money deposits.

Finally, this discussion also assumes that (i) West Coast and each of those entities through which West Coast directly and indirectly owns the stock of the Company (the "West Coast Conduit Entities") are treated as "pass-through" entities (i.e. either partnerships or disregarded entities) for U.S. federal income tax purposes, (ii) none of the Trust, West Coast or the West Coast Conduit Entities will at any time engage in the conduct of a trade or business within the United States and (iii) the Trust will use commercially reasonable efforts to provide a requesting Holder with any certification available under applicable law that is reasonably required to enable such Holder to dispose of its Trust Interest without incurring a U.S. withholding tax.

A failure of any of the assumptions described above may result in different, potentially adverse tax consequences to a Holder. Each Holder is strongly urged to consult its own tax advisor regarding its receipt and ownership of a Trust Interest.

### U.S. Tax Classification of the Trust

The tax classification of the Trust for U.S. federal income tax purposes is subject to some uncertainty. The Trust is expected to be reported as a "liquidating trust" described in Treasury Regulation Section 301.7701-4(d) (a "Liquidating Trust"). In general, a Liquidating Trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a "pass-through" entity) of which the beneficial owners are treated as the owners and grantors (but see discussion regarding the Late Filing Claims Reserve below). While the following discussion assumes that the Trust would be so treated for federal income tax purposes, no ruling has been or will be requested from the IRS concerning the tax status of the Trust as a Liquidating Trust. In addition, the IRS has issued several revenue procedures setting forth the general criteria for obtaining an IRS ruling as to the qualification of a trust as a Liquidating Trust. Not all of the criteria set forth in those revenue procedures will be met by the Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Trust as a Liquidating Trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Trust and the Holders could vary from those discussed herein (including the potential for an entity-level tax imposed on the Trust). There are, however, reasonable arguments that the Trust could be classified as a non-grantor trust or as a partnership for U.S. federal income tax purposes if it is not treated as a Liquidating Trust, both of which are also "pass-through" entities. Such alternative characterizations should not result in entity-level taxes to the Trust (assuming, in the case of a non-grantor trust, income of the trust is timely distributed to its beneficial owners) or materially adversely affect the tax treatment of the Holders.

Assuming the Trust is properly classified as a Liquidating Trust, the Trust will not be subject to U.S. federal income taxes at the entity level. Instead, the income, deductions and credits generated by the assets of the Trust will pass through and be allocated among the Holders for U.S. federal income tax purposes in accordance with their deemed ownership interests in the Trust.

### U.S. Federal Income Tax Treatment of Holders

The assets of the Trust will be treated for U.S. federal income tax purposes as having been transferred directly to the Holders in exchange for their Debt Claims (with each such Holder receiving an undivided interest therein determined on the basis of the amount of its Debt Claim and the priority of distributions set forth in the Trust Agreement), and then by such Holders to the Trust in exchange for the Trust Interests. Thereafter, the income, deductions and credits generated by the assets of the Trust will be allocated among the Holders for U.S. federal income tax purposes in accordance with their Trust Interests.

Subject to the discussion under "Accrued Interest on Debt Claims" and "Information Reporting and Backup Withholding," a Non-U.S. Holder generally should not be subject to U.S. federal income taxation either upon receipt of a Trust Interest nor on its allocable share of the income of the Trust or on any gain realized by such Non-U.S. Holder upon the sale, exchange or retirement of the Trust Interest, unless:

- the recognized income or gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States, and if required by an applicable tax treaty, attributable to a permanent establishment maintained by the Non-U.S. holder in the United States; or

- the non-U.S. Holder is an individual present in the U.S. for one-hundred-eighty-three (183) days or more during the taxable year of the sale, and certain other requirements are met.

A Non-U.S. Holder whose income with respect to the Trust is effectively connected to the conduct of a U.S. trade or business will generally be taxed as if it were a United States person unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income at a rate of 30% unless a treaty applies to reduce such rate.

### Accrued Interest on Debt Claims

To the extent that any portion of the Trust Interests received by a Holder is attributable to accrued and unpaid interest on its Debt Claim, such amount may be includible in such Holder's gross income as ordinary interest income subject to a 30% tax rate (which rate is reduced by treaty to 10% if the Holder is citizen or resident of China)

if such accrued interest has not been included previously in such Holder's gross income for U.S. federal income tax purposes. The applicable Treasury Regulations generally require that any payment on a debt instrument first be allocated to interest to the extent of any accrued and unpaid interest. However, the allocation of amounts paid to a debt holder as between principal on the one hand and accrued and unpaid interest on the other hand is presently unclear, particularly in the distressed context. YT does not intend to report to any Holder any amount attributable to accrued and unpaid interest notwithstanding the previously mentioned Treasury Regulation. However, given this Treasury Regulation, YT intends to disclose this position to the IRS, and holders may, in consultation with their own tax advisors, wish to do the same. The IRS could argue that the value of any Trust Interest received by a Holder should be allocated first to accrued and unpaid interest up to the total amount of accrued and unpaid interest prior to allocating any portion of such amounts to principal. Such argument, if successful, would result in holders being required to report ordinary interest income on such value for U.S. federal income tax purposes.

**Tax Treatment of the Late Filing Claims Reserve**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations or the receipt of an adverse determination by the IRS upon audit if not disputed by the Trustee), the Trustee intends to (i) treat the Late Filing Claims Reserve as a non-grantor trust in accordance with the trust provisions of the IRC (sections 641 et seq.), or such other entity deemed appropriate by the Trustee in its sole discretion, (ii) file all applicable tax and information returns and, if applicable, timely pay all taxes that may become due consistently with such treatment, and (iii) to the extent permitted by applicable law, report consistently for federal, state and local income tax purposes. In general, a non-grantor trust is taxed on any income allocated to it except to the extent such income is timely distributed to its beneficiaries, in which case the income is reported by the beneficiaries.

**Tax Classification of West Coast Conduit Entities**

As stated above, this discussion assumes that each of the West Coast Conduit Entities is treated as a "pass-through" entity (i.e. a partnership or disregarded entity) for U.S. federal income tax purposes. In this regard, one of those entities, Pacific Technology, is intended to be treated and will be reported as a partnership for such purposes. However, an election was mistakenly filed with the IRS to treat Pacific Technology as a corporation. Subsequently, Pacific Technology filed a request for withdrawal of such election. In addition, late elections to be classified as disregarded entities were filed for FF Top and FF Peak. While advisors to YT and the West Coast Conduit Entities believe that the withdrawal of the inadvertent election and the late elections should be effective to cause each of the West Coast Conduit Entities to be classified as a "pass-through" entity based on published guidance and procedures from the IRS governing such elections, there is no assurance that the IRS will agree with that determination. If any of the West Coast Conduit Entities were to be treated as a corporation for U.S. federal income tax purposes, the resulting adverse tax consequences could include corporate level taxes levied on any proceeds from the disposition of stock of the Company held indirectly by such entity as well as potential taxes imposed on any distribution of such proceeds by such entity that are ultimately allocable to the Holders. Such dividends could by subject to tax at a 30% tax rate (subject to reduction under an applicable treaty).

**Information Reporting and Backup Withholding**

Assuming the West Coast Constituent Entities are treated as "pass-through" entities, a Non-U.S. Holder that has provided the Trustee (or, in connection with the sale, exchange or retirement of a Trust Interest, certain applicable intermediaries) with a validly completed original of the appropriate version of IRS Form W-8 will not be subject to backup withholding or information reporting with respect to the receipt of Trust Interests, payments made by the Trust derived from the sale of the stock of the Company, or proceeds from a sale, exchange or retirement of a Trust Interest unless, in each case, the Trustee or applicable payor has actual knowledge or reason to know that the Non-U.S. Holder is a United States person.

Backup withholding is not an additional tax. A Non-U.S. Holder generally will be entitled to credit any amounts withheld under the backup withholding rules against the holder's U.S. federal income tax liability, if any, or may claim a refund if certain information is timely provided to the IRS.

**Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE CONSENSUAL RESTRUCTURING AND PREPACKAGED PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE RESTRUCTURING AND PREPACKAGED PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE RESTRUCTURING AND PREPACKAGED PLAN.

## INVESTOR SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS

**The Exchange Offer is being made to holders of Debt Claims pursuant to an exemption from registration under Regulation S under the Securities Act or other available exemptions in reliance on such exemption from the registration requirements of the Securities Act.**

**The Trust Interests have not been registered under the Securities Act and may not be offered or sold in the United States or to U.S. persons (other than distributors) unless the Trust Interests are registered under the Securities Act, or an exemption from the registration requirements of the Securities Act is available, and any hedging transactions involving those Trust Interests may not be conducted unless in compliance with the Securities Act.**

### General

An investment in the Trust Interests involves significant risks and is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment and who can bear the economic risk of a complete loss of their investment. The Exchange Offer is made in reliance on exemptions from the registration requirements of the Securities Act and the applicable state securities laws or regulations for an offer and sale of securities that does not involve a public offering. The Trust Interests have not been registered under the Securities Act or any state securities laws and, unless registered, may not be offered or sold except under an exemption from, or in a transaction not subject to, such registration requirements.

The suitability standards discussed below represent minimum suitability standards for you. Your satisfaction of such standards does not necessarily mean that the Trust Interests are a suitable investment for you. You are encouraged to consult your personal financial advisors to determine whether an investment in the Trust Interests is appropriate. YT may reject the election of any holder of a Debt Claim to exchange such Debt Claims for Trust Interests, in whole or in part, in his absolute discretion.

YT will require you to represent in writing, among other things, that:

- by reason of your business or financial experience, or that of your financial advisor, you are capable of evaluating the merits and risks of an investment in us and of protecting your own interest in connection with the transaction;

- you are acquiring the Trust Interests for your own account and not with a view toward the resale or distribution of such units;

- you are aware that the Trust Interests have not been registered under the Securities Act or any state securities laws or regulations and that transfer thereof is restricted by the Securities Act and applicable state securities laws or regulations, and you are aware of the absence of any market for the units; and

- you meet the suitability requirements set forth below.

### Investor Suitability Requirements

In order to receive Trust Interests pursuant to the Exchange Offer you must represent in writing that you are not a U.S. person and provide a properly completed and duly executed original of the appropriate version of IRS Form W-8 included with the Letter of Transmittal and Ballot.

Each person receiving this Offering Memorandum and participating in the Exchange Offer will also be deemed to have:

- acknowledged that such person has been afforded an opportunity to request from YT and to review, and has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information contained in this Offering Memorandum;

- acknowledged that it has not relied on YT or any person affiliated with him (only the Company and the Trustee) in connection with its investigation of the accuracy of such information or its investment decision;

- acknowledged that no person has been authorized to give information or to make any representation concerning YT, the Trust Interests or the Company other than as contained herein and, if given or made, such other representation should not be relied upon as having been authorized by YT or any other person affiliated with him;

- acknowledged that if an offer, sale, pledge, or other transfer of the Trust Interests (other than pursuant to an effective registration statement) is proposed, such person must furnish to the Trustee any and all certifications, legal opinions or other information as the Trustee may request to confirm that the proposed transfer is being made pursuant to an exemption from registration under the Securities Act or in a transaction not subject to the Securities Act and that the proposed transfer will not result in the Trust being treated as an association or publicly traded partnership taxable as a corporation;

- acknowledged that YT, the Trustee and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agree that if any acknowledgment, representation or agreement deemed to have been made by its participation in the Exchange Offer is no longer accurate, it shall promptly notify YT and the Trustee; and

- if it is acquiring any of the Trust Interests as fiduciary or agent for one or more investor accounts, represented that it has sole investment discretion with respect to each account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account and that each such account is eligible to purchase the Trust Interests.

No representation or warranty, express or implied, is made by YT as to the accuracy or completeness of any of the information set forth in this Offering Memorandum, including the documents attached as exhibits, and nothing contained in this Offering Memorandum is or shall be relied upon as a promise or representation, whether as to the past or the future. The information contained in this Offering Memorandum is as of the date hereof and is subject to change, completion or amendment without notice. Neither the delivery of this Offering Memorandum at any time nor any subsequent commitment to enter into any exchange shall, under any circumstances, create any implication that there has been no change in the information set forth herein or in YT's affairs and those of our subsidiaries since the date of this Offering Memorandum.

<u>**Transfer Restrictions**</u>

The Exchange Offer has not been registered under the Securities Act, and the Trust Interests may not be offered or sold in the United States by an acquirer in the Exchange Offer except as permitted by the Trust Agreement and pursuant to an effective registration statement (if any) or in accordance with an exemption from the registration requirements of the Securities Act, as set forth below. Neither YT nor the Trustee intend to file any registration statement with respect to the Trust Interests.

The Trust Interests may not be transferred except upon the prior written consent of the Trustee (not to be unreasonably withheld, conditioned, or delayed).

Notwithstanding the foregoing, the Trust Interests may not be transferred to the extent that such transfer would (a) based on the advice of counsel to the Trust, jeopardize the Trust's tax treatment; (b) cause the Trust to become subject to any governmental controls or regulations that affect the administration of the Trust and the Trust Assets; (c) violate applicable law (including any securities law) or any instrument to which the Trust is a party or by

which it is bound; or (d) cause the Trust to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

        If you receive Trust Interests in the Exchange Offer, you will be deemed to have represented and agreed that:

        (1)     you are acquiring the securities pursuant to the Exchange Offer for your own account or for an account with respect to which you exercise sole investment discretion;

        (2)     you understand that the securities you will receive are being offered only in a transaction not involving any public offering within the meaning of the Securities Act, and that (A) those securities may be offered, resold, pledged, hypothecated or transferred only in accordance with the terms of the Trust Agreement and (i) pursuant to any available exemption from the registration requirements of the Securities Act, or (ii) pursuant to an effective registration statement under the Securities Act (if any), in each case in accordance with any applicable securities laws of the United States or any state thereof, (B) the person that purchases Trust Interests from you will be required, and each subsequent holder will be required, to notify any purchaser of these securities of the resale restrictions referred to in (A) above, if then applicable, and (C) in the case of (2)(A)(i) above, the securities may not be offered, sold, pledged, hypothecated or transferred without an opinion of counsel satisfactory to the Trustee or based on other written evidence in form or substance satisfactory to the Trustee that such offer, sale, pledge, hypothecation or transfer is in compliance with this paragraph; and

        (3)     you understand that the following legend will be placed on any certificate representing any of the Trust Interests, unless otherwise agreed:

        "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE 'ACT'), AND (A) MAY BE OFFERED, RESOLD, PLEDGED, HYPOTHECATED OR TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF THE TRUST AGREEMENT OF THE 2019 CREDITOR LIQUIDATING TRUST AND (I) PURSUANT TO ANY AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT, OR (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT (IF ANY), IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE UNITED STATES OR ANY STATE THEREOF, (B) THE PURCHASER OF THESE SECURITIES IS REQUIRED, AND EACH SUBSEQUENT PURCHASER WILL BE REQUIRED, TO NOTIFY ANY PURCHASER OF THESE SECURITIES OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE, IF THEN APPLICABLE, AND (C) IN THE CASE OF (A)(I) ABOVE, THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED OR TRANSFERRED WITHOUT AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES THAT SUCH OFFER, SALE, PLEDGE, HYPOTHECATION OR TRANSFER IS IN COMPLIANCE HEREWITH."

