### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YUETING JIA, | Case No. 19-12220-KBO |
| Debtor. | **Hearing Date: 12/18/2019 @ 10:00 a.m. (ET)**<br>**Obj. Deadline: 12/02/2019 @ 4:00 p.m. (ET)** |

## SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.'S MOTION (I) TO DISMISS THE DEBTOR'S CHAPTER 11 CASE OR, ALTERNATIVELY, (II) TO TRANSFER VENUE TO THE CENTRAL DISTRICT OF CALIFORNIA

**THE ROSNER LAW GROUP LLC**
Frederick B. Rosner (DE #3995)
Zhao (Ruby) Liu (DE #4885)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
rosner@teamrosner.com
liu@teamrosner.com

-and-

**KOBRE & KIM LLP**

Daniel J. Saval, Esq.
John Han, Esq.
Dong Ni (Donna) Xu, Esq.
daniel.saval@kobrekim.com
john.han@kobrekim.com
donna.xu@kobrekim.com
800 Third Ave, Floor 6
New York, NY 10022
Tel: +1 212 488 1200
Fax: +1 212 488 1220

*Counsel to Shanghai Lan Cai*
*Asset Management Co, Ltd*

{00026873. }

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Preliminary Statement | | 1 |
| BACKGROUND | | 3 |
| I. | The Debtor's Meteoric Rise and Fall | 3 |
| II. | The Debtor's Flight From China and Subsequent Injunctions and Freezing Orders | 4 |
| III. | The Debtor's Diversion of Funds into Faraday Future and California Real Estate, While Evading China-Based Creditors | 6 |
| IV. | The California Judgment Enforcement Proceedings | 7 |
| V. | The Debtor's Instant Case | 9 |
|  | A.  The Plan Proposal | 9 |
|  | B.  The China-Based Creditor Body | 10 |
| JURISDICTION | | 11 |
| ARGUMENT | | 11 |
| I. | The Court Should Dismiss the Chapter 11 Case | 11 |
|  | A.  The Case Was Filed in an Improper Venue | 11 |
|  | B.  Dismissal Is Warranted For "Cause" Pursuant to Section 1112(b) | 14 |
|  | C.  Alternatively, the Court Should Dismiss the Chapter 11 Case Pursuant to Section 305(a) of the Bankruptcy Code | 25 |
| II. | Alternatively, the Court Should Transfer Venue of the Case to the Central District of California | 27 |
| CONCLUSION | | 30 |

# TABLE OF AUTHORITIES

**Cases**

*Ackermann v Levine*, 788 F.2d 830 (2d Cir. 1986) ....................................................... 22

*Advanced Restoration Techs., Inc. v. Shortgrass, Inc.*, No. CIV.A. 05-2978 (JLL), 2006 WL 827841 (D.N.J. Mar. 30, 2006) ............................................................ 16

*Argus Group 1700 v. Steinman (In re Argus Group 1700)*, 206 B.R. 757 (E.D. Pa. 1997) ......... 19

*Basic v. Fitzroy Engineering*, No. 97-1052, 1997 WL 753336 (7th Cir. Dec. 4, 1997) .............. 22

*BEPCO v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, 400 B.R. 420 (D. Del. 2009).......... 17

*Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512 (2d Cir. 1975)........................................... 20

*GMAM Inv. Funds Trust I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235 (S.D.N.Y. 2004)....................................... 21

*Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895) ................................... 21

*In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009)................................. 15, 17

*In re Am. Capital Equip., LLC*, 688 F.3d 145 (3d Cir. 2012)........................................ 14

*In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229 (Bankr. S.D.N.Y. 2017) ........................................ 22

*In re Bancredit Cayman Ltd.*, Bankr. No. 06-11026 (SMB), Adv. No. 08-1147, 2008 WL 5396618 (Bankr. S.D.N.Y. Nov. 25, 2008) (Bernstein, J.)....................................... 24

*In re Caesars Entertainment Operating Company, Inc.*, No. 15-10047 (KG), 2015 WL 495259 (Bankr. D. Del. Feb. 2, 2015)................................................................. 28

*In re Columbia Western, Inc.*, 183 B.R. 660 (Bankr. D. Mass. 1995).......................................... 13

*In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427 (Bankr. S.D.N.Y. 2007) ..................... 26

*In re DCNC North Carolina I, LLC*, 407 B.R. 651 (Bankr. E.D. Pa. 2009)................................. 16

*In re Deabel, Inc.*, 193 B.R. 739 (Bankr. E.D. Pa. 1996) ............................................. 13

*In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013) ................................................. 19

*In re Hall, Bayoutree Assocs., Ltd.*, 939 F.2d 802 (9th Cir. 1991) ................................ 13

*In re Irish Bank Resolution Corporation Ltd*, Case No. 13-12159 (CSS), 2014 WL 9953792
    (Bankr. D. Del. April 30, 2014) ......................................................... 21

*In re Mak Petroleum, Inc.*, 424 B.R. 904 (Bankr. M.D. Fla. 2010)................................ 20

*In re Maxwell Commc'n Corp. plc*, 93 F.3d 1036 (2d Cir. 1996).......................... 22, 23

*In re Northshore Mainland Services, Inc.*, 537 B.R. 192 (Bankr. D. Del. 2015) ............ 25, 26, 27

*In re Qualteq, Inc.*, No. 11-12572, 2012 WL 527669 (Bankr. D. Del. Feb. 16, 2012) ......... 27, 28

*In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364 (Bankr. D. Del. 2018) ................................ 15

*In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) ......................................... 14, 15

*In re Sorrells*, 218 B.R. 580 ( 10th Cir. B.A.P. 1998) ................................... 13

*In re Spanish Cay Co., Ltd.*, 161 B.R. 715 (Bankr. S.D. Fla. 1993)............................ 20

*In re Xacur*, 219 B.R. 956 (Bankr. S.D. Tex. 1998)........................................ 25

*In re Yukos Oil Co.,*, 321 B.R. 396 (Bankr. S.D. Tex. 2005) ................................ 19, 21

*Innovative Commc'n Co.*, 358 B.R. 120 (Bankr. D. Del. 2006).................................... 28

*Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013) ................................... 23

*Loucks v. Standard Oil Co.*, 224 N.Y. 99 (1918) (Cardozo, J.).................................... 22

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,
    Inc.)*, 384 F.3d 108 (3d Cir. 2004) ................................................. 15, 16, 17

*Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642 (E.D. Pa. 2000) .............................. 22

*Primestone Inv. Partners, L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners, L.P.)*, 272
    B.R. 554 (D. Del. 2002) ......................................................... 16

**Statutes**

11 U.S.C. § 305.................................................................................... 1

11 U.S.C. § 305(a) ................................................................................................ 24, 25

11 U.S.C. § 305(a)(1) ................................................................................................... 24

11 U.S.C. § 541 .............................................................................................................. 2

11 U.S.C. § 1104(a) ..................................................................................................... 14

11 U.S.C. § 1112 ............................................................................................................. 1

11 U.S.C. § 1112(b) ............................................................................................... passim

11 U.S.C. § 1112(b)(1) ................................................................................................ 14

11 U.S.C. § 1112(b)(4) ................................................................................................ 14

11 U.S.C. § 1125(b) ..................................................................................................... 24

28 U.S.C. § 157(b) ....................................................................................................... 10

28 U.S.C. § 1334 .......................................................................................................... 10

28 U.S.C. § 1406 ......................................................................................... 1, 12, 13, 27

28 U.S.C. § 1406(a) ..................................................................................................... 13

28 U.S.C. § 1408 ................................................................................................ 11, 13, 27

28 U.S.C. § 1408(1) ................................................................................................ 12, 29

28 U.S.C. § 1412 ..................................................................................................... 1, 27

**Other Authorities**

H. Sommer & R. Levin, Collier on Bankruptcy 3.01[5] (15th ed. rev.2003) ............................... 20

J. Moore, A. Vestal & P. Kurland, Moore's Manual, Federal Practice and Procedure, § 7.13[1]
    (1990) ............................................................................................................................... 13

Restatement (Third) of Foreign Relations § 403 ........................................................ 23

**Rules**

Fed. R. Bankr. P. 1014 ................................................................................................... 13, 27

Fed. R. Bankr. P. 1014(a)(1) ............................................................................................... 27

Fed. R. Bankr. P. 1014(a)(2) ............................................................................................... 13

**Constitutional Provisions**

U.S. Const. amend. V ......................................................................................................... 20

Creditor Shanghai Lan Cai Asset Management Co, Ltd. ("Shanghai Lan Cai") hereby submits this motion (the "Motion") to (1) dismiss the above-referenced Chapter 11 case filed by Yueting Jia ("Jia" or the "Debtor") pursuant to 11 U.S.C. §§ 1112 and 305 and 28 U.S.C. § 1406 or, alternatively, (2) transfer venue of the case to the Central District of California, pursuant to 28 U.S.C. § 1412. In support of the Motion, Shanghai Lan Cai respectfully states as follows:

## PRELIMINARY STATEMENT

1. The facts and circumstances of this case *require* that the Court do one of two things—either dismiss the case or transfer venue to the Central District of California. Of the two, dismissal is the appropriate remedy. This is a bad faith filing in several significant ways: it was timed to avoid a court-supervised examination into the Debtor's assets and financial affairs; it seeks to force an almost entirely China-based creditor body with claims under Chinese law to have their claims resolved in the United States; venue was manufactured (unsuccessfully) in Delaware on the basis of a Delaware holding company formed less than 90 days before the filing; and the Debtor proposes to use the Chapter 11 case to distribute to his creditors only those assets he has chosen to disclose, so that he can keep the substantial assets he has fraudulently hidden from those creditors.