## ADDITIONAL INFORMATION

Questions and requests for assistance or for additional copies of this Offering Memorandum, the Letter of Transmittal and Ballot, or any other required documents may be directed to the Exchange Agent at Epiq Corporate Restructuring, LLC, at tabulation@epiqglobal.com (please reference "YT" in the subject line).  You may also visit https://dm.epiq11.com/YT1 for additional information.

YT will undertake to make available to you, during the course of the transaction and prior to exchange of the Debt Claims, the opportunity to ask questions of and receive answers from YT concerning the terms and conditions of this Offering Memorandum and to obtain any additional information necessary to verify the accuracy of the information contained in this Offering Memorandum.

## <u>EXHIBIT A</u>

**Trust Agreement Term Sheet**

## 2019 Creditor Trust Non-Binding Term Sheet

Yueting Jia ("YT") intends, immediately following the effectiveness of his individual restructuring and lifting of any applicable limitations, to (a) transfer the economic interests in 90,588,235 units (representing 100% of the issued and outstanding units) of West Coast LLC ("West Coast"), a Delaware limited liability company (the "West Coast Interests"), and (b) cause to be transferred 147,058,823 Class B Preferred Shares of Smart King Ltd., a company formed under the laws of the Cayman Islands ("Smart King"), which, upon transfer, will automatically convert into Class B Ordinary Shares on a one-to-one basis (the "Smart King Shares"), to the 2019 Creditor Liquidating Trust[1] (the "Creditor Trust") and the Late Filed Debt Claims Reserve (as defined below) (collectively, the "Trust") for the purposes of administering and settling certain claims against YT. As of the date of this term sheet (this "Term Sheet"), the Trust Assets (as defined below) are subject to certain limitations and prohibitions imposed by (i) preliminary injunctions, freezing orders and/or similar orders from courts of competent jurisdiction, which currently include courts of the British Virgin Islands and the United States federal courts situated in the state of California (collectively, the "Injunctions"), (ii) that certain Fourth Amended and Restated Memorandum and Articles of Association of Smart King adopted as of May 15, 2019 (the "SK M&A"), and (iii) that certain Restructuring Agreement, dated as of December 31, 2018, by and among Smart King, YT Season Smart Limited, a company formed under the laws of the British Virgin Islands, and the other parties thereto (the "Restructuring Agreement").

Prior to the date of this Term Sheet, YT and FF Top Holding Ltd., a company formed under the laws of the British Virgin Islands ("FF Top"), entered into a deed of undertaking, pursuant to which they agreed, after the Injunctions are lifted or discharged and all other conditions set forth in the SK M&A and the Restructuring Agreement are satisfied, to transfer the West Coast Interests and the Smart King Shares to the Trust.

| Purpose | The restructuring will, among other things, grant each holder of an Allowed Debt Claim (as defined below) or Late Filed Debt Claim (as defined below) a beneficial interest (a "Trust Interest") in the Creditor Trust or the Late Filed Debt Claims Reserve, as applicable, based on the formula set forth herein. |
|---|---|
| | The Trust will preserve, hold, manage and maximize the Trust Assets for use in paying and satisfying the holders' claims upon the earlier to occur of (a) the consummation of a Liquidity Event (as defined below) or Distribution Event (as defined below) and (b) the termination of the Trust in accordance with the terms and conditions set forth in the definitive trust agreement (the "Trust Agreement"). |
| Assets of the Trust | The assets of the Trust shall consist of the following: |

---

[1] *Note*: The Late Filed Debt Claims Reserve mechanism to be confirmed.

2

| | |
|---|---|
| | (a) all of the West Coast Interests, which represents a preferred distribution right in connection with 30.8% of Smart King's equity interest (collectively owned by YT and the management of Faraday Future), which will entitle YT to a priority distribution of up to US$815.7 million (subject to certain adjustment), right after the return of capital to the management, a special distribution of 10% of the remaining amounts and thereafter, a normal distribution of 20% of the balance owned by Pacific Technology Holding LLC;<br><br>(b) 147,058,823 Smart King Shares; and<br><br>(c) the Trust Expense Funded Amount contributed to the Trust by a postpetition lender (the "Funding Source") as provided herein (collectively, the "Trust Assets").<br><br>The Trustee shall engage an independent valuation firm to conduct a valuation of the Trust Assets (other than the Trust Expense Funded Amount) as of the date of their contribution to the Trust. |
| **Debt Claims** | "Debt Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code) against YT that is (a) not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim (each as defined in the prepackaged chapter 11 plan of reorganization filed by YT (the "Plan")) or (b) otherwise determined by the Bankruptcy Court (as defined in the Plan) to be a Debt Claim.[2]<br><br>"Allowed Debt Claim Allocation Amount" means the Allowed (as defined in the Plan) amount of a Debt Claim *excluding* the amount of any unpaid interest, any penalty interest, any expenses and any fees related thereto.<br><br>"Allowed Debt Claim Distribution Amount" means the Allowed Debt Claim Allocation Amount *minus* the sum of (i) the amount the holder of such Debt Claim will receive from the primary obligor of such debt *plus* (ii) the amount such holder will receive upon the disposition of any assets that (a) have already been collateralized by YT or any other person or entity, (b) have already been pledged by YT or any other person or entity, and (c) YT, his wife Wei Gan, or any other person or entity own that have been seized, attached, or frozen by Chinese judiciary authorities *plus* (iii) if the primary debt obligation is satisfied by conversion to equity in any jurisdiction, the corresponding reduction in the amount of the Debt Claim on account of such conversion. |

---

[2] *Note*:  If the Trust is established pursuant to a consensual restructuring, the definitions in the Trust Agreement will be modified accordingly.

3

| | |
|---|---|
| | "Late Filed Debt Claim" means a Debt Claim filed after the deadline set by the Bankruptcy Court to file claims in the chapter 11 case but before the occurrence of a Distribution Event that is recognized by YT, in his sole discretion, and in an amount to be verified by the Trustee (as defined below). |
| | To the extent any holder of an Allowed Debt Claim continues to have claims against any other person or entity (other than YT or his wife Wei Gan), subject to the following proviso, such claims will remain outstanding notwithstanding the transactions contemplated hereby; *provided, however*, if on and after the date on which the claims of any holder of a Debt Claim is paid in full in accordance with the terms of this Term Sheet, any such Debt Claims shall thereafter be deemed to be and in fact, paid in full in their entirety.  Furthermore, to the extent any holder of a Debt Claim has security or possession of any property or assets of YT or any other person or entity, after such claims are paid in full, such holder shall release and/or return any such property or assets to YT or such other person or entity. |
| | If on and after the date on which the Debt Claims of any creditor are paid in part in accordance with the terms of this Term Sheet, then the aggregate amount distributed to such creditor from the disposition of Chinese frozen or secured assets shall be equal to the proceeds received from the disposition of such frozen or secured assets less the partial payments that have been made to such creditor through the Trust. |
| **Late Filed Debt Claims Reserve** | On the effective date of the Plan, YT shall (a) establish a separate trust (the "Late Filed Debt Claims Reserve") to hold West Coast Interests and Smart King Shares pending the recognition, in YT's sole discretion, but subject to verification of the amount of such claim by the Trustee, of any Late Filed Debt Claims and (b) transfer 10% of the West Coast Interests and Smart King Shares respectively to the Late Filed Debt Claims Reserve. The Late Filed Debt Claims Reserve will have no operations other than to make distributions to holders of Late Filed Debt Claims in accordance with the distribution waterfall set forth on **Exhibit A** attached hereto (the "Distribution Waterfall") and will be managed by the Trustee pursuant to a separate trust agreement with substantially similar governance terms as the Trust Agreement. |
| | The Trustee shall have the right in its discretion to (a) exchange the Late Filed Debt Claims Reserve's portion of the West Coast Interests and Smart King Shares for direct Trust Interests in the Creditor Trust, which shall provide the beneficiaries of the Late Filed Debt Claims Reserve with the same share of distributions they are otherwise entitled to receive under the Distribution Waterfall, and (b) distribute such Trust Interests to the beneficiaries of the Late Filed Debt Claims Reserve in |

4

|  | exchange for their beneficial interests in the Late Filed Debt Claims Reserve.<br><br>In order for a holder of a Late Filed Debt Claim to receive a distribution from the Late Filed Debt Claims Reserve, such holder must execute a full release of YT and his wife Wei Gan from personal liability on all claims in every jurisdiction. Any distribution to a Late Filed Debt Claim shall be from the Late Filed Debt Claims Reserve and holders of Late Filed Debt Claims shall have no recourse against the Creditor Trust or YT. |
|---|---|
| **Voting Rights with respect to Trust Assets** | The Trustee shall exercise all voting rights with respect to the Smart King Shares as directed by FF Top; *provided* that the exercise of such voting rights shall be in accordance with (a) the organizational and governing documents of Smart King and (b) such other agreements that are in effect as of the date of the Trust Agreement (including the SK M&A and the Restructuring Agreement), in each case, to the extent applicable. |
| **Term** | The term of the Trust will extend until the sixth (6th) anniversary of the effective date of the Trust Agreement (such six (6)-year period, the "Initial Term"). The Creditor Trust Committee (as defined below) may, upon delivery of written notice to the Trustee not later than ninety (90) days prior to the expiration of the Initial Term, elect to extend the Initial Term for up to three (3) additional one (1)-year periods (each, a "Creditor Extension Term") to allow for orderly liquidation of any remaining Trust Assets. Subject to the limitations set forth above, the Creditor Trust Committee may, upon delivery of written notice to the Trustee not later than ninety (90) days prior to the expiration of the then-current Creditor Extension Term, elect to extend such Creditor Extension Term.<br><br>If the completion of an initial public offering on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange with respect to the shares of outstanding capital stock of Smart King or such other relevant listing vehicle, as applicable (an "IPO"), occurs during the Initial Term, YT may, upon delivery of written notice to the Trustee and the Creditor Trust Committee not later than ninety (90) days prior to the expiration of the Initial Term, elect to extend the Initial Term for up to three (3) additional one (1)-year periods (each, a "YT Extension Term") in his sole discretion in order to liquidate any Smart King Shares that remain unsold as of the expiration of the Initial Term.<br><br>The Trustee shall dissolve and wind up the Trust and distribute the Trust Assets upon the expiration of (a) the Initial Term, if no YT Extension |

| | |
|---|---|
| | Term or Creditor Extension Term is exercised, or (b) the expiration of the applicable YT Extension Term or Creditor Extension Term, as applicable. |
| | The Trustee may dissolve the Trust before the end of the Initial Term, any Creditor Extension Term or any YT Extension Term if: (i) all of the Allowed Debt Claim Distribution Amounts are fully paid and satisfied and YT has approved the dissolution of the Trust; or (ii) a Liquidity Event has occurred. |
| | Upon termination of the Trust, the Trustee shall obtain a valuation of the Trust Assets as of the termination date (performed by an independent valuation firm selected by the Trustee and approved by the Creditor Trust Committee and YT) and shall, as promptly as practicable following the completion of the independent valuation, distribute the Trust Assets in kind to the creditors in accordance with the Distribution Waterfall. |
| **Trustee** | There shall be one (1) trustee (the "Trustee") who shall be appointed in accordance with the Trust Agreement.  The Trust Agreement shall set forth certain experience and independence criteria for the Trustee. If the Trust is established pursuant to the Plan, the Trustee will be identified prior to confirmation of the Plan. The Trustee shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Trust or to any person except for such of the Trustee's acts or omissions that constitute fraud, willful misconduct or gross negligence as determined by a court of competent jurisdiction.  In addition, the Trustee shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities, or expenses (including without limitation, attorneys' fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to the Trust Agreement or the affairs of the Trust (other than in respect of acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction). The Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance and engage independent legal counsel and financial advisors to assist with its evaluation of any matters with respect to the Trust, including any Liquidity Event. |
| | The Trustee shall be compensated by the Trust in an amount not to exceed US$100,000 per annum (unless approved by the Creditor Trust Committee).  The Trustee shall be entitled to reimburse itself out of any available cash in the Trust, for its actual out-of-pocket expenses and against and from any and all loss, liability, expense, or damage which the Trustee may sustain in good faith and without willful misconduct, |

| | |
|---|---|
| | gross negligence, or fraud in the exercise and performance of any of the powers and duties of the Trustee under the Trust Agreement.

The Trustee may resign upon sixty (60) days' advance written notice to the Creditor Trust Committee so long as a replacement trustee has been appointed.