2. The Debtor is a Chinese national who fled China when its highest court placed him on an official list of credit defaulters. His creditors are overwhelmingly located in China— including *all* of the creditors on the Debtor's list of the largest 20 unsecured claims.[1] Those creditors' claims are overwhelmingly governed by Chinese law. Nevertheless, the Debtor seeks to use a U.S. Chapter 11 proceeding—in a legal system unfamiliar to his creditors, in a language unfamiliar to his creditors, and in a court halfway around the world from his creditors—to

---

[1]    *See* Official Form 101 Voluntary Petition for Individuals Filing for Bankruptcy [Dkt. No. 1], at 9–13.

discharge of all of his debts.  The fundamental unfairness—indeed, the absurdity—of this case is readily illustrated by flipping the role of the United States here:  if a U.S. citizen incurred billions in debt while living in the U.S., fled to a faraway foreign country, and then filed for bankruptcy in that foreign country to discharge his U.S. debts, U.S. creditors would undoubtedly be up in arms. This case is no different.  In fact, this type of cross-border conflict and confusion is exactly the sort of result that principles of international comity are designed to avoid.

3.      Further, the Debtor's attempt to discharge the claims of his Chinese creditors in a U.S. bankruptcy proceeding goes beyond just running roughshod over basic notions of due process.  His gambit also raises substantial doubts as to whether this U.S. bankruptcy case could even work the way it is supposed to.  Those creditors who are not subject to U.S. jurisdiction may very well decide that they are better off disregarding the bankruptcy proceedings altogether and pursuing their claims in China, whose courts are unlikely to recognize the automatic stay and discharge.  This is not just a theoretical possibility.  Creditors have already frozen over $219 million of the Debtor's assets in China.  Right out of the gate, this Court is hamstrung from effectively administering what, under Bankruptcy Code Section 541, is supposed to be a worldwide estate.

4.      For these reasons, as more fully set forth herein, there is more than ample cause to dismiss this case.  And even if the case is not dismissed, it does not belong in Delaware and must be transferred to the Central District of California.  The Debtor has resided in that District since he fled China in 2017.  The only assets that would be distributed under the Debtor's proposed plan are his interests in a California-domiciled corporation, Faraday & Future Inc. ("Faraday Future" or "Faraday").  Even the Debtor's bankruptcy counsel is based in California.  His only claimed connection to Delaware is an interest in a Delaware LLC formed less than three months before the

Chapter 11 filing.  The Debtor's attempt to manufacture venue in Delaware is not just in bad faith, it is deficient on its face.


## **BACKGROUND**

### I.   **The Debtor's Meteoric Rise and Fall**

5.    Jia is a Chinese national and famous debtor in his home jurisdiction, owing both institutional and individual creditors billions in defaulted obligations, in connection with his founding, and the subsequent collapse, of his company, Leshi Internet Information & Technology Corp Beijing ("Leshi" or "Le.com"), traded on the Shenzhen Stock Exchange.  Leshi is affiliated with LeEco, a major technology conglomerate in China.  LeEco—initially hailed as "China's Netflix" and which eventually expanded into a variety of tech areas—took on billions in debt as part of Jia's aggressive attempts to launch a variety of technology-related ventures, from electric cars to consumer electronics, as Jia attempted to "take on Apple, Tesla, Inc., and Netflix Inc. all at once."[2]

6.    Jia was once known as being "among the brashest and most flamboyant figures on China's frenzied technology scene,"[3] and companies he controlled received international attention.  Despite this apparent initial success in founding a series of Chinese tech companies, however, he was accused of bribery and fraud.  As was widely reported in international media, a series of allegations was made against Jia concerning his LeEco empire.  In particular, he is alleged to have

---

[2]    *See* Li Yuan, *Reality Bytes: A Highflying Chinese Tech Entrepreneur Falls Back to Earth*, THE WALL STREET JOURNAL (July 6, 2017), https://www.wsj.com/articles/reality-bytes-a-highflying-chinese-tech-entrepreneur-falls-back-to-earth-1499337030, a true and correct copy of which is attached hereto as **Exhibit 1**; Yifan Xie, *LeEco Founder's Assets, Shares Frozen Over Missed Interest Payment*, THE WALL STREET JOURNAL (July 4, 2017), https://www.wsj.com/articles/leeco-founders-assets-shares-frozen-over-missed-interest-payment1499180269?mod=article_inline, a true and correct copy of which is attached hereto as **Exhibit 2**.

[3]    Raymond Zhong and Carolyn Zhang, *China Names and Shames Tech Tycoon with Debt Blacklist,* N. Y. TIMES (Dec. 13 2017), https://www.nytimes.com/2017/12/13/business/china-blacklist-jia-yueting-leeco.html.  A true and correct copy of this article is attached hereto as **Exhibit 3**.

caused his publicly-traded company to engage in multi-billion dollar insider transactions with companies owned by himself and his family members; to have sold shares of the public company near its apex price and receiving approximately 5.7 billion yuan (or $814 million USD) promising to loan the proceeds back to the ailing company interest-free, but instead kept most of the funds; and to have possibly procured the IPO of the Shenzhen company through bribery and fraud.[4] Indeed, a bribery probe was later launched against several government officials who approved the IPO.[5]

7.      Similarly, Jia is alleged to have absconded with other loan proceeds as well.  For example, while he was still the CEO of LeTV in 2015, the company acquired a riding sharing company called Yidao Yongche. In 2016, a LeEco company owned almost exclusively by Jia borrowed 1.3 billion yuan from Yidao's parent company, Dongfang Che Yun.[6]  The whereabouts of the money is unknown and the debt has never been repaid, and the founder of Yidao has alleged that the proceeds of the 1.3 billion yuan loan were misappropriated.[7]

## II.    The Debtor's Flight From China and Subsequent Injunctions and Freezing Orders

9.      Eventually, based on this notorious history, Chinese authorities placed Jia on an official blacklist of creditors in China.  This blacklist restricted Jia's ability to travel and spend

---

[4]     *See* Leshi Internet Information and Technology Corp., Beijing, 乐视网信息技术（北京）股份有限公司 2017 年年度报告全文 (Apr. 27, 2018), http://file.finance.sina.com.cn/211.154.219.97:9494/MRGG/CNSESZ_STOCK/2018/ 2018-4/2018-04-27/4375026.PDF, a true and correct copy of the relevant excerpt of which, together with its partial English translation and translation certificate, are attached hereto as **Exhibit 4**; *see also* 乐视网：大股东巨额减持资金去哪儿了?, ESNAI (June 19, 2016), http://news.esnai.com/ 2016/0619/135171.shtml.  A true and correct copy of this article, together with its English translation and translation certificate, are attached hereto as **Exhibit 5**.

[5]     *See* Yu Zhang, 独 家 ｜ 多 名 发 审 委 委 员 被 查   关 键 词 "乐 视", CAIXIN (Oct. 30, 2017), http://finance.caixin.com /2017- 10-30/101163023.html.  A true and correct copy of this article, together with its English translation and translation certificate, are attached hereto as **Exhibit 6**.

[6]     *See* Yunxu Qu, 易到创始人周航称乐视挪用 13 亿号到乐视称其恶意诽谤, CAIXIN (Apr. 18, 2017), http://companies.caixin.com/2017-04-18/101079554.html.  A true and correct copy of this article, together with its English translation and translation certificate, are attached hereto as **Exhibit 7**.