The Creditor Trust Committee may remove the Trustee in the event the Trustee commits any act or omission that constitutes fraud, breach of fiduciary duty, willful misconduct, or gross negligence.  Upon the removal of the Trustee as set forth in the immediately preceding sentence, the Creditor Trust Committee shall have the right to appoint a replacement trustee, subject to approval by YT. |
| **Expenses of the Trust** | On the effective date of the Trust Agreement, the Funding Source shall contribute to the Trust as part of the Trust Assets US$600,000 in immediately available funds for the purposes of funding the Trust's administration during the first three (3) years of the Initial Term, including for retaining independent third party advisors (legal counsel, an independent registered accounting firm, and an independent valuation firm, among others), compensating the Trustee, and paying such other fees and expenses incidental to the management and administration of the Trust Assets during the first three (3) years of the Initial Term.  For each year during the Initial Term thereafter, no later than thirty (30) days following the beginning of such year, the Funding Source shall contribute to the Trust as part of the Trust Assets US$200,000 in immediately available funds for the purposes of funding the Trust's administration during such year (the expenses referred to in this paragraph are referred to herein as the "Initial Trust Expenses"). For purposes of clarification, in no event shall the Funding Source be required during the Initial Term to contribute to the Trust as part of the Trust Assets more than US$1,200,000.

To the extent YT elects to extend the duration of the Trust beyond the Initial Term pursuant to a YT Extension Term, the Funding Source shall contribute to the Trust as part of the Trust Assets US$200,000 in immediately available funds for the purposes of funding the Trust's administration during such YT Extension Term (such expenses, the "YT Extension Expenses").

To the extent the Creditor Trust Committee elects to extend the duration of the Trust beyond the Initial Term, the creditors shall obtain financing for the Trust in the amount of US$200,000 in the aggregate for each Creditor Extension Term (with each creditor bearing his, her, or its pro rata share of such amount) for the purposes of funding the Trust's administration (the "Additional Trust Expenses" and, together with the |

| | |
|---|---|
| | Initial Trust Expenses and the YT Extension Expenses the "<u>Trust Expense Funded Amount</u>"). |
| **Liquidity Event** | The term "<u>Liquidity Event</u>" means the liquidation, dissolution or winding up of Smart King. |
| **Distributions; Creditor Claims Waterfall** | On or after the completion of an IPO, the proceeds received by the Trust from (i) any disposition of Smart King Shares or (ii) dividends or distributions in respect of the Smart King Shares or the interest in West Coast (each, a "<u>Distribution Event</u>") will be distributed in accordance with the Distribution Waterfall upon the earlier of (a) 60 days following the occurrence of such Distribution Event, and (b) the termination of the Trust.<br><br>The Trustee may delay or defer the distribution of any proceeds (whether cash, securities, or other property) received by the Trustee in respect of the Trust Assets to the creditors if the Trustee determines that such deferral or delay is in the best interests of the creditors (including if (a) the Trust or the Trust Assets are bound by an injunction, freeze order, judgment or similar order or proceeding affecting such distribution or (b) such distribution would violate applicable law). |
| **Disposition of Smart King Shares after the IPO** | The decision as to when and how much of the Trust Assets to dispose of after an IPO shall be governed in accordance with **Exhibit B** attached hereto, and the Trustee shall, in accordance with instructions in compliance with such Exhibit B, sell, transfer, or otherwise dispose of any securities that are listed (the "<u>Marketable Securities</u>") in one or more open market transactions, private placement, or derivative transactions. The proceeds shall be distributed in accordance with the Distribution Waterfall.<br><br>At any time upon YT's request, and subject to applicable securities law, the Trustee shall distribute the Marketable Securities in kind to the creditors in lieu of any cash distribution. The value of the Marketable Securities shall be the average closing trading price for the five (5) consecutive trading days immediately prior to the distribution. |
| **Creditor Trust Committee** | The creditors shall be represented by a committee (the "<u>Creditor Trust Committee</u>"), which shall consist of no more than five (5) creditors holding Allowed Debt Claims. The members of the Creditor Trust Committee shall serve as fiduciaries to the beneficiaries of the Trust and not act in their individual interests. Members of the Creditor Trust Committee must hold Allowed Debt Claims in excess of US$25 million and have voted to accept the Plan. If more than five (5) such creditors desire to serve on the Creditor Trust Committee, then YT has the right to select two (2) of the members and the Trustee has the right to select the remaining members. No creditor may serve on the Creditor Trust |

8

| | |
|---|---|
| | Committee if the Trustee determines that such creditor is not in a position to serve as a fiduciary for all creditors based on such creditor's economic or other interests. The Creditor Trust Committee shall act by the vote of a majority (over 50%) of the members thereof.<br><br>The members of the Creditor Trust Committee shall not be compensated, but shall be reimbursed for all reasonable out-of-pocket expenses, other than the fees and expenses of counsel to individual members of the Creditor Trust Committee. The Creditor Trust Committee may employ advisors for specified purposes, and the Trustee may pay the fees and expenses of such advisors selected by the Creditor Trust Committee.<br><br>The Trustee shall not take any of the following actions without the consent of the Creditor Trust Committee:<br><br><ul><li>incur expenses on behalf of the Trust in excess of US$50,000; *provided, however*, that such approval shall be deemed granted if not specifically denied within 10 business days after a written request from the Trustee;</li><li>retain and pay certain advisors, including legal counsel, independent accounting firms, valuation firms, and other third parties to assist with the administration of the Trust Assets; *provided, however*, that such approval shall be deemed granted if not specifically denied within 10 business days after a written request from the Trustee;</li><li>except as provided in the Trust Agreement, sell or transfer any Trust Assets;</li><li>invest any moneys held by the Trust; *provided, however*, that such approval shall be deemed granted if not specifically denied within 10 business days after a written request from the Trustee;</li><li>settle or compromise any litigation claim in excess of US$5 million; *provided, however*, that such approval shall be deemed granted if not specifically denied within 10 business days after a written request from the Trustee;</li><li>take any action that would result in the Trust becoming an "investment company" within the meaning of the Investment Company Act of 1940, as amended; or</li><li>amend the Trust Agreement in any manner that is adverse to the creditors.</li></ul> |
| **Information Rights** | The Trustee shall cause to be prepared and distributed to the Creditor Trust Committee (for further distribution to the creditors):<br><br><ul><li>within forty-five (45) days after the end of each calendar quarter and within ninety (90) days after the end of each calendar year</li></ul> |

| | |
|---|---|
| | (i) a statement of net assets of the Trust, (ii) a statement of changes in net assets of the Trust, (iii) a statement of cash flows of the Trust, (iv) a schedule summarized by type of investments and assets, indicating acquisitions and dispositions, and (v) a summary listing of the status of the resolution of claims involving the Trust or any of the Trust Assets, if any; and<br>• within ninety (90) days after the end of each calendar year audited consolidated financial statements of Smart King, if they are made available to the Trust. |
| **Transferability of Trust Interests** | The Trust Interests may not be transferred except upon the prior written consent of the Trustee (not to be unreasonably withheld, conditioned, or delayed).<br><br>Notwithstanding the foregoing, the Trust Interests may not be transferred to the extent that such transfer would (a) based on the advice of counsel to the Trust, jeopardize the Trust's tax treatment; (b) cause the Trust to become subject to any governmental controls or regulations that affect the administration of the Trust and the Trust Assets; (c) violate applicable law (including any securities law) or any instrument to which the Trust is a party or by which it is bound; or (d) cause the Trust to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended. |
| **Management Incentive Plan** | In order to align incentives and reward YT and other key members of management in achieving Smart King's strategic goals, it is anticipated that Smart King will adopt a management incentive equity plan subject to the consummation of the restructuring. |
| **Governing Law** | This Term Sheet and the Trust Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to its choice of law principles. |
| **Amendments to Trust Agreement** | The Trust Agreement will not be amended without the approval of the Creditor Trust Committee. |
| **Subsequent Equity Investment** | Nothing in this Term Sheet shall be construed as to prohibit or restrict in any manner any subsequent equity investment in Smart King or any of its subsidiaries by any person. |
| **Release of Claims** | To the maximum extent permitted by applicable law, each holder of a Debt Claim shall be deemed to have released YT and his wife Wei Gan from personal liability (if applicable) in every jurisdiction; *provided, however*, that such holder shall continue disposing of the following assets through judicial authorities in the People's Republic of China to satisfy such Creditor's Claim through a mechanism that will be mutually agreed to by the parties: (a) assets that have already been |

10

| | |
|---|---|
| | collateralized by YT or any other person or entity; (b) assets that have already been pledged by YT or any other person or entity; (c) assets or interests that YT, his wife Wei Gan, or any other person or entity own that have been seized, attached, or frozen by Chinese judiciary authorities.<br><br>Within thirty (30) days of the effective date of the Plan, each holder of a Debt Claim is obligated to (i) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against YT and his wife Wei Gan from the court or judicial authorities in all jurisdictions, including, but not limited to, the People's Republic of China, or commit or confirm with the judicial authorities that YT or his wife Wei Gan have fulfilled all their debt obligations or legal responsibilities and (ii) file and execute any documents requested by YT to evidence the above release. Unless and until a holder of a Debt Claim complies with the preceding sentence and all of their obligations under the Trust Agreement, such holder shall not be entitled to exercise any voting rights with respect to the Trust or receive any distributions from the Trust; provided, however, that YT reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein. |
| **Parties' Expenses** | Each party shall be responsible for its respective fees and expenses incurred in connection with the preparation and negotiation of this Term Sheet and the Trust Agreement. |

## Exhibit A

### Creditor Claims Waterfall

The Trust Assets of the Creditor Trust and the Late Filed Debt Claims Reserve shall be distributed to the creditors, the Funding Source, and YT as follows:

(a) First, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to the Funding Source, an amount equal to the amount contributed by the Funding Source during the Initial Term to provide for (i) the Initial Trust Expenses and (ii) the YT Extension Expenses, if any;

(b) Second, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to each creditor, an amount equal to such creditor's pro rata share of the Additional Trust Expenses, if any;

(c) Third, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to each holder of an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim that has elected to receive Trust Interests in full and complete settlement, release, and discharge of their claim against YT, equal to the Allowed amount of such claim;

(d) Fourth, the remaining Trust Assets of the Late Filed Debt Claims Reserve, to holders of Late Filed Debt Claims, an amount equal to such holder's pro rata share of the remaining Trust Assets held in the Late Filed Debt Claims Reserve (after accounting for the distributions pursuant to clauses (a) through (c) above, if any), until such holder has received aggregate distributions (in cash or in kind) pursuant to this clause (d) equal to the lessor of (i) such holder's pro rata share of remaining Trust Assets that would be available to satisfy all Allowed Debt Claims and Late Filed Debt Claims; and (ii) the full amount of such Late Filed Debt Claim as verified by the Trustee;

(e) Fifth, to the Creditor Trust, 100% of the amount of the remaining Trust Assets held in the Late Filed Debt Claims Reserve (after accounting for the distributions pursuant to clauses (a) through (d) above), if any;

(f) Sixth, the Trust Assets remaining in the Creditor Trust after distributions pursuant to clauses (a) through (c) above and contributions from clause (e) above, to holders of Allowed Debt Claims, an amount equal to such holder's pro rata share of the remaining proceeds held in the Creditor Trust, if any, until such holder has received aggregate distributions (in cash or in kind) pursuant to this clause (f) equal to the amount of such holder's Allowed Debt Claim Distribution Amount; and

(g) Seventh, to YT, 100% of the amount of the remaining proceeds (after accounting for the distributions pursuant to clauses (a), (b), (c), (d), and (f) above), if any.

## Exhibit B

| Effective date of the Plan (T) plus number of years (12 calendar months) after the effective date of the Plan | After Smart King ("Company") completes the IPO but up to 36 calendar months after IPO | Same | After IPO but more than 36 calendar months after IPO | Same |
|---|---|---|---|---|
| | *Creditor Trust Committee* | *YT* | *Creditor Trust Committee* | *YT* |
| Less than T+3 | N/A | Can cause disposition of up to 100% of Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | If not sold within 36 calendar months after the IPO, can cause disposition of remaining Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | N/A |
| More than T+3; ≤ T+4 | Can cause disposition of up to 5% of Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | Can cause disposition of remaining Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | If not sold within 36 calendar months after the IPO, can cause disposition of remaining Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | N/A |
| More than T+4; ≤ T+5 | Can cause disposition of up to 10% of Company shares owned by the Creditor Trust or the Late Filed | Can cause disposition of remaining Company shares owned by the Creditor | If not sold within 36 calendar months after the IPO, can cause disposition of remaining | N/A |

|  | Debt Claims Reserve | Trust or the Late Filed Debt Claims Reserve | Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve |  |
|---|---|---|---|---|
| More than T+5; ≤ T+6 | Can cause disposition of up to 20% of Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | Can cause disposition of remaining Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | If not sold within 36 calendar months after the IPO, can cause disposition of remaining Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | N/A |
| More than T+6 | Can cause disposition of all Company shares owned by the Creditor Trust or the Late Filed Debt Claims Reserve | N/A | N/A | N/A |

**EXHIBIT B**

**Prepackaged Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- x

In re:

       YUETING JIA,

                Debtor.