[7]     *Id.*

within China.[8]  He and his affiliate entities also faced dozens of lawsuits in various courts in China,

including in Guangdong, Beijing, Ningbo, Chengdu, Nanjing, and Hubei.  *See* Schedules of Assets

and Liabilities and Statement of Financial Affairs [Dkt. No. 28], at 117–25.  In addition, Jia's

assets were also increasingly the targets of freezing orders in China.  In the summer of 2017, the

Shanghai High People's Court froze US $181 million worth of Jia's assets and US $2.3 billion in

Leshi shares, after a missed interest payment.  In addition, over the past few years, at least 20 other

courts in China have likewise issued injunctions and freezing orders against Jia's affiliate

companies.[9]

10.    Instead of dealing with his financial obligations and these pending litigations in his

home country, Jia fled China in about July 2017 and came to California, where he amassed

significant real estate holdings in the order of tens of millions of dollars and infused almost $1

billion in funding to his most recent venture, the electric car start-up known as "Faraday Future."[10]

11.    In late 2017, the Beijing branch of China's Securities Regulatory Commission

(CSRC) ordered Jia in to return to China to "fulfill his obligation" regarding his mounting debt,

and publicly noted his violation of the legal rights of his investors.[11]  Jia never did so.  To date, he

remains in the United States in violation of that order.  Jia is still a citizen of China and has stayed

---

[8]      Raymond Zhong and Carolyn Zhang, *China Names and Shames Tech Tycoon with Debt Blacklist,* N.Y. TIMES (Dec. 13 2017), https://www.nytimes.com/2017/12/13/business/china-blacklist-jia-yueting-leeco.html.

[9]      *See Exclusive: Cash-Strapped LeEco Sees Assets Frozen*, TMT POST (July 6, 2017), https://www.tmtpost.com/2669500.html (outlining the several courts in China that have issued freezing orders against Jia's affiliated entities).  A true and correct copy of this article is attached hereto as **Exhibit 8.**

[10]     Danwei Wang, 《棱镜》150 分钟独家对话贾跃亭：赴美这四个月，我想了些什么, TENCENT (Nov. 7, 2017), https://stock.qq.com/a/20171107/017341.htm.  A true and correct copy of this article, together with its partial English translation and translation certificate, are attached hereto as **Exhibit 9.**

[11]     *See* Catherine Shu, *Debt-laden tech firm LeEco's founder ordered to return to China by securities commission*, TECHCRUNCH (Dec. 26, 2017), https://techcrunch.com/2017/12/26/debt-laden-tech-firm-leecos-founder-ordered-to-return-to-china-by-securities-commission/, a true and correct copy of which, together with its English translation and translation certificate, are attached hereto as **Exhibit 10.**

in the U.S. reportedly on an L-1 visa.[12]

### III.    The Debtor's Diversion of Funds into Faraday Future and California Real Estate, While Evading China-Based Creditors

12.     Since he has left China and his LeEco empire behind, Jia has turned his business attention towards his electric car venture, Faraday Future.  Faraday Future was incorporated in California in May 2014 and has its headquarters in Los Angeles.  *See* Disclosure Statement [Dkt. No. 5], at 38.  While Jia was amassing significant debt in China, and claiming publicly that he was unable to repay his already existing debts, he nevertheless transferred approximately $1 billion into Faraday Future.  *See supra* n. 10.  He does not appear to have disclosed the precise source of those funds.

13.     While he was attempting to build up his electric car start-up, he was also amassing a small empire of mega-mansions in an affluent suburb of Los Angeles: Rancho Palos Verdes, California.  The current residence he reports in his bankruptcy filing—91 Marguerite Drive—is estimated to be worth $8.3 to $8.9 million,[13] and his filings further note that he has held interests in an entire swath of real estate along the same street: 7, 11, 15 and 19 Marguerite Drive.  *See* Disclosure Statement [Dkt. No. 5], at 87.  These properties are owned by an entity known as Ocean View Drive, Inc.  Ocean View Drive, Inc. is, in turn, owned by an entity called Success Pyramid Ltd, which Jia purportedly sold for $6.4 million to another business associate, Shaojie Chu.  *See*

---

[12]     *See* Sean O'Kane, *Faraday Cage: Can an electric car startup save itself from its founder?*, THE VERGE (Oct. 30, 2019), https://www.theverge.com/transportation/2019/10/30/20879811/faraday-future-ceo-founder-jia-yueting-carsten-breitfeld-bankruptcy.  A true and correct copy of which, together with its English translation and translation certificate, are attached hereto as **Exhibit 11**.

[13]     *See Estimate for 91 Marguerite Dr.*, REDFIN, https://www.redfin.com/CA/Rancho-Palos-Verdes/91-Marguerite-Dr-90275/home/7744656 (estimate as of November 11, 2019 of $8,665,682); *91 Marguerite Dr, Ranchos Palos Verdes, CA 90275*, REALTOR.COM, https://www.realtor.com/realestateandhomes-detail/91-Marguerite-Dr_Rancho-Palos-Verdes_CA_90275_M23567-12775 (estimate as of November 11, 2019 of $8,352,100); *Estimate for 91 Marguerite Dr*, ZILLOW, https://www.zillow.com/homedetails/91-Marguerite-Dr-Rancho-Palos-Verdes-CA-90275/21360976_zpid/ (estimate as of November 11, 2019 of $8,944,799).  True and correct copies of relevant portions of the Realtor.com, Redfin, and Zillow pages for 91 Marguerite Drive, Rancho Palos Verdes, CA 90275 is attached hereto as **Exhibit 12**.

Schedules [Dkt. No. 28], at 108.[14]  Shanghai Lan Cai believes that Jia has retained his beneficial ownership interest in these properties.  Indeed, news reports suggest that Faraday company events are hosted at these properties.[15]

## IV.    The California Judgment Enforcement Proceedings

14.    Jia's escape from China did not entirely immunize him from the efforts of his creditors to seek repayment of the loans that they extended to his affiliate companies.  In January 2018, Shanghai Lan Cai obtained an arbitration award of approximately $11 million against Jia and two corporate entities in which he had a significant financial interest at the time of the underlying transaction: LeTV Sports Culture Develop (Beijing) Co., Limited and TV Plus Holdings (Beijing) Limited.[16]  *See* Memorandum of Points and Authorities in Support of Petitioner's *Ex Parte* Application for Right-to-Attach Order and Writ of Attachment, *Shanghai Lan Cai Asset Management Co, Ltd. V. Jia Yueting*, 18-cv-10255-SJO-MRW (C.D. Cal) (hereinafter, "California Docket") [Dkt. No. 5-1], at 4.  Similarly, another of Jia's creditors, Shanghai Qichengyueming Investment Partnership Enterprise, likewise obtained an arbitral award against him in China and sought to enforce that award in the Central District of California.  *See* Disclosure Statement [Dkt. No. 5], at 18.

---

[14]    Indeed, this transaction is merely the tip of the iceberg.  Upon information and belief, in addition to Shaojie Chu, Jia has also used Lian Bossert (a recent college graduate who served as nominee for Jia's interests of West Coast LLC), Chaoying Deng (or Chaoying Bossert, Lian's mother), Jiawei Wang (Jia's nephew) and Ruokan Jia (another of Jia's relatives) as nominees for holding assets—including interests in companies—or as managers through which Jia has been able to exercise control over various corporate interests.  And Jia's concealment of his assets does not stop there.  Further allegations have been made that, at a time when he had billions of dollars of outstanding debt against him, he allegedly established several trusts for his children, each funded with $7.5 million.  *See* 贾跃亭为子女成立海外信托?, XINHUA (Sept.  15, 2017), http://www.xinhuanet.com/fortune/2017-09/15/c_1121666230.htm.  A true and correct copy of this article, together with its English translation and translation certificate, are attached hereto as **Exhibit 13**.

[15]    Ryan Felton, *'Accidental Billionaire': How The Outlandish Ambition of Faraday Future's Financier Brought The Startup To Its Knees*, JALOPNIK (Nov. 17, 2017), https://jalopnik.com/accidental-billionaire-how-the-outlandish-ambition-of-1820471805 (explaining that Jia's residence is known as "The Clubhouse" and serves [b]ottles of whiskey and wine valued up to $2,000").  A true and correct copy of this article is attached hereto as **Exhibit 14**.