-------------------------------------------------------------------- x

:
:
:
:
:
:

Chapter 11

Case No. 19-[_____]

## DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| PACHULSKI STANG ZIEHL & JONES LLP | O'MELVENY & MYERS LLP |
|---|---|
| Richard M. Pachulski (CA Bar No. 90073) | Suzzanne Uhland (NY Bar No. 5359328) |
| Jeffrey W. Dulberg (CA Bar No. 181200) | Diana M. Perez (NY Bar No. 4636403) |
| Malhar S. Pagay (CA Bar No. 189289) | Times Square Tower |
| James E. O'Neill (DE Bar No. 4042) | 7 Times Square |
| 919 N. Market Street, 17th Floor | New York, New York 10036 |
| Wilmington, Delaware 19801 | Tel: (212) 326-2000 |
| Tel: (302) 652-4100 | Fax: (212) 326-2061 |
| Fax: (302) 652-4400 | Email: suhland@omm.com |
| E-mail: rpachulski@pszjlaw.com | dperez@omm.com |
| jdulberg@pszjlaw.com | |
| mpagay@pszjlaw.com | |
| joneill@pszjlaw.com | |
| | |
| Proposed Attorneys for Debtor | Proposed Special Corporate, Litigation, and |
| and Debtor in Possession | International Counsel for Debtor and |
| | Debtor in Possession |

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND INTERPRETATION ............................................................. 1

    1.1.   *Definitions.* ................................................................................................... 1

    1.2.   *Interpretation, Application of Definitions, and Rules of Construction.* ............ 7

ARTICLE II UNCLASSIFIED CLAIMS ............................................................................... 7

    2.1   *Administrative Expense Claims.* ..................................................................... 8

    2.2   *Professional Fees.* ......................................................................................... 8

    2.3   *Priority Tax Claims.* ...................................................................................... 9

    2.4   *Domestic Support Obligations.* ...................................................................... 9

ARTICLE III CLASSIFICATION OF CLAIMS ..................................................................... 9

    3.1   *Class Identification.* ...................................................................................... 10

ARTICLE IV TREATMENT OF CLAIMS ............................................................................ 10

    4.1   *Priority Non-Tax Claims (Class 1).* ............................................................... 10

    4.2   *U.S. Secured Claims (Class 2).* ..................................................................... 10

    4.3   *Debt Claims (Class 3).* ................................................................................. 11

ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY
    ONE OR MORE CLASSES OF CLAIMS ................................................................ 11

    5.1   *Class Acceptance Requirement.* ..................................................................... 11

    5.2   *Deemed Acceptance by Non-Voting Classes.* ................................................. 11

    5.3   *Elimination of Vacant Classes.* ...................................................................... 11

    5.4   *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.* ............... 11

ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 11

    6.1   *Compromise of Controversies.* ...................................................................... 11

    6.2   *The Trust.* .................................................................................................... 12

    6.3   *Cancellation of Liens.* .................................................................................. 16

ARTICLE VII PLAN DISTRIBUTIONS ............................................................................... 17

    7.1   *Plan Distributions.* ....................................................................................... 17

    7.2   *Allocation of Plan Distributions Between Principal and Interest* .................... 17

    7.3   *No Postpetition Interest on Claims.* ............................................................... 17

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 7.4 | *Date of Plan Distributions.* | 17 |
| 7.5 | *Distribution Record Date.* | 17 |
| 7.6 | *Delivery of Plan Distribution.* | 17 |
| 7.7 | *Unclaimed Property.* | 18 |
| 7.8 | *Satisfaction of Claims.* | 18 |
| 7.9 | *Manner of Payment Under Plan.* | 18 |
| 7.10 | *No Distribution in Excess of Amount of Allowed Claim.* | 18 |
| 7.11 | *Setoffs and Recoupments.* | 19 |
| 7.12 | *Withholding and Reporting Requirements.* | 19 |
| 7.13 | *Claims Paid by Third Parties.* | 19 |

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........................... 20

| | | |
|---|---|---|
| 8.1 | *Objections to Claims; Estimation of Claims.* | 20 |
| 8.2 | *Payments and Distributions on Disputed Claims.* | 21 |
| 8.3 | *Preservation of Claims and Rights to Settle Claims.* | 21 |
| 8.4 | *Expenses Incurred On or After the Effective Date.* | 22 |

ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 22

| | | |
|---|---|---|
| 9.1 | *Assumption of Contracts and Leases* | 22 |
| 9.2 | *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* | 22 |
| 9.3 | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.* | 23 |
| 9.4 | *Insurance Policies* | 23 |
| 9.5 | *Reservation of Rights.* | 23 |
| 9.6 | *Pre-existing Obligations to Debtor Under Executory Contracts and Unexpired Leases* | 24 |
| 9.7 | *Contracts and Leases Entered into After the Petition Date.* | 24 |

ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE ........................... 24

| | | |
|---|---|---|
| 10.1 | *Conditions Precedent to Confirmation.* | 24 |
| 10.2 | *Conditions Precedent to the Effective Date.* | 24 |

**TABLE OF CONTENTS**
(continued)

Page

10.3    *Waiver of Conditions Precedent.* .......................................................................25

10.4    *Effect of Non-Occurrence of the Effective Date* ...............................................25

ARTICLE XI EFFECT OF CONFIRMATION ...........................................................................25

11.1    *Vesting of Assets.* ..............................................................................................25

11.2    *Binding Effect.* ..................................................................................................25

11.3    *Discharge of Claims.* .........................................................................................26

11.4    *Releases.* ...........................................................................................................26

11.5    *Exculpation and Limitation of Liability.* ............................................................28

11.6    *Injunction.* .........................................................................................................29

11.7    *Term of Bankruptcy Injunction or Stays.* ...........................................................30

11.8    *Termination of Subordination Rights and Settlement of Related Claims.* ...........30

11.9    *Waiver of Actions Arising Under Chapter 5 of the Bankruptcy Code.* .................30

11.10   *Reservation of Rights.* ........................................................................................30

ARTICLE XII RETENTION OF JURISDICTION ....................................................................31

ARTICLE XIII MISCELLANEOUS PROVISIONS ..................................................................33

13.1    *Payment of Statutory Fees.* ................................................................................33

13.2    *Exemption from Securities Laws.* .......................................................................33

13.3    *Exemption from Certain Transfer Taxes.* ............................................................33

13.4    *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment.* .......33

13.5    *Substantial Consummation.* ................................................................................34

13.6    *Expedited Determination of Postpetition Taxes.* .................................................34

13.7    *Modification and Amendments* ............................................................................34

13.8    *Additional Documents.* .......................................................................................34

13.9    *Effectuating Documents and Further Transactions* .............................................34

13.10   *Plan Supplement.* ...............................................................................................34

13.11   *Entire Agreement.* ..............................................................................................35

13.12   *Revocation or Withdrawal of the Plan.* ...............................................................35

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| 13.13 | *Severability.* | 35 |
| 13.14 | *Solicitation.* | 35 |
| 13.15 | *Governing Law.* | 36 |
| 13.16 | *Compliance with Tax Requirements.* | 36 |
| 13.17 | *Successors and Assigns.* | 36 |
| 13.18 | *Closing of Chapter 11 Case.* | 36 |
| 13.19 | *Document Retention.* | 36 |
| 13.20 | *Conflicts.* | 36 |
| 13.21 | *Service of Documents.* | 37 |
| 13.22 | *Deemed Acts.* | 38 |
| 13.23 | *Waiver or Estoppel.* | 38 |

## INTRODUCTION

Yueting Jia as a debtor and debtor in possession (the "<u>Debtor</u>" or "<u>YT</u>") proposes, and is the proponent of, this chapter 11 plan of reorganization. The Plan[1] provides for the reorganization of the Debtor under chapter 11 of the Bankruptcy Code. As set forth below and described in the Disclosure Statement, under the Plan:

- Holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and U.S. Secured Claims are paid in full;
- Holders of Allowed Debt Claims receive their Pro Rata distribution of the Trust Interests;
- the Debtor and the Reorganized Debtor will irrevocably and unconditionally release, waive, and discharge any Claims or Causes of Action that they have, had, or may have that are based on sections 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law for all purposes; and
- the Debtor and certain Persons and Entities (the Releasing Parties) release certain Persons and Entities (the Released Parties).

**Holders of Claims should refer to the Disclosure Statement for a discussion of the Debtor's history, business interests, assets, financial information, as well as a summary and description of the Plan. Before voting to accept or reject the Plan, holders of Claims entitled to vote on the Plan are encouraged to read carefully the Plan, the Disclosure Statement, and their respective exhibits and schedules in their entirety. These are the only materials approved for use in soliciting acceptances or rejections of the Plan.**

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

### 1.1. *Definitions.*

As used in this Plan, capitalized terms have the meanings set forth in this Article I (such meanings applicable to the singular and plural):

1. *2019 Equity Incentive Plan* has the meaning set forth in Article 6.2(j) of the Plan.

2. *Additional Trust Expenses* has the meaning set forth in Article 6.2(g) of the Plan.

3. *Administrative Expense Claim* means a Claim for a cost or expense of administration of the Estate under sections 503(b) (including Claims arising under section 503(b)(9)), 507(a)(2), or 507(b) of the Bankruptcy Code, including (a) any actual and necessary cost and expense of preserving the Estate incurred after the Petition Date and through the Effective Date; (b) any indebtedness or obligations incurred or assumed by the Debtor after the Petition Date and through the Effective Date; (c) any Allowed compensation for professional services rendered, and Allowed reimbursement of expenses incurred, by a Professional retained by order of the Bankruptcy Court or otherwise Allowed pursuant to section 503(b) of the Bankruptcy Code; and (d) all fees due and payable pursuant to section 1930 of title 28 of the U.S. Code.

4. *Administrative Expense Claim Bar Date* means the first Business Day that is 30 days after the Effective Date.

---

[1] Capitalized terms are as defined in Article 1 below.

**5.**    *Allowed* means, with respect to any Claim, such Claim or portion thereof against or in the Debtor: (a) that has been listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) as to which the deadline for objecting or seeking estimation has passed, and no objection or request for estimation has been filed; (c) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn, or denied by a Final Order; or (d) that is allowed pursuant to the terms of (i) a Final Order, (ii) an agreement by and among the holder of such Claim and the Debtor or the Reorganized Debtor, as applicable, or (iii) the Plan.

**6.**    *Allowed Debt Claim Allocation Amount* means the Allowed amount of a Debt Claim excluding the amount of any unpaid interest, penalty interest, expenses, and any other fees related thereto.

**7.**    *Allowed Debt Claim Distribution Amount* means the amount of an Allowed Debt Claim Allocation Amount *minus* the sum of (a) the amount the holder of such Allowed Debt Claim will receive from the primary obligor of such Claim *plus* (b) the amount such holder will receive upon the disposition of any assets in any jurisdiction that (i) have already been collateralized by the Debtor or any other Person or Entity, (ii) have already been pledged by the Debtor or any other Person or Entity, and (iii) the Debtor, his wife Wei Gan, or any other Person or Entity own that have been seized, attached, or frozen by Chinese judiciary authorities *plus* (c) if the primary debt obligation is satisfied by conversion to equity in any jurisdiction, the corresponding reduction in the amount of the holder's Allowed Debt Claim on account of such conversion.

**8.**    *Ballot* means the form distributed to each holder of an Impaired Claim that is entitled to vote to accept or reject the Plan, on which such holder shall indicate acceptance or rejection of the Plan.

**9.**    *Bankruptcy Code* means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

**10.**    *Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Case or any proceeding within, or appeal of an order entered in, the Chapter 11 Case.

**11.**    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the local rules of the Bankruptcy Court.

**12.**    *Bar Date* means the deadline to be set by the Bankruptcy Court to file proofs of claim against the Debtor in the Chapter 11 Case.

**13.**    *Business Day* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**14.**    *Cash* means legal tender of the United States of America and equivalents thereof.

**15.**    *Causes of Action* means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any equitable remedy, including, without limitation, any claim for equitable

subordination, equitable disallowance, or unjust enrichment; (e) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any cause of action or claim arising under any state or foreign fraudulent transfer law.

16.     *Chapter 11 Case* means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor in the Bankruptcy Court.

17.     *Claim* means a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtor.

18.     *Class* means a category of Claims established under Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

19.     *Confirmation Date* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

20.     *Confirmation Hearing* means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

21.     *Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and granting other related relief.

22.     *Creditor Extension Term* has the meaning set forth in Article 6.2(f) of the Plan.

23.     *Creditor Trust* has the meaning set forth in Article 6.2 of the Plan.

24.     *Creditor Trust Committee* has the meaning set forth in Article 6.2(e) of the Plan.

25.     *Cure Amount* has the meaning set forth in Article 9.3(a) of this Plan.

26.     *Cure Dispute* has the meaning set forth in Article 9.3(c) of this Plan.

27.     *Cure Schedule* has the meaning set forth in Article 9.3(b) of this Plan.

28.     *Debt Claim* means any Claim against the Debtor that is (a) not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim or (b) otherwise determined by the Bankruptcy Court to be a Debt Claim.

29.     *Debtor* has the meaning set forth in the Introduction.

30.     *Disallowed* means, with respect to any Claim, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no proof of claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Bankruptcy Court, (c) is not listed in the Schedules and as to which no proof of claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court, (d) has been withdrawn by agreement of the Debtor and the holder thereof, or (e) has been withdrawn by the holder thereof.

31.     *Discharge Date* means the date upon which the Court grants the Debtor a discharge upon the earlier of: (i) distribution of the Trust Interests to the holders of Allowed Debt Claims and (ii) all Allowed Claims shall have been paid under the Plan.

32.    ***Disclosure Statement*** means that written disclosure statement, dated October 10, 2019, relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, modified, or supplemented from time to time, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.

33.    ***Disputed Claim*** means a Claim that is not yet Allowed.

34.    ***Distribution Record Date*** means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the date of the commencement of the Confirmation Hearing.

35.    ***Distribution Waterfall*** means the distribution waterfall set forth in Article 6.2(i) of this Plan.

36.    ***Domestic Support Obligations*** means a domestic support obligation, as defined in section 101(14A) of the Bankruptcy Code, as such obligations may be modified from time to time by a court of competent jurisdiction.

37.    ***Effective Date*** means, with respect to the Plan, the Business Day selected by the Debtor on which (a) no stay of the Confirmation Order is in effect, (b) the conditions to the effectiveness of the Plan specified in Article 10.2 have been satisfied or waived (in accordance with Article 10.3), and (c) the Debtor declares the Plan effective.

38.    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

39.    ***Estate*** means the estate of the Debtor created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

40.    ***Final Order*** means an order or judgment entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted), appeal further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending; *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to sections 502(j) or 1144 of the Bankruptcy Code, rules 59 or 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rules 9023 or 9024 may be filed with respect to such order or judgment.

41.    ***Funding Source*** has the meaning set forth in Article 6.2(a) of the Plan.

42.    ***Impaired*** means, with respect to a Class of Claims, a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

43.    ***Initial Term*** has the meaning set forth in Article 6.2(f) of the Plan.

4

44.     *Initial Trust Expenses* has the meaning set forth in Article 6.2(g) of the Plan.

45.     *IPO* has the meaning set forth in Article 6.2(h) of the Plan.

46.     *Late Filed Debt Claim* means a Debt Claim filed after the Bar Date but before the occurrence of a Distribution Event that is recognized by YT, in his sole discretion, and in an amount to be verified by the Trustee.

47.     *Late Filed Debt Claims Reserve* has the meaning set forth in Article 6.2 of the Plan.

48.     *Lien* means a lien as defined in section 101(37) of the Bankruptcy Code.