[16]    While the arbitral award itself was approximately $11 million USD, post-judgment interest was awarded by the federal district court in the Central District of California.  *See* Final Judgment, California Docket [Dkt. No. 35], at 2.  Shanghai Lan Cai reserves all rights regarding the amount and priority of its claim.

15.     Shanghai Lan Cai's arbitral award was later recognized by the District Court for the Central District of California, and Shanghai Lan Cai's counsel was granted authorization to conduct post-judgment enforcement proceedings.  *See* Order Granting Petitioner's Petition to Confirm Arbitration Award, California Docket  [Dkt. No. 31]; Final Judgment, California Docket [Dkt. No. 35].   In connection with those proceedings, Jia agreed to be deposed and scheduled the deposition for August 2019.  Only two days before the deposition was supposed to take place, Jia announced – without explanation – that he would simply not show up to it, despite the fact that Shanghai Lan Cai's attorneys were already mid-flight from Hong Kong to Los Angeles, where the deposition was scheduled to take place.  In response to this bald delay tactic and the Debtor's flagrant disregard of his discovery obligations, Shanghai Lan Cai obtained a court order to conduct a debtor's examination, pursuant to applicable California state procedural rules,[17] this time before a magistrate judge in the Central District of California.  *See* Order to Appear for Examination of Judgment Debtor RE: Enforcement of Judgment, California Docket [Dkt. No. 63].

16.     That examination was initially scheduled for September 11, 2019, *id.*, but was later adjourned at Jia's request.  *See* Order Granting Joint Stipulation to Continue Judgment Debtor's Examination of Respondent Jia Yueting, California Docket [Dkt. No. 82].   It was then scheduled to take place on Thursday, October 17, 2019 and Friday, October 18, 2019.  *Id.*  By all accounts, the examination was anticipated to move forward as of the morning of October 14, 2019.

17.     However, Jia used this bankruptcy filing as a means to dodge—once again—an examination into his financial affairs.  In fact, in the weeks that followed his bankruptcy filing, his

---

[17]     Under the applicable California procedural rules, the service of the order requiring a judgment debtor to appear for examination "creates a lien on the personal property of the judgment debtor for a period of one year from the date of the order unless extended or sooner terminated by the court."  Cal. Civ. P. § 708.110(d).  On this basis, Jia has scheduled – on a "disputed" basis – Shanghai Lan Cai's claim against him as secured.  *See* Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 28], at 30 (line 20.20 of Schedule D: Creditors Who Have Claims Secured By Property).  Shanghai Lan Cai reserves all rights to assert a secured claim in these proceedings if the case is not dismissed.

motivation to opportunistically use the automatic stay to prevent disclosure of information regarding his assets and financial affairs has become even more apparent. Since the filing, Jia's counsel has repeatedly demanded that Shanghai Lan Cai instruct non-debtor subpoena recipients who received third-party subpoenas before the petition date to not produce documents, and has even threatened Shanghai Lan Cai and its counsel with an action for sanctions, claiming they would be willfully violating the automatic stay if they did not capitulate to those demands. *See* Email correspondence between Jia's counsel, Pachulski Stang Ziehl & Jones LLP and O'Melveny & Meyers LLP, and Shanghai Lan Cai's counsel, Kobre & Kim LLP, a true and correct copy of which is attached hereto as **Exhibit 16**.

## V.     The Debtor's Instant Case

18.     On October 14, 2019, Jia filed his Chapter 11 petition and a curious set of papers that purported to propose an out-of-court restructuring and a "prepackaged" bankruptcy plan. The papers—which totaled over 210 pages—were not provided in Chinese, despite the fact that almost all of his creditor body is Chinese. In the days that followed, Shanghai Lan Cai understood from other of Jia's creditors that they were confused about the filing, the implications of the filing and the basic terms of the plan. To date, not a single creditor has come forward to support either the filing of Jia's bankruptcy or the proposed plan.

### A.     The Plan Proposal

19.     Jia's prepackaged bankruptcy plan (the "Plan") would require a critical mass of creditors to vote in favor of the Plan. *See* Prepackaged Plan of Reorganization [Dkt. No. 4] § 5.2. If confirmed, the Plan would result in creditors receiving pro rata interests in a creditor trust that would hold interests in Faraday Future, through two companies: Smart King Ltd. and West Coast LLC (the Delaware entity on which he improperly claims is his venue hook to this District).

Significantly, the Plan would result in a distribution to claimants only in the event that Faraday successfully undergoes an IPO, and creditors would be forced to provide broad non-consensual releases—not only to Jia, but also his *wife*.  And the Debtor has stated the reason he is pursuing this plan is that *Faraday*—rather than Jia himself—needs additional funding.  *See* Disclosure Statement [Dkt. No. 5], at 7 (noting that the purpose of the restructuring is "to enable *the Company* [Faraday] to obtain the necessary financing and reestablish normal relations with its suppliers").  However, the Debtor has disclosed no details whatsoever about any potential funding or financing for Faraday that hinges on the Plan.

### B.    The China-Based Creditor Body

20.    As discussed above, a majority of the creditor base are China-based companies, including *all* of the creditors on the Debtor's list of the 20 largest unsecured claims.  Upon information and belief, those creditors' claims arise from loan agreements governed by Chinese law and are written in Chinese, and which may have forum selection clauses that select tribunals in China to resolve any claims arising from them.  Unsurprisingly, the Chapter 11 filing caused confusion among Jia's many creditors in China.  Indeed, in just the one week following the filing of the Chapter 11 petition, Shanghai Lan Cai conferred with 5 creditors based in China who do not read English proficiently, and who expressed that they do not comprehend the English-only 210-page set of offering documents—let alone U.S. bankruptcy law or the proceedings in the United States that have already begun to prejudice their rights, and that could discharge their claims altogether without their participation.

21.    Notwithstanding the significant challenges faced by creditors for whom not only the language, but also the entire legal process, are foreign, a formation meeting for the Official Committee of Unsecured Creditors took place only 10 days after the petition was filed, on October

25, 2019.  Shanghai Lan Cai understands from at least one other creditor that that creditor did not understand the significance of the formation meeting until the night before it was scheduled to take place.  Of those creditors who were aware of the meeting, the majority of them appeared there through Delaware or other east coast proxies.

## JURISDICTION

22.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court.  Solely for purposes of consideration of this Motion (in order to consider whether to dismiss or transfer venue of the case), venue is proper pursuant to 28 U.S.C. § 1408.

## ARGUMENT

### I.    The Court Should Dismiss the Chapter 11 Case

23.    Jia's improperly-filed and improperly-venued case must be dismissed.  Not only was it was filed in a forum for which he transparently sought to manufacture jurisdiction, but it was done so in bad faith and in contravention of the principles of international comity.  More fundamentally, a Chapter 11 case before this Court is patently unfair to the Chinese creditor body whose claims would be subject to adjudication and discharge in these U.S. proceedings.

### A.    The Case Was Filed in an Improper Venue

24.    Perhaps the most obvious and straightforward ground for dismissal of this case is that Delaware is an improper venue.  Under 28 U.S.C. § 1408 a debtor may only commence a bankruptcy case in the district where the debtor's (i) domicile, (ii) residence, (iii) principal place of business in the United States or (iv) principal assets in the United States have been located for the 180 days immediately preceding the commencement of the proceedings (or for a longer portion of that 180-day period than the domicile, residence, principal place of business in the United States,

or principal assets in the United States of the debtor were located in any other district).

25.    Here, Jia's only "hook" for venue in the District of Delaware is his claimed "principal asset," *see* Chapter 11 Petition [Dkt. No. 1], at 2, an entity ironically named West Coast LLC.  *See* Prepackaged Plan of Reorganization [Dkt. No. 4], at 17 (discussing West Coast). However, information obtained through the Delaware Department of State's Division of Corporations reveals that West Coast LLC was strategically incorporated *only 83 days* prior to the petition date, in July 2019. [18]  Therefore, even assuming, *arguendo*, that West Coast LLC is currently Jia's principal asset, that principal asset has not been located in this District for the 180 days immediately preceding the bankruptcy filing or "for a longer period of such 180 day period" than his principal assets "were located in any other District," as required by 28 U.S.C. § 1408(1). Further, there are no other Delaware sited-assets that could provide the basis for venue in this District.[19]  And since none of Jia's domicile, residence and principal place of business in the United States are in Delaware—they are all clearly in California—venue here is improper.