49.     *Liquidity Event* has the meaning set forth in Article 6.2(f) of the Plan.

50.     *Marketable Securities* has the meaning set forth in Article 6.2(h) of the Plan.

51.     *Person* means person as defined in section 101(41) of the Bankruptcy Code.

52.     *Petition Date* means the date on which the Debtor filed his petition for relief commencing the Chapter 11 Case.

53.     *Plan* means this prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, including the exhibits and schedules hereto and the Plan Supplement, as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof.

54.     *Plan Distribution* means a payment or distribution under the Plan to holders of Allowed Claims or other eligible Entities.

55.     *Plan Supplement* means the compilation of documents (or forms or summary of material terms thereof), schedules, and exhibits to the Plan (in each case as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules) to be filed no later than five (5) days before the Voting Deadline or such later date as the Bankruptcy Court may approve, including: (a) form and/or definitive agreements and related documents with respect to the Trust Agreement; and (b) the Schedule of Rejected Contracts and Leases.

56.     *Priority Non-Tax Claim* means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

57.     *Priority Tax Claim* means any Claim entitled to priority in payment as specified in section 507(a)(8) of the Bankruptcy Code.

58.     *Pro Rata* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

59.     *Professional* means an Entity (a) employed in the Chapter 11 Case pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise, or (b) seeking or awarded compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

5

60. *Released Parties* means, collectively, (a) the Debtor and the Estate; (b) the Debtor's wife, Wei Gan; (c) all Persons engaged or retained by the Debtor in connection with the Chapter 11 Case (including in connection with the preparation of and analyses relating to the Disclosure Statement and the Plan); and (d) any and all advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, and representatives of each of the foregoing Persons and Entities (whether current or former, in each case in his, her, or its capacity as such).

61. *Releasing Parties* means, collectively, and each solely in its capacity as such: (a) each Released Party; (b) each holder of a Claim that either (i) votes to accept the Plan or (ii) is conclusively deemed to have accepted the Plan; and (c) all other holders of Claims to the extent permitted by law.

62. *Reorganized Debtor* means the Debtor as reorganized under the Plan, and any successor thereto on or after the Effective Date.

63. *Retained Actions* has the meaning set forth in Article 8.3 of the Plan.

64. *Schedule of Rejected Contracts and Leases* means a schedule of the executory contracts and unexpired leases to be rejected pursuant to section 365 of the Bankruptcy Code and Article 9.1 hereof.

65. *Schedules* means the schedules of assets and liabilities to be filed by the Debtor on or after the Petition Date as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

66. *Securities Act* means the Securities Act of 1933, and all rules and regulations promulgated thereunder.

67. *Smart King* has the meaning set forth in Article 6.2 of the Plan.

68. *Smart King Shares* has the meaning set forth in Article 6.2 of the Plan.

69. *Trust* has the meaning set forth in Article 6.2 of the Plan.

70. *Trust Agreement* means that certain Trust Agreement, by and among, the Debtor and the Trustee, on substantially similar terms as described in the Trust Agreement Term sheet. A form of the Trust Agreement will be included in the Plan Supplement.

71. *Trust Agreement Term Sheet* means that certain Trust Agreement Term Sheet attached as Exhibit A to the Disclosure Statement.

72. *Trust Assets* has the meaning set forth in Article 6.2(a) of the Plan.

73. *Trust Election* means the election by a holder of an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim to receive their pro rata share of the Trust Assets pursuant to the Distribution Waterfall in lieu of their assigned recoveries under the Plan.

74. *Trust Expense Funded Amount* has the meaning set forth in Article 6.2(g) of the Plan.

75. *Trust Interest* has the meaning set forth in Article 6.2 of the Plan.

76. *Trustee* has the meaning set forth in Article 6.2(d) of the Plan.

*77.* ***Unimpaired*** means, with respect to any Claim, or a Class of Claims, that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

*78.* ***U.S. Secured Claim*** means a Claim against the Debtor that is secured by a valid, unavoidable, perfected, and enforceable Lien on, or security interest in, property of the Debtor located in the United States, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the holder's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, the value of which shall be determined as provided in section 506 of the Bankruptcy Code.

79.    ***U.S. Trustee*** means the United States Trustee for the District of Delaware.

80.    ***Voting Agent*** means Epiq Corporate Restructuring LLC.

81.    ***Voting Deadline*** means 5:00 p.m. (Beijing Time) on November 8, 2019.

82.    ***West Coast*** has the meaning set forth in Article 6.2 of the Plan.

83.    ***West Coast Interests*** has the meaning set forth in Article 6.2 of the Plan.

84.    ***YT Extension Expenses*** has the meaning set forth in Article 6.2(g) of the Plan.

85.    ***YT Extension Term*** has the meaning set forth in Article 6.2(f) of the Plan.

**1.2.    *Interpretation, Application of Definitions, and Rules of Construction.***

(a)    For purposes of the Plan and unless otherwise specified herein (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (ii) any term that it not defined herein, but that is used in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to the term in the Bankruptcy Code or Bankruptcy Rules, as applicable; (iii) any reference in the Plan to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (iv) any reference to an Entity as a holder of a Claim includes that Entity's permitted successors and assigns; and (v) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Case, unless otherwise stated.

(b)    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(c)    All references in the Plan to monetary figures refer to currency of the United States of America.

## ARTICLE II
## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Domestic Support Obligations have not been classified for purposes of voting or receiving distributions.  Rather, all such Claims are treated separately as unclassified Claims as set forth in this Article II, and the holders thereof are not entitled to vote on the Plan.

### 2.1     *Administrative Expense Claims.*

(a)     Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim, other than (i) a Claim covered by Article 2.2, (ii) a liability incurred and payable in the ordinary course of business by the Debtor after the Petition Date, (iii) timely filed and Allowed Claims arising under section 503(b)(9) of the Bankruptcy Code; or (iv) an Administrative Expense Claim that has been Allowed on or before the Administrative Expense Claim Bar Date, must file and serve on the Reorganized Debtor a request for payment of such Administrative Expense Claim so that it is received no later than the Administrative Expense Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  **Holders required to file and serve, who fail to file and serve, a request for payment of Administrative Expense Claims by the Administrative Expense Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor or Reorganized Debtor and their property, and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article 11.6 hereof.**  Notwithstanding the foregoing, pursuant to section 503(b)(1)(D) of the Bankruptcy Code, no governmental unit shall be required to file a request for payment of any Administrative Expense Claim of a type described in sections 503(b)(1)(B) or 503(b)(1)(C) of the Bankruptcy Code as a condition to such Claim being Allowed.

(b)     Allowance of Administrative Expense Claims.  An Administrative Expense Claim, with respect to which a request for payment has been properly and timely filed pursuant to Article 2.1(a) shall become an Allowed Administrative Expense Claim if no objection to such request is filed with the Bankruptcy Court and served on the Debtor and the requesting party on or before the one-hundred twentieth (120th) day after the Effective Date, as the same may be modified or extended by order of the Bankruptcy Court.  If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or as such Claim is settled, compromised, or otherwise resolved pursuant to Article 8.3.

(c)     Payment of Allowed Administrative Expense Claims.  Except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Case, the holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, or the Holder of an Allowed Administrative Expense Claim makes a Trust Election, and except as provided in Article 2.2, each holder of an Allowed Administrative Expense Claim against the Debtor shall receive, in full and complete settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of such Allowed Administrative Expense Claim on the latest of (i) the Effective Date or as soon thereafter as reasonably practicable; (ii) 30 days after the date on which such Administrative Expense Claim becomes Allowed; (iii) the date on which such Administrative Expense Claim becomes due and payable in the ordinary course of the Debtor's business in accordance with the terms and subject to the conditions of any agreements or understandings governing, or other documents relating to, such Allowed Administrative Expense Claim; and (iv) such other date as may be agreed to by such holder and the Debtor or Reorganized Debtor.

### 2.2     *Professional Fees.*

(a)     Final Fee Applications.  Each Professional requesting compensation pursuant to sections 327, 328, 330, 331, 363, 503(b), or 1103 of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case before the Effective Date shall (i) file with the Bankruptcy Court, and serve on the Reorganized Debtor, an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the forty-fifth (45th) day following the Effective Date, and (ii) after notice and a hearing in accordance with the procedures established by the

Bankruptcy Code and Bankruptcy Rules and any prior orders of the Bankruptcy Court in the Chapter 11 Case, be paid in full, in Cash, in such amounts as are Allowed.

(b)      Ordinary Course Professional Fees and Expenses.  The immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtor is permitted to pay, without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of professional fees and expenses in the ordinary course of business (and in accordance with any relevant prior order of the Bankruptcy Court), the payments for which may continue notwithstanding the occurrence of confirmation of the Plan.

(c)      Post-Effective Date Fees and Expenses.  From and after the Effective Date, the Reorganized Debtor may, upon submission of appropriate documentation and in the ordinary course of business, pay the post-Effective Date charges incurred by the Reorganized Debtor for any Professional's fees, disbursements, expenses, or related support services without application to or approval from the Bankruptcy Court.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional for fees and charges incurred from and after the Effective Date in the ordinary course of business without any notice to or approval of the Bankruptcy Court.

**2.3      *Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim against the Debtor shall receive, in full and complete settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of such Allowed Priority Tax Claim on the latest of (a) the Effective Date or as soon thereafter as reasonably practicable; (b) 30 days after the date on which such Priority Tax Claim becomes Allowed; (c) the date on which such Priority Tax Claim becomes due and payable; and (d) such other date as may be mutually agreed to by and among such holder and the Debtor or Reorganized Debtor; *provided, however*, that the Reorganized Debtor shall be authorized, at his option, and in lieu of payment in full, in Cash, of an Allowed Priority Tax Claim as provided above, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

**2.4      *Domestic Support Obligations.***

On the Effective Date, the Debtor shall make any payments to comply with any postpetition unfunded obligations on account of any Domestic Support Obligations, if any such obligations exist, as may be required for the Debtor to be current with respect to such Domestic Support Obligations as of the Effective Date pursuant to section 1129(a)(14) of the Bankruptcy Code.  After the Effective Date, the Debtor shall timely make all payments on account of Domestic Support Obligations to the parties entitled to receive such payments, if any such obligations exist, in each case at the times and in the amounts required by the agreements and orders evidencing such Domestic Support Obligations, as such agreements may from time to time be modified in accordance with applicable law.

**ARTICLE III**
**CLASSIFICATION OF CLAIMS**

The following table designates the Classes of Claims against the Debtor, and specifies which Classes are (a) Impaired or Unimpaired; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept the Plan.  A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof

qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

**3.1    *Class Identification.***

Claims against the Debtor are classified as follows:

| Class | Description | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Non- Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | U.S. Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Debt Claims | Impaired | Yes |

**ARTICLE IV
TREATMENT OF CLAIMS**

**4.1    *Priority Non-Tax Claims (Class 1).***

(a)    Classification. Class 1 consists of all Priority Non-Tax Claims.

(b)    Treatment. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment or makes a Trust Election, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, at the option of the Debtor and in full and complete settlement, release, and discharge of, and in exchange for, such Claim (i) payment in full in Cash; or (ii) other treatment rendering such Claim Unimpaired. Any Allowed Class 1 Claim not due and owing on the Effective Date shall be paid in full, in Cash, when it becomes due and owing.

(c)    Impairment and Voting. Class 1 is Unimpaired. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

**4.2    *U.S. Secured Claims (Class 2).***

(a)    Classification. Class 2 consists of all U.S. Secured Claims.

(b)    Treatment. Except to the extent that a holder of an Allowed U.S. Secured Claim agrees to less favorable treatment or makes a Trust Election, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed U.S. Secured Claim shall receive, at the option of the Debtor and in full and complete settlement, release, and discharge of, and in exchange for, such Claim (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim; (iii) reinstatement pursuant to section 1124 of the Bankruptcy Code; or (iv) other treatment rendering such Claim Unimpaired.

(c)    Impairment and Voting. Class 2 is Unimpaired. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and accordingly, are not entitled to vote to accept or reject the Plan.

**4.3**     *Debt Claims (Class 3).*

    (a)     <u>Classification</u>. Class 3 consists of all Debt Claims.

    (b)     <u>Treatment</u>. Except to the extent that a holder of an Allowed Debt Claim agrees to less favorable treatment, each holder of an Allowed Debt Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange for, such Claim, its Pro Rata share of the Trust Interests, which distribution shall be made in accordance with Article 6.2 of the Plan.

    (c)     <u>Impairment and Voting</u>. Class 3 is Impaired. Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF THE PLAN

**5.1**     *Class Acceptance Requirement.*

    Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if it is accepted by at least two thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.

**5.2**     *Deemed Acceptance by Non-Voting Classes.*

    If a Class contains Claims eligible to vote and no holder of a Claim eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

**5.3**     *Elimination of Vacant Classes.*

    Any Class of Claims that does not have at least one holder of an Allowed Claim or a Claim temporarily Allowed as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

**5.4**     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.*

    Section 1129(b) of the Bankruptcy Code provides for confirmation (or "cram-down") of a plan of reorganization even if the plan is not accepted or deemed accepted by all impaired classes of claims, as long as at least one impaired class of claims has voted to accept the plan and certain other requirements are met. Subject to Article 13.7 of the Plan, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan or any related document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code. The Debtor also reserves the right to request confirmation of the Plan, as it may be modified, supplemented, or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

## ARTICLE VI
## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1**     *Compromise of Controversies.*

    In consideration for the Plan Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan constitute a good faith compromise and

settlement of all Claims and controversies relating to any Allowed Claim or any Plan Distribution to be made on account thereof or otherwise resolved under the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and his Estate. All Plan Distributions made in accordance with the Plan are intended to be, and shall be, final.

### 6.2    *The Trust.*

On or after the Effective Date, the Debtor or the Reorganized Debtor shall (a) transfer the economic interests in 90,588,235 units (representing 100% of the issued and outstanding units) of West Coast LLC ("West Coast"), a Delaware limited liability company (the "West Coast Interests") and (b) cause to be transferred 147,058,823 Class B Preferred Shares of Smart King Ltd. ("Smart King"), a company formed under the laws of the Cayman Islands, which, upon transfer, will automatically convert into Class B Ordinary Shares on a one-to-one basis (the "Smart King Shares") to (i) the 2019 Creditor Liquidating Trust for the benefit of holders of Allowed Debt Claims (the "Creditor Trust") and (ii) a trust for the benefit of holders of Late Filed Debt Claims (the "Late Filed Debt Claims Reserve" and together with the Creditor Trust, the "Trust").