26.    On the other hand, Jia's U.S. connections are squarely in California, and specifically within the Central District of California.  He resides in Rancho Palos Verdes, a wealthy suburb of Los Angeles, and has lived there ever since he left China.  And he retains a beneficial interest in the various mega-mansions located in that same neighborhood he owns through Ocean View Drive, Inc.  Likewise, his "principal assets" are his interests in his *California*-domiciled

---

[18]    Information obtained through Delaware's Department of State's Division of Corporations website at https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx by searching the entity "West Coast LLC," a true and correct copy of which is attached hereto as **Exhibit 17**.

[19]    The only other two businesses identified in Jia's Statement of Financial Affairs that have Delaware addresses are Pacific Technology Holding LLC and FF Global Partners.  *See* Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 28], at 112.  Nowhere are their business operations described, let alone their principal place of business.  Nor do the filings state that Jia is relying on them to establish venue.  In any event, similar to West Coast LLC, these appear to be only recently incorporated as well.  *See id.* (late July 2018 for Pacific Technology Holding LLC and late December 2018 for FF Global Partners LLC).

electric car company, Faraday Future.  He also intends to remain in an executive management role

at Faraday, *in California.*

27.    Where venue is improper, the court "*shall* dismiss, or if it be in the interest of

justice, transfer such case to any district or division in which it could have been brought."  28

U.S.C. § 1406 (emphasis added); *see also* Fed. R. Bankr P. 1014(a)(2) (providing for dismissal or

transfer of venue if a case is filed in an improper district).  Accordingly, "transfer or dismissal are

the *only* available options" where a case was brought in an improper venue.   *In re Columbia*

*Western, Inc.*, 183 B.R. 660, 665 (Bankr. D. Mass. 1995) (emphasis added) (noting that where

assets were moved to the District two days before the petition, among other problems with venue,

"[t]he issue before the Court is not whether venue is appropriate under 1408 . . . . The issue is what

to do about the improper venue."); *see also In re Sorrells*, 218 B.R. 580, 586 (10th Cir. B.A.P.

1998) (observing that "[t]he majority of courts have held that, if venue is contested and found to

be improper, a bankruptcy court may not retain the case, but rather must dismiss it or transfer it

pursuant to section 1406(a) and Bankruptcy Rule 1014(a)(2)" and collecting cases); *In re Deabel,*

*Inc.*, 193 B.R. 739, 742 (Bankr. E.D. Pa. 1996) ("[I]n contrast to retaining the case . . . a bankruptcy

court faced with an improperly venued action must either dismiss the action, or if transfer it, if is

in the interest of justice or for the convenience of the parties, pursuant to Rule 1014(a)(2) and

1406(a)." (citation and quotation omitted)).

28.    Pursuant to 28 U.S.C. § 1406 and Bankruptcy Rule 1014, the case should be

dismissed because it was filed in an improper venue in bad faith.  *See In re Hall, Bayoutree Assocs.,*

*Ltd.*, 939 F.2d 802, 806 (9th Cir. 1991) ("[D]ismissal is proper where filing in an improper forum

evidences bad faith." (citing 1 J. Moore, A. Vestal & P. Kurland, Moore's Manual, Federal Practice

and Procedure, § 7.13[1] (1990)).  And while the Court has the discretion to instead transfer the

case to the proper district "in the interests of justice," the interests of justice here overwhelmingly support dismissal.  It is not just that this case does not belong in a bankruptcy court in the District of Delaware—it does not belong in *any* U.S. bankruptcy court.

### B.    Dismissal Is Warranted For "Cause" Pursuant to Section 1112(b)

29.    Section 1112(b) provides that, except for circumstances inapposite here, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1); *see In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999).  Section 1112(b)(4), in turn, provides a non-exhaustive list of grounds for dismissal for cause.  Those grounds include, for example, an inability to effectuate substantial consummation of a confirmed plan.  However, grounds not specifically listed in the statute—including bad faith, lack of fundamental fairness, and a lack of reasonable possibility of a successful reorganization within a reasonable amount of time—may also warrant dismissal.  *See SGL Carbon*, 200 F.3d at 160; *In re Am. Capital Equip., LLC*, 688 F.3d 145, 161–62 (3d Cir. 2012).

30.    There is "cause" to dismiss this Chapter 11 case because (1) it was filed in bad faith and (2) a U.S. bankruptcy proceeding is not the appropriate means to resolve the claims of the Debtor's almost entirely Chinese creditor body.  And while Section 1112(b) requires the court to consider whether conversion to Chapter 7 or appointment of a trustee are better alternatives to dismissal, those remedies cannot resolve the hurdles to fair and effective administration of this case.

a.    **The Petition was Filed in Bad Faith**

31.    It is well-settled in this Circuit that bad faith is sufficient to warrant dismissal of a Chapter 11 case.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith.").  Where, as here, there are allegations of bad faith, the burden is on the debtor to establish good faith.  *See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004) (citing *In re SGL Carbon Corp.*, 200 F.3d at 159–62.).  "[A] debtor's desire to invoke the powers conferred by the Bankruptcy Code does not establish good faith, nor does it constitute a valid bankruptcy purpose." *In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364, 375 (Bankr. D. Del. 2018) *citing In re Integrated Telecom Express, Inc.*, 384 F.3d at 127–28.  In fact, "courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation." *In re 15375 Mem'l Corp. v. Bepco, L.P*, 589 F.3d 605, 620 (3d Cir. 2009) (affirming dismissal of case for bad faith).

32.    The Third Circuit has adopted a "totality of facts and circumstances" test in determining good faith.  Under this test, the Court looks to (1) whether the petition serves a valid bankruptcy purpose, and (2) whether the petition was filed merely to obtain a tactical advantage. *SGL Carbon Corp*, 200 F.3d. at 165–66.  That test requires a determination of where "the [bankruptcy] petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* at 162.

33.    Courts in this District look to a variety of factors in order to conduct the "totality of facts and circumstances" analysis.  Those factors include, among other things:  whether the "[p]etition was filed on the eve of foreclosure;" whether the debtor's "[p]repetition conduct was improper;" whether the "[d]ebtor filed solely to create automatic stay;" and the "[s]ubjective intent of the debtor." *See Primestone Inv. Partners, L.P. v. Vornado PS, L.L.C. (In re Primestone Inv.*

*Partners, L.P.)*, 272 B.R. 554, 557 (D. Del. 2002) (citations omitted) (noting that no single factor is determinative). Here, each of these factors strongly counsel in favor of dismissal.

34.     Instead of serving any legitimate bankruptcy purpose, the petition was "filed merely to obtain a tactical litigation advantage." *See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119–20 (3d Cir. 2004). Specifically, Jia's petition was filed for the principal purpose of evading his judgment creditors, making it more expensive and inconvenient for those legitimate judgment creditors to continue to pursue him. A case initiated "solely to hinder or delay creditors" is not filed in good faith. *In re DCNC North Carolina I, LLC*, 407 B.R. 651, 661 (Bankr. E.D. Pa. 2009).

35.     When the petition was filed—and even the venue the petition was filed *in*—also demonstrate bad faith. Indeed, bad faith sufficient to warrant dismissal has been found by courts in this Circuit where the "[d]ebtor file[s] its petition to obtain 'technical litigation advantages' for itself . . . in an effort to . . . escape its duties and obligations under an agreement" upheld in an arbitration proceeding and the "[d]ebtor has unclean hands." *See, e.g.*, *Advanced Restoration Techs., Inc. v. Shortgrass, Inc.*, No. CIV.A. 05-2978 (JLL), 2006 WL 827841, at *4 (D.N.J. Mar. 30, 2006). Here, the timing of the petition—on the eve of an examination where Jia would be forced to answer questions regarding his assets, business dealings, and debt-dodging—demonstrates that the purpose of the filing was to obtain a bad faith tactical advantage in litigation.

36.     Thus, this is not a case where the Debtor filed his petition to obtain "breathing room" in response to loan defaults or mounting pressure from his Chinese creditor body. In fact, the only creditors pursuing Jia were those involved in the two enforcement proceedings in California. Indeed, in a recent filing, Jia stated explicitly that he filed this Chapter 11 case as a result of these enforcement proceedings commenced in the United States. *See* Debtor's Statement

Regarding Shanghai Lan Cai Asset Management Co, Ltd.'s Response to the Debtor's Chapter 11 Filing [Dkt. No. 66] ¶ 3.  And, so far in this case, Jia has shown that he seeks to use the automatic stay as a sword and not a shield.  For example, after the petition date, Jia's bankruptcy counsel *and* his non-bankruptcy litigation counsel threatened to take action against Shanghai Lan Cai and its counsel for "willful stay violation" if they did not instruct *non-debtor third parties* to not produce documents in response to subpoenas issued to those third parties *before the bankruptcy filing*, as part of Shanghai Lan Cai's enforcement proceedings  *See* Exhibit 16 (email correspondence between Jia's counsel, Pachulski Stang Ziehl & Jones LLP and O'Melveny & Meyers LLP, and Shanghai Lan Cai's counsel, Kobre & Kim LLP); *see also* Letter from Jia's bankruptcy counsel to third-party subpoena recipient, a true and correct copy of which is attached hereto as **Exhibit 18**.