Each holder of an Allowed Debt Claim or Late Filed Debt Claim shall receive a beneficial interest (a "Trust Interest") in the Creditor Trust or the Late Filed Debt Claims Reserve, as applicable, based on the formulas set forth below. The Trust will preserve, hold, manage, and maximize the Trust Assets (as defined below) for use in paying and satisfying the holders' Claims upon the earlier to occur of (x) the consummation of a Liquidity Event or Distribution Event and (y) the termination of the Trust in accordance with the Trust Agreement.

(a)    Trust Assets.

The assets of the Trust shall consist of the following: (i) the economic interest in 90,588,235 units of West Coast (representing 100% of the issued and outstanding units of West Coast); (ii) 147,058,823 Smart King Shares; and (iii) the Trust Expense Funded Amount contributed to the Trust by a postpetition lender (the "Funding Source") as provided in the Trust Agreement Term Sheet (collectively, the "Trust Assets").

(b)    Voting Rights With Respect to the Trust Assets.

The Trustee will exercise all voting rights with respect to the Smart King Shares as directed by FF Top Holding Ltd.; *provided* that the exercise of such voting rights shall be in accordance with (i) the organizational and governing documents of Smart King, (ii) such other agreements that are in effect as of the date of the Trust Agreement (including the certain *Fourth Amended and Restated Memorandum and Articles of Association of Smart King* adopted as of May 15, 2019), and (iii) that certain Restructuring Agreement, dated as of December 31, 2018, by and among Smart King, YT Season Smart Limited, a company formed under the laws of the British Virgin Islands, and the other parties thereto, in each case, to the extent applicable.

(c)    Late Filed Debt Claims Reserve.

On the Effective Date, the Debtor shall transfer 10% of the West Coast Interests and

Smart King Shares respectively to the Late Filed Debt Claims Reserve for the benefit of holders of Late Filed Debt Claims. The Late Filed Debt Claims Reserve will have no operations other than to make distributions to holders of Late Filed Debt Claims in accordance with the Distribution Waterfall and will be managed by the Trustee pursuant to a separate trust agreement with substantially similar governance terms as the Trust Agreement.

The Trustee shall have the right in its discretion to (i) exchange the Late Filed Debt Claims Reserve's portion of the West Coast Interests and Smart King Shares for direct Trust Interests in the Creditor Trust, which shall provide the beneficiaries of the Late Filed Debt Claims Reserve with the same share of distributions they are otherwise entitled to receive under the Distribution Waterfall, and (ii) distribute such Trust Interests to the beneficiaries of the Late Filed Debt Claims Reserve in exchange for their beneficial interests in the Late Filed Debt Claims Reserve.

In order for a holder of a Late Filed Debt Claim to receive a distribution from the Late Filed Debt Claims Reserve, such holder must execute a full release of the Debtor and his wife Wei Gan from personal liability on all claims in every jurisdiction. Any distribution to a Late Filed Debt Claim shall be from the Late Filed Debt Claims Reserve and holders of Late Filed Debt Claims shall have no recourse against the Creditor Trust or the Debtor.

(d) Appointment of the Trustee.

On or after the Effective Date, one (1) trustee (the "Trustee") shall be appointed in accordance with the Trust Agreement, the identity of which shall be disclosed prior to confirmation of the Plan. The Trust Agreement shall set forth certain experience and independence criteria for the Trustee. The Trustee shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Trust or to any person except for such of the Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction. In addition, the Trustee shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities, or expenses (including without limitation, attorneys' fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to the Trust Agreement or the affairs of the Trust (other than in respect of acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction). The Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance and engage independent legal counsel and financial advisors to assist with its evaluation of any matters with respect to the Trust, including any Liquidity Event.

The Trustee shall be compensated by the Trust in an amount not to exceed $100,000 per annum (unless approved by the Creditor Trust Committee). The Trustee shall be entitled to reimburse itself out of any available cash in the Trust, for its actual out-of-pocket expenses and against and from any and all loss, liability, expense, or damage, which the Trustee may sustain in good faith and without willful misconduct, gross negligence, or fraud in the exercise and performance of any of the powers and duties of the Trustee under the Trust Agreement.

The Trustee may resign upon sixty (60) days' advance written notice to the Creditor Trust Committee so long as a replacement trustee has been appointed.

(e) Creditor Trust Committee.

Holders of Trust Interests will be represented by a committee that shall consist of a number of holders of Allowed Debt Claims (the "Creditor Trust Committee"), the responsibilities and governance of which are set forth in the Trust Agreement Term Sheet.

13

    (f)    <u>Term of the Trust</u>.

The term of the Trust will extend until the sixth (6th) anniversary of the effective date of the Trust Agreement (such six (6)-year period, the "<u>Initial Term</u>"). The Creditor Trust Committee may, upon delivery of written notice to the Trustee not later than ninety (90) days prior to the expiration of the Initial Term, elect to extend the Initial Term for up to three (3) additional one (1)-year periods (each, a "<u>Creditor Extension Term</u>") to allow for orderly liquidation of any remaining Trust Assets. Subject to the limitations set forth above, the Creditor Trust Committee may, upon delivery of written notice to the Trustee not later than ninety (90) days prior to the expiration of the then-current Creditor Extension Term, elect to extend such Creditor Extension Term.

If the completion of an IPO occurs during the Initial Term, the Debtor may, upon delivery of written notice to the Trustee and the Creditor Trust Committee not later than ninety (90) days prior to the expiration of the Initial Term, elect to extend the Initial Term for up to three (3) additional one (1)-year periods (each, a "<u>YT Extension Term</u>") in his sole discretion to liquidate any Smart King Shares that remain unsold as of the expiration of the Initial Term.

The Trustee shall dissolve and wind up the Trust and distribution the Trust Assets upon the expiration of (i) the Initial Term if no YT Extension Term or Creditor Extension Term is exercised or (ii) the expiration of the applicable YT Extension Term or Creditor Extension Term, as applicable. The Trustee may dissolve the Trust before the end of the Initial Term, any Creditor Extension Term, or any YT Extension Term if: (x) all Allowed Debt Claim Distribution Amounts are fully paid and satisfied and the Debtor has approved the dissolution of the Trust or (y) upon the liquidation, dissolution, or winding up of Smart King (a "<u>Liquidity Event</u>"). Upon termination of the Trust, the Trustee will obtain a valuation of the Trust Assets as of the termination date (performed by an independent valuation firm selected by the Trustee and approved by the Creditor Trust Committee and the Debtor) and shall, as promptly as practicable following the completion of the independent valuation, distribute the Trust Assets in kind to the holders of Allowed Debt Claims in accordance with the distribution waterfall set forth on Exhibit A to the Trust Agreement Term Sheet.

    (g)    <u>Expenses of the Trust</u>.

On the effective date of the Trust Agreement, the Funding Source will contribute to the Trust as part of the Trust Assets $600,000 in immediately available funds for the purposes of funding the Trust's administration during the first three (3) years of the Initial Term, including for retaining independent third party advisors (legal counsel, an independent registered accounting firm, and an independent valuation firm, among others), compensating the Trustee, and paying such other fees and expenses incidental to the management and administration of the Trust Assets during the first three (3) years of the Initial Term. For each year during the Initial Term thereafter, no later than thirty (30) days following the beginning of such year, the Funding Source shall contribute to the Trust as part of the Trust Assets $200,000 in immediately available funds for the purposes of funding the Trust's administration during such year (the expenses referred to in this paragraph are referred to herein as the "<u>Initial Trust Expenses</u>"). For purposes of clarification, in no event shall the Funding Source be required during the Initial Term to contribute to the Trust as part of the Trust Assets more than $1,200,000.

In the event that the Debtor elects to extend the duration of the Trust beyond the Initial Term pursuant to a YT Extension Term, the Funding Source will contribute to the Trust as part of the Trust Assets $200,000 in immediately available funds for the purposes of funding the Trust's administration during such YT Extension Term (such expenses, the "<u>YT Extension Expenses</u>"). In the event that the Creditor Trust Committee elects to extend the duration of the Trust beyond the Initial Term, the holders of Trust Interests shall obtain financing for the Trust in the amount of $200,000 in the

14

aggregate for each Creditor Extension Term (with each holder bearing his, her, or its pro rata share of such amount) for the purposes of funding the Trust's administration (the "Additional Trust Expenses" and, together with the Initial Trust Expenses and the YT Extension Expenses the "Trust Expense Funded Amount").

      (h)      Distribution of Trust Assets.

On or after the completion of an initial public offering on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange with respect to the shares of outstanding capital stock of Smart King or such other relevant listing vehicle, as applicable (an "IPO"), the proceeds received by the Trust from (i) any disposition of Smart King Shares or (ii) dividends or distributions in respect of the Smart King Shares or the interest in West Coast (each, a "Distribution Event") will be distributed in accordance with the Distribution Waterfall upon the earlier of (i) sixty (60) days following the occurrence of such Distribution Event, and (ii) the termination of the Trust.

The Trustee may delay or defer the distribution of any proceeds (whether cash, securities, or other property) received by the Trustee in respect of the Trust Assets if the Trustee determines that such deferral or delay is in the best interests of the holders of Trust Interests (including if (i) the Trust or the Trust Assets are bound by an injunction, freeze order, judgment, or similar order or proceeding affecting such distribution or (ii) such distribution would violate applicable law).

The decision as to when and how much of the Trust Assets to dispose of after an IPO will be governed in accordance with the schedule attached as Exhibit B to the Trust Agreement Term Sheet, and the Trustee will, in accordance with instructions in compliance with such schedule, sell, transfer, or otherwise dispose of any securities that are listed (the "Marketable Securities") in one or more open market transactions, private placement, or derivative transactions. The proceeds shall be distributed in accordance with the Distribution Waterfall.

At any time upon the Debtor's request, the Trustee will distribute the Marketable Securities in kind to the holders of Trust Interests in lieu of any cash distribution. The value of the Marketable Securities will be the average closing trading price for the five (5) consecutive trading days immediately prior to the distribution.

      (i)      Distribution Waterfall.

The Trust Assets of the Creditor Trust and the Late Filed Debt Claims Reserve shall be distributed to the Funding Source, holders of eligible Claims that made a Trust Election, holders of the Trust Interests, and the Debtor as follows:

      (i)      First, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to the Funding Source, an amount equal to the amount contributed by the Funding Source during the Initial Term to provide for (x) the Initial Trust Expenses and (y) the YT Extension Expenses, if any;

      (ii)      Second, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to each holder of Trust Interests, an amount equal to such holder's pro rata share of the Additional Trust Expenses, if any;

      (iii)      Third, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to each holder of an Administrative Expense Claim, Priority

Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim that has made a Trust Election, equal to the Allowed amount of such Claim;

(iv) Fourth, the remaining Trust Assets of the Late Filed Debt Claims Reserve, to holders of Late Filed Debt Claims, an amount equal to such holder's pro rata share of the remaining Trust Assets held in the Late Filed Debt Claims Reserve (after accounting for the distributions pursuant to clauses (i) through (iii) above, if any), until such holder has received aggregate distributions (in cash or in kind) pursuant to this clause (iv) equal to the lessor of (x) such holder's pro rata share of remaining Trust Assets that would be available to satisfy all Allowed Debt Claims and Late Filed Debt Claims; and (y) the full amount of such Late Filed Debt Claim as verified by the Trustee;

(v) Fifth, to the Creditor Trust, 100% of the amount of the remaining Trust Assets held in the Late Filed Debt Claims Reserve (after accounting for the distributions pursuant to clauses (i) through (iv) above), if any;

(vi) Sixth, the Trust Assets remaining in the Creditor Trust after distributions pursuant to clauses (i) through (iii) above and contributions from clause (v) above, to holders of Allowed Debt Claims, an amount equal to such holder's pro rata share of the remaining proceeds held in the Creditor Trust, if any, until such holder has received aggregate distributions (in cash or in kind) pursuant to this clause (vi) equal to the amount of such holder's Allowed Debt Claim Distribution Amount; and

(vii) Seventh, to the Debtor, 100% of the amount of the remaining proceeds (after accounting for the distributions pursuant to clauses (i), (ii), (iii), (iv), and (vi) above), if any.

(j)  2019 Equity Incentive Plan.

In order to align incentives and reward the Debtor and other key members of management in achieving Smart King's strategic goals, it is anticipated that Smart King will adopt a management incentive equity plan subject to the consummation of the restructuring (the "2019 Equity Incentive Plan"). The board of directors of Smart King may grant certain stock-based awards upon the achievement of financial targets upon a Distribution Event. The total available equity awards under the 2019 Equity Incentive Plan will be as follows:

| Smart King Value (in thousands) | $5,000 | $10,000 | $21,000 |
|---|---|---|---|
| Dilution | 2% (Post series B) | Additional 3% (Post IPO) | Additional 3% (Post IPO) |

**6.3   *Cancellation of Liens.***

Except as provided otherwise in this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens on assets located in the United States that secure any U.S. Secured Claim shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall revert to the Reorganized Debtor and his

16

successors and assigns, and the holder of such U.S. Secured Claim shall be authorized and directed, at the sole cost and expense of the Reorganized Debtor, to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such holder, and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The filing of the Confirmation Order with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## ARTICLE VII
## PLAN DISTRIBUTIONS

### 7.1    *Plan Distributions.*

The Debtor shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

### 7.2    *Allocation of Plan Distributions Between Principal and Interest.*

The aggregate consideration to be distributed to the holders of Allowed Claims under the Plan shall be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claims of such holders, as determined for federal income tax purposes, and any remaining consideration as satisfying accrued, but unpaid, interest, if any.