37.    This tactical use of the automatic stay to seek to prevent non-debtors from producing third-party documents is a quintessential example of bad faith.  *See In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 128 (3d Cir. 2004) ("Indeed, if there is a 'classic' bad faith petition, it may be one in which the petitioner's only goal is to use the automatic stay provision to avoid posting an appeal bond in another court."); *BEPCO v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, 400 B.R. 420, 428 (D. Del. 2009), *aff'd sub nom. In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009) (holding that the debtors' petitions—even where they had proposed a plan of liquidation and sought to efficiently distribute assets—were filed in bad faith when they were done so to stave off litigation on the eve of trial through the automatic stay).

38.    Moreover, Jia's claimed "reorganization purpose" for this case does even not relate to *him*, but rather to *Faraday*—which is not a debtor in this case.  *See* Disclosure Statement [Dkt. No. 5], at 7–8 (noting that Jia "believes that it is imperative to consummate the Restructuring as swiftly as possible in order to enable [Faraday] to obtain the necessary financing and reestablish

normal relationships with suppliers and other parties that do business with . . . [Faraday]").  There is plainly no authority for this Court to turn these proceedings into a *de facto* Chapter 11 case for Faraday, and this Court should decline Jia's request that it do so.[20]  Putting that aside, Jia has disclosed nothing to substantiate his assertion that his Plan is necessary to obtain the financing he claims he can obtain for Faraday.

39.     Finally, Jia's need for—and even his ability to obtain—a bankruptcy discharge is highly questionable, at best.  Jia presumably could offer his Chinese creditors the same proposal he is offering them in this case outside of a U.S. bankruptcy proceeding, and indeed that is precisely what he previously did when he initially proposed this through the pre-bankruptcy exchange offer. *See* Chapter 11 Status Report and Notice of Termination of Plan Voting Deadline [Dkt. 73] ¶ 3 (noting that Jia had "commenced the out-of-court exchange offer backed by the Plan" before he filed his petition). And given the evidence mounting against Jia as to his fraudulent dealings, creditors will likely have strong arguments that their claims should not be discharged.[21]  What's more, Jia is not only pursuing a discharge for himself, but also *his non-debtor wife*, by including a broad, non-consensual release of her in the Plan.  That is a flagrant attempt to abuse U.S. bankruptcy law.

40.     Jia's attempt to manufacture venue in Delaware is yet another indicator of a bad faith filing.  The obvious venue for this case is the Central District of California.  But just as he fled from China to the U.S. to avoid his Chinese creditors and Chinese regulators, he is now seeking to escape the courts in a District that are well aware of his many attempts to avoid his legal

---

[20]     Of course, as a California corporation, Faraday would have the right to file a Chapter 11 case in the United States. *See generally* 11 U.S.C. § 109(a).

[21]     Shanghai Lan Cai reserves the right to seek a declaration of non-dischargeability against Jia pursuant to Section 523(a) because it believes that Jia used false pretenses to secure the loan he obtained from Shanghai Lan Cai on behalf of entities he controlled. *See* 11 U.S.C. § 523(a) (identifying exceptions to discharge).

obligations, evade compliance with his discovery obligations, and otherwise conceal his assets from creditors. Courts have dismissed Chapter 11 proceedings where, as here, the debtors' bankruptcy petition was filed in a "bad faith" effort to fabricate jurisdiction and avoid proceedings in other courts. *See, e.g., Argus Group 1700 v. Steinman (In re Argus Group 1700)*, 206 B.R. 757 (E.D. Pa. 1997) (affirming the bankruptcy court's dismissal of chapter 11 proceeding pursuant to § 1112(b) where debtor initiated proceeding in bad faith in order to fabricate federal court jurisdiction for a pending state court proceeding); *cf. In re Fairfield Sentry Ltd.*, 714 F.3d 127, 135 (2d Cir. 2013) (ruling that a manipulation of a foreign debtor's center of main interest in bad faith can be a ground for denial of Chapter 15 recognition). Shanghai Lan Can respectfully submits that any substantive relief granted by this Court—other than dismissing the case or transferring venue—would implicitly put this Court's imprimatur on Jia's bad faith gambit to manufacture venue in Delaware.

### b. A U.S. Bankruptcy Proceeding is Not the Appropriate Means to Resolve Creditors' Claims

41.     This Court cannot effectively administer this estate in this case, and therefore Jia's reorganization cannot be appropriately effectuated in the U.S., given that the center of gravity of the debt claims against Jia lies halfway across the world. Indeed, millions of dollars' worth of the Debtor's assets have already been frozen in China by Chinese court orders.

42.     The overwhelming majority of creditors are based in China, and their claims are governed by Chinese law. Those creditors could not have reasonably foreseen that they would need to participate in a U.S. bankruptcy process, governed by U.S. law, to have their claims resolved. Jia should not be permitted to use this Chapter 11 case as a mechanism to end run those expectations. *See In re Yukos Oil Co.*, 321 B.R. 396 at 411 (Bankr. S.D. Tex. 2005) (finding that the debtor's attempt to "substitute United States law" in the place of Russian and international law,

and to "use judicial structures of the United States in an attempt to alter creditor priorities that would be applicable in the law of other jurisdictions" was a factor that weighed in favor of dismissal under Section 1112(b)).

43.     In addition, it is not at all clear that any discharge granted by a U.S. court will be enforced by Chinese courts or can be enforced against Chinese creditors who may not be subject to this Court's jurisdiction.  Jia has made no showing that the Chinese courts would respect any discharge.  Nor has he demonstrated that *this* Court could enjoin a Chinese creditor from acting against assets he holds in China.  *See Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 516–17 (2d Cir. 1975) (holding that a "stay cannot be effective . . . without in personam jurisdiction over the creditor who has begun an action in a foreign tribunal that is not within the jurisdiction of the United States."); *In re Mak Petroleum, Inc.*, 424 B.R. 904, 905 (Bankr. M.D. Fla. 2010) ("[T]o enjoin a party from commencing or prosecuting a foreign proceeding . . . the Court must be authorized to exercise personal jurisdiction over that entity pursuant to the Due Process Clause of the Fifth Amendment to the U.S. Constitution."); *In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 726 (Bankr. S.D. Fla. 1993) (abstaining from exercising jurisdiction over debtor's Chapter 11 case where the Court "could not prevent Bahamian citizens and the Bahamian governmental agencies from proceeding with their claims against the [Bahamian] debtor" even *if* the Court retained jurisdiction of the case).

44.     Although U.S. bankruptcy courts have *in rem* jurisdiction over property of the estate "wherever located and by whomever held," "the Bankruptcy Court may not be able to secure compliance with such orders except to the degree that it may either assert personal jurisdiction over those now in possession of [the debtor's] assets or obtain cooperation from courts in foreign jurisdictions where [the debtor's] assets are held." *GMAM Inv. Funds Trust I v. Globo*

*Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235, 250 n. 9 (S.D.N.Y. 2004); *see also* 1 COLLIER ON BANKRUPTCY ¶ 3.01[5], at 3–32 to 3–33 (15th ed. rev.2003) ("If a creditor causes property of a title 11 estate to be seized in a foreign country, that creditor has violated the automatic stay. Whether that creditor can be *punished*, however, is a function of that creditor's amenability to United States process." (emphasis added)).

45.     Under these circumstances, therefore, principles of international comity strongly militate in favor of dismissal.  Comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895).  Accordingly, courts have dismissed Chapter 11 cases for cause pursuant to Section 1112(b) where, as here, the debtor sought to substitute United States law in place of the law of more relevant countries.  In *Yukos*, for example, the court dismissed a Chapter 11 proceeding for cause after finding that where "the vast majority of the business and financial activities" of the debtor occurred in Russia, the debtor "[sought] to substitute United States law in place of Russian law . . . and to use judicial structures within the United States in an attempt to alter the creditor priorities that would be applicable in the law of other jurisdictions." *In re Yukos Oil Co.*, 321 B.R. at 410.