### 7.3    *No Postpetition Interest on Claims.*

Other than as specifically provided in the Plan, Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claim, and no holder of a prepetition Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 7.4    *Date of Plan Distributions.*

Except as otherwise provided herein, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 7.5    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtor, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. The Debtor shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. The Debtor and the Reorganized Debtor, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 7.6    *Delivery of Plan Distribution.*

Subject to the provisions contained in this Article VII and subject to Bankruptcy Rule 9010, the Debtor shall make all Plan Distributions or payments to any holder of an Allowed Claim as and

when required by this Plan at: (a) the address of such holder on the books and records of the Debtor or his agents; or (b) the address in any written notice of address change delivered to the Debtor, including any addresses included on any filed proofs of claim or transfers of claim filed with the Bankruptcy Court. In the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Debtor has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder without interest; *provided, however,* such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.

### 7.7    *Unclaimed Property.*

Except with respect to the Trust Interests held in the Trust, one (1) year from the later of: (a) the Effective Date, and (b) the date that a Claim is first Allowed, all unclaimed property or interests in property distributable hereunder on account of such Claim shall revert to the Reorganized Debtor or the successors or assigns of the Reorganized Debtor, and any claim or right of the holder of such Claim to such property or interest in property shall be discharged and forever barred. The Reorganized Debtor shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtor's books and records, the proofs of Claim filed against the Debtor, as reflected on the claims register maintained by the Voting Agent, and any change of address reflected on the docket of the Chapter 11 Case.

### 7.8    *Satisfaction of Claims.*

Unless otherwise provided herein, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction, and discharge of such Allowed Claims.

### 7.9    *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Reorganized Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor or the Reorganized Debtor.

### 7.10    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim, to the extent such interest is permitted by Article 7.3 of this Plan.

To the extent any holder of an Allowed Debt Claim continues to have claims against any other Person or Entity (other than the Debtor or his wife Wei Gan), subject to the following proviso, such claims will remain outstanding notwithstanding the transactions contemplated hereby; *provided, however,* if on and after the date on which the claims of any holder of an Allowed Debt Claim is paid in full in accordance with the terms of this Plan, any such Allowed Debt Claims shall thereafter be deemed to be and in fact, paid in full in their entirety. Furthermore, to the extent any holder of an Allowed Debt Claim has security or possession of any property or assets of the Debtor or any other Person or Entity, after such Claims are paid in full, such holder shall release and/or return any such property or assets to the Debtor or such other Person or Entity.

If on and after the date on which a holder of an Allowed Debt Claim is paid in part in

accordance with the terms of this Plan, then the aggregate amount distributed to such holder from the disposition of Chinese frozen or secured assets will be equal to the proceeds received from the disposition of such frozen or secured assets less the partial payments that have been made to such holder through the Trust.

### 7.11    *Setoffs and Recoupments.*

(a)    Except as expressly provided in this Plan, the Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided, however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. For the avoidance of doubt, nothing in this Plan shall affect the right of any holder of a Claim against the Debtor that is evidenced by a timely filed proof of claim to seek an order of the Bankruptcy Court authorizing such holder to set off such Claim against any claim, right, or Cause of Action of the Debtor that arose prior to the Petition Date.

(b)    In no event shall any holder of Claims against the Debtor be entitled to recoup any such Claim against any claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtor in accordance with Article 13.21 of the Plan on or before the Effective Date, notwithstanding any indication in any proof of claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 7.12    *Withholding and Reporting Requirements.*

In connection with this Plan and all Plan Distributions hereunder, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtor or Reorganized Debtor believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provisions of this Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations on account of such distribution; and (b) no distribution shall be required to be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom.

### 7.13    *Claims Paid by Third Parties.*

(a)    <u>Claims Paid by Third Parties</u>.  Except as otherwise provided in the Plan, the Debtor or Reorganized Debtor, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without an objection having to be filed and without any further notice to, or action, order, or

approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not the Debtor or Reorganized Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or Reorganized Debtor on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim as of the date of any such distribution under the Plan. In the event such holder fails to timely repay or return such distribution, the Debtor, the Reorganized Debtor, or the Trustee, as applicable, may pursue any rights and remedies against such holder under applicable law.

(b)  Applicability of Insurance Policies.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Pursuant to section 524(e) of the Bankruptcy Code, nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor, the Reorganized Debtor, or any Entity may hold against any other Entity under any insurance policies, including against insurers, nor shall anything contained in this Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VIII
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### 8.1   *Objections to Claims; Estimation of Claims.*

Except insofar as a Claim is Allowed under the Plan, the Debtor or the Reorganized Debtor, as applicable, shall be entitled to object to Claims. No other Entity shall be entitled to object to Claims after the Effective Date. Any objections to Claims shall be served and filed on or before (a) the one-hundred eightieth (180th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as may be fixed by the Bankruptcy Court.

The Reorganized Debtor may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, except that the Reorganized Debtor may not request estimation of any non-contingent or liquidated Claim if the Debtor's objection to such Claim was previously overruled by a Final Order, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**8.2**     *Payments and Distributions on Disputed Claims.*

If an objection to a Claim is filed as set forth in Article 8.1, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

At such time as a Disputed Claim becomes an Allowed Claim or as soon as practicable thereafter, the Debtor shall distribute to the holder of such Allowed Claim the property distributable to such holder pursuant to Article IV of the Plan; *provided, however*, that the timing of distributions to holders of Claims in Class 3 shall be governed in all respects by Article 6.2 of the Plan.  To the extent that all or a portion of a Disputed Claim is Disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is Disallowed.  Notwithstanding any other provision of the Plan, no interest shall accrue or be Allowed on any Claim during the period after the Petition Date, except to the extent that section 506(b) of the Bankruptcy Code permits interest to accrue and be Allowed on such Claim.

**8.3**     *Preservation of Claims and Rights to Settle Claims.*

Except as otherwise provided in the Plan, or in any contract, instrument, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss all Claims, rights, Causes of Action, suits, and proceedings, including those described in the Plan Supplement (collectively, the "Retained Actions"), whether at law or in equity, whether known or unknown, that the Debtor or his Estate may hold against any Entity (other than Claims, rights, Causes of Action, suits, and proceedings released pursuant to Article 11.4 below), without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  For the avoidance of doubt, Retained Actions do not include any Claim or Cause of Action released pursuant to Article 11.4 and 11.9 below.  The Reorganized Debtor or his successor(s) may pursue such Retained Actions, as appropriate, in accordance with the best interests of the Reorganized Debtor or his successor(s) that hold such rights.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Action against it as any indication that the Reorganized Debtor will not, or may not, pursue any and all available Retained Actions against it.  The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Actions against any Entity.  Unless any Retained Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Retained Actions for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Action upon, after, or as consequence of, confirmation or consummation of the Plan.  For the avoidance of doubt, all Claims, Causes of Action, suits, and proceedings of the Debtor that are not Retained Actions are waived as of the Effective Date.

**8.4**     *Expenses Incurred On or After the Effective Date.*

      Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtor, the amount of reasonable expenses incurred by any Professional or the Voting Agent on or after the Effective Date in connection with implementation of this Plan, including, without limitation, reconciliation of, objection to, and settlement of claims, shall be paid in Cash by the Reorganized Debtor.

## ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1**     *Assumption of Contracts and Leases.*

      As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtor shall be deemed assumed except that: (a) any executory contracts and unexpired leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; (b) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases, shall be deemed rejected as of the Effective Date; and (c) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the Final Order resolving such motion.

      Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections described in this Article 9.1 pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Article 9.1 shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law. The pendency of any motion to assume or reject executory contracts or unexpired leases shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

      Unless otherwise provided in the Plan, each executory contract and unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect. Modifications, amendments, supplements, and restatements to prepetition executory contracts or unexpired leases that have been executed by the Reorganized Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease.

**9.2**     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

      Proofs of Claim with respect to all Claims arising from the rejection of Executory Contracts must be filed within sixty (60) days after the later of (a) the date of entry of an order of the Bankruptcy Court approving such rejection or (b) the Confirmation Date. Any Claims not filed within such times shall be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, and the property thereof. Unless otherwise ordered by the Bankruptcy Court, all such Claims shall be allowed in accordance with provisions of the Bankruptcy Code, including section 502(b)(6), and shall, following their allowance and payment pursuant to the terms of the Plan, be Unimpaired and be treated as Allowed Claims in Class 3.

### 9.3 *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)     Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "Cure Amount") in full in Cash on the later of thirty (30) days after: (i) the Effective Date or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(b)     No later than ten (10) calendar days prior to the commencement of the Confirmation Hearing, the Debtor shall file a schedule (the "Cure Schedule") setting forth the Cure Amount, if any, for each executory contract and unexpired lease to be assumed pursuant to Article 9.1 of the Plan, and serve such Cure Schedule on each applicable counterparty.  Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within ten (10) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

(c)     In the event of a dispute (each, a "Cure Dispute") regarding: (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption in accordance with Article 9.3(a).  To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that the Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  To the extent the Cure Dispute is resolved or determined against the Debtor or Reorganized Debtor, as applicable, the Debtor or Reorganized Debtor, as applicable, may reject the applicable executory contract or unexpired lease within ten (10) Business Days after such determination by filing and serving upon the counterparty a notice of rejection, and the counterparty may thereafter file a proof of claim in the manner set forth in Article 9.2 hereof.

### 9.4 *Insurance Policies.*

All insurance policies pursuant to which the Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor (and assigned to the Reorganized Debtor if necessary to continue such insurance policies in full force) pursuant to section 365 of the Bankruptcy Code and shall continue in full force and effect.

### 9.5 *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor that any agreement, contract, or lease is an executory contract or unexpired lease subject to Article IX of the Plan, as applicable, or that the Debtor or Reorganized Debtor has any liability thereunder.

The Debtor and Reorganized Debtor, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts and Leases until and including the Effective Date or as otherwise provided by Bankruptcy Court order; *provided, however*, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to the asserted Cure Amount, then the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to amend the decision to assume, or assume and assign, such executory contract or unexpired lease.

**9.6    *Pre-existing Obligations to Debtor Under Executory Contracts and Unexpired Leases***

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor contracting from non-Debtor counterparties to rejected executory contracts or unexpired leases.

**9.7    *Contracts and Leases Entered into After the Petition Date.***

Contracts and leases entered into after the Petition Date by the Debtor in the ordinary course of business or following approval pursuant to a Bankruptcy Court order, including any executory contracts and unexpired leases assumed by the Debtor, shall be performed by the Debtor or Reorganized Debtor, as the case may be, in the ordinary course of business. Accordingly, such contracts and leases (including any assumed executory contracts and unexpired leases) shall survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE X
## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

**10.1    *Conditions Precedent to Confirmation.***

It shall be a condition to confirmation of this Plan that the following conditions shall have been satisfied in full or waived in accordance with Article 10.3 of the Plan:

(a)    The Disclosure Statement shall have been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code; and

(b)    The Confirmation Order shall have been entered on the docket for the Chapter 11 Case and be in full force and effect.

**10.2    *Conditions Precedent to the Effective Date.***

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions have been satisfied in full or waived in accordance Article 10.3 of the Plan:

(a)    The Confirmation Order shall have become a Final Order in full force and effect;

(b)    The documents comprising the Plan Supplement, including the Trust Agreement, shall, to the extent applicable, have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(c)    All necessary actions, documents, certificates, and agreements necessary to implement the Plan on the Effective Date shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and

(d)    All applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtor to emerge from chapter 11 pursuant to the Plan and any statutory waiting periods shall have expired.

**10.3    *Waiver of Conditions Precedent.***

Each of the conditions precedent in Articles 10.1 and 10.2 of the Plan may be waived, in whole or in part, by the Debtor in writing, without notice to any other third parties or order of the Bankruptcy Court or any other formal action.

**10.4    *Effect of Non-Occurrence of the Effective Date.***

If the conditions listed in Articles 10.1 and 10.2 are not satisfied or waived in accordance with Article 10.3, then (a) the Confirmation Order shall be of no further force or effect; (b) the Plan shall be null and void in all respects; (c) no distributions under the Plan shall be made; (d) no executory contracts or unexpired leases that were not previously assumed, assumed and assigned, or rejected shall be deemed assumed, assumed and assigned, or rejected by operation of the Plan; (e) the Debtor and all holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date; and (f) nothing contained in the Plan or the Disclosure Statement shall (i) be deemed to constitute a waiver or release of (x) any Claims by any creditor or the Debtor or (y) any Claims against the Debtor, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor in any respect.

**ARTICLE XI**
**EFFECT OF CONFIRMATION**

**11.1    *Vesting of Assets.***

Except as otherwise provided in the Plan, as of the Effective Date, all property of the Estate, and any property acquired by the Debtor or Reorganized Debtor under the Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances and interests. On and after the Effective Date, the Debtor may use, acquire, and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**11.2    *Binding Effect.***

Subject to the occurrence of the Effective Date and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062, on and after the Confirmation Date, the provisions of the Plan shall be immediately effective and enforceable and deemed binding upon any holder of a Claim against the Debtor, and such holder's respective successors and assigns, (whether or not the Claim of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor counterparties to executory contracts, unexpired leases, and

any other prepetition agreements. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

### 11.3    *Discharge of Claims.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against the Debtor of any nature whatsoever, whether known or unknown, or against the assets or properties of the Debtor that arose before the Effective Date. Except as expressly provided in the Plan, on the Discharge Date (and subject to its occurrence), and pursuant to section 1141(d)(5) of the Bankruptcy Code, entry of the Confirmation Order shall be deemed to act as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against the Debtor and his assets, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Plan or is entitled to receive a distribution under the Plan; *provided, however,* that in no event shall occurrence of the Discharge Date discharge the Debtor from any obligations remaining under the Plan as of the Discharge Date. Any default by the Debtor with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Case shall be deemed cured on the Discharge Date.