46.     And the fact that Chinese law does not allow individuals to file for bankruptcy is no reason to disregard comity principles here.  Comity is not limited to situations involving competing insolvency proceedings that afford the debtor relief identical to that available under the U.S. Bankruptcy Code.  *See In re Irish Bank Resolution Corporation Ltd*, Case No. 13-12159 (CSS), 2014 WL 9953792, at *21 (Bankr. D. Del. April 30, 2014) (explaining that the evaluation

of "the principles of comity" require only that "the [foreign] proceeding does not offend our notions of justice" and therefore "[t]he foreign laws need not be identical to their counterparts under the laws of the United States"). Indeed, "[a]s Judge Cardozo so lucidly observed: 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.'" *Ackermann v Levine*, 788 F.2d 830, 842 (2d Cir. 1986) (quoting *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 110–11 (1918) (Cardozo, J.)). The fact that China addresses the debtor-creditor relationship for individuals differently than the U.S. is therefore not a basis to conclude that a U.S. bankruptcy proceeding is the appropriate means to resolve the claims of an almost entirely China-based creditor body.[22]

47.    Instead, the branch of comity known as the "comity of nations" or "prescriptive comity" looks to whether—out of deference to another sovereign nation's laws—the exercise of jurisdiction by a U.S. court is "unreasonable." *See In re Maxwell Commc'n Corp. plc*, 93 F.3d 1036, 1047–48 (2d Cir. 1996); *see also Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642, 645 (E.D. Pa. 2000) ("Under the principle of comity between sovereign nations, a district court should decline to exercise jurisdiction under certain circumstances in deference to the laws and interests of another foreign country." (citing *Basic v. Fitzroy Engineering*, No. 97-1052, 1997 WL 753336 at *8 (7th Cir. Dec. 4, 1997)); *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 237–38 (Bankr. S.D.N.Y. 2017), *reconsideration denied*, No. 12-11076 (SHL), 2018 WL 718399 (Bankr. S.D.N.Y. Feb. 5, 2018) (noting that "prescriptive comity" shortens the foreign reach of a U.S. statute even absent a competing foreign proceeding).

---

[22]    It bears noting, however, that China has been significantly bolstering its bankruptcy regime for companies and, indeed, doing so in a manner that "draw[s] on U.S. chapter 11 provisions." *See* Zhou Wei & Serena Ng, *China Embraces Bankruptcy, U.S.-Style, to Cushion a Slowing Economy,* The Wall Street Journal (Nov. 6, 2019), https://www.wsj.com/articles/china-embraces-bankruptcy-u-s-style-to-cushion-a-slowing-economy-11573058567?mod=mhp, a true and correct copy of which is attached hereto as **Exhibit 15**. In addition, China is also finding technologically innovative ways to expedite the bankruptcy process and has expended significant resources in building its bankruptcy court system. *Id.*

48.     To determine whether it is reasonable to exercise U.S. jurisdiction, courts are instructed to look to "familiar choice-of-law factors," such as "the link between the regulating state and the relevant activity, the connection between that state and the person responsible for the activity (or protected by the regulation), the nature of the regulated activity and its importance to the regulating state, the effect of the regulation on justified expectations, the significance of the regulation to the international system, the extent of other states' interests, and the likelihood of conflict with other states' regulations." *In re Maxwell Commc'n Corp. plc*, 93 F.3d at 1048 (relying on the Restatement (Third) of Foreign Relations § 403) (other citations omitted).

49.     Here, those factors all strongly militate in favor of dismissal.  The Chinese creditor body who issued their Chinese-law-governed loans to Chinese companies controlled by Jia, a Chinese national, had no reason to expect that they would be haled into a U.S. bankruptcy proceeding that is foreign in every sense of the word.  *See In re Maxwell*, 93 F.3d at 1051 (finding that, for purposes of the comity analysis, "England has a much closer connection to these disputes than does the United States" where the transfer occurred in England and "English law applied to the resolution of disputes arising under" the credit agreements under which the relevant transfers were made).  Moreover, the Chinese securities regulator *ordered* Jia's return to China by the end of 2017 so that he could resolve his debt *in that jurisdiction*, evincing its clear interest in applying the laws of China to Jia's debts.  *See supra* n. 12.  As such, using a U.S. bankruptcy process to resolve those debts would cause precisely the type of international conflict that comity is designed to avoid.  *See Linde v. Arab Bank, PLC*, 706 F.3d 92, 109 (2d Cir. 2013) (purpose of international comity is to "avoid conflict with international law" (citing *In re Maxwell Commc'n Corp.*, 93 F.3d at 1048).

50.     Against the backdrop of China's overwhelming and demonstrated interest in

resolving Jia's debts, a court in the United States should not be adjudicating these substantial issues of Chinese law.  Instead, under principles of comity, it should defer to a Chinese legal system far better equipped to handle these claims of individuals and entities familiar with that system.  Indeed, permitting Jia's case to continue in a U.S. bankruptcy court would undermine the United States' "strong interest in not assuming the singular burden of collection court to the world." *In re Bancredit Cayman Ltd.*, Bankr. No. 06-11026 (SMB), Adv. No. 08-1147, 2008 WL 5396618, at *9 (Bankr. S.D.N.Y. Nov. 25, 2008) (Bernstein, J.).

51.    In addition, that the Chinese legal system would be familiar to Chinese creditors both in process and in language is significant.  Jia's now-withdrawn motion that sought a combined disclosure statement and plan confirmation hearing [Dkt. No 38] never explained, for example, how the Court could possibly rule that a Disclosure Statement written in English contains "adequate information" sufficient for *Chinese* creditors to make an informed decision how to vote on Jia's proposed plan, as required by Section 1125(b).[23]  Other creditors have similarly expressed skepticism that they will be able to appropriately understand Jia's proposals.  *See* O-Film Global's Preliminary Objection [Dkt. No. 75], at 3.  For these reasons, a U.S. bankruptcy proceeding is plainly not in the "best interests" of creditors within the meaning of Section 1112(b).

52.    Moreover, neither appointment of a bankruptcy trustee nor conversion to a case under Chapter 7 can remedy the intractable problems presented by this filing.  The very nature of the debts involved in this case, the law that governs those debts, and the location of virtually the entire creditor body fundamentally hamstring this Court from administering Jia's estate—let alone

---

[23]    Even if the Disclosure Statement were written in Chinese, it is difficult to see how this Court could determine that it provided "adequate information" in that language.

doing so in a manner that is fair to the Chinese creditor body.  Accordingly, the case should be dismissed.

**C.     Alternatively, the Court Should Dismiss the Chapter 11 Case Pursuant to Section 305(a) of the Bankruptcy Code**

53.     Section 305(a)(1) of the Bankruptcy Code permits a bankruptcy court to dismiss any bankruptcy case or suspend all proceedings therein where "the interests of creditors and the debtor would be better served by such dismissal . . ." 11 U.S.C. § 305(a)(1).  While courts agree that abstention pursuant to Section 305(a) is a form of "extraordinary relief," the extraordinary circumstances here are precisely the type that warrant such relief.  *See, e.g.*, *In re Xacur*, 219 B.R. 956, 969 (Bankr. S.D. Tex. 1998) (dismissing case of a Mexican national residing in Texas as of the petition date under Section 305(a) because "[a] Mexican court may not recognize the automatic stay of a United States bankruptcy proceeding" and "[t]here are pending Mexican lawsuits to collect on some of the avals at issue").  And, as in the case with dismissals for "cause" pursuant to Section 1112(b), "considerations of comity" can also "support abstention pursuant to § 305(a)." *In re Northshore Mainland Services, Inc.*, 537 B.R. 192 at 208 (Bankr. D. Del. 2015).

54.     For the reasons set forth above, the Debtor's historical course of conduct casts serious doubt as to whether his Chapter 11 filing was intended in any way to serve the Chinese creditors' interests, and whether this case even *could* serve those interests.  To the contrary, creditors will be harmed by their inability to meaningfully participate in the process and the Debtor's obfuscation of his assets.  Thus, the Court should abstain from hearing the case.

55.     In determining the best interests of creditors and the debtor for purposes of Section 305(a), courts look to a non-exclusive list of factors, including: (i) the economy and efficiency of administration; (ii) whether federal proceedings are necessary to reach a just and equitable solution; (iii) whether there is an alternative means of achieving an equitable distribution of assets;

(iv) whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests of the case; and (v) the purpose for which bankruptcy jurisdiction has been sought. *See In re Northshore Mainland Svcs., Inc.*, 537 B.R. at 204–205*; In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007).