No later than five (5) business days after the occurrence of the Discharge Date, the Debtor or Reorganized Debtor, as applicable, shall file with the Bankruptcy Court a notice of the occurrence of the Discharge Date, and serve such notice on all creditors. In addition, following the occurrence of the Discharge Date, the Debtor or Reorganized Debtor, as applicable, shall file a motion seeking entry of an order of discharge after notice and a hearing, which motion (and the discharge) shall be granted upon a showing that the Debtor has made all payments required under the Plan. Except as expressly provided in the Plan, any holder of a discharged Claim will be precluded from asserting against the Debtor or any of his assets any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. Except as expressly provided in the Plan, and subject to the occurrence of the Discharge Date, the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor to the extent allowed under section 1141 of the Bankruptcy Code, and the Debtor will not be liable for any Claims and will only have the obligations that are specifically provided for in the Plan. Notwithstanding the foregoing, nothing contained in the Plan or the Confirmation Order shall discharge the Debtor from any debt excepted from discharge under section 523 of the Bankruptcy Code by a Final Order.

### 11.4    *Releases.*

(a)    <u>Releases by the Debtor.</u>    Upon the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, in his individual capacity and as debtor in possession, shall be deemed forever to release, waive, and discharge (x) the Estate; (y) all Persons engaged or retained by the Debtor in connection with the Chapter 11 Case (including in connection with the preparation of and analyses relating to the Disclosure Statement and the Plan); and (z) any and all advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, and representatives of each of the foregoing Persons and Entities (whether current or former, in each case in his, her, or its capacity as such), from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws (other than the rights of the Debtor or Reorganized

26

Debtor to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) the Debtor or the Chapter 11 Case; (ii) any action or omission of any Released Party with respect to any indebtedness under which the Debtor is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, or agent of, or advisor to, the Debtor; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; (v) the business or contractual arrangements between the Debtor and any Released Party; (vi) the restructuring of Claims before or during the Chapter 11 Case; and (vii) the negotiation, formulation, preparation, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, or related agreements, instruments, or other documents, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence. The Reorganized Debtor shall be bound, to the same extent the Debtor is bound, by the releases and discharges set forth above.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article 11.4(a) by the Debtor, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article 11.4(a) is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(b)     <u>Releases by Holders of Claims and Other Entities</u>. Upon the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party, in consideration for the obligations of the Debtor and the Reorganized Debtor under the Plan, and the Trust Interests and Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed forever to release, waive, and discharge the Released Parties from personal liability in every jurisdiction from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtor, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws or laws of any other jurisdiction or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) the Debtor or the Chapter 11 Case; (ii) any action or omission of any Released Party with respect to any indebtedness under which the Debtor is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, agent of, or advisor to, the Debtor; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; (v) the business or contractual arrangements between the Debtor and any Released Party; (vi) the restructuring of Claims before or during the Chapter 11 Case and the solicitation of votes with respect to the Plan; and (vii) the negotiation, formulation, preparation, entry into, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement

and all documents contained or referred to therein), the Disclosure Statement, or related agreements, instruments, or other documents; *provided, however*, that the Releasing Parties shall continue to dispose of the following assets through judicial authorities in the People's Republic of China to satisfy such Releasing Party's Claim through a mechanism that will be mutually agreed to by the parties: (x) assets that have already been collateralized by the Debtor or any other Person or Entity; (y) assets that have already been pledged by the Debtor or any other Person or Entity; and (z) assets or interests that the Debtor, his wife Wei Gan, or any other Person or Entity own that have been seized, attached, or frozen by Chinese judiciary authorities. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Within thirty (30) days of the Effective Date, each holder of a Debt Claim is obligated to (i) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against the Debtor and his wife Wei Gan from the court or judicial authorities in all jurisdictions, including, but not limited to, the People's Republic of China, or commit or confirm with the judicial authorities that the Debtor or his wife Wei Gan have fulfilled all their debt obligations or legal responsibilities and (ii) file and execute any documents requested by the Debtor to evidence the above release. Unless and until a holder of a Debt Claim complies with the preceding sentence and all of their obligations under the Trust Agreement, such holder shall not be entitled to exercise any rights with respect to the Trust or receive any distributions from the Trust; *provided, however*, that the Debtor reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein, and the Chinese judicial authorities shall have jurisdiction to enforce such rights.

In connection with the releases described in this Article 11.4(b), each Releasing Party shall waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article 11.4(b), which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Article 11.4(b) is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

11.5    *Exculpation and Limitation of Liability.*

None of the Debtor or Reorganized Debtor, or the direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents, or other professionals (whether current or former, in each case, in his, her, or its capacity as such) of the Debtor or the Reorganized Debtor, or the Released Parties shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim, or any other party in interest in the

Chapter 11 Case, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or direct or indirect affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, formulation, negotiation, preparation, dissemination, confirmation, solicitation, implementation, or administration of the Plan, the Plan Supplement and all documents contained or referred to therein, the Disclosure Statement, any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other pre- or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor or confirming or consummating the Plan (including the distribution of any property under the Plan); *provided, however*, that the foregoing provisions of this Article 11.5 shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence and shall not impact the right of any holder of a Claim, or any other party to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan. Without limiting the generality of the foregoing, the Debtor and the Debtor's direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents and other professionals (whether current or former, in each case, in his, her, or its capacity as such) shall, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The exculpated parties have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such exculpating parties from liability.

### 11.6    *Injunction.*

(a)    <u>General</u>. All Persons or Entities who have held, hold, or may hold Claims (other than Claims that are reinstated under the Plan), and all other parties in interest in the Chapter 11 Case, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claim or Cause of Action released or settled hereunder, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against the Released Parties, the Debtor, or the Reorganized Debtor, or in respect of any Claim or Cause of Action released or settled hereunder; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Released Parties, the Debtor, or the Reorganized Debtor; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties, the Debtor, or the Reorganized Debtor; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Released Parties, the Debtor, or the Reorganized Debtor, or against the property or interests in property of the Debtor or Reorganized Debtor, on account of such Claims; or (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Plan; *provided, however*, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms hereof and the contracts,

instruments, releases, and other agreements and documents delivered under or in connection with the Plan.

(b)    **Injunction Against Interference With the Plan.**    Upon entry of the Confirmation Order, all holders of Claims and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article 11.6 of the Plan.

### 11.7    *Term of Bankruptcy Injunction or Stays.*

All injunctions or stays (excluding any injunctions or stays contained in the Plan or the Confirmation Order) in effect in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court or otherwise, and in existence as of the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 11.8    *Termination of Subordination Rights and Settlement of Related Claims.*

The classification and manner of satisfying all Claims under the Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. All subordination rights that a holder of a Claim may have with respect to any distribution to be made under the Plan, shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Accordingly, distributions under the Plan to holders of Allowed Claims shall not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by a beneficiary of such terminated subordination rights.

### 11.9    *Waiver of Actions Arising Under Chapter 5 of the Bankruptcy Code.*

Without limiting any other applicable provisions of, or releases contained in, this Plan, each of the Debtor, the Reorganized Debtor, their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, throughf, for, or because of the foregoing entities, hereby irrevocably and unconditionally release, waive, and discharge any and all Claims or Causes of Action that they have, had or may have that are based on section 544, 547, 548, 549, and 550 of the Bankruptcy Code and analogous non-bankruptcy law for all purposes; *provided, however,* that notwithstanding this or any other provision of the Plan, the Debtor and Reorganized Debtor, as the case may be, retain all such Claims or Causes of Action against any holder of a putative U.S. Secured Claim. For the avoidance of doubt, none of the Claims or Causes of Action referenced in this Article 11.9, except as excluded herein, shall constitute Retained Actions.

### 11.10    *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Effective Date. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor or any other party, including the Released Parties, with respect to any Claims or any other matter.

## ARTICLE XII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code, to the fullest extent permitted by law, and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or out of, or related to, the Chapter 11 Case, the Plan, or the Confirmation Order, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of Claims;

(b)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is party to or with respect to which the Debtor or Reorganized Debtor may be liable, and hear, determine, and, if necessary, liquidate, any Claims arising therefrom;

(c)    Determine any and all motions, adversary proceedings, applications, contested matters, or other litigated matters pending on the Effective Date;

(d)    Ensure that Plan Distributions to holders of Allowed Claims are accomplished pursuant to the terms of the Plan;

(e)    Adjudicate any and all disputes arising from or relating to Plan Distributions;

(f)    Enter, implement, or enforce such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Confirmation Order;

(g)    Enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(h)    Issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(i)    Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(j)    Hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Bankruptcy Code incurred prior to the Confirmation Date;

31

(k)     Hear and determine any rights, Claims, or Causes of Action held or reserved by, or accruing to, the Debtor or the Reorganized Debtor pursuant to the Bankruptcy Code, the Confirmation Order, or, in the case of the Debtor, any other applicable law;

(l)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(m)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions contemplated thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing, or the effect of the Plan under any agreement to which the Debtor, the Reorganized Debtor, or any affiliate thereof are party;

(n)     Hear and determine any issue for which the Plan or a related document requires a Final Order of the Bankruptcy Court;

(o)     Issue such orders as may be necessary or appropriate to aid in execution of the Plan or to maintain the integrity of the Plan following consummation, to the extent authorized by section 1142 of the Bankruptcy Code;

(p)     Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(q)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(r)     Enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(s)     Hear and determine all disputes involving the existence, scope, and nature of the discharges, releases, or injunctions granted under the Plan and the Bankruptcy Code;

(t)     Hear and determine all disputes involving or in any manner implicating the exculpation or indemnification provisions contained in the Plan;

(u)     Hear and determine any matters arising under or related to sections 1141 and 1145 of the Bankruptcy Code;

(v)     Recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

(w)     Enter an order of discharge, upon request of the Debtor or Reorganized Debtor, as applicable;

(x)     Enter a final decree closing the Chapter 11 Case; and

(y)     Hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**13.1** *Payment of Statutory Fees.*

On the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the U.S. Code shall be paid by the Debtor.  Following the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  The Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**13.2** *Exemption from Securities Laws.*

To the maximum extent provided by section 1145(a) of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance, or distribution of the Trust Interests, shall be exempt from, among other things, section 5 of the Securities Act, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

**13.3** *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the transfer of title to or ownership of any of the Debtor's interests in any property; or the making or delivery of any instrument of transfer in connection with the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the foregoing, any issuance, transfer, or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including, without limitation, any and all stamp taxes or similar taxes and any interest, penalties, and addition to the tax that may be required to be paid in connection with the consummation of the Plan) pursuant to sections 106, 505(a), 1141, and 1146(a) of the Bankruptcy Code.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

**13.4** *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee(s) appointed in the Chapter 11 Case shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case.  The Reorganized Debtor shall not be responsible for paying any fees and expenses incurred after the Effective Date, if any, by the professionals retained by any such committee, other than for the reasonable fees and expenses for the services authorized to be provided pursuant to this Article 13.4.

**13.5**    *Substantial Consummation.*

On the Discharge Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**13.6**    *Expedited Determination of Postpetition Taxes.*

The Reorganized Debtor shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtor for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

**13.7**    *Modification and Amendments.*

Subject to the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtor may alter, amend, or modify the Plan at any time prior to the Effective Date. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification complies with the requirements of this Article 13.7 and does not materially and adversely change the treatment of the Claim of such holder; *provided, however,* that any holders of that were deemed to accept the Plan because such Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be Unimpaired.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**13.8**    *Additional Documents.*

On or before the Effective Date, the Debtor may enter into any agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or Reorganized Debtor, as applicable, and all holders of Claims receiving Plan Distributions and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**13.9**    *Effectuating Documents and Further Transactions.*

On and after the Effective Date, the Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents, except for those expressly required pursuant to the Plan.

**13.10**    *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.deb.uscourts.gov, and at the website of the Voting Agent at https://dm.epiq11.com/YT1. The

documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**13.11** *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.12** *Revocation or Withdrawal of the Plan.*

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date. If the Debtor takes such action, the Plan shall be deemed null and void in its entirety and of no force or effect, and any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void. In such event, nothing contained in the Plan shall (a) constitute or be deemed to be a waiver or release of any Claim against the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any Entity in further proceedings involving the Debtor; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

**13.13** *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtor, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

**13.14** *Solicitation.*

Upon entry of the Confirmation Order, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(e) and (g) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation. The Debtor, the Reorganized Debtor, and each of their respective employees, agents, representatives, advisors, attorneys, accountants, and professionals shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of any securities offered or sold under the Plan, and therefore, are not, and on account of such offer, issuance, sale, solicitation, or purchase shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of any securities offered or sold under the Plan.

### 13.15    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

### 13.16    *Compliance with Tax Requirements.*

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any Entity issuing any instruments or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Any Entity issuing any instruments or making any distribution under the Plan to a holder of an Allowed Claim has the right, but not the obligation, not to make a distribution until such holder has provided to such Entity the information necessary to comply with any withholding requirements of any such taxing authority, and any required withholdings (determined after taking into account all information provided by such holder pursuant to this Article 13.16) shall reduce the distribution to such holder.

### 13.17    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

### 13.18    *Closing of Chapter 11 Case.*

The Reorganized Debtor shall, as promptly as practicable after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, Del. Bankr. L.R. 3022-1, and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### 13.19    *Document Retention.*

On and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with his current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor without order of the Bankruptcy Court.

### 13.20    *Conflicts.*

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; *provided, however,* that in the event of a conflict between the Confirmation Order, on the one hand, and the Plan or the Plan Supplement, on the other hand, the Confirmation Order shall govern and control in all respects.

**13.21**  *Service of Documents.*

        After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

        the Debtor or the Reorganized Debtor, shall be served on:

> PACHULSKI STANG ZIEHL & JONES LLP
> 919 North Market Street
> 17th Floor
> Wilmington, Delaware 19801
> Attn: James E. O'Neill
> Email: joneill@pszjlaw.com
>
> - and -
>
> PACHULSKI STANG ZIEHL & JONES LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, California 90067
> Attn: Richard M. Pachulski; Jeffrey W. Dulberg; Malhar S. Pagay
> Email: rpachulski@pszjlaw.com; jdulberg@pszjlaw.com;
> mpagay@pszjlaw.com
>
> - and -
>
> O'Melveny & Myers LLP
> Times Square Tower
> Seven Times Square
> New York, New York 10036
> Attn: Suzzanne Uhland; Diana Perez
> Email: suhland@omm.com; dperez@omm.com

        After the Effective Date, the Reorganized Debtor shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

**13.22** *Deemed Acts.*

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**13.23** *Waiver or Estoppel.*

Each holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtor or its counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.