56.     Judge Carey's decision in *In re Northshore Mainland Svcs., Inc.* is instructive.  In *Northshore*, several Bahamian entities filed for Chapter 11 protection despite the fact that the underlying debts arose from a Bahamian hotel development that were owed to foreign creditors, who the Court found might expect to be haled into insolvency proceedings in the *Bahamas* but certainly not in Delaware.  *See In re Northshore Mainland Svcs, Inc.*, 537 B.R. at 197.  In granting dismissal of all of the cases other than that of the Delaware-based entity, the Court agreed with the movants' contention that the case "lack[ed] any meaningful connection to the United States." *Id.* at 200.  In particular, Judge Carey emphasized the importance of creditors' expectations, observing the following:

> I perceive no reason—and have not been presented with any evidence—that the parties expected that any "main" insolvency proceeding would take place in the United States. In business transactions, particularly now in today's global economy, the parties, as one goal, seek certainty. Expectations of various factors—including the expectations surrounding the question of where ultimately disputes will be resolved—are important, should be respected, and not disrupted unless a greater good is to be accomplished.

> *Id.* at 206.

57.     As the Court found in *Northshore*, where, among other things, a majority of the parties-in-interest are either incorporated or located in a foreign country, expectations of those parties, "including the expectations surrounding the question of *where* ultimately dispute will be resolved" are "important, should be respected, and not disrupted unless a greater good is to be accomplished."  *Id.* at 206.  Indeed, those factors even outweighed the fact that Bahamian

insolvency rules did not afford the debtors with the same rights as they would have obtained under Chapter 11.  *Id.* at 205.  Similarly, here, there is no question that the Chinese creditors expected to resolve their disputes with Jia and his entities in China, as evidenced by, among other things, the extensive litigation against him there.

58.     For the reasons set forth above and in Section I, it is in the best interests of creditors to dismiss the case.

## II.     Alternatively, the Court Should Transfer Venue of the Case to the Central District of California

59.     As previously explained, Delaware is an improper venue for this Chapter 11 case. Therefore, in the event the case is not dismissed, 28 U.S.C. § 1406 and Bankruptcy Rule 1014 *require* the Court to transfer venue to the proper district, the Central District of California.   And in that case, Shanghai Lan Cai submits that, "in the interests of justice," 28 U.S.C. § 1406, the Court should allow the Central District of California Bankruptcy Court to decide whether to dismiss the case (given that the issue is so critical).

60.     Even assuming that the requirements under 28 U.S.C. § 1408 for Delaware venue are technically satisfied (and they are not), this Court should still transfer this case to the Central District of California.  When venue is proper in multiple districts, a party-in-interest may seek to have the case transferred to another proper venue, "in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412; Fed. R. Bankr. P. 1014(a)(1).  Because § 1412 is written in the disjunctive, "this statutory provision creates two distinct analytical bases upon which the transfer of venue may be grounded." *In re Qualteq, Inc.*, No. 11-12572 (KJC), 2012 WL 527669 at \*6 (Bankr. D. Del. Feb. 16, 2012) (citations omitted).  In this case, both the interest of justice *and* the convenience of the parties weigh in favor of transfer.

61.     The "interest of justice" prong of the Section 1412 inquiry is "a broad and flexible

standard which must be applied in a case-by-case basis." *See In re Caesars Entertainment Operating Company, Inc.*, No. 15-10047 (KG), 2015 WL 495259 at *5–7 (Bankr. D. Del. Feb. 2, 2015) (transferring venue).  The inquiry "contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness." *Id.* at *6.

62.     In making a determination of whether to transfer venue for the convenience of the parties, this Court weighs six primary factors (in addition to its discretion to consider other public and private interest factors).  Those six factors are: (i) proximity of creditors "of every kind" to the court; (ii) proximity of the debtor; (iii) proximity of witnesses who are necessary to the administration of the estate; (iv) the location of the debtor's assets; (v) the economic administration of the estate, and (vi) the necessity for ancillary administration in the event of liquidation.  *See In re Qualteq, Inc.,* No. 11-12572 (KJC), 2012 WL 527669 (Bankr. D. Del. Feb. 16, 2012) (citing *Innovative Commc'n Co.*, 358 B.R. 120, 126–27 (Bankr. D. Del. 2006)).  All of the relevant factors weigh decisively in favor of transferring venue to the Central District of California.

### a.     The Proximity of Creditors, the Debtor, and Potential Witnesses

63.     In weighing the proximity of creditors to the court, the Central District of California is the most obvious venue choice.  There are no known creditors in this case in Delaware.  Almost all of the creditors in this case are located in China.  And while this case should be dismissed so that Chinese creditors can deal with their claims accordingly in their home country, the most preferable venue within the United States for the Chinese creditors is California.  Flights to and from Los Angeles are significantly faster, less expensive, and more frequent than flights from China to the Delaware area.  While it is not ideal for creditors to have to travel from China to the United States to deal with their claims, it is far easier to travel from China to California than from

China to Delaware. Jia's own actions reflect that he agrees: Shanghai Lan Cai understands that Jia has invited his Chinese creditors to an in-person meeting later this month to discuss the Plan, *in California* (not in Delaware).

64.     The Debtor's own location in the Central District of California is plainly another important factor weighing in favor of transfer. *See* [Dkt. No. 1], at 2. Even the Debtor's *counsel* is located in California. The Debtor's proposed bankruptcy counsel, Pachulski Stang Ziehl & Jones ("PSZ&J"), is a law firm with offices in Los Angeles. Tellingly, of the four PSZ&J attorneys listed on the Debtor's initial pleadings, three are based out of (and provide attorney bar numbers for) California. [24] Attorneys with the California-based law firm O'Melveny & Meyers also representing the Debtor in these proceedings. And to the extent that there are potential witnesses in this proceeding, those witnesses would likely be located in California or China.

### b.    The Location of the Debtor's Assets

65.     The Debtor's Plan centers around a company with its headquarters in Los Angeles. *See* Disclosure Statement and Consent Solicitation [Dkt. No.5], at 18. The Plan provides a release under California law. *Id.* at 13. The sole assets that Jia seeks to transfer to creditors under his Plan are interests in Faraday Future—a company that, by Jia's own admission, is "incorporated in the State of California," "is "headquartered in California," and is his "main operating company in the United States." *See* Disclosure Statement for a Prepacked Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 5], at 18, 42 (emphasis added). Even the Delaware LLC that Jia relies on (improperly) for Delaware venue, aptly named West Coast LLC, is merely a holding company for interests in California-based Faraday Future. In addition, Jia appears, as

---

[24]     Information about individual attorneys at Pachulski and their respective office locations is available at http://www.pszjlaw.com/attorneys.html?results.

discussed above, to have retained beneficial ownership of several real estate properties in the Los Angeles area. The Debtor's principal assets are therefore located in California.

### c.    The Economic Administration of the Estate

66.    The case would clearly be more efficiently and effectively administered in the Central District of California because, as discussed above, all key players are either located in that District or in China. There is no need for the estate to bear the expense of frequent travel of the Debtors' team of Los Angeles-based lawyers to Delaware, when a more appropriate court to hear this case is located in the same district as the Debtor, his counsel, and potential witnesses.

67.    Finally, because the Debtor himself acknowledges that the only connection of this case to Delaware is an interest in a Delaware holding company formed less than 90 days before the petition date, transferring venue to the Central District of California will not prejudice the Debtor.

## CONCLUSION

For the reasons stated above, Shanghai Lan Cai respectfully requests that this Court enter an Order (1) dismissing this case or, alternatively, (2) transferring the venue of this case to the Central District of California (and allowing the Central District of California Bankruptcy Court to decide whether the case should be dismissed), and (3) granting Shanghai Lan Cai such other and further relief as this Court may deem just and proper.

Dated:   November 13, 2019

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Zhao Liu*
Frederick B. Rosner (DE # 3995)
Zhao (Ruby) Liu (DE# 6436)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Tel.: (302) 777-1111
Email:  rosner@teamrosner.com
liu@teamrosner.com

-     and     -

**KOBRE & KIM LLP**

Daniel J. Saval, Esq.
John Han, Esq.
Dong Ni (Donna) Xu, Esq.
daniel.saval@kobrekim.com
john.han@kobrekim.com
donna.xu@kobrekim.com
800 Third Ave, Floor 6
New York, NY 10022
Tel: +1 212 488 1200
Fax: +1 212 488 1220

*Counsel to Shanghai Lan Cai Asset*
*Management Co, Ltd.*