# EXHIBIT 7

# In Re:

*HIGHLAND CAPITAL MANAGEMENT, L.P.*
*Case No. 19-12239(CSS)*

*December 2, 2019*

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*

Min-U-Script® with Word Index

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

7          Debtor.                        19-12239(CSS)

8  - - - - - - - - - - - - - - - - - - - - -x

9

10

11              United States Bankruptcy Court

12              824 North Market Street

13              Wilmington, Delaware

14

15              December 2, 2019

16              10:07 AM

17

18

19  B E F O R E:

20  HON. CHRISTOPHER S. SONTCHI

21  CHIEF U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  LESLIE MURIN

24

25

1

2  Motion for Entry of an Order (I) Authorizing Bradley D. Sharp

3  to Act as Foreign Representative Pursuant to 11 U.S.C. Section

4  1505 and (II) Granting Related Relief (Docket No. 68).

5

6  Motion of the Official Committee of Unsecured Creditors for

7  Entry of an Order Authorizing Filing Under Seal of the Omnibus

8  Objection of the Official Committee of Unsecured Creditors to

9  the Debtor's (1) Motion for Final Order Authorizing Continuance

10 of the Existing Cash Management System, (II) Motion to Employ

11 and Retain Development Specialists, Inc. to Provide a Chief

12 Restructuring Officer, and (III) Precautionary Motion for

13 Approval of Protocols for "Ordinary Course" Transactions

14 (Docket No. 123).

15

16 Motion of Debtor for Entry of Interim and Final Orders

17 Authorizing Debtor to File Under Seal Portions of Its Creditor

18 Matrix Containing Employee Address Information (Docket No. 8).

19

20 Debtor's Application for an Order Authorizing the Retention and

21 Employment of Foley Gardere, Foley & Lardner LLP as Special

22 Texas Counsel, Nunc Pro Tunc to the Petition Date (Docket No.

23 69).

24

25

1

2   Debtor's Application for an Order Authorizing the Retention and

3   Employment of Lynn Pinker Cox & Hurst LLP as Special Texas

4   Litigation Counsel, Nunc Pro Tunc to the Petition Date (Docket

5   No. 70).

6

7   Motion of Debtor for Entry of Interim and Final Orders

8   Authorizing (A) Continuance of Existing Cash Management System

9   and Brokerage Relationships, (B) Continued Use of the Prime

10  Account, (C) Limited Waiver of Section 345(b) Deposit and

11  Investment Requirements, and (D) Granting Related Relief

12  (Docket No. 5).

13

14  Motion Pursuant to 11 U.S.C. Sections 105(a) and 363(b) to

15  Employ and Retain Development Specialists, Inc. to Provide a

16  Chief Restructuring Officer, Additional Personnel, and

17  Financial Advisory and Restructuring-Related Services, Nunc Pro

18  Tunc as of the Petition Date (Docket No. 75).

19

20  Precautionary Motion of the Debtor for Order Approving

21  Protocols for the Debtor to Implement Certain Transactions in

22  the Ordinary Course of Business (Docket No. 77).

23

24

25

1

2  Motion of the Official Committee of Unsecured Creditors for an

3  Order Transferring Venue of This Case to the United States

4  Bankruptcy Court for the Northern District of Texas (Docket No.

5  86).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Clara Rubin

1
2  A P P E A R A N C E S :
3  PACHULSKI STANG ZIEHL & JONES LLP
4          Attorneys for Debtor
5  BY:   JAMES E. O'NEILL, ESQ.
6          GREGORY DEMO, ESQ.
7          IRA D. KHARASCH, ESQ.
8          MAXIM LITVAK, ESQ.
9          JOHN A. MORRIS, ESQ.
10         JEFFREY N. POMERANTZ, ESQ.
11
12
13  UNITED STATES DEPARTMENT OF JUSTICE
14          Office of the United States Trustee
15  BY:   JANE LEAMY, ESQ.
16
17
18  SIDLEY AUSTIN LLP
19          Proposed Counsel for Official Committee of Unsecured
20          Creditors
21  BY:   MATTHEW A. CLEMENTE, ESQ.
22          PENNY P. REID, ESQ.
23          DENNIS M. TWOMEY, ESQ.
24
25

1

2  YOUNG CONAWAY STARGATT & TAYLOR, LLP

3       Attorneys for Official Committee of Unsecured Creditors

4  BY:    SEAN M. BEACH, ESQ.

5         KEVIN A. GUERKE, ESQ.

6         MICHAEL R. NESTOR, ESQ.

7

8

9  ASHBY & GEDDES, P.A.

10      Attorneys for Jefferies, LLC

11 BY:   WILLIAM P. BOWDEN, ESQ.

12

13

14 BLANK ROME LLP

15      Attorneys for Acis Capital Management GP, et al.

16 BY:    JOHN E. LUCIAN, ESQ.

17        JOSE F. BIBILONI, ESQ.

18

19

20 DENTONS US, LLP

21      Attorneys for Jefferies

22 BY:    LAUREN MACKSOUD, ESQ. (TELEPHONICALLY)

23        PATRICK C. MAXCY, ESQ. (TELEPHONICALLY)

24

25

1

2  GIBSON, DUNN & CRUTCHER LLP

3          Attorneys for Alvarez & Marsal

4  BY:   MICHAEL A. ROSENTHAL, ESQ.

5

6

7  JENNER & BLOCK

8          Attorneys for Redeemer Committee of Crusader Fund

9  BY:   MARC B. HANKIN, ESQ.

10          TERRI L. MASCHERIN, ESQ.

11

12

13  LATHAM & WATKINS, LLP

14          Attorneys for UBS Securities LLC and UBS London Bank

15  BY:   ASIF ATTARWALA, ESQ. (TELEPHONICALLY)

16          JEFF BJORK, ESQ. (TELEPHONICALLY)

17          ANDREW B. CLUBOK, ESQ. (TELEPHONICALLY)

18          KUAN HUANG, ESQ. (TELEPHONICALLY)

19          KIMBERLY A. POSIN, ESQ. (TELEPHONICALLY)

20

21

22  MORRIS, NICHOLS, ARSHT & TUNNELL LLP

23          Attorneys for Redeemer Committee of Crusader Fund

24  BY:   CURTIS S. MILLER, ESQ.

25

1

2 POTTER ANDERSON & CORROON LLP

3       Attorneys for Alvarez & Marsal

4 BY:   JEREMY W. RYAN, ESQ.

5

6

7 ROGGE DUNN GROUP, PC.

8       Attorneys for Acis Capital Management GP, et al.

9 BY:   BRIAN P. SHAW, ESQ.

10

11

12 SCHULTE ROTH & ZABEL LLP

13       Attorneys for CLO Entities, Intertrust Entities

14 BY:   JAMES T. BENTLEY, ESQ. (TELEPHONICALLY)

15

16

17 WINSTEAD, P.C.

18       Attorneys for Acis Capital Management GP, et al.

19 BY:   RAKHEE V. PATEL, ESQ.

20

21

22

23

24

25

1

2  ALSO PRESENT:

3         ISAAC D. LEVENTON, ESQ., Asst. General Counsel, Highland

4         Capital Management

5         FRANK WATERHOUSE, Partner and CFO, Highland Capital

6         Management

7         BRADLEY SHARP, Pres. and CEO, Development Specialists,

8         Inc.

9         FRED CARUSO, COO, Development Specialists, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.

4            MR. O'NEILL:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl &

7    Jones, here today on behalf of the debtor, Highland Capital

8    Management.  With me, Your Honor, at counsel table is Jeff

9    Pomerantz, Ira Kharasch, John Morris, Greg Demo, and Max

10   Litvak, representing the debtor.  Also in the courtroom with

11   us, from our client, Isaac Leventon and Frank Waterhouse and,

12   from DSI, Brad Sharp and Fred Caruso.

13           THE COURT:  Welcome.

14           MR. O'NEILL:  Your Honor, we have a number of matters

15   on the agenda today, but we are going to proceed with item

16   number 12 on the agenda, which is the committee's venue motion.

17   So I will yield the podium to them.

18           THE COURT:  Okay.

19           MR. CLEMENTE:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           MR. CLEMENTE:  Matthew Clemente from Sidley Austin,

22   proposed counsel to the official committee of unsecured

23   creditors.  With me here today, my colleagues Dennis Twomey and

24   Penny Reid, along with our co-counsel from Young Conaway, Mike

25   Nestor and Sean Beach.

1        Your Honor, we have filed our venue motion.  We

2   believe that venue -- it's appropriate to transfer venue to the

3   bankruptcy court in the District of Texas for the reasons that

4   we laid out in the motion.  Based on Your Honor's --

5   discussions with Your Honor this morning, we understand that we

6   would proceed with what I believe would be a short proffer from

7   the debtor, we would have an opportunity to cross, and then we

8   would proceed to argument from there.  If that's acceptable to

9   Your Honor, that's --

10        THE COURT:  That's fine.  Thank you.

11        MR. CLEMENTE:  -- that's the way we'd proceed.

12        THE COURT:  Yes.

13        MR. CLEMENTE:  Thank you, Your Honor.

14        MR. POMERANTZ:  Good morning, Your Honor.  Jeff

15   Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

16   debtor.  We'd also like at this time, Your Honor, to move into

17   evidence Exhibits A through U, except for Exhibit G.  Exhibit G

18   is one of those documents that we refer to in chambers as would

19   be subject to seal.  We don't need to refer to it in connection

20   with the venue motion.  But if Your Honor would like, I can

21   approach with a binder containing the --

22        THE COURT:  Yeah, I don't have those.

23        MR. POMERANTZ:  -- exhibits.  There have been no

24   objections to them.

25        MR. POMERANTZ:  Your Honor, if Mr. Sharp were called

 1 to testify, he would testify --

 2          THE COURT:  Hang --

 3          MR. POMERANTZ:  Oh, sorry.

 4          THE COURT:  Hang on.  Okay.

 5          MR. POMERANTZ:  Okay.

 6          THE COURT:  Look at the documents.  It's the first

 7 I've seen them.

 8     (Pause)

 9          THE COURT:  So you're moving A through U, except for

10 G?

11          MR. POMERANTZ:  Correct, Your Honor.

12          THE COURT:  Any objection?

13          MR. CLEMENTE:  Sorry, Your Honor, one --

14          THE COURT:  No; yeah, that's fine.

15          MR. CLEMENTE:  No objection, Your Honor.

16          THE COURT:  All right, they're admitted without

17 objection, other than G.  G is not admitted at this time.

18     (Debtors' Exhibits A through U, except for Exhibit G, were

19 hereby received into evidence, as of this date.)

20          THE COURT:  All right, you may proceed with the

21 proffer.

22          MR. POMERANTZ:  Thank you, Your Honor.

23          If Mr. Sharp were called to testify, he would testify

24 that he is the proposed chief restructuring officer of the

25 debtor; he's also the president of Development Specialists,

1  Inc., a financial advisory firm.  He would testify that he's

2  been a restructuring professional with over twenty-five years

3  of experience as a trustee, a chief restructuring officer, and

4  a financial advisor, in a myriad of industries.  He would

5  testify that he has been appointed as chief restructuring

6  officer in four cases in Delaware, including In re Variant

7  before Judge Shannon, In re Woodbridge before Judge Carey, In

8  re WL Homes before Judge Shannon, and In re Beverly Hills

9  Bancorp before Judge Carey.

10        He would testify that he has a national practice, he's

11 physically headquartered in Los Angeles, and it would be as

12 convenient for him to travel to this court in Delaware than it

13 would be for him to travel to Dallas.  He would testify that

14 the debtor's counsel, Pachulski Stang Ziehl & Jones, has

15 offices in Delaware and, if the case were transferred, the

16 debtor would need to retain local counsel in Dallas.

17        He would testify that he was initially engaged by the

18 debtor on October 7, 2019 and that, prior to his engagement as

19 a CRO, he had no prior involvement with Highland or any of its

20 senior management employees or principals.  He would testify

21 that he was introduced to Highland by Pachulski Stang Ziehl &

22 Jones.

23        He would testify that, since his engagement, he and

24 his colleague, Fred Caruso, who functions as an extension of

25 him in his role as chief restructuring officer, and other

1  employees of DSI have devoted themselves to learning about the

2  debtor's business and financial affairs, knowledge that only

3  increases as the days go by.  He would testify that he and

4  others from DSI have spent hundreds of hours meeting with

5  various employees of the debtor and reviewing and accessing the

6  debtor's books and records.  He would testify that he's been

7  given complete access to a wealth of information by the debtor,

8  and nothing he or his team have requested from the debtor have

9  been withheld by them.

10         He would testify that the debtor's a limited

11  partnership organized under the laws of Delaware and that the

12  debtor's general partner, Strand Advisors, is a corporation

13  organized under Delaware law as well, and Strand is the manager

14  of the debtor.  He would testify that over ninety-nine percent

15  of the debtor's limited partnerships are held by Delaware

16  entities.

17         He would testify that the debtor owns and manages a

18  sophisticated financial-advisory-services and money-management

19  business that has assets and interests all over the world; that

20  the debtor's assets under management, including its own

21  proprietary assets and those of its clients, through various

22  related parties, exist in the United States, Asia, South

23  America, and Europe.

24         He would testify that the debtor has over two-and-a-

25  half billion dollars of assets under management and receives

1  management and advisory fees from a multitude of sources around

2  the world.  He would also testify that the debtor provides

3  shared services for approximately 7.5 billion of assets managed

4  by a variety of affiliated and unaffiliated entities, including

5  other affiliated registered investment advisors.

6         He would testify that although the debtor is based in

7  Dallas, the debtor's affiliates and related parties maintain

8  offices or have personnel in many international locales,

9  including Buenos Aires, Rio de Janeiro, Singapore, and Seoul.

10  He would testify that the debtor owns and manages targeted

11  funds in Korea, South America, and Singapore.

12         He would testify that the debtor's filed the motion

13  that's pending today to appoint him as foreign representative

14  in order to manage certain foreign interests, including those

15  proceedings pending in Bermuda and Cayman.  He would testify

16  that the principal assets in the United States consist of

17  custodial and noncustodial interests and investments located

18  all over the country, and that the debtor's prime brokerage

19  account that holds the bulk of the debtor's liquid assets is

20  located in New York City with Jefferies.

21         He would testify the debtor owes approximately 30

22  million dollars to Jefferies on account of margin obligations

23  that are secured by the securities in the prime account, and

24  that the debtor's other principal secured creditor, Frontier

25  State Bank, is based in Oklahoma City and is owed approximately

1    5.2 million dollars as of the petition date.

2          He would testify that one aspect of the debtor's

3    business is management advisory services in connection with

4    various investments and collateralized loan obligations, or

5    "CLOs", and that the debtor previously provided submanager,

6    subadvisory, and shared services to Acis CLOs pursuant to

7    certain contractual agreements that were terminated during the

8    course of Acis' bankruptcy in or around August 2018.  He would

9    testify that he's informed and believes that the compensation

10   structure for subadvisory and shared-service agreements is

11   different for CLOs than with other types of private equity or

12   hedge funds that the debtor manages.

13         He will testify that a focus of DSI's efforts in this

14   case will be to evaluate the appropriateness and the economics

15   of the shared-service agreements and subadvisory agreements

16   that the debtor's a party to with both affiliated and

17   unaffiliated third parties, and he would determine what

18   modifications are appropriate given the facts and

19   circumstances.

20         He would testify that, since the petition date and, he

21   believes, since August 2018, the debtor has not had any direct

22   business dealings with respect to Acis or the CLO assets for

23   which Acis serves as CLO manager, and that the debtor no longer

24   advises or subadvises any active CLOs; the debtor only has CLOs

25   that are in liquidation and in the process of monetizing their

1    underlying assets and paying off their remaining investors'

2    revenues that will decrease over time; and that the CLO portion

3    of the debtor's business provides just ten percent of the

4    debtor's revenue, which, again, will shrink over time.

5         He would testify that the debtor derives ninety

6    percent of its other revenue from managing asset classes that

7    have nothing to do with Acis, including private equity, hedge

8    fund, mutual funds, open-ended retail funds, and real-estate

9    funds.

10        He would testify that the debtors and Acis assert

11   various substantial disputed and unliquidated claims against

12   each other, and the debtor has outstanding claims against Acis

13   that total no less than eight million dollars for services

14   rendered.  He would testify that the debtor and Acis have been,

15   and continue to be, involved in highly contentious litigation,

16   including matters that are subject to multiple appeals from the

17   bankruptcy court and pending fraudulent-transfer claims brought

18   by Acis against the debtor, in Texas.  He would testify the

19   debtor is currently supporting two pending appeals of orders of

20   the Texas bankruptcy court, granting the involuntary petition

21   against Acis and confirming Acis' Chapter 11 plan that put Mr.

22   Terry in charge of Acis.

23        He would testify that, although he serves subject to

24   the debtor's ability to terminate him, he has full

25   responsibility with respect to analyzing and pursing insider

1  transactions and is in charge of the debtor's restructuring

2  efforts, and that he has no prior relationship with either Acis

3  or the Texas bankruptcy court with respect to this matter.  He

4  would testify that his goal in this case is to maximize the

5  value of the debtor's estate for the benefit of all

6  constituents, and he intends to evaluate all available

7  strategic options for accomplishing the goal, and hopes to work

8  constructively with the committee in that regard.

9          He believes that the outcome of this case will not

10  turn on the day-to-day management of the debtor's assets but

11  instead will be driven by the debtor's ability to restructure

12  its balance sheet and maximize the value of its assets, many of

13  which are liquid.  He would testify that either he or Fred

14  Caruso would provide substantially all the testimony that would

15  be provided for the debtor in this case.

16          Lastly, he would testify that he's been on the job for

17  over a month-and-a-half, that the debtor has been following the

18  protocols set out in the motion for which approval is being

19  sought today.  He would testify the debtor's being transparent

20  with the creditors' committee, has met with and communicated

21  with FTI on many occasions, and shared a lot of information.

22  And he would testify that there have been no allegations made

23  by the committee or any other party, regarding any post-

24  petition impropriety by the debtor.

25          That concludes my proffer of Mr. Sharp's testimony.

1          THE COURT:  All right, thank you very much.

2          Does anyone wish to cross-examine the witness?

3          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

4          THE COURT:  Yes?

5          UNIDENTIFIED SPEAKER:  Yeah.

6          THE COURT:  Okay.

7          MS. REID:  Yes, Your Honor.

8          THE COURT:  Mr. Sharp, would you please take the

9   stand?  And remain standing for your affirmation.

10          THE CLERK:  Would you step up to the stand, please?

11   Raise your right hand.

12      (Witness affirmed)

13          THE CLERK:  Please state and spell your name for the

14   record.

15          THE WITNESS:  Bradley Sharp, B-R-A-D-L-E-Y; last name,

16   S-H-A-R-P.

17          THE CLERK:  Thank you.

18          THE COURT:  Very good.

19          MS. REID:  Good morning, Your Honor.  Penny Reid on

20   behalf of the creditors' committee.

21          THE COURT:  Good morning.

22          Mr. Sharp, just -- you look like a veteran, but if you

23   could stay close to the microphone, I'd appreciate it.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.

1   CROSS-EXAMINATION

2   BY MS. REID:

3   Q.  Mr. Sharp, you've only met Mr. Dondero once; correct?

4   A.  That is correct.

5   Q.  And that was in Dallas; correct?

6   A.  That is correct.

7   Q.  And your team has been at the debtor's offices; correct?

8   A.  Yes.

9   Q.  And worked over a hundred hours at the debtor's offices;

10  correct?

11  A.  Yes.

12  Q.  And that's all been in Dallas; correct?

13  A.  Yes.

14  Q.  Your team has not been to a New York office; has it?

15  A.  No.

16  Q.  Has your team -- your team has not been to Korea; has it?

17  A.  No.

18  Q.  Your team has not been to Singapore; has it?

19  A.  With respect to this engagement, no.

20  Q.  Okay.  And you haven't met any employees in the Singapore

21  office; have you?

22  A.  No.

23  Q.  And under this proposed engagement, you're going to report

24  to Mr. Dondero; correct?

25  A.  Yes.

1     MS. REID:  We will reserve our rights to further

2  question him on the other issues, non-venue issues.

3     THE COURT:  Of course.

4     MR. SHAW:  Good morning, Your Honor.  Brian Shaw on

5  behalf of Acis Capital Management, a creditor.

6     THE COURT:  Yes, Mr. Shaw, you may proceed.

7  CROSS-EXAMINATION

8  BY MR. SHAW:

9  Q.  Mr. Sharp, you were hired nine days before the bankruptcy

10 petition was filed in this case; correct?

11 A.  Correct.

12 Q.  Other than the retention of DSI, are there any other new

13 managers at the debtor, that didn't exist prior to the

14 bankruptcy filing?

15     MR. MORRIS:  Objection.  Beyond the scope, Your Honor.

16 This should be a traditional cross.

17     THE COURT:  You're going to need to find a microphone

18 or talk into one that's in front of you.

19     MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

20 Jones, for the debtor.

21     This line of questioning is beyond the scope.  This

22 should be a traditional cross.  The moving parties have called

23 no witnesses, as Your Honor is aware.

24     THE COURT:  Well, they reserved the right to call

25 witnesses based on what you did in your direct.  So I'm not

1  going to hold them to technicalities.

2          You may proceed.

3          MR. SHAW:  Thank you, Judge.

4          THE COURT:  Do you remember the question, Mr. Shaw?

5          THE WITNESS:  I do.

6  A.  Not that I'm aware of.

7  Q.  Okay.  So other than -- so DSI is the only difference pre-

8  petition and post-petition; is that right?

9  A.  With respect to management.  Obviously, the company's now

10  operating in bankruptcy, which is significantly different.

11  Q.  You testified, in your proffer, regarding the provision of

12  shared services and subadvisory to Acis; do you remember that

13  proffer your counsel commented about?

14  A.  I do.

15  Q.  And one of the core parts of the debtor's business is the

16  provision of shared services and subadvisory services to

17  affiliates and nonaffiliates; right?

18  A.  Yes.

19  Q.  Okay.  And so that was true for Acis and it's true for

20  current affiliates of the debtor; right?

21  A.  Yes, except for, you know, Acis was primarily CLOs, which

22  is a reducing part of the debtor's business.

23  Q.  Do you have any reason to believe that the Northern

24  District of Texas cannot hear this case expeditiously and

25  fairly?

1  A.  No.

2          MR. SHAW:  Pass the witness.

3          THE COURT:  Any other cross-examination?

4          Hearing none, any -- redirect; that's what it's

5  called.  There we go.

6          MR. MORRIS:  No, thank you, Your Honor.

7          THE COURT:  All right.  Thank you, sir.  You may step

8  down.

9          THE WITNESS:  Thank you.

10         THE COURT:  Any further evidence by any party, in

11  connection with the venue motion only?

12         MR. CLEMENTE:  Your Honor, I believe we would like to

13  call Mr. Waterhouse to the stand to testify in connection with

14  the venue motion briefly.

15         THE COURT:  All right.  Mr. Waterhouse.  I thought

16  we -- there we go.  If you could please take the stand as well,

17  sir, and remain standing.

18         MR. GUERKE:  May it please the Court.  Good morning,

19  Your Honor.  Kevin Guerke on behalf of the creditors'

20  committee.

21         THE CLERK:  Please raise your right hand.

22      (Witness affirmed)

23         THE CLERK:  Please state and spell your name for the

24  record.

25         THE WITNESS:  Yes; it's Frank Waterhouse, F-R-A-N-K,

1   W-A-T-E-R-H-O-U-S-E.

2           THE CLERK:  Thank you.

3           THE COURT:  Thank you.  Please be seated and try to

4   remain close to the microphone, if you would, please.  It's a

5   little awkward here.

6           You may proceed.

7   DIRECT EXAMINATION

8   BY MR. GUERKE:

9   Q.  Mr. Waterhouse, you've worked for the debtor, Highland

10  Capital Management, L.P., since 2006; correct?

11  A.  Yes.

12  Q.  You started there as a senior accountant; right?

13  A.  That is correct.

14  Q.  You were promoted to chief financial officer at the end of

15  2011; correct?

16  A.  Yes.

17  Q.  That's the title that you hold today; right?

18  A.  Yes.

19  Q.  You also currently hold the title of partner; right?

20  A.  Yes.

21  Q.  You were made partner three or four years ago; correct?

22  A.  Yes.  I mean, I don't remember the exact time but, yeah,

23  approximately three or four years ago.

24  Q.  You are an officer in Highland Affiliates; correct?

25  A.  Yes.

1   Q.  James Dondero is the president of Highland Capital

2   Management, L.P.; right?

3   A.  Yes.

4   Q.  Mr. Dondero owns and controls Highland's general partner,

5   Strand Advisors, Inc.; right?

6         MR. MORRIS:  Your Honor, I'm just going to object for

7   the record.  This is supposed to be a rebuttal witness.  This

8   isn't rebutting anything; it's just new facts --

9         THE COURT:  He's laying

10         MR. MORRIS:  -- that they're seeking --

11         THE COURT:  I'm sure he's laying foundation.

12         MR. GUERKE:  I am, Your Honor.  It's background, it's

13   foundation.  It has to go (sic) with the organizational

14   structure.

15         THE COURT:  That's fine.  Objection overruled.

16   Q.  Mr. Waterhouse, Mr. Dondero owns and control Highland's

17   general partner, Strand Advisors, Inc.; correct?

18   A.  I don't remember his exact title but, yes, he is

19   president.

20   Q.  He owns a hundred percent of the equity in Strand; right?

21   A.  Yes.

22   Q.  He also has a limited-partnership interest in Highland;

23   correct?

24   A.  That is correct.

25   Q.  Mr. Dondero's the portfolio manager of all Highland funds;

1  right?

2          MR. MORRIS:  Objection to the form of the question.

3          THE COURT:  Overruled.

4          You can answer.

5  A.  Yes, he -- he is the portfolio manager or the -- or a co-

6  portfolio manager.  We have several funds.  I -- I -- I can't

7  recall if he is the sole portfolio manager on every single fund

8  or -- but he -- he -- but yes, he is -- he is a portfolio

9  manager.

10  Q.  As the president of Highland, Mr. Dondero promoted you to

11  CFO back in 2011; right?

12  A.  Yes.  My -- my promotion was recommended by the -- the

13  former CFO and, as president, Mr. Dondero had to, you know,

14  obviously, approve that taking.

15  Q.  You report to Mr. Dondero; right?

16  A.  Yes.

17  Q.  He's your boss; correct?

18  A.  Yes.

19  Q.  And after the transition period from the old CFO to you,

20  you've reported only to Mr. Dondero; right?

21  A.  That is correct.

22  Q.  After the bankruptcy was filed, you still report to Mr.

23  Dondero; right?

24  A.  Yes.

25  Q.  And Mr. Dondero doesn't report to anyone; correct?

1  A.  Yeah, not -- not to my knowledge.  Yeah, it's correct.

2  Q.  Mr. Dondero has the ability to terminate you; right?

3  A.  Again, I -- I assume so.  Again, I think I -- I testified

4  earlier last week, I -- I -- I -- you know, again, I don't know

5  through this process -- again, I'm not -- bankruptcy is not

6  something that I -- I am, you know, a specialist.  I'm not a

7  bankruptcy attorney.  But maybe the CRO can, or Jim, or

8  something in -- in conjunction.  But I think, theoretically,

9  yes.

10  Q.  Post-bankruptcy, you don't report to Bradley Sharp; right?

11          MR. MORRIS:  Objection, Your Honor.  Same objection:

12  beyond the scope.

13          THE COURT:  Overruled.

14  A.  I do not.

15  Q.  Post-bankruptcy, you don't report to Fred Caruso; correct?

16  A.  I do not.

17  Q.  Mr. Sharp doesn't have the power to terminate your

18  employment; right?

19  A.  Again, I'll --

20          THE COURT:  Actually, he already answered that

21  question; said he wasn't sure.

22  Q.  Mr. Waterhouse, there are six groups below Mr. Dondero in

23  Highland's organizational chart; correct?

24  A.  Give or -- give or take.

25  Q.  The heads of those groups are the executive-level

1    management employees that you describe in your declaration that

2    was submitted in association with the first-day motions; right?

3    A.   Yes.

4    Q.   You manage one of those teams; correct?

5    A.   Yes.

6    Q.   Your team is made up of the corporate accounting folks,

7    Funding Accounting, the tax group, Valuation, Operations,

8    Retail Fund Operations, Human Resources, and IT; right?

9    A.   That -- that is correct.

10   Q.   The other Highland teams are the legal-compliance team --

11   correct?

12   A.   Yes.

13   Q.   The credit-research team; right?

14   A.   Yes.

15   Q.   Public-relations team; correct?

16   A.   Yes.

17   Q.   Private-equity team; right?

18   A.   Yes.

19   Q.   And the trading team; true?

20   A.   Yes.

21   Q.   The heads of each one of those groups report up to Mr.

22   Dondero; isn't that true?

23   A.   Yes, and we -- we -- well, and we also -- and -- but we

24   have a risk-management team as well, at Highland.  That -- that

25   risk-management team reports up through the trading team.

1  Q.  As the CFO, your office is in Dallas, Texas; right?

2  A.  Yes.  My -- yes, we office in -- or my office is in

3  Dallas, Texas.

4  Q.  That's been the location of your office since you joined

5  Highland; correct?

6  A.  My current location in Dallas, Texas, is not the same as

7  it was when I joined Highland Capital in October of 2006.

8  Q.  You started in 2006 and your office was in Dallas; right?

9  A.  Well, my offices were in Dallas but it was not at the same

10  location as we are currently.

11  Q.  Your current offices are also in Dallas; right?

12  A.  Yes, their address is in Dallas, Texas.

13  Q.  Over seventy Highland employees work out of Highland's

14  Dallas office; right?

15  A.  Yes.

16  Q.  Dallas is the only location where Debtor Highland

17  employees work; correct?

18  A.  Yes.

19  Q.  Mr. Dondero's office is in Dallas; true?

20  A.  Yes.

21  Q.  Members of the legal team have offices in Dallas; right?

22  A.  Yes.

23  Q.  You meet with Mr. Dondero at a minimum of once a week;

24  correct?

25  A.  Yes, give or take.

1  Q.  Usually those meetings are in his office in Dallas; right?

2  A.  Yes.

3  Q.  All the group heads that we just discussed all have

4  offices in Dallas; right?

5  A.  Yes.  We used to -- our -- our risk-management team used

6  to be officed in New York.  But yes, we -- we -- yes.

7  Q.  You mentioned New York.  There's a location in New York

8  that we discussed at your deposition; do you remember that?

9  A.  Yes.

10  Q.  That office in New York is not in Highland -- the debtor's

11  name; true?

12  A.  That is correct.

13  Q.  It's in another nondebtor-entity name; correct?

14  A.  Yes.

15  Q.  There are no Highland employees in that New York location;

16  correct?

17  A.  That is correct.

18  Q.  In the proffer that you just heard, and at your

19  deposition, there was some discussion about offices outside of

20  the United States.  Do you recall that?

21  A.  Yes.

22  Q.  The people who work in those locations are not employees

23  of the debtor, Highland Capital Management, L.P.; right?

24  A.  That's right.

25  Q.  The offices outside the U.S. are subsidiary offices with

1  subsidiary employees; correct?

2  A.  That is correct.

3  Q.  You've never been to those offices; right?

4  A.  I have not.

5  Q.  You have members of team who include David Klos, Clifford

6  Stoops, and some other folks; right?

7  A.  Yes.

8  Q.  You have standing weekly meetings with those folks --

9          THE COURT:  All right --

10  Q.  -- right?

11          THE COURT:  -- I'm going to reprimand -- this is well

12  beyond -- I was giving you some leeway but, if this is what you

13  wanted to put on -- it's your motion, sir.  I mean, this is --

14  you're laying your foundation in your case-in-chief.  Why

15  didn't you put this on to begin with?

16          MR. GUERKE:  Your Honor, it's rebuttal to the proffer

17  that Mr. Sharp just offered.

18          THE COURT:  In what way?

19          MR. GUERKE:  Related to the organizational structure

20  and how decisions are made currently at the debtor.

21          MR. MORRIS:  Your Honor, if I may.  I don't believe

22  any aspect of the proffer went to the location of decision-

23  making.

24          THE COURT:  Would you like to reply to that?

25          MR. GUERKE:  Yes.  The proffer was made that decisions

1  are made in California and around the country, and around the

2  world I believe.  And this evidence rebuts that; that the

3  organizational structure and the day-to-day operations are

4  still run in Dallas, Texas, as they were before bankruptcy.

5          And, Your Honor, I have three questions, then I'll sit

6  down.

7          THE COURT:  Okay.  All right, I'll allow it.

8  Q.  When you meet with people on your team that we just

9  identified, you meet with them in Dallas; correct?

10 A.  That's correct.

11         MR. GUERKE:  Those are my only questions.  Thank you,

12 Mr. Waterhouse.

13         THE COURT:  All right.

14         THE WITNESS:  Thank you.

15         THE COURT:  That was direct.  Any further direct?

16         Yes, sir.

17         MR. SHAW:  Real briefly, Your Honor.

18 DIRECT EXAMINATION

19 BY MR. SHAW:

20 Q.  Mr. Waterhouse, as the CFO of the debtor, were you aware

21 that the debtor intended to file bankruptcy prior to the

22 filing?

23         MR. MORRIS:  Objection.  Beyond the scope.

24         MR. SHAW:  Judge, we designated any witness that they

25 designated, so I don't know that we necessarily have called --

1          THE COURT:  Well, yeah, but it's your motion --

2          MR. SHAW:  Correct.

3          THE COURT:  -- and you declined to put any evidence on

4   in support of your motion.  They then put on evidence in

5   opposition to your motion.  So you're limited, sir, to

6   rebutting the evidence they put on.  You had your chance to

7   make your case-in-chief; you decided not to do it.  It's not my

8   fault.

9          MR. SHAW:  My understanding was that we were -- that,

10   depending upon what the proffer was, which we -- we're not

11   aware of what the proffer was before today, that we reserved

12   the right to call Mr. Waterhouse, which I understood from our

13   chambers conference is what we exercised that right to do.  If

14   I misunderstood how procedurally we were going about it,

15   then --

16          THE COURT:  Well, I don't understand how -- that

17   doesn't make any sense to me.  You get a free shot to hear

18   their case first, and then you get to make your direct case?

19   Why would I allow that?  It's your motion.

20          MR. SHAW:  Understood.

21          THE COURT:  All right, so let's stick to rebutting

22   what they put on.

23          MR. SHAW:  Okay.

24          THE COURT:  I gave a lot of leeway to your colleague;

25   I'll give you leeway.  But I don't really want to sit through

1  forty-five minutes of direct that you could have done in the

2  first place.

3         MR. SHAW:  And I promise you, I have a very few

4  limited questions.

5         THE COURT:  All right.

6  BY MR. SHAW:

7  Q.  With regard -- where is Mr. Dondero today?

8  A.  I don't know.

9  Q.  For the shared services and subadvisory services that the

10 debtor previously provided Acis -- are you aware of those?

11 A.  I'm aware of them generally.

12 Q.  All right.  Have you ever reviewed the shared-services and

13 subadvisory agreements between Acis and Highland?

14 A.  I'm sure I reviewed them at -- at some point, but I

15 honestly can't recall.

16 Q.  How are those agreements different than the shared-

17 services and subadvisory agreements currently between the

18 debtor and various affiliates?

19         MR. MORRIS:  Objection.  No foundation.

20         MR. SHAW:  It's directly relevant to -- the foundation

21 being he said he's aware of them.  I --

22         MR. MORRIS:  The witness just testified that he's not

23 familiar with them as he sits here --

24         THE COURT:  I can't hear you.

25         MR. MORRIS:  The witness just testified that he's not

1  familiar with them as he sits here today.  He may have seen

2  them in some -- at some point in the past.

3            THE COURT:  Well, he can qualify the answer further.

4  Overruled.

5            You can answer.

6  A.  You know, again, I -- I don't -- I don't know.  I don't

7  have the documents in front of me.  I -- I -- like I said, I'm

8  generally aware of -- of the Acis agreements.  You know, I

9  don't have these agreements memorized to any certain degree, so

10  I -- I -- I -- I don't know specifically.

11  Q.  As -- you're familiar with the -- as the CFO, with the

12  shared-services and subadvisory agreements that govern the

13  seven billion dollars in assets under management that the

14  debtor provides for affiliates and nonaffiliates; right?

15  A.  Yes, I'm generally aware of those agreements.

16  Q.  And are those agreements typical in form?  Do they differ

17  widely in their content?

18  A.  Again, I don't know -- I mean, they -- they can.  Again,

19  it -- it depends on the nature of the services.  And -- you

20  know, it -- there isn't a standard template, I would say, for

21  shared services.  Yes, they can differ.  As I said, I don't

22  have those agreements memorized, so I can't speak as to how

23  they are similar or how they are not.

24            MR. SHAW:  Pass the witness.

25            THE COURT:  Thank you.

1        I guess it'll be cross of your own witness.  Any
2    cross?
3            MR. MORRIS:  No, thank you, Your Honor.
4            THE COURT:  All right, sir, thank you.  Mr.
5    Waterhouse, you may step down.
6            THE WITNESS:  Thank you.
7            THE COURT:  You're welcome.
8            Any further evidence?
9            MS. PATEL:  Your Honor, as I referenced, we just have
10   some exhibits; I believe these to be the unobjected-to pieces
11   of it.  We -- Acis provided a witness-and-exhibit list.  These
12   are the unobjected-to exhibits, and we would just move them in.
13   And --
14           THE COURT:  Is this the ones I already have?
15           MS. PATEL:  No, Your Honor.  I believe you only have
16   the debtor's.
17           THE COURT:  Yeah.
18           MS. PATEL:  And I will apologize, Your Honor; we've
19   given debtors a copy of the exhibits.  Our -- there was
20   miscommunication.  They are not bound.
21           THE COURT:  That's fine.
22           MS. PATEL:  But they are numbered.
23           THE COURT:  All right.
24           MS. PATEL:  If I may approach?
25           THE COURT:  Yes.  Please don't hurt yourself.  It's a

1  bit of a mess there.

2          MS. PATEL:  There's a little trash back here.

3          THE COURT:  These are all not objected to; is that

4  correct?

5          MS. PATEL:  (Indiscernible), Your Honor, but I go

6  through them.

7          THE COURT:  Are they -- okay.

8          MS. PATEL:  What I've handed the Court and to opposing

9  counsel are Exhibits 1 -- Acis Exhibits 1 through 18, with the

10 exclusion of Exhibit 3 and Exhibit 9, which were objected to;

11 and then also Exhibit Numbers 24 and 25, which were not

12 objected to.  We do have one additional exhibit, Your Honor,

13 that was objected to, that I would like to move in.

14         THE COURT:  All right.  Is there any objection to the

15 admission of the documents that counsel has represented there's

16 no objection to?

17         MR. MORRIS:  No, Your Honor.

18         THE COURT:  Okay.  They are admitted without

19 objection.

20     (Acis' Exhibits 1 through 18, with the exception of Nos. 3

21 and 9; and Exhibits 24 and 25, were hereby received into

22 evidence, as of this date.)

23         MS. PATEL:  If I may approach, Your Honor?

24         THE COURT:  Yes.

25         Thank you.

1          MS. PATEL:  And, Your Honor, my co-counsel will handle

2    that -- will handle it since we -- this was a late objection

3    and he prepared with respect to this; I prepared with respect

4    to argument.

5          THE COURT:  Okay.

6          Yes, sir.

7          MR. CLEMENTE:  I believe there's a hearsay objection

8    regarding this.

9          MR. MORRIS:  Relevance and hearsay, Your Honor.

10         THE COURT:  Okay.

11         MR. CLEMENTE:  Your Honor, I'll address hearsay first.

12   Federal Rule of Evidence 807 is a residual exception to the

13   hearsay rule; provides that a hearsay statement is admissible

14   if the statement is supported by sufficient guarantees of

15   trustworthiness, after considering the totality of the

16   circumstances under which it was made and evidence, if any,

17   corroborating the statement, and (2) it is more probative on

18   the point for which it is offered, than any other evidence that

19   the proponent can obtain through reasonable efforts.

20         This is an email exchange between counsel for Acis and

21   the courtroom deputy for Judge Jernigan, just requesting and

22   ask -- inquiring about the court's availability.  Everything

23   about that email supports the fact that it is -- that it is

24   authentic and that there's no question about whether or not it

25   is -- it's trustworthy.  How would we put on evidence of

1  whether or not Judge Jernigan in the Northern District of Texas

2  has sufficient time to hear these numerous motions that are

3  set, other than by providing something like this?  I mean, we

4  can't call or depose the courtroom deputy or the judge.  So

5  based upon that, also -- there also is an exception, under the

6  hearsay rule, to a public record.  I think this also falls

7  within that exception to the rule.  So for that reason, we

8  don't believe the hearsay objection is proper.

9          As far as relevance, it goes to the argument about

10 transfer and whether or not the transferee court can

11 expeditiously hear the matter.  And that's one of the elements

12 and one of the core questions about judicial efficiency.

13         So for those reasons, we believe that the objections

14 are not well-founded and we offer this exhibit.  And it's

15 Exhibit 26.

16         THE COURT:  Reply?

17         MR. MORRIS:  Briefly, Your Honor.

18         THE COURT:  Yes.

19         MR. MORRIS:  I'm not aware of any case where a court

20 has ever considered, let alone decided, a venue motion on the

21 availability of another court's time.  So I don't think it's

22 relevant at all.  I do think it's an out-of-court statement

23 being offered for the truth of the matter asserted, and I do

24 believe it's hearsay.

25         MR. CLEMENTE:  It most certainly is hearsay, Judge;

1   just to respond.  But the question is not whether it's hearsay

2   but whether it's admissible.  And of course the Court is well

3   aware that hearsay can be admissible, and one of the exceptions

4   is the exception that I outlined.

5           THE COURT:  All right, I'll overrule the objection and

6   admit the document.  It is hearsay but it clearly meets the

7   reliability aspects for the exception to hearsay.  With regard

8   to the relevance, I think its relevance is very -- well, let me

9   put it this way; I think it's tangentially relevant.  I mean,

10  it certainly is relevant whether the Northern District of Texas

11  has the ability to handle the case were it transferred there.

12  To me that's -- I don't even think that's disputed, I mean,

13  it's obvious, it's a fantastic bankruptcy court.  They're more

14  than capable of handling it.  So I -- it's probably

15  duplicative, if nothing else.

16          Also, it's very carefully written so that you don't

17  actually identify what case you're talking about.  So whether

18  the courtroom deputy realized what you were saying or not

19  saying with regard to this specific motion is obviously

20  unclear.  But I will allow it for very limited purposes.

21          (Email exchange between Acis' counsel and Hon. Jernigan's

22  courtroom deputy was hereby received into evidence as Acis'

23  Exhibit 26, for the stated limited purposes, as of this date.)

24          MR. CLEMENTE:  Thank you, Your Honor.

25          THE COURT:  Any other evidence?

1          I'm going to -- all right, last chance.  I'm going to
2   close the evidentiary record.

3          All right, the evidentiary record's closed.  Let's
4   take a short recess; then I'll hear argument.  We will start
5   with the movants and their supporters, and then we'll turn it
6   over to the debtor.  Okay?  We'll take a short recess.

7          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8       (Recess at 10:48 a.m. until 11:05 a.m.)

9          THE COURT:  Be seated.  Sorry about the delay.  We had
10  some computer difficulties.  But they're all ironed out.

11         You may proceed.

12         MR. CLEMENTE:  Thank you, Your Honor.  Again, Matthew
13  Clements from Sidley Austin, on behalf of the committee.

14         Your Honor, to begin, everything we rely on in our
15  venue argument is uncontested and uncontroverted and is in the
16  record that either the debtor's exhibits or the Asic's (sic)
17  exhibits or the record of this case, or published opinions of
18  the Dallas bankruptcy court, and which Your Honor can take
19  judicial notice of -- we believe that that record more than
20  amply carries our evidentiary burden with respect to the venue
21  motion.

22         With respect to the Sharp proffer, Your Honor, it
23  attempted to create the appearance of a debtor with operations
24  in far-flung jurisdictions, employees at nondebtor entities
25  that may be located in places other than Dallas, offices that

1   may be in New York that aren't actually debtor offices.  And

2   the testimony of Mr. Waterhouse rebutted that and made clear

3   that the debtor has no employees other than in Dallas and that

4   Mr. Dondero makes all of the decisions, and he is in Dallas.

5   The nerve center of this debtor is in Dallas.  And we wanted to

6   make that clear, Your Honor, after the proffer, the rebuttal,

7   and the evidentiary record.  We believe that the evidentiary

8   record is largely uncontroverted with respect to the arguments

9   that we're going to be made (sic) in our venue motion, and that

10  Mr. Sharp's testimony has been effectively rebutted.

11          With that, Your Honor, we believe that this case is

12  atypical and presents a set of unique facts which we believe

13  are uncontroverted, that warrant transfer of venue to the

14  Dallas bankruptcy court.  And frankly, Your Honor, it does beg

15  the question as to why the debtor chose not to file in Dallas,

16  what we believe the most logical venue is, in the first

17  instance.  Let's talk about some of these unique facts here;

18  then we'll move into some of the arguments we made in our

19  motion, and then we'll talk about some of the things that the

20  debtor made (sic) in its reply.

21          First and perhaps most importantly, which is obvious

22  from the nature of this proceeding, not a single creditor or

23  party-in-interest has filed papers supporting the debtor's

24  venue in Delaware, other than, obviously, the debtor.  The

25  official committee has unanimously supported venue transfer to

1   Dallas, Texas.  Acis, in its own capacity as creditor, has
2   joined the transfer request.  It's not surprising to us, Your
3   Honor, that no creditor has affirmatively come out in favor of
4   venue in Delaware, because the debtor is in Dallas and, in
5   fact, that is where its nerve center is.

6           Your Honor, we do believe that it's particularly
7   significant because in this case, although schedules and
8   statements have not yet been filed, the creditors' committee
9   makes up the vast majority of creditors in this case, in terms
10  of absolute dollar amounts.  There may be multiple creditors in
11  number, but the vast majority of dollar amount of creditors are
12  represented by the official committee of unsecured creditor
13  (sic).

14          There was reference to Jefferies.  They're owed thirty
15  million dollars.  There was reference to Frontier Bank.
16  They're owed five million dollars.  A single claim of one
17  committee member dwarfs that by multiples, Your Honor.  So we
18  believe the fact that no other creditor supports venue in
19  Delaware is a very significant fact, Your Honor, and is not
20  controverted.

21          Second, Your Honor, until a few months ago, the Acis
22  case, which is pending in the Dallas bankruptcy court, was an
23  affiliated case.  And again, this can be gleaned from the
24  published decisions and the record that's been put into
25  evidence.  Had this case been filed prior to confirmation of

1   the Acis plan, under Rule 1014 the Dallas bankruptcy court

2   would be the appropriate court to determine venue.  And

3   although I would never suppose to predetermine how a judge

4   would rule, I think there would have been a high probability

5   that the Dallas court would have taken venue over the debtor's

6   case.

7         This is important, Your Honor, because the third point

8   I'd like to make is that Highland and the debtor, and as we

9   have described in our papers and related attachments, and as

10   Mr. Sharp referred to in his proper -- in his proffer, has

11   itself filed an appeal, seeking to overturn the confirmed Acis

12   plan of reorganization and return the equity that was

13   distributed to Mr. Terry under that confirmed plan, to an

14   entity called Nutro (ph.).

15         Second on Nutro, Your Honor.  Nutro's wholly owned by

16   Mr. Dondero and, therefore, if Acis were returned underneath

17   Nutro, it would become an affiliate of this debtor, and Acis

18   would once again be subject to, as an initial matter, a

19   venue -- excuse me, this debtor would be subject to, as an

20   initial matter, a venue determination by the Dallas bankruptcy

21   court.  If we have a successful appeal, we would have

22   affiliated cases with dueling jurisdictions, Your Honor, and

23   the Dallas bankruptcy court, as I mentioned, would determine

24   venue.

25         On that, Your Honor, the debtor must believe -- it's

1   not just me speculating.  The debtor must believe that there is

2   a material possibility of this occurrence, as it has been

3   seeking to employ counsel -- and you'll hear about that

4   shortly -- and expend estate resources on behalf of Nutro, a

5   nondebtor affiliate, in an attempt to have the Acis

6   confirmation order overturned, with, again, the result being

7   Acis would, again, be a debtor affiliate.  Therefore, the

8   debtor cannot argue that such possibility does not materially

9   impact the venue decision or is remote, in particular where

10  they're trying to convince the committee and this Court to use

11  estate resources to achieve that very outcome.  The debtor's

12  effectively arguing for a ruling on appeal, but the debtor is

13  an affiliate of Acis, in which case the current Chapter 11

14  proceeding should be in Dallas, Texas.

15          Fourth, Your Honor --

16          THE COURT:  Well --

17          MR. CLEMENTE:  Yes, Your Honor.

18          THE COURT:  -- let me interrupt you for a moment,

19  because that hasn't happened.  As we sit here today --

20          MR. CLEMENTE:  That's correct, Your Honor.

21          THE COURT:  -- they're not affiliates.  There seems to

22  be an assumption that, were this case to be transferred to the

23  Northern District of Texas, it would be assigned to -- sorry,

24  I'm losing my notes --

25          MR. CLEMENTE:  Judge Jernigan, Your Honor.

1          THE COURT:  Jernigan, yes.  Thank you.  Sorry.  I know
2    Judge Jernigan fairly well.

3          But if they're not affiliates, isn't the case subject
4    to random assignment under the normal procedures in the
5    Northern District of Texas?  And if it's not assigned to Judge
6    Jernigan, don't your arguments about judicial knowledge and
7    experience in connection with this case fall away because
8    nobody other than Judge Jernigan has that special knowledge in
9    Texas?  And all -- what other colleagues would be able to do
10   there is simply walk down the hall and talk to her.  And of
11   course, I can pick up the phone and talk to her any time, as
12   well.

13         So I'm just teasing out this assumption that
14   definitely feels to be behind everybody's arguments, that she's
15   going to get this case.  Is there anything in the record that
16   would support that?  Is there some sort of rule I'm not aware
17   of in Texas or that I'm -- am I assuming something that's not
18   consistent with practice down there, which is that this case
19   would be randomly assigned?

20         MR. CLEMENTE:  Your Honor, I believe you are correct
21   in the sense that the case would be randomly assigned, but I
22   believe Your Honor could look at -- as I understand, there are
23   three judges located in the Dallas court district; one is
24   obviously Judge Houser.  I could be getting the name wrong.
25   But she's overseeing the Puerto Rican proceeding --

1              THE COURT:  Um-hum.

2              MR. CLEMENTE:  -- so her docket is clearly beyond --

3              THE COURT:  She's also --

4              MR. CLEMENTE:  -- full.

5              THE COURT:  -- about to retire, so I don't even know

6      if she's taking new cases.

7              MR. CLEMENTE:  Correct.  So that leaves two judges,

8      Your Honor.  And we understand -- perhaps Acis' counsel would

9      be able to expand on that, given their familiarity with the

10     Dallas bankruptcy court, but that judge is not being assigned

11     new cases, given a circumstance with that particular judge.

12             But to answer your direct question, Your Honor, I

13     believe you are correct; it would be a random assignment.  But

14     we do believe that there is a high probability it would wind up

15     with Judge Jernigan.

16             THE COURT:  But it might be a pool of one; right?

17             MR. CLEMENTE:  That is correct, Your Honor.  And even

18     if it wasn't, I think, clearly, for all the reasons we'll

19     discuss, we would have a very strong case to make that it

20     should be transferred to Judge Jernigan, even if it initially

21     got somebody else on the --

22             THE COURT:  Well, you know, I mean, if a judge were a

23     lawyer, a judge couldn't have both these cases.  A judge (sic)

24     couldn't have a case with two warring former affiliates,

25     because it would create a conflict of interest.  Now, those

1   rules don't apply to judges.  We're assumed to be above all

2   that.  But -- since we don't have clients.  But it does -- it

3   might inform someone's decision about do I really feel

4   comfortable having Acis and Highland, given the situation -- I

5   mean, they wouldn't be jointly administered, certainly, of

6   course.  They're --

7           MR. CLEMENTE:  That's correct, Your Honor.

8           THE COURT:  Again, they're not affiliates, at least as

9   we stand here today; although the debtors are trying to change

10  that, purportedly.  It might create a situation where a judge

11  might take that into consideration in deciding whether to have

12  the case or not.  And I --

13          Now, we deal all the time with jointly administered

14  affiliated cases, right, because there's always intercompany

15  debt --

16          MR. CLEMENTE:  That's correct.

17          THE COURT:  -- and we all just assume it away (ph.).

18          MR. CLEMENTE:  That's correct, Your Honor.

19          THE COURT:  But this is a little different in that

20  they're not affiliates.

21          MR. CLEMENTE:  I do think, Your --

22          THE COURT:  Again, she would -- the judge wouldn't be

23  required -- Judge Jernigan wouldn't be required -- it's not a

24  recusal issue.  It's not a disqualification issue.  It's just

25  a -- sort of something to think about in making the decision.

1        MR. CLEMENTE:  I don't disagree, Your Honor.  I do

2   think Your Honor hit on it, though.  Bankruptcy judges are

3   unique in that perspective that they're put in situations all

4   the time where a decision may impact one particular entity to

5   the detriment of another entity that's also before Your Honor

6   in connection with a particular bankruptcy proceeding.

7        THE COURT:  Yeah.

8        MR. CLEMENTE:  With that, Your Honor, I'll continue to

9   move forward.

10       THE COURT:  Yeah, please.

11       MR. CLEMENTE:  Fourth, and this gets back to the point

12  we were just discussing with Your Honor, we do not believe

13  there's any credible dispute that the Dallas court has already

14  upped the learning curve relative to this Court.  Again, not

15  that Your Honor wouldn't be able to come up to speed and that

16  Your Honor has tremendous capacity to do that, but the record

17  is clear, from our perspective, that the Dallas bankruptcy

18  court has already had to wrestle with issues involving the

19  debtor.  There has been extensive proceeding (sic) in the

20  Dallas bankruptcy court, not just the bankruptcy court but also

21  the district court, with respect to the Acis case.

22       There are several written opinions, again, that Your

23  Honor can take judicial notice of and which are also in the

24  record, that provide, after an extensive and developed factual

25  record, that Acis only operated through Debtor Highland -- the

1  debtor, Highland.  It is clear that the Dallas court had to

2  develop an understanding of how the debtor's complex business

3  worked.  It is the same business as the debtor engages in here,

4  albeit a subset.

5       That's consistent with Mr. Sharp's testimony.  Mr.

6  Sharp didn't say that they no longer are in the CLO business.

7  He characterized it in a certain fashion, but the debtor

8  clearly still manages and advises CLOs.  That is a part of the

9  debtor's business.  That is what was at issue in the Acis

10  proceeding. And also, as Mr. Waterhouse testified to quite

11  clearly in the rebuttal, and as Mr. Sharp testified to in the

12  cross, it's the same principal actors:  Mr. Dondero and others

13  on his management team.

14       Your Honor, this case, although the idea is to get a

15  fresh start, we believe will necessary require a backward-

16  looking review of the facts.  And the Dallas court has upped

17  the learning curve from that perspective.  The committee

18  recognizes that the Dallas court would take time and determine

19  issues as presented to it.  And depending on the issue, the

20  past experience of the court will have varying degrees of

21  relevance.  But that experience is nonetheless important to the

22  committee to ensure maximum efficiency, with an entity that has

23  demonstrated itself to be highly litigious, Your Honor.  One

24  needs only to review the top-twenty list of creditors, made up

25  largely of law firms and other professionals, to make the

1  determination that the debtor is highly litigious, as well as

2  the record in this proceeding.

3        So Your Honor, those four facts, we believe, are

4  unique, and we believe that they strike in favor of

5  transferring venue to Dallas.  I do want to walk through some

6  of the arguments we made in our papers, as well, but I wanted

7  to highlight what we believe are truly distinguishing features

8  of this particular situation.

9        Your Honor, as we more fully lay out in our papers, we

10  do believe the convenience of the parties supports transfer of

11  venue.  The debtor's nerve center is in Dallas; Mr. Waterhouse

12  was clear on that.  Mr. Dondero is the portfolio manager for

13  all of the Highland funds, and he is the one-hundred-percent

14  owner of Strand.  Strand's the general partner of this debtor.

15  All decisions run through Mr. Dondero.  And it's clear that Mr.

16  Dondero and all of the other key personnel are located in

17  Dallas.

18        Your Honor, a large number of creditors are located in

19  Dallas; you need not look past the list of twenty largest

20  unsecured creditors to determine that.  There are almost a

21  majority of those creditors that are located in Texas.  While

22  the committee agrees that the overall organization with several

23  thousand affiliates is complex -- and you'll hear about that as

24  we go on this afternoon -- there's 2,000 affiliated entities

25  with Highland -- the debtor is only Highland.  And so the idea

1  that there may be offices in far-flung jurisdictions, those are

2  not debtor offices.

3          Your Honor, the interests of justice also support the

4  transfer of venue.  The Dallas bankruptcy court has clearly

5  invested time and resources that are applicable to this debtor.

6  In this context, the learning curve that is referred to in the

7  cases clearly favors transfer of venue to Dallas.  Although

8  this case has been pending for a while, Your Honor, there's

9  only been a first-day hearing with very limited relief granted,

10  and one brief status conference.

11          There are also economic efficiencies in Dallas.

12  Dallas is convenient for all debtor employees.  Yes, people can

13  get on planes, but it's hard to argue that being a mile-and-a-

14  half away from the courthouse isn't more convenient.

15          THE COURT:  I don't know.  Parking's tough.

16          MR. CLEMENTE:  And perhaps an overnight trip is

17  helpful for the family life, Your Honor.  It depends.

18          Dallas is convenient for the professionals.  It's easy

19  to fly in and out of Dallas, as we point out in our papers,

20  Your Honor.  There's no real, I believe, disagreement that

21  Dallas would not be convenient.

22          Additionally, Your Honor, and we think that this is a

23  unique factor as well, if the long history of Highland's

24  litigious nature is any indicator here, there will be discovery

25  disputes.  And under Rule 45, contested nonparty discovery

1  would likely occur in the Northern District in Texas, in

2  Dallas.  Given the massive number of nondebtor affiliates --

3  again, we only have 1 box here; there's, like, 2,000 others.

4  It is highly likely that nonparty discovery will become an

5  issue.

6          The fact that -- I heard Mr. Sharp testify in his

7  proffer that he believes he and Mr. Caruso will provide all of

8  the testimony.  That's great and good and well for him to think

9  that.  I think the committee's going to take a different view

10  of that, Your Honor.

11          Our own limited history in this case shows the

12  relevance of Dallas.  Two of the three depositions occurred in

13  Dallas.  I believe we informed Your Honor of that on the status

14  call that we had.  And the third didn't, only because we

15  believe Mr. Sharp was not able to travel to Dallas.

16          The justice that the debtor seeks in the Acis case,

17  Your Honor, yields a result that this places -- excuse me, Your

18  Honor.  The justice that we talked about in the appeal with

19  respect to the Acis confirmation order yields a result that

20  places this debtor in the Dallas bankruptcy court, which is

21  also in the interest of justice.

22          So, Your Honor, we believe there are several unique

23  factors.  We believe that the traditional factors, as we lay

24  out in our papers, support the transfer of venue.  And I wanted

25  to just briefly touch on some of the objections that the debtor

1  raised to our venue motion.  First, the debtor thinks too

2  little of the Dallas court, in asserting that we're trying to

3  gain some type -- the committee is trying to gain some type of

4  litigation advantage.  We have no doubt, as Your Honor has

5  tremendous respect for the Dallas court, that the Dallas court

6  will take each issue as it comes to it, without prejudice or

7  predetermination.  History and experience doesn't mean

8  prejudice or predetermination; it just means familiarity, Your

9  Honor.  That's all it means.

10          Our point is simply that the Dallas court clearly had

11  to spend time wrestling with the debtor, how it operated, and

12  its opaque structure.  And let me spend a second on how.  As we

13  point out in our reply and, again, as the record is clear based

14  on the published opinions, Acis had no employees; it was a box.

15  And it subcontracted its management services to the debtor.

16  The Dallas court examined that contract, that subadvisory

17  agreement that Mr. Sharp and, I believe, Mr. Waterhouse

18  referred to, and had to become familiar with it.  That's clear

19  from the published opinions.  And the debtor has numerous other

20  similar contracts.

21          The Dallas court also made determinations -- and

22  these, again, are in published opinions -- whether certain of

23  the debtor's contracts with Acis were personal-services

24  contracts.  Again, they may differ, Your Honor, in terms of the

25  specifics, but these are clear examples of where the Dallas

1  bankruptcy court had to wrestle with contracts of Highland, the

2  way Highland operated, and the way that it was managed.

3          Additionally, Your Honor, on the point of litigation

4  advantage, as I thought about this, I think the debtor's, sort

5  of, arguments regarding a litigation advantage, frankly, worked

6  the other way.  If I may, here, for a second, Your Honor.  Mr.

7  Dondero is the sole controlling party, as the testimonies made

8  clear.  He's based in Dallas.  As we demonstrated in our

9  papers, Dallas is clearly the most efficient and convenient

10  forum for the creditors.  And the creditors have sent this

11  message loud and clear through this motion to transfer and the

12  lack of any party affirmatively supporting the debtor and venue

13  in Delaware.

14          Mr. Dondero, in our view, as he has shown in the past,

15  consistently makes decisions that are in his best interest,

16  potentially fleeing from a jurisdiction and not his creditors.

17  And we believe that fleeing from the Dallas court, that is,

18  steps away from his office -- and that is convenient for his

19  creditors and, frankly, seems to be the most logical choice of

20  venue -- again, understanding -- we don't dispute that the

21  debtor is a Delaware limited partnership.  We're not disputing

22  that.  But we're talking about what's logical.  That's the

23  point that I would like to make here, Your Honor.

24          Again, back to --

25          THE COURT:  Well, I mean --

1        MR. CLEMENTE:  Yes, Your Honor.

2        THE COURT:  -- I mean, a cynic -- and after almost

3  fourteen years, maybe I'm becoming one; I don't know.  But a

4  cynic would say -- and not necessarily badly (ph.), that both

5  sides want -- are interested in forum-shopping; the debtor

6  fleeing, obviously, adverse rulings in Texas, and the creditors

7  fleeing Delaware to go back to the home of adverse rulings

8  against the debtor in Texas.  And it's six one, half dozen the

9  other.  However, at least the cases -- or some of the cases say

10 that the debtor is entitled to some deference in its forum-

11 shopping, as opposed to the creditor, in their opposition, in

12 their forum-shopping.  I'm not sure I buy that.  And as a

13 matter of fact, I've ruled previously that there is no

14 deference --

15       MR. CLEMENTE:  Correct.

16       THE COURT:  -- that should be afforded to the debtor,

17 in the EFH case.  But --

18       MR. CLEMENTE:  That's correct, Your Honor.

19       THE COURT:  -- I just throw that out there.

20       MR. CLEMENTE:  And I believe Your Honor also made a

21 point, in the EFH ruling, regarding the support of the various

22 parties for the venue.  And so I believe that is actually a

23 very strong factor that weighs in favor of transfer to --

24       THE COURT:  Well, and -- yeah, I mean --

25       MR. CLEMENTE:  -- Dallas.

1          THE COURT:  -- and that case had -- the government of

2    Texas or the committee, or both, supported venue.  That case

3    probably, thankfully, would have been sent to Texas, freed up

4    five years of my life, and twenty appeals and --

5          MR. CLEMENTE:  You're stronger for it, though --

6          THE COURT:  -- everything else.

7          MR. CLEMENTE:  -- Your Honor.

8          THE COURT:  Yeah -- I don't know about that.  I'm

9    heavier, that's for sure.

10         MR. CLEMENTE:  I wish I could blame that for my

11   weight, Your Honor, but I can't.

12         Your Honor, back -- very briefly, because we did touch

13   on it already.  We do believe that the Dallas court experience

14   is highly relevant, contrary to what the debtor remarks in

15   their objection.  The debtor again tries to cast the Acis

16   bankruptcy as being narrow and only involving CLOs.  Again, the

17   testimony, I believe, showed, in -- shows, in point of fact,

18   the debtor does manage a significant number of CLOs.  Even if

19   they are in liquidation, there are still decisions that are

20   being made.  And therefore, exposure to how the debtor operated

21   with respect to CLOs is highly relevant.

22         Your Honor, I already mentioned, so I won't repeat

23   myself, that Acis was a box and it had no employees, and

24   therefore, obviously, the court had to look through to what was

25   going on at Highland in terms of how the debtor was managed.

1          Your Honor, the CRO, unfortunately, I believe, for the

2     debtor, does not cleanse the venue choice.  The CRO was not

3     around.  The CRO didn't decide venue.  And as clear from the

4     testimony, the CRO reports to Mr. Dondero.  Nothing has

5     changed.  There has been no management changes.  I believe that

6     was also consistent with the testimony.  And everybody still

7     reports to Mr. Dondero, and he's located in Dallas, and Dallas

8     is the nerve center.

9          Additionally, as I mentioned, the cases will be very

10    much about the past, unfortunately, Your Honor, a time when the

11    CRO was not involved, and about transactions and conduct

12    engaged in by the debtor and Mr. Dondero in the run-up to this

13    bankruptcy.

14         In short, I believe the CRO issue is a red herring,

15    Your Honor; it doesn't erase the history the Dallas bankruptcy

16    court has with the debtor through the Acis proceeding, and it

17    doesn't erase the history of the decision-making process that

18    the debtor engaged in, in the past and currently engages in

19    today.

20         With that, Your Honor -- we already had a colloquy

21    about how we do not believe the Dallas bankruptcy court is

22    conflicted, so I won't spend any further time on that.  But I

23    would like to sum up.  Your Honor, let me be very clear.  We

24    have the utmost respect for you and for this Court, so I want

25    to make sure that Your Honor is very clear on that.  However,

1  the committee respectfully believes that this case presents the

2  unique combination of facts which dictate that the transfer of

3  venue to the Dallas bankruptcy court is appropriate.

4          THE COURT:  You don't need to worry.  My ego assumes

5  you have respect for me.

6      (Laughter)

7          MR. CLEMENTE:  Thank you for that, Your Honor.  Unless

8  Your Honor has any questions, I'll sit.

9          THE COURT:  I do not.  There may be others in support

10  who want to be heard.

11          Mr. Pomerantz (sic).

12          MR. LUCIAN:  Your Honor, for the record, John Lucian

13  of Blank Rome, local counsel for Acis.

14          Just during the break, we had a binder made for Your

15  Honor so that the exhibits that Ms. Patel had handed up that

16  were admitted -- I know Mr. Morris has no objection to us

17  handing that up, Your Honor.  It's the -- 1 through 26, with

18  the ones that were not admitted.  This will save you from --

19          THE COURT:  Is that these?

20          MR. LUCIAN:  Yeah.  That's the -- you got them in the

21  binder now.

22          THE COURT:  Okay.  Is this in there --

23          MR. LUCIAN:  Yeah.

24          THE COURT:  -- the email?

25          MR. LUCIAN:  Yes; 26, yes.  If you want to switch to

1  that.  Perfect.

2          MS. PATEL:  Thank you, Your Honor.  For the record,

3  Rakhee Patel on behalf of Acis Capital Management, L.P., who

4  joined in the committee's motion.  And I will make reference to

5  those -- certain of those documents.  I'm generally loathe to

6  hand up big binders or big stacks of documents without telling

7  the Court of what's been handed up.  So, very briefly, Your

8  Honor, I will say, Exhibits 1 and 2 (sic) in the binder are the

9  involun -- the issue -- I'm sorry, the opinion issued by the

10 Dallas bankruptcy court, in connection with the involuntary

11 trial, and Exhibit number 2 is the opinion that was issued in

12 connection with confirmation of Acis' plan.  I would also point

13 the Court to Exhibit Number 17, which is the actual

14 confirmation order in Acis Capital Management.  And I'll make

15 reference to one other exhibit as I go through my presen -- or

16 a number of other exhibits, but -- one additional ruling by the

17 court, as I go through my presentation.

18          THE COURT:  What was the date of -- oh, okay.  Never

19 mind.  So the confirmation was late January?

20          MS. PATEL:  Yes, Your Honor.  January 31st, 2019.  And

21 the plan went effective on February 15th of 2019.

22          THE COURT:  Okay.

23          MS. PATEL:  And the Highland bankruptcy, I believe,

24 was just a little bit over eight months later.

25          And, Your Honor, I'll try not to duplicate necessarily

1  what the committee did, and I will promise to keep this as

2  brief as I can.  I'm happy to answer any questions, because

3  standing here before you is the counsel -- at least the

4  bankruptcy counsel that lived and breathed the Acis case from

5  the date that they were filed on January 30th of 2018, through

6  today.

7        Now, Your Honor -- and along with my co-counsel, Mr.

8  Shaw, who has been living and breathing, frankly, the issues

9  longer than I have, even.

10       Your Honor, I will repeat something that was in our

11  moving papers.  And I know Your Honor and Your Honor's team has

12  probably read all the moving papers. but I think this bears

13  repeating, and that is that this case is unique.  It is, in my

14  mind, exceptionally unique.  These facts are so unique, Your

15  Honor, that I would venture to say I don't think that this is

16  necessarily a case that would even possibly or remotely or even

17  tangentially open any floodgates, because these facts are so

18  different from the typical motion to transfer venue.

19       Your Honor, touching quickly on the burden-of-proof

20  issue that Your Honor referenced in your colloquy with Mr.

21  Clemente.  Your Honor, Acis concedes, obviously, the burden of

22  proof is clear that it's the preponderance of the evidence.

23  And I won't go through ad nauseum all of the factors.  I know

24  the Court is exceptionally familiar with all the factors on

25  both the convenience-of-the-parties and interest-of-justice

1  side.  But I would just note that, at least in the Court's
2  prior rulings, you've said that the factors are not really a
3  scorecard, that we're not counting three factors versus three
4  factors, or four versus two.
5              And I would just --
6              THE COURT:  Well, that follows with my fundamental
7  tenet, which is that any legal test with more than three
8  factors is useless.  It's just a -- it's just a question of
9  discussion.
10             MS. PATEL:  I think -- and I think this Court has wide
11 discretion with whether to transfer this case or not.
12             Your Honor, one final quick point that I'll call
13 the -- kind of the four corners or setting the table, for
14 purposes of go-forward, is back to the reference to the -- that
15 there's no real deference, necessarily, to the debtor's choice
16 of venue.  That's sort of subsumed in the burden of proof.  The
17 movant bears a burden of proof and, if they meet the
18 preponderance of the evidence, then the burden shifts.  And
19 that's really kind of where the debtor's choice of forum weighs
20 in.
21             Now, Your Honor, one other quick point is that there's
22 been a lot of discussion in the objections and the responses
23 and the replies, indicating that this whole issue is about Acis
24 as a creditor.  And what I'm here to say, Your Honor, is that
25 this, actually, the issue, the motion to transfer venue, is not

1    really about Acis as a creditor.  And I'm here representing
2    Acis as a creditor.  This has been painted as there's one
3    creditor that's driving this, and that's Acis.  That's just
4    simply not the case, Your Honor.

5         The reality is that you've got hundreds of millions of
6    dollars or claims represented by the committee, as a fiduciary
7    to those claims, that have made this motion.  This is not Acis'
8    motion.  Yes, we did join with respect to it.  And really, it
9    has -- that has more to do with the fact that we're the Texas
10   folks, we're the Texas creditor.  And we -- again, I and Mr.
11   Shaw lived and breathed the Texas cases.  And I'm here to stand
12   before the Court and answer any questions you may have with
13   respect to what happened, what transpired, but, more
14   importantly, what could happen on a go-forward basis.

15        Your Honor, it's important -- and I -- again, harking
16   back to this concept of this is unique.  As Your Honor noted in
17   EFH, had the committee signed on, had the Texas comptroller
18   signed on, perhaps that outcome would have been a little bit
19   different.  But here, Your Honor, we've got the committee
20   moving for transfer of venue.  And I think that's really
21   significant.  And I'll go through in a little bit sort of the
22   debt stack that we're dealing with here, and you'll see that,
23   hands down, the committee is the fulcrum debt here.  It is the
24   fulcrum debt, Your Honor.

25        Your Honor, one final quick note on forum-shopping.

1  And there's been conversation with respect to the committee's

2  forum-shopping, the debtor's relationship.  Look, I've read

3  Your Honor's prior opinions and I really do think the issue

4  boils down to -- I think it's probably neutral with respect to

5  both sides.  As Your Honor pointed out, the debtor has the

6  ability to choose the state of its incorporation as its venue

7  for filing of bankruptcy.  And also, the committee has the

8  ability to move, to transfer, pursuant to 1412, to a place that

9  is the interest of justice and the convenience of the parties.

10  I really view that as being the -- there should be no negatives

11  cast on, frankly, either side, with respect to forum-shopping,

12  because it's kind of invited by the structure of the statute.

13          So if the case isn't about Acis as a creditor, what is

14  this case about?  Well, I -- or what is this motion about?

15  Here I really do think that -- at its heart, that this

16  particular motion to transfer, and probably motions to transfer

17  in general, boil down to the bankruptcy case itself.  So here

18  that would be -- this is all about Highland's bankruptcy and

19  where it should be administered, what makes sense.

20          And, Your Honor, I want to go through a couple of

21  different subtopics on this.  First I want to talk about the

22  business lines that the debtor engages in.  What does it do?

23  And this is all from the -- what I'm going to refer the Court

24  to is all included in the first-day declaration of Mr.

25  Waterhouse, which is Debtor's Exhibit O.

1          And, Your Honor, in Mr. Waterhouse's declaration, he

2    goes through the three kind of general lines of the debtor's

3    business.  First is proprietary trading.  And that involves

4    sort of trading with the debtor's money or leveraged money in

5    certain brokerage accounts.  And I really think that

6    proprietary trading is probably that line of business -- when

7    we're thinking about which court is best suited to oversee that

8    line of business and what's going to happen with respect to it,

9    I think that's really neutral.  I think both Delaware and

10   Dallas could adequately handle that issue.

11         The issue really becomes a lot more focused, though,

12   when we look at the other two lines of business.  The next line

13   of business is investment management services.  And this is --

14   and a big piece of that is the debtor's operation of its CLOs

15   or collateralized loan obligations.

16         If the 2018 financials -- again, I believe they're

17   contained in debtor's exhibits -- if you take a look at those

18   you'll see that as a part of investment management fee revenue,

19   a lot of the revenue that was generated is related to the

20   debtor's operation of eighteen CLOs along with some managed

21   separate accounts, et cetera.

22         Your Honor, the CLO piece and the separate accounts

23   are issues that the Dallas court was faced with through Acis'

24   bankruptcy and Highland's management of it.  And I'll borrow

25   from Mr. Clemente his phrase:  Acis was effectively a box.  It

1    had no employees of its own.  It only had two officers, Mr.

2    Dondero and Mr. Waterhouse, who was the treasurer of Acis,

3    until their resignation shortly after the appointment of --

4    shortly after the involuntary filings and the appointment of a

5    trustee.

6           Now, Your Honor, the other -- the last piece that's

7    also involved is shared services.  So we've got investment

8    management, and there's subpieces of it.  And I won't represent

9    to the Court that is Judge Jernigan familiar with every aspect

10   of Highland's investment management services?  No, likely not.

11   But neither is this Court.  This Court is still, very much so,

12   on the learning curve with respect to that.

13          And I would submit, Your Honor, that Judge Jernigan is

14   frankly just further along that learning curve with respect to

15   the investment management services.

16          On shared services, Your Honor, as Mr. Clemente

17   referenced, the opinions are very clear -- again, Exhibits 1

18   and 2 -- with respect to there is -- it's clear that Judge

19   Jernigan had to evaluate shared services.  And I'll kind of

20   summarize what the structure of what Judge Jernigan had to

21   evaluate was.  Again, Acis is a box.  It was provided its

22   services by Highland, pursuant to two key agreements:  a

23   subadvisory agreement and a shared-services agreement.  And

24   that shared-services agreement is relatively generic.  And all

25   that is is the subadvisory -- I like to think of it as that's

1   the thinking brain stuff.  That's the investment advisory.

2   Does this comply with SEC guidelines?  Should these trades be

3   made?  What does the marketplace look like?

4           Shared services, on the other hand, Your Honor, are

5   all that middle- and back-office typical type stuff.  There's

6   no real rocket science with respect to it.  It's just providing

7   infrastructure:  accounting, legal, bookkeeping functions, all

8   those things that any sort of generic business would provide.

9           And again, that is something that Judge Jernigan is

10  just more familiar with.  She is familiar with Highland's

11  business modus operandi.

12          And, Your Honor, if you look sort of across the

13  Highland structure, you will see that Acis really was just a

14  little microcosm.  It's a little template, because it gets

15  repeated throughout the Highland empire.

16          And one of the exhibits -- and forgive me; I didn't

17  bring up the other exhibit list, but multiple parties have

18  designated it, and it's the entities list.  And there's 2,000

19  entities, approximately.  I didn't count them all up.  But

20  that's a number that's been thrown around:  2,000 entities

21  under this.  And they are all each little microcosms.

22  Certainly, Judge Jernigan is further along with respect to the

23  Acis microcosm, but also with respect to the template as well.

24          Your Honor, with respect to then, therefore, economy

25  or -- judicial economy or efficiency, again, Judge Jernigan,

1    further along the learning curve.

2            Your Honor, now turning then to the debt stack, as I

3    had referenced earlier -- again, this is all set forth in the

4    declaration of Mr. Waterhouse -- you've got two secured

5    lenders, Jefferies and Frontier.  And no one's heard with

6    respect to -- from them with respect to their position.  Your

7    Honor, these are two creditors that are vastly oversecured, and

8    so really they -- I'll put them as sort of neutral with respect

9    to what's going to happen in this bankruptcy case.

10            Then the next item in the debt stack that Mr.

11   Waterhouse identifies is Highland CLO Management.  Well, Your

12   Honor, it's a note that was transferred -- Highland is the

13   obligor on the note.  It's about nine-and-a-half million

14   dollars.  And it was a note that was previously held by Acis

15   and that was transferred to an entity by the name of Highland

16   CLO Management, by Mr. Dondero.

17            Highland CLO Management, in turn -- Mr. Waterhouse

18   references that there's sort of -- Highland doesn't have a

19   beneficial interest with respect to it.  But if you look at the

20   retention applications that are set for hearing a little bit

21   later today, you'll see that actually the debtors (sic) are

22   claiming there is an interest in this, that the debtor has an

23   interest in making sure that Highland CLO Management has a

24   defense when it comes to the issue of was that transfer from

25   Acis to Highland CLO Management a fraudulent transfer.

1          And again, these are issues that Judge Jernigan has

2     had to grapple with all throughout the bankruptcy case.  There

3     have been no -- there has been no adjudication that it was a

4     fraudulent transfer; but certainly she's had to evaluate it in

5     connection with four injunctions that were issued in connection

6     with the Acis case.

7          First there was a -- excuse me -- a sua sponte

8     injunction.  Second there came an ex parte injunction.  Third

9     there was a preliminary injunction.  And then fourth there was

10    a plan injunction.  And that plan injunction, Your Honor, is

11    embodied in Exhibit Number 17.  And again, all of these

12    transfers and transactions -- part of the debt stack of

13    Highland has been evaluated by Judge Jernigan.

14         Last in the debt stack, but certainly not least, Your

15    Honor, we have the general unsecureds.  And Mr. Waterhouse, in

16    his deposition that was held in Dallas, estimated that perhaps

17    the general unsecureds could be upwards of two billion dollars,

18    all told.

19         Now, just looking at the twenty largest, we're still

20    in the hundreds of millions, and we don't have the benefit of

21    schedules yet.  But this is -- this is the big dog.  This is

22    the big layer of debt.  This is who is really the fulcrum here.

23         And keep in mind, Your Honor, this is a free-fall

24    bankruptcy.  No one knows where this is going to go.  At the

25    first-day hearings, debtor's Counsel referenced that there

1  could be sales of assets and divestiture of certain things,

2  operational restructuring.  There's really no idea where this

3  case is headed.  And I think that's significant, Your Honor,

4  because this is an operational restructure or perhaps a

5  liquidation.

6          I hope not.  I hope that this is an operational

7  restructure and that all creditors can be paid either in full

8  or close to in full, but that's significant.  And the reason

9  why it's significant here is because, Your Honor, you've got

10  the fiduciary for that fulcrum debt voting with their feet with

11  what could happen -- what should happen on a plan.

12          And they're saying we think this case should be

13  administered in Texas.  And I think, again, going back to what

14  makes this case so unique, I think that's what makes it so

15  unique is that there are -- just from a dollar perspective and

16  volume perspective, the significant creditors and the committee

17  with respect to who's a fiduciary telling you, Judge, we think

18  this case should be administered in Texas.  And those votes are

19  going to be important with respect to any exit that happens

20  here.

21          Your Honor, I'll hit sort of on another factor, the

22  sort of forum's interest or a local interest in the

23  controversy.  And I concede, clearly -- and I think Your Honor

24  has referenced in the past -- Delaware, when it -- when an

25  entity is organized under Delaware law, that the forum state

1    has an interest in protecting its entities.  However, I will

2    say, I think what's different here is --

3              THE COURT:  Say that again?

4              MS. PATEL:  I'm sorry, Your Honor.  I probably

5    misstated that.  That the state of incorporation has an

6    interest in entities that are --

7              THE COURT:  Yeah, but --

8              MS. PATEL:  -- formed under its state's law.

9              THE COURT:  -- you're in the wrong court for that.

10   That's state court.  This is --

11             MS. PATEL:  I'm sorry?

12             THE COURT:  -- the --

13             MS. PATEL:  Oh, yeah.

14             THE COURT:  You're in the wrong court for that.  I

15   don't care about that.  This is --

16             MS. PATEL:  All right.

17             THE COURT:  -- this is federal court.

18             MS. PATEL:  Fair enough.  I'll take that one, then.

19             THE COURT:  This is federal court.  That's for the

20   chancery and the governor.

21             MS. PATEL:  Well, Your Honor, and going back just to

22   the issue of the unique factors here, usually, Your Honor, in a

23   motion to transfer venue, you have what I'll call relatively

24   similarly situated courts, certainly if you've got a transfer-

25   of-venue motion that was filed as early as the one that was

1   filed in this case, within the first few weeks of the case, and

2   within, I believe, two days of the committee's formation.

3         That's just not the scenario here, Your Honor.  You

4   have a bankruptcy court in Texas who is familiar with various

5   aspects of the debtor's business.  Is it familiar with every

6   aspect of the debtor's business?  No.  But that certainly can't

7   be said as to the Delaware Court either, that you are familiar

8   with every aspect of the debtor's business.

9         Your Honor, in Texas there's not only a bankruptcy

10   court, there's a district court who is familiar with all of

11   the -- with aspects of the debtor's business, and that is the

12   Honorable Judge Fitzwater.

13         And what I will say -- Your Honor was asking questions

14   with respect to the judge -- the bankruptcy judge that it would

15   be assigned to.  I'm happy to address those from my

16   perspective.  But what I will note is that every appeal that

17   stemmed out of the Acis bankruptcy case -- and there were in

18   excess of ten -- every single one was transferred ultimately to

19   Judge Fitzwater for adjudication.

20         So even if -- even if we look just one layer up from

21   the bankruptcy court to the district court, Judge Fitzwater is

22   intimately familiar.  And now we've got three -- in connection

23   with the Acis cases -- three appeals that are pending before

24   the Fifth Circuit, two of which involve Highland or a Highland-

25   related entity.

1          Your Honor, I want to quickly touch on the --

2          THE COURT:  Is it the practice in the -- it's the

3   practice in our district court that once a district judge is

4   assigned an appeal in connection with a bankruptcy, any further

5   appeals in that bankruptcy go to that district judge.  Is that

6   the practice in Texas?

7          MS. PATEL:  It's the practice, Your Honor.  I don't

8   believe that there's a specific local rule that says that that

9   will happen, but that's functionally what happens.  And

10  sometimes you have to make a motion to transfer between two

11  courts, but invariably, it usually goes to sort of either the

12  first-filed court or kind of the first court to really get into

13  a substantive issue.

14         THE COURT:  Okay.

15         MS. PATEL:  Your Honor, I'll touch on a couple more

16  quick points.  It is offensive to me when I read through the

17  debtor's pleadings and that there is an implication that the

18  Dallas court is somehow biased.  I think of Judge Jernigan and

19  I think of this Court and I think of virtually every bankruptcy

20  court that I've ever had the privilege of appearing before as

21  being fair and impartial.  And this concept of bias, that's

22  only grounded in the fact that the debtors have -- or I'm

23  sorry -- the debtor has lost a few.

24         And I will say, just to kind of forestall that easy

25  conclusion based on the opinions, I would note, in Acis'

 1  exhibits, if you look at Exhibit Number 12, that is -- it's an

 2  email that the court sent in connection with Acis' first

 3  confirmation hearing.  And that was a confirmation hearing that

 4  occurred in August of 2018.  And the court ultimately denied

 5  confirmation of the first sort of plan.  And there were kind of

 6  three sub-plans.  But the court denied it.

 7          And so again, I'm offended that there would be even an

 8  implication that the court is somehow biased, because this

 9  isn't a scenario where there have been only adverse rulings to

10  Highland in connection with the Acis bankruptcy case.  Judge

11  Jernigan has called the balls and strikes as she sees them,

12  Your Honor.

13          Your Honor, I'll conclude with the following, which is

14  that I would venture to guess that if this Court were in sort

15  of -- if we reversed the scenario and this Court had expended

16  hundreds of hours, hundreds of pages of opinions, untold hours

17  of its courtroom staff's time, going through and poring through

18  an exceptionally voluminous record, over 100,000 pages, and

19  having expended over forty days of courtroom time, with that

20  significant of an interest in the case and that expenditure of

21  time, I would venture to guess that this Court would want this

22  case transferred back to Delaware, if it had been filed

23  anywhere else.

24          And so I would submit to Your Honor that this Court

25  should -- this case should be transferred to Dallas for all of

1   the reasons proffered by the committee and as joined by Acis.
2   Thank you, Your Honor.
3           THE COURT:  You're welcome.
4           Anyone else in favor of the motion?
5           All right.  This time it will be short.  We're going
6   to take a very short recess, and then I'll hear from the
7   debtor.
8       (Recess at 11:50 a.m. until 12:00 p.m.)
9           THE CLERK:  All rise.
10          THE COURT:  Please be seated.  I apologize.  I know
11  it's getting warmer and warmer in here.  And we're trying to
12  contact -- we're trying to find someone in Maintenance who's
13  working today.
14          MR. POMERANTZ:  It's usually motivation to get the
15  hearings done quickly, in my experience.
16          THE COURT:  Yeah, it's -- if I take off my robe, don't
17  be offended.  I do have clothes on underneath.
18          MR. BOWDEN:  Thank you.
19          THE COURT:  I heard you, Mr. Bowden.
20          All right, go ahead.
21          MR. POMERANTZ:  Good afternoon, again, Your Honor.
22  Jeff Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the
23  debtors-in-possession (sic).  Before I go on to my prepared
24  remarks, I just want to address a couple of the points that
25  were raised by Mr. Clemente and Acis' Counsel.

1          First, we are not aware of any formal statement that

2   Judge Hale, in the Northern District of Texas, is not taking

3   cases.  So I think Your Honor's point was a good one.  There's

4   no definite -- there's no requirement, and it may or may not be

5   that this case gets transferred, if Your Honor were to transfer

6   it.

7          Second, Your Honor, Highland has -- there have been

8   appeals made not only from confirmation of the plan but also

9   from the involuntary itself.  If the involuntary appeal

10  succeeded, there wouldn't even be a bankruptcy case to be

11  related to.  And in any event, the case law says that events

12  that may or may not happen in the future are not really

13  relevant to the venue analysis.

14         Lastly, Your Honor, Mr. Clemente started by saying he

15  thinks the facts are largely in dispute, and you heard Counsel

16  then go through in detail, as did Acis' Counsel, about how

17  there's no dispute that Judge Jernigan has a learning curve.

18         Of course they need to say that because that is the

19  focus and the crux of their venue-transfer argument.  As I will

20  demonstrate in my comments and as the evidence is before the

21  Court, other than the opinions that were written and other than

22  the amount of time the court has spent, there is no real nexus

23  between what happened in that case and what happened in this

24  case.

25         We have no doubt that Judge Jernigan learned all about

1  Acis, learned all about Acis' relationship to Highland.  But

2  the real issue before Your Honor is what does that have to do

3  with this debtor, this debtor's assets and liabilities, and

4  this debtor's operations.  And as my comments will show, we

5  think that's a significantly overblown argument.

6         Your Honor, during their presentation, Counsel really

7  strayed a little bit from what the motion and the joinders sort

8  of said.  There they went through a painstaking analysis of the

9  various factors supporting venue.  I know Your Honor said that

10  over three factors, you don't find that helpful, but the courts

11  have relied on a series of factors.

12         And I think the reason why they have strayed away from

13  that and focused on the committee being the one to support the

14  transfer-of-venue motion and the facts of the Acis case is

15  because when you pare it down, the actual factors demonstrate

16  that there is no way the committee can carry its burden to

17  demonstrate that venue should be transferred.

18         However -- Your Honor pointed to this at the

19  beginning, in mentioning comments about forum-shopping -- the

20  committee and Acis are really being disingenuous, and they have

21  not told you the real reason that they want the case before

22  Judge Jernigan.

23         At the first-day hearing, Your Honor, Acis said they

24  intended to file a motion for an appointed trustee.  The

25  committee has told the debtor it intends to file a motion to

1    appoint a trustee after this hearing.  The motion has not yet

2    been filed, Your Honor, because they want Judge Jernigan to

3    rule on that motion.  And it's not because she's familiar with

4    this debtor's business, this debtor's assets, or this debtor's

5    liabilities, because she generally is not.  It is because she

6    formed negative views regarding certain members of the debtor's

7    management that the committee and Acis hope will carry over to

8    this case.

9         The convenience of the parties and the interests of

10   justice and how this case is so unique are just a pretext.

11   They want a trustee to run the debtor, and they want Judge

12   Jernigan and not Your Honor to rule on that motion.  That, Your

13   Honor, is not a proper reason to transfer venue, but rather a

14   transparent litigation ploy.

15        Similarly, Acis also wants the case to proceed in its

16   home court where it has enjoyed success in litigating against

17   the debtor.  Your Honor mentioned the conflicts-of-interest

18   theories.  They're not just conflicts of interest between two

19   jointly administered debtors.  These go to the crux of what the

20   Acis case is about and significant claims against the debtor.

21        The Court may ask, appropriately -- and the Court

22   did -- why would the debtor file the case in Delaware?  Chapter

23   11 is all about a fresh start.  The debtor recognized concerns

24   that the creditors had with certain aspects of its pre-petition

25   conduct, and proactively appointed Brad Sharp as chief

1   restructuring officer with expanded powers, to oversee the

2   debtor's operations.

3        Mr. Sharp worked with the debtor and Counsel to craft

4   a protocol for transactions that would be subject to increased

5   transparency.  The debtor didn't have to do that.  As Your

6   Honor mentioned at the first-day hearing, the debtor operates

7   its business in the ordinary course.  But given the

8   circumstances surrounding this case, given the history, we

9   felt, and the CRO, importantly, felt it was important to get on

10  the table what the debtor, through the CRO, believed was

11  ordinary and what was not, so we could have a transparent

12  discussion, discussion that, while we've made headway with the

13  committee, we have not yet been able to come to an agreement.

14       The debtor filed the case in this district because it

15  wanted a judge to preside over this case that would look at

16  what's going on with this debtor, with this debtor's

17  management, this debtor's post-petition conduct, without the

18  baggage of what happened in a previous case, which contrary to

19  what Acis and the committee says, has very little to do with

20  this debtor.

21       These form insufficient grounds, Your Honor, to

22  overturn the debtor's choice of venue, and the motion should be

23  denied.

24       I would like to now walk through the statutory

25  analysis, something that Counsel avoided, because again, I

1    think it highlights the weakness of their argument.

2            It is clear that the Delaware venue is proper, and

3    1408 says the places where a Chapter 11 debtor can file the

4    case.  As the vast majority of debtors who file cases in this

5    district, the debtor filed here because it was domiciled in

6    Delaware.  It is a Delaware LP.  But it goes further than that.

7    99.94 percent of its LP interests are owned by Delaware

8    entities.  And the general partner, Strand Advisors, is a

9    Delaware general partner.

10           While many cases, Your Honor, before this court, rely

11   on the domicile of one affiliate to bring other non-Delaware

12   related affiliates before the court, that's not the case here.

13   All you have, virtually, are Delaware entities, through the

14   ownership structure.

15           As I will also discuss in a few moments, Your Honor,

16   domicile is not the only connection that this debtor has to

17   this district, as significant litigation matters involving the

18   debtor, including those commenced by committee members, that

19   was the catalyst to the filing, are pending in Delaware.

20   Accordingly, the committee acknowledges, as they must, that

21   Delaware is, of course, a proper venue.

22           However, they rely on 1412 which sets forth the

23   standard -- test that the movant has to meet in order to

24   transfer venue, either for the convenience of the parties or

25   the interest of the justice.

1          And courts, including the written opinions in this

2     district by your colleagues, most often cite to the six factors

3     in the CORCO decision in the Fifth Circuit in 1979.  And as

4     Judge Gross, in his 2016 opinion in Restaurants Acquisition

5     makes clear, the movant bears the burden of demonstrating that

6     the factors strongly weigh in favor of a transfer.

7          Similarly, Judge Gross stated in that case -- and I

8     know Your Honor may not fully subscribe -- that courts

9     generally grant substantial deference to the debtor's choice of

10    forum.

11          And in the case here, where not only do you have the

12    debtor is a Delaware entity, but virtually all of its holdings

13    are well -- are Delaware entities as well, it is even more

14    appropriate to defer to the debtor's choice of forum.  As Judge

15    Walsh said in his 1998 opinion at PWS Holding, it is a

16    fundamental legal tenet that every citizen of a state is

17    entitled to take advantage of the state and federal judicial

18    process in that state.

19          So the question before Your Honor is whether the facts

20    in this case strongly weigh in favor of a venue transfer such

21    that the Court will disregard the debtor's reasoned business

22    judgment to commence the case in this district?

23          We submit, Your Honor, that the committee and Acis

24    have not come close to meeting that standard, and the CORCO

25    factors do not support a transfer.

1            The first one is the proximity of creditors.  And the

2     committee is focused on the fact that the committee -- the

3     representative fiduciary of the estate -- has determined that

4     venue is appropriate.  But the factor not only looks at the

5     number of creditors, it looks at the dollar amount of the

6     creditors.  And if you analyze -- an analysis of either

7     demonstrates that convenience of the parties does not support a

8     transfer of venue in this case.

9            The debtor has two secured creditors.  Jefferies is

10    headquartered in New York City.  Frontier Bank is headquartered

11    in Oklahoma.  There was reference by Acis' Counsel to HCLOF.

12    Their secured claim is unrelated to the note that was at issue

13    in Acis, and there's nothing in the record to say that that

14    secured instrument has anything to do with the Acis case.

15    Neither of those creditors has weighed in on the motion to

16    transfer venue.

17            So let's look at the unsecured creditors.  Of the

18    twenty that were listed in the debtor's petition, seven have

19    Texas addresses.  Five of those are debtor's either current or

20    former law firms.  Two of them are in the courtroom today.  And

21    as Your Honor I'm sure appreciates, debtor professionals --

22    former debtor professionals are not usually active in

23    bankruptcy cases.  Indeed, none of them filed a notice of

24    appearance in this case.

25            The other two that have Texas addresses are the claims

1   related to Acis:  the Acis claim and the Josh Terry claim.

2   There are no other unsophisticated creditors that the Court

3   needs to worry about that would not be able to travel to

4   Delaware, as needed.

5        The two largest unsecured creditors in the top twenty

6   are the Redeemer Committee and Patrick Daugherty, each of whom

7   had pre-petition litigation pending against the debtor that

8   they each commenced in the Delaware Chancery Court.  And the

9   arbitration proceeding that preceded the Redeemer chancery

10   court litigation was pending in New York City.

11        UBS, a member of the committee, listed as number

12   nineteen with a disputed and unliquidated claim, will likely

13   claim it is the largest creditor of the estate.  It is based in

14   New York.  It has litigation pending against the debtor in New

15   York, and used Latham & Watkins' DC office for that litigation.

16        And lastly, the fifth largest creditor, Your Honor,

17   Meta-e Discovery, is also on the committee.  Where is their

18   address?  Stamford, Connecticut.

19        As Judge Gross reasoned in Restaurants Acquisition, in

20   order to overcome the strong presumption in favor of the venue

21   transfer, a transfer must substantially improve the

22   administrative feasibility with respect to the creditor body as

23   a whole.  So the committee sits out there and Acis sits out

24   there saying that it's convenient for the creditors, it's much

25   more convenient in Dallas.  Their actions belie their

1    statements.  All this litigation was focused on either Delaware

2    or the Northeast.  It is just simply disingenuous for them to

3    argue otherwise.

4            The next factor, Your Honor, is the proximity of the

5    debtor.  And in applying this factor, the courts focus

6    primarily on the parties who appear in court.  The debtor

7    retained Brad Sharp, and he has demonstrated its intention --

8    and the debtor has demonstrated its intention of having Mr.

9    Sharp be the face of the reorganization efforts before the

10   Court.

11           Indeed, in cases where a CRO is reported, Your Honor,

12   the CRO is more apt to testify in court than any other debtor

13   representative.  And I believe Mr. Sharp's testimony, which was

14   uncontroverted, was that he expects that he and Mr. Caruso will

15   provide the bulk of the testimony required from debtor

16   representatives during this bankruptcy case; and that's because

17   the debtor has given Mr. Sharp broad authority to evaluate the

18   propriety of post-petition transactions and to pursue and

19   analyze insider claims.

20           And at today's hearing the debtor will offer the

21   testimony of Mr. Sharp and his colleague, Mr. Caruso, to

22   support the relief requested.  They have developed a

23   substantial amount of knowledge regarding the debtor's assets,

24   liabilities, and operations, in the six weeks they've been on

25   the job; and that knowledge will continue to grow.

1    And Mr. Sharp has significant experience, as he

2    testified to, being a CRO in cases in this district; and he

3    could travel just as easily to Delaware as he can to Texas.

4        While the debtor acknowledges that other debtor

5    employees like Frank Waterhouse may be called to testify, as he

6    was today, the involvement of the debtor's personnel in this

7    court is likely to be immaterial.  And he was the only Texas

8    person called to testify in this case.  And if the committee

9    and Acis felt it was so important that representatives of the

10   debtor be -- it would be easier for them to travel to court,

11   they didn't call any witnesses in today, which is the most

12   important hearing in the case.

13       Also, Your Honor, our offices, as you know, are in

14   Delaware.  And while it's true that we practice all around the

15   country, we would need separate counsel if we were to -- if the

16   case was to be -- to move.

17       And similarly, the committee retained Young Conaway,

18   which took a significantly active role in the litigation

19   leading up to today.  That information and knowledge and

20   expertise would be lost if the case was transferred.

21       Next, Your Honor, related, is the proximity of

22   witnesses.  And a I said, the committee can't demonstrate that

23   witnesses in this case would find Texas a substantially more

24   convenient forum than this court.  And you would have expected

25   them to have subpoenaed Texas witnesses if that were so

1  important.

2          Location of assets, Your Honor, is one of the CORCO

3  factors.  And the committee makes a big point that all the

4  decision-making is in Texas and all the people are in Texas and

5  the office is in Texas.  The courts that look at location of

6  assets as being critical typically involve cases that are

7  single-asset real-estate cases, or cases that are small local

8  businesses that have significant regional connections.

9          But if you look at the debtor's assets here, it's not

10  the case.  Their assets generally include financial instruments

11  and investments in a wide variety of public stock; advisory

12  contracts; shared services; and interests in nonpublic hedge

13  funds and private equity funds.

14          The assets are located throughout the United States

15  and in Latin America, Korea, and Singapore.  And the majority

16  of the debtor's liquid assets are in New York.  We were not --

17  we don't dispute the point that there aren't significant people

18  in Dallas and that the offices are in Dallas and all the

19  employees.  We don't dispute that.  But the assets are far-

20  flung around the country, and the cases, again, that focus on

21  the assets, focus on local expertise that the court will bring

22  to bear, particularly in real-estate cases with respect to

23  valuation.  You have nothing of that here.

24          The debtor intends to use its Chapter 11 to provide

25  breathing room and to evaluate, hopefully in a constructive way

1   with the committee, how best to maximize value for the debtor's

2   assets through a consensual restructuring; and there's no

3   reason to believe why Texas rather than this court, would be a

4   more appropriate forum for this restructuring.

5          The last factor, Your Honor, is the economic

6   administration of the estate, which the courts generally point

7   to as the most important factor.  And the committee points to

8   five reasons, which is essentially retreads of its previous

9   arguments.

10         Again, they argue a higher concentration of creditors

11  in Texas and Midwest.  That's not the case, as I mentioned.

12  They argue that there's a higher concentration of professionals

13  in Texas and Midwest.  And if you look at all the

14  professionals, they're all from national firms; they're all

15  metropolitan areas that practice routinely before this Court.

16  And the concept that the flights being different and the

17  mileage being different is in any way -- is in any way

18  important, is just not -- is just not the case.

19         People practice in a global, national world, these

20  days.  And if that argument succeeded, most of the -- your

21  brethren and yourself would not have much to do, because that

22  argument could support transfers in most cases.

23         THE COURT:  Well, I think really goes to why -- I

24  mean, I know this is the standards that are generally applied,

25  but it's a case from 1979.  It's really behind the times.  I

1  don't think the factors reflect corporate practice of

2  bankruptcy reality of 2019.

3          MR. POMERANTZ:  And that's exactly what Judge Gross

4  said in the Caesar's opinion --

5          THE COURT:  Right.

6          MR. POMERANTZ:  -- which is cited in the material,

7  that this argument, given technology, given frequency of air --

8  ease of air travel, it's just not a relevant factor anymore.

9          And the two pages that the movants spent in the brief

10  talking to you about how many direct flights there are from LA

11  to Delaware as opposed to LA to Dallas, that, Your Honor, I

12  think is just silly.

13          The committee also argues that most creditors would

14  need to retain local counsel if they were here.  Well, if you

15  look, the case has been pending a month-and-a-half, and other

16  than notices of appearance filed by committee members, there

17  have only been two notices of appearance that have been filed

18  that are unrelated to debtor entities.  And one of those is

19  Daugherty, who commenced litigation in chancery court.  So the

20  argument that is made typically in cases where they're filed in

21  jurisdictions far off from where the debtor's operating is, is

22  that it'll be burdensome on the mom-and-pop creditor, Your

23  Honor, we don't have mom-and-pop creditors here.  And there's

24  nobody out there with material claims against the estate that

25  will not have the ability and have trouble and demonstrated the

1    willingness to hire Delaware Counsel.

2              The last argument --

3              THE COURT:  Even when you do have mom and -- again, to

4    comment on reality, even when you do have mom-and-pop creditors

5    in businesses that are very locally focused, general practice

6    today is to make their claims irrelevant, in that to the extent

7    they have avoidance claims, they're paid on the first day.

8    Their real concern is whether the business will continue or

9    not.

10             Now, it's certainly true that pension claims are

11   important, and proofs of claim are important.  But we have

12   many -- all courts have many procedures in place to ensure that

13   those types of creditors can participate without having to go

14   to the courthouse.

15             MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16   mentioned that in the Restaurants Acquisition case, which was a

17   Texas-based --

18             THE COURT:  He's a smart guy.

19             MR. POMERANTZ:  We'll be sorry to see him go, Your

20   Honor.

21             THE COURT:  Yeah, absolutely.

22             MR. POMERANTZ:  Which was a Texas-based restaurant

23   chain that had more of a local flair.  But he made the comments

24   Your Honor made.

25             The last argument the committee makes is that Texas is

1  more convenient.  And this is really the crux, which I'll spend

2  some time over the next few minutes.

3          Texas is more convenient -- convenient -- because the

4  Texas bankruptcy court, where Acis is pending has, in their

5  words, already expended great time and effort familiarizing

6  itself with the debtor and its operations.  You've heard

7  statements like "learning curve".  You heard statements about

8  everything that the debtor -- that Judge Jernigan has found out

9  about this debtor, and how important and how helpful it is, and

10  how Your Honor will be behind the learning curve.  We just

11  don't buy that, Your Honor.

12          And aside from that argument, the arguments that the

13  committee makes for transfer are arguments that could be made

14  in any case before Your Honor.

15          THE COURT:  Yeah, I was going to say that's kind of an

16  interesting argument, because actually it assumes Judge

17  Jernigan's going to ignore the rules of evidence in making

18  factual findings, because you're limited to the record before

19  you on a specific motion.  And what fact you may have learned

20  with regard to something a person has done, maybe that goes

21  into questions of credibility on cross-examination or direct

22  testimony, but to actually base your decision on a fact that's

23  not in the record for the specific proceeding would be

24  improper.

25          MR. POMERANTZ:  Look, I agree, Your Honor.  And the

1  familiarity with the type of business -- if I wasn't speaking

2  to Your Honor or your brethren or many other judges around the

3  country, I'd say well, maybe there are certain judges who

4  haven't dealt with large financial services company, may not

5  know what a CLO, may not know what a hedge fund is or private

6  equity fund is.  I'm very confident that Your Honor has had

7  many cases with sophisticated financial instruments, likely CLO

8  obligations, so that Your Honor not only has a good base of

9  knowledge that would give you the same base of knowledge that

10 Judge Jernigan has, but as we've also found, you are a fairly

11 quick study and that I have no doubt that you could come up-to-

12 speed without very little effort.

13         So their argument is a grossly overstated

14 interpretation of what the Acis case was about and that what

15 was learned in that case has any relevance.  As a part -- as a

16 result of the Acis plan confirmation, Acis is no longer part of

17 the debtor's organizational structure.  The debtor owns no

18 equity in Acis.  And the debtor no longer provides any advisory

19 services to Acis.

20         We admit that Judge Jernigan conducted many hearings,

21 and she issued several lengthy opinions, and she heard from a

22 variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23 has not -- Your Honor might read the opinions that she wrote

24 that are attached to the exhibits, the plan confirmation

25 opinion, the arbitration opinion, the involuntary opinion; and

1    you will conclude, I believe, as I have concluded, that ninety-
2    five percent of that stuff has nothing to do with this debtor.

3            It focused on the CLO obligations -- CLO business, the
4    relationship, the transfers of certain assets away from Acis
5    that basically Acis is claiming were fraudulent conveyances,
6    and that was the real focus; not on any of the debtor's
7    business operations.

8            Acis was the advisory arm through which the debtor
9    structured its collateral loan portfolio.  The fees -- the
10   uncontroverted evidence is the fees generated from the CLO
11   business represent approximately ten percent of the debtor's
12   revenue and that that will reduce over time, because since the
13   market crash in 2009 the debtor has not created any new CLO
14   funds.  So there's no active management and advisory services
15   going on for the CLOs.  They're just being liquidated in the
16   normal course.  Their importance will continue to decrease.
17   And even right now, it's only ten percent.

18           The debtor generates its revenues from trading public
19   securities; its equity positions in a variety of nonpublic,
20   private-equity, and hedge funds; and advisory and back-office
21   service provided to third parties.  It is the monetization of
22   those assets that will provide the basis for the restructuring
23   of this debtor.  And Judge Jernigan's prior experience with the
24   small sliver of what the debtor's business currently is, will
25   be only marginally relevant, at all.

1          Acis didn't have any other balance-sheet assets.  They

2  were basically an advisor of CLOs.

3          For example, Judge Jernigan has no experience or

4  knowledge surrounding the debtor's multi-strat. fund; its

5  Korean, Latin American, or Singapore private-equity

6  investments; its investments in the PetroCap funds; or the

7  other myriad of assets that are on the debtor's balance sheet

8  which Your Honor will likely will hear about in connection with

9  the hearings that will go on later.

10          The committee and Acis make a big point of arguing

11  that Judge Jernigan is familiar with the shared-service and

12  management agreements between Acis and the debtor.  However,

13  there was a lot of testimony from the podium on that.  The only

14  testimony before Your Honor is that the contracts are

15  different.  Mr. Waterhouse wasn't even familiar with the

16  contracts, couldn't provide any testimony.  But Mr. Sharp

17  testified that the type of shared-service and advisory

18  agreements for CLOs are markedly different than the type of

19  services and advisory agreements for non-CLO entities.  While

20  Acis' Counsel stood up there and said there's a template and

21  they're pretty much the same, that was purely argument.  There

22  was no evidence in the record to reflect that.

23          And in fact, the only two agreements that involved

24  Highland in the Acis case were these two agreements.  But

25  again, they're like apples and oranges.

1          In any event, Your Honor, one of the matters that Mr.
2    Sharp is focusing on will be the appropriate economic
3    arrangement between the debtor and its affiliates and
4    nonaffiliates, through its shared-services and advisory
5    agreements.  That has been a focus of DSI's analysis.  The
6    committee has indicated that's something that they want to
7    focus on.  And Mr. Sharp will come up with a recommendation as
8    to what those should be, and it'll be that recommendation
9    that'll be based on the market rate for these contracts in
10   these particular businesses that will be relevant for Your
11   Honor to consider, at some point.
12          They attached a post-confirmation opinion that Judge
13   Jernigan issued with respect to denial of a motion to seek
14   arbitration regarding provisions of those agreements.  But if
15   you read that opinion carefully, you will see that the primary
16   issues in that case were whether an arbitration provision
17   actually survived, given that the last version of the agreement
18   did not have them -- there were five different iterations in
19   each of the agreements.  And after concluding that the
20   arbitration provision did survive, she ultimately ruled that
21   that notwithstanding, she would not enforce arbitration because
22   the claims were too related to the other claims that were being
23   asserted.  Again, nothing to do with the debtor's business.
24          In fact, Your Honor, after today, I have no doubt that
25   Your Honor will be a lot more familiar -- if Your Honor is not

1   already -- with what the debtor does.  So Your Honor will hear

2   testimony from Mr. Caruso; Your Honor will hear testimony from

3   Mr. Sharp, about various aspects of the debtor's business, what

4   it's doing, its management structure, how that structure is

5   working.  All that you will hear, which will put you in an

6   advanced state, compared to Judge Jernigan, as opposed to being

7   behind.

8         And there are other aspects of this case that are on

9   the way that have nothing to do with Acis.  For example, we

10  just filed a motion to approve ordinary-course bonuses to

11  employees.  And we may also seek approval of a KERP and a KEIP.

12  Acis had their own employees, and Judge Jernigan had no special

13  knowledge of the debtor that would put her in a better position

14  to give her an advantage over this Court in determining an

15  appropriate compensation structure.

16        It isn't that difficult.  Your Honor hears it all the

17  time:  KEIPs, KERPs.  Judge Jernigan hears it all the time.  My

18  point is, Your Honor, there's nothing that would help her, from

19  her knowledge of Acis, that would justify a transfer of venue.

20        They also stress that -- in their papers, that Judge

21  Jernigan heard a lot of testimony from debtor's management.

22  But they really don't discuss what the content of that

23  testimony is or how it's, in any event, relevant to this case.

24  They just really want to rely on the sheer volume of

25  information that they have foisted on Your Honor, citing to the

1    entire record, by saying there's so much; there's been hundreds

2    of pages, dozens of hearings, and then that means Judge

3    Jernigan is in a much better position.

4            If they wanted to point to specific things in the

5    record where the judge had specific knowledge, they could have.

6    They shouldn't (sic) have.  And they're trying to do this on a

7    big holistic view, but when Your Honor looks at the record, I

8    think Your Honor will conclude otherwise.

9            In any event, it's not really -- they don't explain

10   why familiarity with the debtor's management is at all

11   relevant.  Look, they clearly want a trustee in this case and

12   believe that because Judge Jernigan found debtor's management

13   to not be credible, she'll be more apt to appoint a trustee

14   than this Court.  But that argument doesn't withstand scrutiny.

15           This case is different.  This case is being managed by

16   a CRO.  This case had the debtor file a motion it didn't have

17   to file for ordinary-course protocols.  This case has -- thus

18   far, you haven't heard anything about any discovery disputes,

19   you haven't heard anything -- although you heard a couple weeks

20   ago there might be issues with cooperation, we provided a

21   substantial amount of documents, produced witnesses, in a

22   significantly accelerated time frame.  You have heard nothing

23   about that.

24           So any un-cooperation or difficulty of any -- that

25   they may have encountered in the Acis case, there's no evidence

1  that that's occurring here, for good reason; because Mr. Sharp

2  is in charge.  And although he is still reporting to Mr.

3  Dondero, as his corporate structure, Mr. Dondero can terminate

4  him, and if he terminates him, he has to give notice.  That's

5  appropriate.  That's one of the issues we address in connection

6  with the U.S. Trustee's concerns with the CRO motion.  In order

7  to file a corporate governance, he has to report.  But there

8  are certain things, as you'll hear later, that he has been

9  given primary responsibility for.

10          Your Honor, Chapter 11 is about giving a debtor a

11  fresh start, and this court is no -- this case is no exception.

12  This Court is fully capable of evaluating the veracity of the

13  debtor's witnesses; and transferring the case to Judge

14  Jernigan, when the real motivation is because of how she has

15  dealt with the prior case -- which they may not say it, but

16  that's clearly what's happening here -- would be unduly

17  prejudicial to the debtor.

18          We have nothing against Judge Jernigan.  She is a fine

19  jurist.  But in this case I think it's a challenge and there's

20  a reason why we decided to have the case filed here.

21          And then I'll also point to Your Honor the significant

22  adversity between the two estates.  Your Honor mentioned that.

23  Counsel said, well, it happens in all cases.  True.  We've been

24  involved in many, many cases with multi debtors, that they have

25  issues in intercompany claims.  That's a fact of modern

1  corporate life.

2          But this is different.  The whole -- one of the -- the

3  most significant asset of Acis are their claims against this

4  debtor.  How those claims are prosecuted and when they succeed,

5  may make or break the Acis case as to whether unsecured

6  creditors get paid or not.

7          In a case like this, this factor does not support a

8  transfer of venue; we argue that it supports keeping the case

9  before Your Honor so that it can maintain the separateness of

10  the estates.

11          In conclusion, Your Honor, we don't believe the

12  committee has come close to satisfying its burden that a change

13  of venue is appropriate under 1412.  And as I mentioned at the

14  beginning of my presentation, the committee's motive in

15  bringing the motion and Acis' motive in joining the motion is

16  clear.  Even though the debtor has installed a CRO with

17  expanded powers, with impeccable credentials to address

18  creditor concerns, the committee and Acis are focused on the

19  appointment of a Chapter 11 trustee and believe the transfer of

20  the case to Texas is the most likely to get that goal

21  accomplished.

22          But rather than filing the case -- or filing a trustee

23  motion here, they took their shot on a venue motion and hope

24  that Your Honor will give them a shot to do it in Texas.

25          Your Honor, for those reasons, we respectfully request

1   that Your Honor deny the motion.

2              THE COURT:  Thank you.

3              MR. POMERANTZ:  Does Your Honor have any more

4   questions?

5              THE COURT:  No.

6              MR. POMERANTZ:  Thank you, Your Honor.

7              THE COURT:  Reply?

8              MR. CLEMENTE:  Briefly, Your Honor.  I will be brief.

9   It will be a little less organized, because I'll just run

10   through some points very quickly.

11              THE COURT:  Okay.

12              MR. CLEMENTE:  First of all, on Restaurant

13   Acquisitions, I believe in that opinion, Your Honor, there were

14   creditors that supported venue in Delaware.  We do not have a

15   single creditor on the record supporting Delaware -- excuse

16   me -- supporting venue in Delaware.

17              Regarding the litigation in New York and Delaware,

18   that's a red herring, Your Honor.  They're forced creditors.

19   They were forced to bring lawsuits to achieve their view of

20   justice.  It's not relevant to whether -- the location of

21   that -- those lawsuits being in Delaware and New York.  They

22   were forced to bring those lawsuits in order to get paid by Mr.

23   Dondero and the debtor.

24              Your Honor, we didn't call witnesses this morning,

25   because we believe -- as I mentioned in my argument -- that the

1    uncontroverted facts support our venue-transfer motion.  The

2    other motions are their burden, Your Honor.  And so I wanted to

3    remind Your Honor of that.

4              Regarding Young Conaway, obviously, we shouldn't -- it

5    shouldn't be held against us that we decided that the smart and

6    prudent thing to do is to have able Co-Counsel advise us as we

7    proceed in front of Your Honor.  So I believe that that's

8    something that simply is of no moment.

9              The location of the assets, Your Honor, these are

10   financial instruments.  They're interests in limited

11   partnerships.  They're documents.  They're things that are

12   created by documents.  And again, it's not controverted.

13   That's all located in Dallas, Your Honor.

14             So this idea of far-flung assets throughout the

15   country just simply isn't true.  These are documents.  They're

16   interests.  They're things that exist on paper.

17             Your Honor, we have not made this about the mom-and-

18   pop creditors.  We take Your Honor's comments to heart on that.

19   As Counsel for Acis suggested, this is about the large body of

20   unsecured creditors that are sitting at the bottom of this cap

21   structure with oversecured creditors on top of it.  And this

22   large body of unsecured creditors has said we believe that

23   venue is appropriate in Dallas.

24             Regarding the rules of evidence, of course Judge

25   Jernigan is not going to ignore the rules of evidence.  But

1  we're talking about judicial efficiency.

2          For example, when I need to look at an indenture, I

3  know in article 2 it's going to have payment terms.  That's the

4  type of thing that we're talking about, Your Honor; not that

5  she's going to pre-judge or ignore the rules of evidence as she

6  makes her determinations.

7          Finally, Your Honor, two things that I would -- that I

8  would like to say.  The testimony you may hear this afternoon,

9  obviously that should not factor into what you're up the

10  learning curve today, right now, in terms of considering the

11  venue motion.  That would put the cart before the horse, I

12  think.

13          And, Your Honor, I'd be remiss if I didn't talk about

14  this ordinary-course motion that we keep hearing about.  If

15  they didn't need it, they shouldn't have filed it.  But

16  instead, what they're trying to do is create some type of

17  transparency and legitimacy around transactions that I think

18  we'll make clear, are not in the ordinary course.

19          And the final point that I would make there, Your

20  Honor; it's interesting Mr. Pomerantz referred to the multi-

21  strategy transaction.  That one is -- Your Honor, I will

22  call -- a doozy.  And you will hear more about it this

23  afternoon, to the extent Your Honor decides not (sic) to keep

24  venue.

25          With that, unless you have questions for me, I'll sit

1   down.

2            THE COURT:  No questions.

3            MR. CLEMENTE:  Thank you.

4            THE COURT:  Thank you.

5            MS. PATEL:  Your Honor, I'll be brief, and I won't

6   repeat anything that Mr. Clemente, on behalf of the committee,

7   said.  But I did want to just address kind of the first point

8   Mr. Pomerantz made with respect to Judge Hale, and he's not

9   aware of any formal statement that Judge Hale is not taking

10  cases.  Your Honor, that's accurate.  I'm not aware of any

11  formal statement that Judge Hale is not taking cases either.

12           So to answer Your Honor's question, in terms of random

13  assignment, in the Northern District of Texas, where I have

14  practiced my entire career, and primarily practice before the

15  courts that are there -- and I'm a former law clerk to Judge

16  Hale also -- I will say that although there may be a random

17  assignment, it is not -- absolutely not unheard of that when

18  you've got the matter -- for example, if a case were assigned

19  to Judge Hale, but Judge Houser were to hear first-day matters

20  and other significant matters, that Judge Hale would then

21  transfer that case for judicial efficiency and economy within

22  the district, to Judge Houser for further proceedings.

23           In other words, the Northern District of Texas always

24  finds the easiest way in which to handle matters.  And I am

25  confident, Your Honor, that if this matter were transferred to

1  the Northern District of Texas, that despite whoever it would

2  be assigned to, that everyone is well aware of the time that

3  Judge Jernigan has spent becoming familiar with Highland, these

4  issues, and the amount of court resources that have been

5  expended, such that this case would be transferred to Judge

6  Jernigan.

7           But perhaps that's just a question for Judge Jernigan

8  and her courtroom staff or the Northern District of Texas and

9  the courtroom -- I'm sorry -- the court clerk or the staff

10 that's there.

11          Your Honor, one last very quick point.  The comment

12 was made that -- with respect to CLOs that Highland hasn't had

13 a new CLO since 2009.  That, Your Honor, is because every new

14 CLO that was issued from 2009 going forward to 2017, every one

15 of those was issued in Acis.  Acis was the structured-credit

16 arm of Highland.  It is how it issued new CLOs.

17          Indeed, it issued seven CLOs under Acis, with over two

18 billion dollars in assets under management.  The fact that

19 there have been no new CLOs since then, simply means that they

20 haven't been able to get one off the ground.

21          But make no mistake, Your Honor, the CLO business is

22 valuable enough that it is now the subject of significant

23 litigation because of all of the attempts to transfer those CLO

24 assets away.  So in terms of the court's familiarity, I would

25 submit, again, that the bankruptcy court is clearly more

1   familiar with a significant piece of Highland's business.

2          One last thing, Your Honor, and somewhat similar to

3   that, that Judge Jernigan was not familiar with the Korean

4   entities, the Singapore entities, or the multi-strat.  I submit

5   to Your Honor that this Court hasn't been exposed to those

6   things as well, other than conclusory statements that well,

7   we've got some Korean assets; oh, we've got some Singapore

8   assets; and we've got multi-strat; and other than Mr.

9   Waterhouse's, like, five-minute testimony at the first-day

10  hearing where I was questioning him with respect to the assets

11  which he didn't really quite know about what's inside a

12  multi-strat.

13         Other than that, this Court hasn't been exposed either

14  to those assets, so when we're looking at the broad playing

15  field rather than looking at specific assets, there is a

16  learning curve.  Judge Jernigan is further along it with

17  respect to certain things.  Otherwise both courts are similarly

18  situated or neutral to each other.  But it's those assets that

19  she is familiar with, the business model of Highland, and that

20  further along the learning curve that she is, that's what's

21  significant here, Your Honor.

22         And that will play into, clearly, what will ultimately

23  be how Highland is going to restructure.  Again, the creditors

24  here have voted with their feet in filing this transfer motion.

25  And these are the very same creditors, Your Honor, that will be

1    necessary in order for this -- if it's going to be a successful

2    restructure, they're the ones that are necessary to make it a

3    successful restructure.  Thank you.

4              THE COURT:  You're welcome.

5              All right, let's break for lunch until 1:45.  And when

6    I come back at 1:45 -- when we come back at 1:45, I am going to

7    issue an oral decision on this motion.  All right.

8         (Recess at 12:39 p.m. until 1:47 p.m.)

9              THE CLERK:  All rise.

10             THE COURT:  Please be seated.

11             Okay, good afternoon.  Thank you for coming back.  I'm

12   now prepared to rule on the motion to transfer venue, which I'm

13   going to grant.

14             So I think, as I hinted at during argument, that the

15   case law that we're kind of clinging to on motions to transfer

16   venue, really do not reflect the modern reality of Chapter 11

17   practice in the U.S. and internationally.  And I think a lot of

18   the parts of the test really don't reflect what's going on

19   generally in Chapter 11 cases.

20             The thing I take greatest umbrage -- no, "umbrage"

21   isn't the right word -- but disagree with the most is the idea

22   that there's somehow a strong presumption of the debtor's

23   choice of forum.

24             Look, every debtor that files bankruptcy -- certainly

25   every sophisticated Chapter 11 debtor that files bankruptcy --

1  is engaged in forum-shopping.  There is an element to that.

2  Where you file will depend on a lot of things that are unique

3  to the forum.

4          I don't think you need to be ashamed of that.  I don't

5  think that's bad.  As long as the venue you're choosing is

6  appropriate under the law, certainly you're going to make

7  decisions based on what the law is in that particular district,

8  perhaps even a preference to individual judges or judge in that

9  district.

10          To compound that with a strong presumption in favor of

11 the debtor is to really give a boost to the debtor's choice of

12 forum, which is made -- included in the decision-making process

13 is an element of forum-shopping, to a level that makes it very

14 difficult to overcome that presumption.

15          Of course, the creditors that file a motion to

16 transfer venue are engaged in forum-shopping themselves.

17 Otherwise, why would they be switching forums and going for a

18 different location.  Again, I don't think that the word "forum-

19 shopping" should have the negative connotation that it has come

20 to have in the law.  It is the reality of bankruptcy practice.

21          Now, if that's involved -- if that goes a step further

22 and somehow involves chicanery or something inappropriate just

23 from an ethical standpoint, of course that's problematic.  But

24 there's absolutely no indication here whatsoever that anyone,

25 on behalf of the debtor or the creditors or the Dallas court or

1  the Delaware court, is doing anything other than acting

2  appropriately.

3          The question about a motion to transfer venue is

4  whether the motion should be granted by a preponderance of the

5  evidence.  If you add a strong presumption, you're turning it

6  into a harder motion to be granted; and I don't think that's

7  appropriate.

8          However, I find the laundry list of factors that are

9  generally discussed to be irrelevant or almost irrelevant to

10 the actual issues that are going on, particularly in a case

11 like this.  And I'll get to that in a second.

12         So six of the debtors are located in Texas; UBS is

13 located in New York.  UBS is located everywhere.  Wells Fargo

14 is located everywhere.  Certainly companies have executive

15 suites.  But whether or not that should be the decision about

16 where a case should file, to me, isn't particularly clear.  It

17 depends on the facts of the case.

18         I think a more general approach that would involve

19 looking at the facts and circumstances of a case and seeing

20 whether it points to a specific jurisdiction might be a more

21 helpful way of proceeding.  And that's what this case is really

22 about.

23         This is a unique case, I think.  It is a different

24 case than those that we usually run into.  And although maybe

25 not completely different from every case, but in any event,

1  this case is very focused on responding to existing litigation.

2  And that existing litigation of a former affiliate, as of a few

3  months ago, and a pending appeal that could make it a current

4  affiliate, is located in the Northern District of Texas.

5         The judge in the Northern District of Texas has done a

6  tremendous amount of work and has done -- issued a number of

7  opinions, had a number of trials.  That work creates a

8  familiarity with the facts, issues, and players in a case

9  which, while it may not affect the actual decision based on

10 evidence on a motion-by-motion basis, certainly could color a

11 judge's approach to a case.

12        Judges are human.  Judges make judgments over time as

13 to the parties, as to the lawyers.  That's not inappropriate,

14 as long as you stick by the rules of evidence.  But it

15 certainly can color what credibility you might give to a

16 witness or to counsel.

17        I think here we have a situation where the real

18 gravitas of this case is in Dallas.  The two facts that really

19 come out to me are, in this case, the fact that the executive

20 suite is very focused and very Dallas-oriented.  It's a global

21 empire, but it's clearly focused in Dallas.  And the existing

22 litigation in the Acis bankruptcy that's been going on for some

23 time; those are the two predominant factors.

24        Everything else kind of falls away.  The creditors are

25 scattered.  The assets are scattered.  The economic

1  administration isn't being affected one way or the other.  I

2  mean, people can get on planes and you can go to Philly or you

3  can go to Dallas.  Either way, you're stuck on American

4  Airlines.  But so be it.

5        It can be done.  And as a result, I think that the

6  best solution here, to give the debtors a fair shot at

7  reorganization, but to balance the creditors' rights and the

8  creditors' desires, is to move the case to Texas.

9        And on that latter point, just to finish up.  As I

10  said with my previous decision in EFH, it was striking in that

11  case that only one creditor moved to transfer venue and that

12  none of the other creditors either actively opposed or simply

13  stayed silent with regard to that motion, including significant

14  creditors, like the official committee.

15        In this case, we have the opposite.  We have the

16  debtor defending its venue choice, of course.  But there's a

17  lot of silence, because there's no one else on that side.  I

18  thought it highly significant that Jefferies and -- is it

19  Fortress?

20        UNIDENTIFIED SPEAKER:  Frontier.

21        THE COURT:  Frontier, thank you.  That Jefferies and

22  Frontier did not take a position.  And no other creditors

23  opposed the committee's motion.  And the committee consists of

24  a series of very large creditors.

25        So I think that given these facts and circumstances,

1    particularly the unique nature of the ongoing litigation and

2    the existing tie to Dallas, the executive suite and management,

3    principal place of business, if you will, being focused in

4    Dallas, and creditors -- as Counsel said -- voting with their

5    feet to move the case to Dallas, and applying just a good old

6    fashioned preponderance of the evidence standard, that the

7    Court should grant the motion, which I will do.

8           Now, I need an order.  And we will get the machinery

9    in place, as soon as I get the order signed, to transfer the

10   file as quickly as possible.

11          I did call Judge Jernigan prior -- right before I came

12   out -- well, right before I went and got lunch and then came

13   out -- to inform her what I was going to do, so the Dallas

14   court is aware that this is -- that this is an issue that's

15   coming their way.

16          Is there anything -- I'm not going to create a lot of

17   law of the case for Judge Jernigan on matters that don't need

18   to be decided today.  Is there anything the parties actually

19   agree on that needs to go forward today or can go forward

20   today?  If not, I'd rather just save everything for Judge

21   Jernigan to have a fresh look at.  I know that she did mention

22   that she has availability on her calendar over the next several

23   weeks.  So you should be able to get on it rather quickly, once

24   the case gets transferred.

25          We used to send big boxes in the mail to do this, but

1  now it's just hitting a couple buttons on a computer to take

2  care of that.

3          So is there anything we could -- we need to decide?

4          Okay.  Just a question.  Obviously there are estate

5  professionals -- Pachulski not really a problem, since you'll

6  stay in the case, but I'm thinking of Young Conaway -- and I

7  don't know if there are any other firms that are Delaware firms

8  that might fall out of the case that would be subject to the

9  Court.  But I'll leave that for Judge Jernigan to decide

10  whether to retain them for a limited period of time or to pay

11  them or not pay them.  Hopefully, of course, they've earned

12  their money; they should be paid.

13          Yes, sir.

14          MR. KHARASCH:  Your Honor, Ira Kharasch of Pachulski.

15  I think Your Honor, there is one vital matter that you should

16  hear today and rule on.  I would think it would be generally an

17  easy motion.  It is the application to employ the CRO.  That is

18  within the debtor's business judgment, given -- as we described

19  the reasons for that, considering the concerns raised by

20  creditors.

21          I think it's critical that the CRO be formally

22  engaged.  They've done a tremendous amount of work in the past

23  six weeks.  They've been at the company full time, for a team,

24  for a month.  They have done a lot of good stuff in this case.

25  They have a lot more things to do.

1          The CRO has been tasked under the modified -- under

2   the protocols, with broadened authority to take all kinds of

3   and accept all kinds of decision-making over key decisions of

4   this case, involving insider transactions, ordinary-course

5   transactions.  We've done a lot of work modifying the protocols

6   that relate to that.

7          This company is operating every day.  I think the CRO

8   and his team deserve some comfort that they should get employed

9   as of today, Your Honor.  I -- you know --

10          THE COURT:  Let me hear from the committee.

11          MR. CLEMENTE:  Thank you, Your Honor.  Matthew

12   Clemente on behalf of the committee.

13          Your Honor, we don't agree with that.  Again, it's not

14   about DSI being paid or not being paid.  As Your Honor

15   mentioned with Young Conaway, that isn't the issue.  But to the

16   extent Your Honor has any familiarity with the motions, they're

17   all intertwined.  The CRO is all part of the protocols that

18   they're advancing in the ordinary-course motion.

19          So this isn't about simply retaining a professional to

20   ensure that that professional gets paid.  It really is about

21   setting what I like to call concrete pillars in the ground in

22   terms of how the debtor views the case should be managed going

23   forward.  And I think based on Your Honor's ruling, that's

24   something that Judge Jernigan should be given the opportunity

25   to weigh in on.

1     So again, it's not about Mr. Sharp and his firm

2 getting paid.  I don't believe that that is the issue.  They

3 can continue doing what they've been doing, up to this point,

4 just like we have, for example, at Sidley, and the rest of the

5 professionals that haven't been retained.  And I don't see why

6 that should cause a problem.

7     But we do believe that that is integrated with the

8 other suite of motions that would be before Your Honor; and we

9 think it's appropriate for Judge Jernigan to make those

10 decisions.

11     THE COURT:  All right.  Well, I don't view a retention

12 application to be an emergent basis to hear a motion anyway.

13 But I'm certainly not going to agree to sign it over objection

14 of the committee, given how I just ruled.  So --

15     MR. CLEMENTE:  Thank you, Your Honor.

16     THE COURT:  -- I'd also say.  So I'd ask the committee

17 Counsel to circulate a form of order and submit it under

18 certification of counsel.  I think the simpler the better; just

19 for the reasons set forth on the record, and it's transferred.

20 Don't put a lot of findings in there.  That'll just cause

21 trouble.  That's my belief.  But you can negotiate what you

22 want to negotiate, and as soon as that's ready, upload it,

23 inform chambers, we'll get it signed, and we'll start the

24 machinery in place.

25     MR. CLEMENTE:  Great.  Thank you very much, Your

1  Honor.  We appreciate it.

2          THE COURT:  All right.  We're adjourned.

3      (Whereupon these proceedings were concluded at 2:02 PM)

1                          I N D E X

2    WITNESS                 EXAMINATION BY          PAGE

3    Bradley Sharp           Ms. Reid               20

4    Bradley Sharp           Mr. Shaw               21

5    Frank Waterhouse        Mr. Guekre             24

6    Frank Waterhouse        Mr. Shaw               32

7

8                          E X H I B I T S

9    DEBTOR'S         DESCRIPTION                   PAGE

10   --              A thru U, except for G          12

11   ACIS'               DESCRIPTION                PAGE

12   --              Exhibits 1 through 18, with      37

13                   the exception of Nos. 3 and

14                   9; and Exhibits 24 and 25

15   26              Email exchange between Acis'     40

16                   counsel and Hon. Jernigan's

17                   courtroom deputy

18

19                          RULINGS

20                                        Page    Line

21   Motion of the Official Committee of     105      13

22   Unsecured Creditors for an Order

23   Transferring Venue of this Case to the

24   United States Bankruptcy Court for the

25   Northern District of Texas, granted.

1

2                    **C E R T I F I C A T I O N**

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10                                      December 3, 2019

11   _____      _____

12   CLARA RUBIN                          DATE

13

14   eScribers, LLC

15   352 Seventh Avenue, Suite #604

16   New York, NY 10001

17   (973) 406-2250

18   operations@escribers.net

19

20

21

22

23

24

25

# A

**ability (7)**
17:24;18:11;27:2;
40:11;64:6,8;88:25
**able (9)**
46:9;47:9;49:15;
53:15;79:13;83:3;
100:6;103:20;
110:23
**above (1)**
48:1
**absolute (1)**
43:10
**absolutely (3)**
89:21;102:17;
106:24
**accelerated (1)**
96:22
**accept (1)**
112:3
**acceptable (1)**
11:8
**access (1)**
14:7
**accessing (1)**
14:5
**accomplished (1)**
98:21
**accomplishing (1)**
18:7
**Accordingly (1)**
80:20
**account (3)**
15:19,22,23
**accountant (1)**
24:12
**accounting (3)**
28:6,7;67:7
**accounts (3)**
65:5,21,22
**accurate (1)**
102:10
**achieve (2)**
45:11;99:19
**Acis (106)**
6:15;8:8,18;16:6,
22,23;17:7,10,12,14,
18,21,22;18:2;21:5;
22:12,19,21;34:10,
13;35:8;36:11;37:9;
38:20;43:1,21;44:1,
11,16,17;45:5,7,13;
48:4;49:21,25;50:9;
53:16,19;54:14,23;
57:15,23;58:16;
59:13;60:3,14;61:4,
21;62:23;63:1,2,3;
64:13;65:25;66:2,
21;67:13,23;68:14,
25;69:6;72:17,23;
74:10;75:1;77:1,14,

20,23;78:7,15,20;
79:19;81:23;82:13,
14;83:1,1,23;85:9;
90:4;91:14,16,16,18,
19;92:4,5,8;93:1,10,
12,24;95:9,12,19;
96:25;98:3,5,18;
100:19;103:15,15,
17;108:22
**Acis' (17)**
16:8;17:21;37:20;
40:21,22;47:8;
60:12;63:7;65:23;
73:25;74:2;75:25;
76:16;77:1;82:11;
93:20;98:15
**acknowledges (2)**
80:20;85:4
**Acquisition (3)**
81:4;83:19;89:16
**Acquisitions (1)**
99:13
**across (1)**
67:12
**acting (1)**
107:1
**actions (1)**
83:25
**active (4)**
16:24;82:22;
85:18;92:14
**actively (1)**
109:12
**actors (1)**
50:12
**actual (4)**
60:13;77:15;
107:10;108:9
**Actually (10)**
27:20;40:17;42:1;
56:22;62:25;68:21;
90:16,22;94:17;
110:18
**ad (1)**
61:23
**add (1)**
107:5
**additional (2)**
37:12;60:16
**Additionally (3)**
52:22;55:3;58:9
**address (8)**
29:12;38:11;
72:15;75:24;83:18;
97:5;98:17;102:7
**addresses (2)**
82:19,25
**adequately (1)**
65:10
**adjourned (1)**
114:2
**adjudication (2)**
69:3;72:19

**administered (6)**
48:5,13;64:19;
70:13,18;78:19
**administration (2)**
87:6;109:1
**administrative (1)**
83:22
**admissible (3)**
38:13;40:2,3
**admission (1)**
37:15
**admit (2)**
40:6;91:20
**admitted (5)**
12:16,17;37:18;
59:16,18
**advanced (1)**
95:6
**advancing (1)**
112:18
**advantage (5)**
54:4;55:4,5;81:17;
95:14
**adverse (3)**
56:6,7;74:9
**adversity (1)**
97:22
**advise (1)**
100:6
**advises (2)**
16:24;50:8
**advisor (2)**
13:4;93:2
**Advisors (5)**
14:12;15:5;25:5,
17;80:8
**advisory (12)**
13:1;15:1;16:3;
67:1;86:11;91:18;
92:8,14,20;93:17,19;
94:4
**affairs (1)**
14:2
**affect (1)**
108:9
**affected (1)**
109:1
**affiliate (7)**
44:17;45:5,7,13;
80:11;108:2,4
**affiliated (7)**
15:4,5;16:16;
43:23;44:22;48:14;
51:24
**affiliates (15)**
15:7;22:17,20;
24:24;34:18;35:14;
45:21;46:3;47:24;
48:8,20;51:23;53:2;
80:12;94:3
**affirmation (1)**
19:9
**affirmatively (2)**

43:3;55:12
**affirmed (2)**
19:12;23:22
**afforded (1)**
56:16
**afternoon (5)**
51:24;75:21;
101:8,23;105:11
**again (52)**
17:4;27:3,3,4,5,19;
35:6,18,18;41:12;
43:23;44:18;45:6,7;
48:8,22;49:14,22;
53:3;54:13,22,24;
55:20,24;57:15,16;
63:10,15;65:16;
66:17,21;67:9,25;
68:3;69:1,11;70:13;
71:3;74:7;75:21;
79:25;86:20;87:10;
89:3;93:25;94:23;
100:12;103:25;
104:23;106:18;
112:13;113:1
**against (13)**
17:11,12,18,21;
56:8;78:16,20;83:7,
14;88:24;97:18;
98:3;100:5
**agenda (2)**
10:15,16
**ago (5)**
24:21,23;43:21;
96:20;108:3
**agree (4)**
90:25;110:19;
112:13;113:13
**agreement (6)**
54:17;66:23,23,
24;79:13;94:17
**agreements (22)**
16:7,10,15,15;
34:13,16,17;35:8,9,
12,15,16,22;66:22;
93:12,18,19,23,24;
94:5,14,19
**agrees (1)**
51:22
**ahead (1)**
75:20
**air (2)**
88:7,8
**Aires (1)**
15:9
**Airlines (1)**
109:4
**al (3)**
6:15;8:8,18
**albeit (1)**
50:4
**allegations (1)**
18:22
**allow (3)**

32:7;33:19;40:20
**almost (3)**
51:20;56:2;107:9
**alone (1)**
39:20
**along (8)**
10:24;61:7;65:20;
66:14;67:22;68:1;
104:16,20
**although (11)**
15:6;17:23;43:7;
44:3;48:9;50:14;
52:7;96:19;97:2;
102:16;107:24
**Alvarez (2)**
7:3;8:3
**always (2)**
48:14;102:23
**America (3)**
14:23;15:11;86:15
**American (2)**
93:5;109:3
**amount (8)**
43:11;76:22;82:5;
84:23;96:21;103:4;
108:6;111:22
**amounts (1)**
43:10
**amply (1)**
41:20
**analysis (5)**
76:13;77:8;79:25;
82:6;94:5
**analyze (2)**
82:6;84:19
**analyzing (1)**
17:25
**ANDERSON (1)**
8:2
**ANDREW (1)**
7:17
**Angeles (1)**
13:11
**answered (1)**
27:20
**anymore (1)**
88:8
**apologize (2)**
36:18;75:10
**appeal (8)**
44:11,21;45:12;
53:18;72:16;73:4;
76:9;108:3
**appeals (6)**
17:16,19;57:4;
72:23;73:5;76:8
**appear (1)**
84:6
**appearance (4)**
41:23;82:24;
88:16,17
**appearing (1)**
73:20

**apples (1)**
93:25
**applicable (1)**
52:5
**application (2)**
111:17;113:12
**applications (1)**
68:20
**applied (1)**
87:24
**apply (1)**
48:1
**applying (2)**
84:5;110:5
**appoint (3)**
15:13;78:1;96:13
**appointed (3)**
13:5;77:24;78:25
**appointment (3)**
66:3,4;98:19
**appreciate (2)**
19:23;114:1
**appreciates (1)**
82:21
**approach (5)**
11:21;36:24;
37:23;107:18;
108:11
**appropriate (15)**
11:2;16:18;44:2;
59:3;81:14;82:4;
87:4;94:2;95:15;
97:5;98:13;100:23;
106:6;107:7;113:9
**appropriately (2)**
78:21;107:2
**appropriateness (1)**
16:14
**approval (2)**
18:18;95:11
**approve (2)**
26:14;95:10
**approximately (6)**
15:3,21,25;24:23;
67:19;92:11
**apt (2)**
84:12;96:13
**arbitration (6)**
83:9;91:25;94:14,
16,20,21
**areas (1)**
87:15
**argue (6)**
45:8;52:13;84:3;
87:10,12;98:8
**argues (1)**
88:13
**arguing (2)**
45:12;93:10
**argument (21)**
11:8;38:4;39:9;
41:4,15;76:19;77:5;
80:1;87:20,22;88:7,

20;89:2,25;90:12,16;
91:13;93:21;96:14;
99:25;105:14
**arguments (9)**
42:8,18;46:6,14;
51:6;55:5;87:9;
90:12,13
**arm (2)**
92:8;103:16
**around (10)**
15:1;16:8;32:1,1;
58:3;67:20;85:14;
86:20;91:2;101:17
**arrangement (1)**
94:3
**ARSHT (1)**
7:22
**article (1)**
101:3
**ashamed (1)**
106:4
**ASHBY (1)**
6:9
**Asia (1)**
14:22
**Asic's (1)**
41:16
**aside (1)**
90:12
**ASIF (1)**
7:15
**aspect (5)**
16:2;31:22;66:9;
72:6,8
**aspects (6)**
40:7;72:5,11;
78:24;95:3,8
**assert (1)**
17:10
**asserted (2)**
39:23;94:23
**asserting (1)**
54:2
**asset (2)**
17:6;98:3
**assets (40)**
14:19,20,21,25;
15:3,16,19;16:22;
17:1;18:10,12;
35:13;70:1;77:3;
78:4;84:23;86:2,6,9,
10,14,16,19,21;87:2;
92:4,22;93:1,7;
100:9,14;103:18,24;
104:7,8,10,14,15,18;
108:25
**assigned (9)**
45:23;46:5,19,21;
47:10;72:15;73:4;
102:18;103:2
**assignment (4)**
46:4;47:13;
102:13,17

**association (1)**
28:2
**Asst (1)**
9:3
**assume (2)**
27:3;48:17
**assumed (1)**
48:1
**assumes (2)**
59:4;90:16
**assuming (1)**
46:17
**assumption (2)**
45:22;46:13
**attached (2)**
91:24;94:12
**attachments (1)**
44:9
**ATTARWALA (1)**
7:15
**attempt (1)**
45:5
**attempted (1)**
41:23
**attempts (1)**
103:23
**attorney (1)**
27:7
**Attorneys (12)**
6:3,10,15,21;7:3,8,
14,23;8:3,8,13,18
**atypical (1)**
42:12
**August (3)**
16:8,21;74:4
**Austin (2)**
10:21;41:13
**authentic (1)**
38:24
**authority (2)**
84:17;112:2
**availability (3)**
38:22;39:21;
110:22
**available (1)**
18:6
**avoidance (1)**
89:7
**avoided (1)**
79:25
**aware (17)**
21:23;22:6;32:20;
33:11;34:10,11,21;
35:8,15;39:19;40:3;
46:16;76:1;102:9,
10;103:2;110:14
**away (8)**
46:7;48:17;52:14;
55:18;77:12;92:4;
103:24;108:24
**awkward (1)**
24:5

**B**

**back (14)**
26:11;37:2;49:11;
55:24;56:7;57:12;
62:14;63:16;70:13;
71:21;74:22;105:6,6,
11
**background (1)**
25:12
**back-office (2)**
67:5;92:20
**backward- (1)**
50:15
**bad (1)**
106:5
**badly (1)**
56:4
**baggage (1)**
79:18
**balance (3)**
18:12;93:7;109:7
**balance-sheet (1)**
93:1
**balls (1)**
74:11
**Bancorp (1)**
13:9
**Bank (4)**
7:14;15:25;43:15;
82:10
**bankruptcy (63)**
11:3;16:8;17:17,
20;18:3;21:9,14;
22:10;26:22;27:5,7;
32:4,21;40:13;
41:18;42:14;43:22;
44:1,20,23;47:10;
49:2,6,17,20,20;
52:4;53:20;55:1;
57:16;58:13,15,21;
59:3;60:10,23;61:4;
64:7,17,18;65:24;
68:9;69:2,24;72:4,9,
14,17,21;73:4,5,19;
74:10;76:10;82:23;
84:16;88:2;90:4;
103:25;105:24,25;
106:20;108:22
**base (3)**
90:22;91:8,9
**Based (13)**
11:4;15:6,25;
21:25;39:5;54:13;
55:8;73:25;83:13;
94:9;106:7;108:9;
112:23
**basically (2)**
92:5;93:2
**basis (4)**
63:14;92:22;
108:10;113:12

**BEACH (2)**
6:4;10:25
**bear (1)**
86:22
**bears (3)**
61:12;62:17;81:5
**become (3)**
44:17;53:4;54:18
**becomes (1)**
65:11
**becoming (2)**
56:3;103:3
**beg (1)**
42:14
**begin (2)**
31:15;41:14
**beginning (2)**
77:19;98:14
**behalf (12)**
10:7;11:15;19:20;
21:5;23:19;41:13;
45:4;60:3;75:22;
102:6;106:25;
112:12
**behind (4)**
46:14;87:25;
90:10;95:7
**belie (1)**
83:25
**belief (1)**
113:21
**believes (5)**
16:9,21;18:9;53:7;
59:1
**below (1)**
27:22
**beneficial (1)**
68:19
**benefit (2)**
18:5;69:20
**BENTLEY (1)**
8:14
**Bermuda (1)**
15:15
**best (4)**
55:15;65:7;87:1;
109:6
**better (3)**
95:13;96:3;113:18
**Beverly (1)**
13:8
**Beyond (6)**
21:15,21;27:12;
31:12;32:23;47:2
**bias (1)**
73:21
**biased (2)**
73:18;74:8
**BIBILONI (1)**
6:17
**big (9)**
60:6,6;65:14;
69:21,22;86:3;

93:10;96:7;110:25
**billion (5)**
14:25;15:3;35:13;
69:17;103:18
**binder (4)**
11:21;59:14,21;
60:8
**binders (1)**
60:6
**bit (6)**
37:1;60:24;63:18,
21;68:20;77:7
**BJORK (1)**
7:16
**blame (1)**
57:10
**BLANK (2)**
6:14;59:13
**BLOCK (1)**
7:7
**body (3)**
83:22;100:19,22
**boil (1)**
64:17
**boils (1)**
64:4
**bonuses (1)**
95:10
**bookkeeping (1)**
67:7
**books (1)**
14:6
**boost (1)**
106:11
**borrow (1)**
65:24
**boss (1)**
26:17
**both (8)**
16:16;47:23;56:4;
57:2;61:25;64:5;
65:9;104:17
**bottom (1)**
100:20
**bound (1)**
36:20
**BOWDEN (3)**
6:11;75:18,19
**box (5)**
53:3;54:14;57:23;
65:25;66:21
**boxes (1)**
110:25
**Brad (3)**
10:12;78:25;84:7
**BRADLEY (3)**
9:7;19:15;27:10
**B-R-A-D-L-E-Y (1)**
19:15
**brain (1)**
67:1
**break (3)**
59:14;98:5;105:5

**breathed (2)**
61:4;63:11
**breathing (2)**
61:8;86:25
**brethren (2)**
87:21;91:2
**BRIAN (2)**
8:9;21:4
**brief (5)**
52:10;61:2;88:9;
99:8;102:5
**briefly (7)**
23:14;32:17;
39:17;53:25;57:12;
60:7;99:8
**bring (5)**
67:17;80:11;
86:21;99:19,22
**bringing (1)**
98:15
**broad (2)**
84:17;104:14
**broadened (1)**
112:2
**brokerage (2)**
15:18;65:5
**brought (1)**
17:17
**Buenos (1)**
15:9
**bulk (2)**
15:19;84:15
**burden (9)**
41:20;61:21;
62:16,17,18;77:16;
81:5;98:12;100:2
**burden-of-proof (1)**
61:19
**burdensome (1)**
88:22
**business (39)**
14:2;19;16:3,22;
17:3;22:15,22;50:2,
3,6,9;64:22;65:3,6,8,
12,13;67:8,11;72:5,
6,8,11;78:4;79:7;
81:21;89:8;91:1;
92:3,7,11,24;94:23;
95:3;103:21;104:1,
19;110:3;111:18
**businesses (3)**
86:8;89:5;94:10
**buttons (1)**
111:1
**buy (2)**
56:12;90:11

# C

**Caesar's (1)**
88:4
**calendar (1)**
110:22

**California (1)**
32:1
**call (12)**
21:24;23:13;
33:12;39:4;53:14;
62:12;71:23;85:11;
99:24;101:22;
110:11;112:21
**called (9)**
11:25;12:23;
21:22;23:5;32:25;
44:14;74:11;85:5,8
**came (3)**
69:8;110:11,12
**can (31)**
11:20;26:4;27:7;
35:3,5,18,21;38:19;
39:10;40:3;41:18;
43:23;46:11;49:23;
52:12;61:2;70:7;
77:16;80:3;85:3;
89:13;97:3;98:9;
108:15;109:2,2,3,5;
110:19;113:3,21
**cap (1)**
100:20
**capable (2)**
40:14;97:12
**capacity (2)**
43:1;49:16
**Capital (13)**
6:15;8:8,18;9:4,5;
10:7;21:5;24:10;
25:1;29:7;30:23;
60:3,14
**care (2)**
71:15;111:2
**career (1)**
102:14
**carefully (2)**
40:16;94:15
**Carey (2)**
13:7,9
**carries (1)**
41:20
**carry (2)**
77:16;78:7
**cart (1)**
101:11
**CARUSO (9)**
9:9;10:12;13:24;
18:14;27:15;53:7;
84:14,21;95:2
**case (149)**
13:15;16:14;18:4,
9,15;21:10;22:24;
33:18,18;39:19;
40:11,17;41:17;
42:11;43:7,9,22,23,
25;44:6;45:13,22;
46:3,7,15,18,21;
47:19,24;48:12;
49:21;50:14;52:8;

53:11,16;56:17;57:1,
2;59:1;61:4,13,16;
62:11;63:4;64:13,14,
17;68:9;69:2,6;70:3,
12,14,18;72:1,1,17;
74:10,20,22,25;76:5,
10,11,23,24;77:14,
21;78:8,10,15,20,22;
79:8,14,15,18;80:4,
12;81:7,11,20,22;
82:8,14,24;84:16;
85:8,12,16,20,23;
86:10;87:11,18,25;
88:15;89:16;90:14;
91:14,15;93:24;
94:16;95:8,23;96:11,
15,15,16,17,25;
97:11,13,15,19,20;
98:5,7,8,20,22;
102:18,21;103:5;
105:15;107:10,16,
17,19,21,23,24,25;
108:1,8,11,18,19;
109:8,11,15;110:5,
17,24;111:6,8,24;
112:4,22
**case-in-chief (2)**
31:14;33:7
**cases (31)**
13:6;44:22;47:6,
11,23;48:14;52:7;
56:9,9;58:9;63:11;
72:23;76:3;80:4,10;
82:23;84:11;85:2;
86:6,7,7,20,22;
87:22;88:20;91:7;
97:23,24;102:10,11;
105:19
**cast (2)**
57:15;64:11
**catalyst (1)**
80:19
**cause (2)**
113:6,20
**Cayman (1)**
15:15
**center (4)**
42:5;43:5;51:11;
58:8
**CEO (1)**
9:7
**certain (14)**
15:14;16:7;35:9;
50:7;54:22;60:5;
65:5;70:1;78:6,24;
91:3;92:4;97:8;
104:17
**certainly (15)**
39:25;40:10;48:5;
67:22;69:4,14;
71:24;72:6;89:10;
105:24;106:6;
107:14;108:10,15;

113:13
**certification (1)**
113:18
**cetera (1)**
65:21
**CFO (7)**
9:5;26:11,13,19;
29:1;32:20;35:11
**chain (1)**
89:23
**challenge (1)**
97:19
**chambers (3)**
11:18;33:13;
113:23
**chance (2)**
33:6;41:1
**chancery (4)**
71:20;83:8,9;
88:19
**change (2)**
48:9;98:12
**changed (1)**
58:5
**changes (1)**
58:5
**Chapter (10)**
17:21;45:13;
78:22;80:3;86:24;
97:10;98:19;105:16,
19,25
**characterized (1)**
50:7
**charge (3)**
17:22;18:1;97:2
**chart (1)**
27:23
**chicanery (1)**
106:22
**chief (6)**
12:24;13:3,5,25;
24:14;78:25
**choice (10)**
55:19;58:2;62:15,
19;79:22;81:9,14;
105:23;106:11;
109:16
**choose (1)**
64:6
**choosing (1)**
106:5
**chose (1)**
42:15
**Circuit (2)**
72:24;81:3
**circulate (1)**
113:17
**circumstance (1)**
47:11
**circumstances (5)**
16:19;38:16;79:8;
107:19;109:25
**cite (1)**

81:2
**cited (1)**
 88:6
**citing (1)**
 95:25
**citizen (1)**
 81:16
**City (4)**
 15:20,25;82:10;
 83:10
**claim (7)**
 43:16;82:12;83:1,
 1,12,13;89:11
**claiming (2)**
 68:22;92:5
**claims (17)**
 17:11,12,17;63:6,
 7;78:20;82:25;
 84:19;88:24;89:6,7,
 10;94:22,22;97:25;
 98:3,4
**classes (1)**
 17:6
**cleanse (1)**
 58:2
**clear (22)**
 42:2,6;49:17;50:1;
 51:12,15;54:13,18,
 25;55:8,11;58:3,23,
 25;61:22;66:17,18;
 80:2;81:5;98:16;
 101:18;107:16
**clearly (15)**
 40:6;47:2,18;50:8,
 11;52:4,7;54:10;
 55:9;70:23;96:11;
 97:16;103:25;
 104:22;108:21
**CLEMENTE (51)**
 10:19,21,21;11:11,
 13;12:13,15;23:12;
 38:7,11;39:25;
 40:24;41:12;45:17,
 20,25;46:20;47:2,4,
 7,17;48:7,16,18,21;
 49:1,8,11;52:16;
 56:1,15,18,20,25;
 57:5,7,10;59:7;
 61:21;65:25;66:16;
 75:25;76:14;99:8,
 12;102:3,6;112:11,
 12;113:15,25
**Clements (1)**
 41:13
**CLERK (11)**
 10:2;19:10,13,17;
 23:21,23;24:2;75:9;
 102:15;103:9;105:9
**client (1)**
 10:11
**clients (2)**
 14:21;48:2
**Clifford (1)**

31:5
**clinging (1)**
 105:15
**CLO (21)**
 8:13;16:22,23;
 17:2;50:6;65:22;
 68:11,16,17,23,25;
 91:5,7;92:3,3,10,13;
 103:13,14,21,23
**CLOs (19)**
 16:5,6,11,24,24;
 22:21;50:8;57:16,18,
 21;65:14,20;92:15;
 93:2,18;103:12,16,
 17,19
**close (6)**
 19:23;24:4;41:2;
 70:8;81:24;98:12
**closed (1)**
 41:3
**clothes (1)**
 75:17
**CLUBOK (1)**
 7:17
**co- (1)**
 26:5
**co-counsel (4)**
 10:24;38:1;61:7;
 100:6
**collateral (1)**
 92:9
**collateralized (2)**
 16:4;65:15
**colleague (3)**
 13:24;33:24;84:21
**colleagues (3)**
 10:23;46:9;81:2
**colloquy (2)**
 58:20;61:20
**color (2)**
 108:10,15
**combination (1)**
 59:2
**comfort (1)**
 112:8
**comfortable (1)**
 48:4
**coming (2)**
 105:11;110:15
**commence (1)**
 81:22
**commenced (3)**
 80:18;83:8;88:19
**comment (2)**
 89:4;103:11
**commented (1)**
 22:13
**comments (5)**
 76:20;77:4,19;
 89:23;100:18
**Committee (66)**
 6:3;7:8,23;10:22;
 18:8,20,23;19:20;

23:20;41:13;42:25;
 43:8,12,17;45:10;
 50:17,22;51:22;
 54:3;57:2;59:1;61:1;
 63:6,17,19,23;64:7;
 70:16;75:1;77:13,16,
 20,25;78:7;79:13,19;
 80:18,20;81:23;82:2,
 2;83:6,11,17,23;
 85:8,17,22;86:3;
 87:1,7;88:13,16;
 89:25;90:13;93:10;
 94:6;98:12,18;
 102:6;109:14,23;
 112:10,12;113:14,16
**committee's (7)**
 10:16;53:9;60:4;
 64:1;72:2;98:14;
 109:23
**communicated (1)**
 18:20
**companies (1)**
 107:14
**company (3)**
 91:4;111:23;112:7
**company's (1)**
 22:9
**compared (1)**
 95:6
**compensation (2)**
 16:9;95:15
**complete (1)**
 14:7
**completely (1)**
 107:25
**complex (2)**
 50:2;51:23
**comply (1)**
 67:2
**compound (1)**
 106:10
**comptroller (1)**
 63:17
**computer (2)**
 41:10;111:1
**CONAWAY (6)**
 6:2;10:24;85:17;
 100:4;111:6;112:15
**concede (1)**
 70:23
**concedes (1)**
 61:21
**concentration (2)**
 87:10,12
**concept (3)**
 63:16;73:21;87:16
**concern (1)**
 89:8
**concerns (4)**
 78:23;97:6;98:18;
 111:19
**conclude (3)**
 74:13;92:1;96:8

**concluded (2)**
 92:1;114:3
**concludes (1)**
 18:25
**concluding (1)**
 94:19
**conclusion (2)**
 73:25;98:11
**conclusory (1)**
 104:6
**concrete (1)**
 112:21
**conduct (3)**
 58:11;78:25;79:17
**conducted (1)**
 91:20
**conference (2)**
 33:13;52:10
**confident (2)**
 91:6;102:25
**confirmation (12)**
 43:25;45:6;53:19;
 60:12,14,19;74:3,3,
 5;76:8;91:16,24
**confirmed (2)**
 44:11,13
**confirming (1)**
 17:21
**conflict (1)**
 47:25
**conflicted (1)**
 58:22
**conflicts (1)**
 78:18
**conflicts-of-interest (1)**
 78:17
**conjunction (1)**
 27:8
**Connecticut (1)**
 83:18
**connection (17)**
 11:19;16:3;23:11,
 13;46:7;49:6;60:10,
 12;69:5,5;72:22;
 73:4;74:2,10;80:16;
 93:8;97:5
**connections (1)**
 86:8
**connotation (1)**
 106:19
**consensual (1)**
 87:2
**consider (1)**
 94:11
**consideration (1)**
 48:11
**considered (1)**
 39:20
**considering (3)**
 38:15;101:10;
 111:19
**consist (1)**
 15:16

**consistent (3)**
 46:18;50:5;58:6
**consistently (1)**
 55:15
**consists (1)**
 109:23
**constituents (1)**
 18:6
**constructive (1)**
 86:25
**constructively (1)**
 18:8
**contact (1)**
 75:12
**contained (1)**
 65:17
**containing (1)**
 11:21
**content (2)**
 35:17;95:22
**contentious (1)**
 17:15
**contested (1)**
 52:25
**context (1)**
 52:6
**continue (6)**
 17:15;49:8;84:25;
 89:8;92:16;113:3
**contract (1)**
 54:16
**contracts (8)**
 54:20,23,24;55:1;
 86:12;93:14,16;94:9
**contractual (1)**
 16:7
**contrary (2)**
 57:14;79:18
**control (1)**
 25:16
**controlling (1)**
 55:7
**controls (1)**
 25:4
**controversy (1)**
 70:23
**controverted (2)**
 43:20;100:12
**convenience (5)**
 51:10;64:9;78:9;
 80:24;82:7
convenience-of-the-parties (1)
 61:25
**convenient (13)**
 13:12;52:12,14,18,
 21;55:9,18;83:24,25;
 85:24;90:1,3,3
**conversation (1)**
 64:1
**conveyances (1)**
 92:5
**convince (1)**
 45:10

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**COO (1)**
9:9
**cooperation (1)**
96:20
**copy (1)**
36:19
**CORCO (3)**
81:3,24;86:2
**core (2)**
22:15;39:12
**corners (1)**
62:13
**corporate (5)**
28:6;88:1;97:3,7;
98:1
**corporation (1)**
14:12
**corroborating (1)**
38:17
**CORROON (1)**
8:2
**Counsel (33)**
9:3;10:8,22;13:14,
16;22:13;37:9,15;
38:20;40:21;45:3;
47:8;59:13;61:3,4;
69:25;75:25;76:15,
16;77:6;79:3,25;
82:11;85:15;88:14;
89:1;93:20;97:23;
100:19;108:16;
110:4;113:17,18
**count (1)**
67:19
**counting (1)**
62:3
**country (6)**
15:18;32:1;85:15;
86:20;91:3;100:15
**couple (5)**
64:20;73:15;
75:24;96:19;111:1
**course (15)**
16:8;21:3;40:2;
46:11;48:6;76:18;
79:7;80:21;92:16;
100:24;101:18;
106:15,23;109:16;
111:11
**COURT (260)**
10:3,5,13,18,20;
11:3,10,12,22;12:2,
4,6,9,12,14,16,20;
13:12;17:17,20;
18:3;19:1,4,6,8,18,
21,25;21:3,6,17,24;
22:4;23:3,7,10,15,
18;24:3;25:9,11,15;
26:3;27:13,20;31:9,
11,18,24;32:7,13,15;
33:1,3,16,21,24;
34:5,24;35:3,25;
36:4,7,14,17,21,23,

25;37:3,7,8,14,18,
24;38:5,10;39:10,16,
18,19;40:2,5,13,25;
41:9,18;42:14;
43:22;44:1,2,5,21,
23;45:10,16,18,21;
46:1,23;47:1,3,5,10,
16,22;48:8,17,19,22;
49:7,10,13,14,18,20,
20,21;50:1,16,18,20;
52:4,15;53:20;54:2,
5,5,10,16,21;55:1,17,
25;56:2,16,19,24;
57:1,6,8,13,24;
58:16,21,24;59:3,4,
9,19,22,24;60:7,10,
13,17,18,22;61:24;
62:6,10;63:12;
64:23;65:7,23;66:9,
11,11;71:3,7,9,9,10,
12,14,14,17,17,19,
19;72:4,7,10,10,21,
21;73:2,3,12,12,14,
18,19,20;74:2,4,6,8,
14,15,21,24;75:3,10,
16,19;76:21,22;
78:16,21,21;80:10,
12;81:21;83:2,8,10;
84:6,10,12;85:7,10,
24;86:21;87:3,15,23;
88:5,19;89:3,18,21;
90:4,15;95:14;
96:14;97:11,12;99:2,
5,7,11;102:2,4;
103:4,9,25;104:5,13;
105:4,10;106:25;
107:1;109:21;110:7,
14;111:9;112:10;
113:11,16;114:2
**courthouse (2)**
52:14;89:14
**courtroom (10)**
10:10;38:21;39:4;
40:18,22;74:17,19;
82:20;103:8,9
**courts (11)**
71:24;73:11;
77:10;81:1,8;84:5;
86:5;87:6;89:12;
102:15;104:17
**court's (4)**
38:22;39:21;62:1;
103:24
**craft (1)**
79:3
**crash (1)**
92:13
**create (5)**
41:23;47:25;
48:10;101:16;
110:16
**created (2)**
92:13;100:12

**creates (1)**
108:7
**credentials (1)**
98:17
**credibility (2)**
90:21;108:15
**credible (2)**
49:13;96:13
**creditor (21)**
15:24;21:5;42:22;
43:1,3,12,18;56:11;
62:24;63:1,2,3,10;
64:13;83:13,16,22;
88:22;98:18;99:15;
109:11
**Creditors (50)**
6:3;10:23;43:9,10,
11;50:24;51:18,20,
21;55:10,10,16,19;
56:6;68:7;70:7,16;
78:24;82:1,5,6,9,15,
17;83:2,5,24;87:10;
88:13,23;89:4,13;
98:6;99:14,18;
100:18,20,21,22;
104:23,25;106:15,
25;108:24;109:12,
14,22,24;110:4;
111:20
**creditors' (6)**
18:20;19:20;
23:19;43:8;109:7,8
**credit-research (1)**
28:13
**critical (2)**
86:6;111:21
**CRO (21)**
13:19;27:7;58:1,2,
3,4,11,14;79:9,10;
84:11,12;85:2;
96:16;97:6;98:16;
111:17,21;112:1,7,
17
**cross (6)**
11:7;21:16,22;
36:1,2;50:12
**CROSS-EXAMINATION (4)**
20:1;21:7;23:3;
90:21
**cross-examine (1)**
19:2
**Crusader (2)**
7:8,23
**CRUTCHER (1)**
7:2
**crux (3)**
76:19;78:19;90:1
**current (6)**
22:20;29:6,11;
45:13;82:19;108:3
**currently (7)**
17:19;24:19;
29:10;31:20;34:17;

58:18;92:24
**CURTIS (1)**
7:24
**curve (12)**
49:14;50:17;52:6;
66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**custodial (1)**
15:17
**cynic (2)**
56:2,4

**D**

**Dallas (96)**
13:13,16;15:7;
20:5,12;29:1,3,6,8,9,
11,12,14,16,19,21;
30:1,4;32:4,9;41:18,
25;42:3,4,5,14,15;
43:1,4,22;44:1,5,20,
23;45:14;46:23;
47:10;49:13,17,20;
50:1,16,18;51:5,11,
17,19;52:4,7,11,12,
19,19,21;53:2,12,13,
15,20;54:2,5,5,10,16,
21,25;55:8,9,17;
56:25;57:13;58:7,7,
15,21;59:3;60:10;
65:10,23;69:16;
73:18;74:25;83:25;
86:18,18;88:11;
100:13,23;106:25;
108:18,21;109:3;
110:2,4,5,13
**Dallas-oriented (1)**
108:20
**date (7)**
12:19;16:1,20;
37:22;40:23;60:18;
61:5
**Daugherty (2)**
83:6;88:19
**David (1)**
31:5
**day (2)**
89:7;112:7
**days (5)**
14:3;21:9;72:2;
74:19;87:20
**day-to-day (2)**
18:10;32:3
**DC (1)**
83:15
**de (1)**
15:9
**deal (1)**
48:13
**dealing (1)**
63:22
**dealings (1)**

16:22
**dealt (2)**
91:4;97:15
**debt (10)**
48:15;63:22,23,
24;68:2,10;69:12,14,
22;70:10
**debtor (159)**
10:7,10;11:7,16;
12:25;13:16,18;14:5,
7,8,14,17,24;15:2,6,
10,21;16:5,12,21,23,
24;17:5,12,14,18,19;
18:15,17,24;21:13,
20;22:20;24:9;
29:16;30:23;31:20;
32:20,21;34:10,18;
35:14;41:6,23;42:1,
3,5,15,20,24;43:4;
44:8,17,19,25;45:1,
7,8,12;49:19,25;
50:1,3,7;51:1,14,25;
52:2,5,12;53:16,20,
25;54:1,11,15,19;
55:12,21;56:5,8,10,
16;57:14,15,18,20,
25;58:2,12,16,18;
64:5,22;68:22;
73:23;75:7;77:3,25;
78:11,17,20,22,23;
79:3,5,6,10,14,16,20;
80:3,5,16,18;81:12;
82:9,21,22;83:7,14;
84:5,6,8,12,15,17,20;
85:4,4,10;86:24;
88:18;90:6,8,9;
91:17,18;92:2,8,13,
18,23;93:12;94:3;
95:1,13;96:16;97:10,
17;98:4,16;99:23;
105:24,25;106:11,
25;109:16;112:22
**debtors (10)**
17:10;36:19;48:9;
68:21;73:22;78:19;
80:4;97:24;107:12;
109:6
**Debtors' (1)**
12:18
**debtor's (88)**
13:14;14:2,6,10,
12,15,20;15:7,12,18,
19,24;16:2,16;17:3,
4,24;18:1,5,10,11,
19;20:7,9;22:15,22;
30:10;36:16;41:16;
42:23;44:5;45:11;
50:2,9;51:11;54:23;
55:4;62:15,19;64:2,
25;65:2,4,14,17,20;
69:25;72:5,6,8,11;
73:17;77:3,4;78:4,4,
4,6;79:2,16,17,22;

81:9,14,21;82:18,19;
84:23;85:6;86:9,16;
87:1;88:21;91:17;
92:6,11,24;93:4,7;
94:23;95:3,21;96:10,
12;97:13;105:22;
106:11;111:18
**debtors-in-possession (1)**
75:23
**decide (3)**
58:3;111:3,9
**decided (5)**
33:7;39:20;97:20;
100:5;110:18
**decides (1)**
101:23
**deciding (1)**
48:11
**decision (10)**
45:9;48:3,25;49:4;
81:3;90:22;105:7;
107:15;108:9;
109:10
**decision- (1)**
31:22
**decision-making (4)**
58:17;86:4;
106:12;112:3
**decisions (10)**
31:20,25;42:4;
43:24;51:15;55:15;
57:19;106:7;112:3;
113:10
**declaration (4)**
28:1;64:24;65:1;
68:4
**declined (1)**
33:3
**decrease (2)**
17:2;92:16
**defending (1)**
109:16
**defense (1)**
68:24
**defer (1)**
81:14
**deference (4)**
56:10,14;62:15;
81:9
**definite (1)**
76:4
**definitely (1)**
46:14
**degree (1)**
35:9
**degrees (1)**
50:20
**Delaware (42)**
13:6,12,15;14:11,
13,15;42:24;43:4,19;
55:13,21;56:7;65:9;
70:24,25;72:7;
74:22;78:22;80:2,6,

6,7,9,13,19,21;81:12,
13;83:4,8;84:1;85:3,
14;88:11;89:1;
99:14,15,16,17,21;
107:1;111:7
**delay (1)**
41:9
**Demo (1)**
10:9
**demonstrate (4)**
76:20;77:15,17;
85:22
**demonstrated (5)**
50:23;55:8;84:7,8;
88:25
**demonstrates (1)**
82:7
**demonstrating (1)**
81:5
**denial (1)**
94:13
**denied (3)**
74:4,6;79:23
**Dennis (1)**
10:23
**DENTONS (1)**
6:20
**deny (1)**
99:1
**depend (1)**
106:2
**depending (2)**
33:10;50:19
**depends (3)**
35:19;52:17;
107:17
**depose (1)**
39:4
**deposition (3)**
30:8,19;69:16
**depositions (1)**
53:12
**deputy (4)**
38:21;39:4;40:18,
22
**derives (1)**
17:5
**describe (1)**
28:1
**described (2)**
44:9;111:18
**deserve (1)**
112:8
**designated (3)**
32:24,25;67:18
**desires (1)**
109:8
**despite (1)**
103:1
**detail (1)**
76:16
**determination (2)**
44:20;51:1

**determinations (2)**
54:21;101:6
**determine (5)**
16:17;44:2,23;
50:18;51:20
**determined (1)**
82:3
**determining (1)**
95:14
**detriment (1)**
49:5
**develop (1)**
50:2
**developed (2)**
49:24;84:22
**Development (3)**
9:7,9;12:25
**devoted (1)**
14:1
**dictate (1)**
59:2
**differ (3)**
35:16,21;54:24
**difference (1)**
22:7
**different (19)**
16:11;22:10;
34:16;48:19;53:9;
61:18;63:19;64:21;
71:2;87:16,17;93:15,
18;94:18;96:15;
98:2;106:18;107:23,
25
**difficult (2)**
95:16;106:14
**difficulties (1)**
41:10
**difficulty (1)**
96:24
**direct (11)**
16:21;21:25;24:7;
32:15,15,18;33:18;
34:1;47:12;88:10;
90:21
**directly (1)**
34:20
**disagree (2)**
49:1;105:21
**disagreement (1)**
52:20
**discovery (5)**
52:24,25;53:4;
83:17;96:18
**discretion (1)**
62:11
**discuss (3)**
47:19;80:15;95:22
**discussed (3)**
30:3,8;107:9
**discussing (1)**
49:12
**discussion (5)**
30:19;62:9,22;

79:12,12
**discussions (1)**
11:5
**disingenuous (2)**
77:20;84:2
**dispute (6)**
49:13;55:20;
76:15,17;86:17,19
**disputed (3)**
17:11;40:12;83:12
**disputes (2)**
52:25;96:18
**disputing (1)**
55:21
**disqualification (1)**
48:24
**disregard (1)**
81:21
**distinguishing (1)**
51:7
**distributed (1)**
44:13
**District (30)**
11:3;22:24;39:1;
40:10;45:23;46:5,
23;49:21;53:1;
72:10,21;73:3,3,5;
76:2;79:14;80:5,17;
81:2,22;85:2;102:13,
22,23;103:1,8;106:7,
9;108:4,5
**divestiture (1)**
70:1
**docket (1)**
47:2
**document (1)**
40:6
**documents (10)**
11:18;12:6;35:7;
37:15;60:5,6;96:21;
100:11,12,15
**dog (1)**
69:21
**dollar (4)**
43:10,11;70:15;
82:5
**dollars (11)**
14:25;15:22;16:1;
17:13;35:13;43:15,
16;63:6;68:14;
69:17;103:18
**domicile (2)**
80:11,16
**domiciled (1)**
80:5
**Dondero (32)**
20:3,24;25:1,4,16;
26:10,13,15,20,23,
25;27:2,22;28:22;
29:23;34:7;42:4;
44:16;50:12;51:12,
15,16;55:7,14;58:4,
7,12;66:2;68:16;

97:3,3;99:23
**Dondero's (2)**
25:25;29:19
**done (9)**
34:1;75:15;90:20;
108:5,6;109:5;
111:22,24;112:5
**doozy (1)**
101:22
**doubt (4)**
54:4;76:25;91:11;
94:24
**down (9)**
23:8;32:6;36:5;
46:10,18;63:23;64:4,
17;77:15;102:1
**dozen (1)**
56:8
**dozens (1)**
96:2
**driven (1)**
18:11
**driving (1)**
63:3
**DSI (6)**
10:12;14:1,4;
21:12;22:7;112:14
**DSI's (2)**
16:13;94:5
**dueling (1)**
44:22
**DUNN (1)**
7:2;8:7
**duplicate (1)**
60:25
**duplicative (1)**
40:15
**during (5)**
16:7;59:14;77:6;
84:16;105:14
**dwarfs (1)**
43:17

**E**

**earlier (2)**
27:4;68:3
**early (1)**
71:25
**earned (1)**
111:11
**ease (1)**
88:8
**easier (1)**
85:10
**easiest (1)**
102:24
**easily (1)**
85:3
**easy (3)**
52:18;73:24;
111:17
**economic (4)**

52:11;87:5;94:2;
108:25
**economics (1)**
16:14
**economy (3)**
67:24,25;102:21
**effective (1)**
60:21
**effectively (3)**
42:10;45:12;65:25
**efficiencies (1)**
52:11
**efficiency (5)**
39:12;50:22;
67:25;101:1;102:21
**efficient (1)**
55:9
**effort (2)**
90:5;91:12
**efforts (4)**
16:13;18:2;38:19;
84:9
**EFH (4)**
56:17,21;63:17;
109:10
**ego (1)**
59:4
**eight (2)**
17:13;60:24
**eighteen (1)**
65:20
**either (15)**
18:2,13;41:16;
64:11;70:7;72:7;
73:11;80:24;82:6,
19;84:1;102:11;
104:13;109:3,12
**element (2)**
106:1,13
**elements (1)**
39:11
**else (7)**
40:15;47:21;57:6;
74:23;75:4;108:24;
109:17
**email (5)**
38:20,23;40:21;
59:24;74:2
**embodied (1)**
69:11
**emergent (1)**
113:12
**empire (2)**
67:15;108:21
**employ (2)**
45:3;111:17
**employed (1)**
112:8
**employees (20)**
13:20;14:1,5;
20:20;28:1;29:13,
17;30:15,22;31:1;
41:24;42:3;52:12;

54:14;57:23;66:1;
85:5;86:19;95:11,12
**employment (1)**
27:18
**encountered (1)**
96:25
**end (1)**
24:14
**enforce (1)**
94:21
**engaged (6)**
13:17;58:12,18;
106:1,16;111:22
**engagement (4)**
13:18,23;20:19,23
**engages (3)**
50:3;58:18;64:22
**enjoyed (1)**
78:16
**enough (2)**
71:18;103:22
**ensure (3)**
50:22;89:12;
112:20
**entire (2)**
96:1;102:14
**Entities (18)**
8:13,13;14:16;
15:4;41:24;51:24;
67:18,19,20;71:1,6;
80:8,13;81:13;
88:18;93:19;104:4,4
**entitled (2)**
56:10;81:17
**entity (8)**
44:14;49:4,5;
50:22;68:15;70:25;
72:25;81:12
**equity (8)**
16:11;17:7;25:20;
44:12;86:13;91:6,
18;92:19
**erase (2)**
58:15,17
**ESQ (22)**
6:4,5,6,11,16,17,
22,23;7:4,9,10,15,16,
17,18,19,24;8:4,9,14,
19;9:3
**essentially (1)**
87:8
**estate (8)**
18:5;45:4,11;82:3;
83:13;87:6;88:24;
111:4
**estates (2)**
97:22;98:10
**estimated (1)**
69:16
**et (4)**
6:15;8:8,18;65:21
**ethical (1)**
106:23

**Europe (1)**
14:23
**evaluate (7)**
16:14;18:6;66:19,
21;69:4;84:17;86:25
**evaluated (1)**
69:13
**evaluating (1)**
97:12
**even (19)**
40:12;47:5,17,20;
57:18;61:9,16,16;
72:20,20;74:7;
76:10;81:13;89:3,4;
92:17;93:15;98:16;
106:8
**event (5)**
76:11;94:1;95:23;
96:9;107:25
**events (1)**
76:11
**everybody (1)**
58:6
**everybody's (1)**
46:14
**everyone (1)**
103:2
**everywhere (2)**
107:13,14
**evidence (30)**
11:17;12:19;
23:10;32:2;33:3,4,6;
36:8;37:22;38:12,16,
18,25;40:22,25;
43:25;61:22;62:18;
76:20;90:17;92:10;
93:22;96:25;100:24,
25;101:5;107:5;
108:10,14;110:6
**evidentiary (5)**
41:2,3,20;42:7,7
**ex (1)**
69:8
**exact (2)**
24:22;25:18
**exactly (1)**
88:3
**EXAMINATION (2)**
24:7;32:18
**examined (1)**
54:16
**example (5)**
93:3;95:9;101:2;
102:18;113:4
**examples (1)**
54:25
**except (4)**
11:17;12:9,18;
22:21
**exception (7)**
37:20;38:12;39:5,
7;40:4,7;97:11
**exceptionally (3)**

61:14,24;74:18
**exceptions (1)**
40:3
**excess (1)**
72:18
**exchange (2)**
38:20;40:21
**exclusion (1)**
37:10
**excuse (4)**
44:19;53:17;69:7;
99:15
**executive (3)**
107:14;108:19;
110:2
**executive-level (1)**
27:25
**exercised (1)**
33:13
**Exhibit (17)**
11:17,17;12:18;
37:10,10,11,12;
39:14,15;40:23;
60:11,13,15;64:25;
67:17;69:11;74:1
**Exhibits (20)**
11:17,23;12:18;
36:10,12,19;37:9,9,
20,21;41:16,17;
59:15;60:8,16;
65:17;66:17;67:16;
74:1;91:24
**exist (3)**
14:22;21:13;
100:16
**existing (4)**
108:1,2,21;110:2
**exit (1)**
70:19
**expand (1)**
47:9
**expanded (2)**
79:1;98:17
**expected (1)**
85:24
**expects (1)**
84:14
**expeditiously (2)**
22:24;39:11
**expend (1)**
45:4
**expended (4)**
74:15,19;90:5;
103:5
**expenditure (1)**
74:20
**experience (10)**
13:3;46:7;50:20,
21;54:7;57:13;
75:15;85:1;92:23;
93:3
**expertise (2)**
85:20;86:21

**explain (1)**
96:9
**exposed (2)**
104:5,13
**exposure (1)**
57:20
**extension (1)**
13:24
**extensive (2)**
49:19,24
**extent (3)**
89:6;101:23;
112:16

**F**

**face (1)**
84:9
**faced (1)**
65:23
**fact (17)**
38:23;43:5,18,19;
53:6;56:13;57:17;
63:9;73:22;82:2;
90:19,22;93:23;
94:24;97:25;103:18;
108:19
**factor (11)**
52:23;56:23;
70:21;82:4;84:4,5;
87:5,7;88:8;98:7;
101:9
**factors (20)**
53:23,23;61:23,
24;62:2,3,4,8;71:22;
77:9,10,11,15;81:2,
6,25;86:3;88:1;
107:8;108:23
**facts (18)**
16:18;25:8;42:12,
17;50:16;51:3;59:2;
61:14,17;76:15;
77:14;81:19;100:1;
107:17,19;108:8,18;
109:25
**factual (2)**
49:24;90:18
**Fair (3)**
71:18;73:21;109:6
**fairly (3)**
22:25;46:2;91:10
**fall (2)**
46:7;111:8
**falls (2)**
39:6;108:24
**familiar (21)**
34:23;35:1,11;
54:18;61:24;66:9;
67:10,10;72:4,5,7,
10,22;78:3;93:11,15;
94:25;103:3;104:1,3,
19
**familiarity (7)**

47:9;54:8;91:1;
96:10;103:24;108:8;
112:16
**familiarizing (1)**
90:5
**family (1)**
52:17
**fantastic (1)**
40:13
**far (3)**
39:9;88:21;96:18
**far- (1)**
86:19
**far-flung (3)**
41:24;52:1;100:14
**Fargo (1)**
107:13
**fashion (1)**
50:7
**fashioned (1)**
110:6
**fault (1)**
33:8
**favor (8)**
43:3;51:4;56:23;
75:4;81:6,20;83:20;
106:10
**favors (1)**
52:7
**feasibility (1)**
83:22
**features (1)**
51:7
**February (1)**
60:21
**Federal (4)**
38:12;71:17,19;
81:17
**fee (1)**
65:18
**feel (1)**
48:3
**feels (1)**
46:14
**fees (3)**
15:1;92:9,10
**feet (3)**
70:10;104:24;
110:5
**felt (3)**
79:9,9;85:9
**few (7)**
34:3;43:21;72:1;
73:23;80:15;90:2;
108:2
**fiduciary (4)**
63:6;70:10,17;
82:3
**field (1)**
104:15
**Fifth (3)**
72:24;81:3;83:16
**file (14)**

32:21;42:15;
77:24,25;78:22;80:3,
4;96:16,17;97:7;
106:2,15;107:16;
110:10
**filed (22)**
11:1;15:12;21:10;
26:22;42:23;43:8,
25;44:11;61:5;
71:25;72:1;74:22;
78:2;79:14;80:5;
82:23;88:16,17,20;
95:10;97:20;101:15
**files (2)**
105:24,25
**filing (7)**
21:14;32:22;64:7;
80:19;98:22,22;
104:24
**filings (1)**
66:4
**final (3)**
62:12;63:25;
101:19
**Finally (1)**
101:7
**financial (8)**
13:1,4;14:2;24:14;
86:10;91:4,7;100:10
**financial-advisory-services (1)**
14:18
**financials (1)**
65:16
**find (5)**
21:17;75:12;
77:10;85:23;107:8
**findings (2)**
90:18;113:20
**finds (1)**
102:24
**fine (5)**
11:10;12:14;
25:15;36:21;97:18
**finish (1)**
109:9
**firm (2)**
13:1;113:1
**firms (5)**
50:25;82:20;
87:14;111:7,7
**first (19)**
12:6;33:18;34:2;
38:11;42:16,21;
54:1;64:21;65:3;
69:7;72:1;73:12;
74:2,5;76:1;82:1;
89:7;99:12;102:7
**first-day (8)**
28:2;52:9;64:24;
69:25;77:23;79:6;
102:19;104:9
**first-filed (1)**
73:12

**Fitzwater (3)**
72:12,19,21
**five (6)**
43:16;57:4;82:19;
87:8;92:2;94:18
**five-minute (1)**
104:9
**flair (1)**
89:23
**fleeing (4)**
55:16,17;56:6,7
**flights (2)**
87:16;88:10
**floodgates (1)**
61:17
**flung (1)**
86:20
**fly (1)**
52:19
**focus (8)**
16:13;76:19;84:5;
86:20,21;92:6;94:5,7
**focused (11)**
65:11;77:13;82:2;
84:1;89:5;92:3;
98:18;108:1,20,21;
110:3
**focusing (1)**
94:2
**foisted (1)**
95:25
**folks (4)**
28:6;31:6,8;63:10
**following (2)**
18:17;74:13
**follows (1)**
62:6
**forced (3)**
99:18,19,22
**foreign (2)**
15:13,14
**forestall (1)**
73:24
**forgive (1)**
67:16
**form (4)**
26:2;35:16;79:21;
113:17
**formal (3)**
76:1;102:9,11
**formally (1)**
111:21
**formation (1)**
72:2
**formed (2)**
71:8;78:6
**former (6)**
26:13;47:24;
82:20,22;102:15;
108:2
**forth (3)**
68:3;80:22;113:19
**Fortress (1)**

109:19
**forty (1)**
74:19
**forty-five (1)**
34:1
**forum (10)**
55:10;62:19;
70:25;81:10,14;
85:24;87:4;105:23;
106:3,12
**forum- (2)**
56:10;106:18
**forums (1)**
106:17
**forum's (1)**
70:22
**forum-shopping (9)**
56:5,12;63:25;
64:2,11;77:19;106:1,
13,16
**forward (5)**
49:9;103:14;
110:19,19;112:23
**found (3)**
90:8;91:10;96:12
**foundation (5)**
25:11,13;31:14;
34:19,20
**four (7)**
13:6;24:21,23;
51:3;62:4,13;69:5
**fourteen (1)**
56:3
**Fourth (3)**
45:15;49:11;69:9
**frame (1)**
96:22
**FRANK (4)**
9:5;10:11;23:25;
85:5
**F-R-A-N-K (1)**
23:25
**frankly (6)**
42:14;55:5,19;
61:8;64:11;66:14
**fraudulent (3)**
68:25;69:4;92:5
**fraudulent-transfer (1)**
17:17
**FRED (5)**
9:9;10:12;13:24;
18:13;27:15
**free (1)**
33:17
**freed (1)**
57:3
**free-fall (1)**
69:23
**frequency (1)**
88:7
**fresh (4)**
50:15;78:23;
97:11;110:21

**front (3)**
21:18;35:7;100:7
**Frontier (7)**
15:24;43:15;68:5;
82:10;109:20,21,22
**FTI (1)**
18:21
**fulcrum (4)**
63:23,24;69:22;
70:10
**full (5)**
17:24;47:4;70:7,8;
111:23
**fully (3)**
51:9;81:8;97:12
**functionally (1)**
73:9
**functions (2)**
13:24;67:7
**Fund (8)**
7:8,23;17:8;26:7;
28:8;91:5,6;93:4
**fundamental (2)**
62:6;81:16
**Funding (1)**
28:7
**funds (13)**
15:11;16:12;17:8,
8,9;25:25;26:6;
51:13;86:13,13;
92:14,20;93:6
**further (15)**
21:1;23:10;32:15;
35:3;36:8;58:22;
66:14;67:22;68:1;
73:4;80:6;102:22;
104:16,20;106:21
**future (1)**
76:12

## G

**gain (2)**
54:3,3
**gave (1)**
33:24
**GEDDES (1)**
6:9
**General (13)**
9:3;14:12;25:4,17;
51:14;64:17;65:2;
69:15,17;80:8,9;
89:5;107:18
**generally (12)**
34:11;35:8,15;
60:5;78:5;81:9;
86:10;87:6,24;
105:19;107:9;
111:16
**generated (2)**
65:19;92:10
**generates (1)**
92:18

generic (2)
66:24;67:8
gets (5)
49:11;67:14;76:5;
110:24;112:20
GIBSON (1)
7:2
given (18)
14:7;16:18;36:19;
47:9,11;48:4;53:2;
79:7,8;84:17;88:7,7;
94:17;97:9;109:25;
111:18;112:24;
113:14
giving (2)
31:12;97:10
gleaned (1)
43:23
global (2)
87:19;108:20
goal (3)
18:4,7;98:20
goes (7)
39:9;65:2;73:11;
80:6;87:23;90:20;
106:21
go-forward (2)
62:14;63:14
Good (18)
10:4,5,19,20;
11:14;19:18,19,21;
21:4;23:18;53:8;
75:21;76:3;91:8;
97:1;105:11;110:5;
111:24
govern (1)
35:12
governance (1)
97:7
government (1)
57:1
governor (1)
71:20
GP (3)
6:15;8:8,18
grant (3)
81:9;105:13;110:7
granted (3)
52:9;107:4,6
granting (1)
17:20
grapple (1)
69:2
gravitas (1)
108:18
great (3)
53:8;90:5;113:25
greatest (1)
105:20
Greg (1)
10:9
Gross (5)
81:4,7;83:19;88:3;

89:15
grossly (1)
91:13
ground (2)
103:20;112:21
grounded (1)
73:22
grounds (1)
79:21
GROUP (3)
8:7;28:7;30:3
groups (3)
27:22,25;28:21
grow (1)
84:25
guarantees (1)
38:14
GUERKE (9)
6:5;23:18,19;24:8;
25:12;31:16,19,25;
32:11
guess (3)
36:1;74:14,21
guidelines (1)
67:2
guy (1)
89:18

## H

Hale (7)
76:2;102:8,9,11,
16,19,20
half (3)
14:25;52:14;56:8
hall (1)
46:10
hand (4)
19:11;23:21;60:6;
67:4
handed (3)
37:8;59:15;60:7
handing (1)
59:17
handle (5)
38:1,2;40:11;
65:10;102:24
handling (1)
40:14
hands (1)
63:23
Hang (2)
12:2,4
HANKIN (1)
7:9
happen (7)
63:14;65:8;68:9;
70:11,11;73:9;76:12
happened (5)
45:19;63:13;
76:23,23;79:18
happening (1)
97:16

happens (3)
70:19;73:9;97:23
happy (2)
61:2;72:15
hard (1)
52:13
harder (1)
107:6
harking (1)
63:15
HCLOF (1)
82:11
headed (1)
70:3
headquartered (3)
13:11;82:10,10
heads (3)
27:25;28:21;30:3
headway (1)
79:12
hear (20)
22:24;33:17;
34:24;39:2,11;41:4;
45:3;51:23;75:6;
93:8;95:1,2,5;97:8;
101:8,22;102:19;
111:16;112:10;
113:12
heard (14)
30:18;53:6;59:10;
68:5;75:19;76:15;
90:6,7;91:21;95:21;
96:18,19,19,22
Hearing (12)
23:4;52:9;68:20;
74:3,3;77:23;78:1;
79:6;84:20;85:12;
101:14;104:10
hearings (5)
69:25;75:15;
91:20;93:9;96:2
hears (2)
95:16,17
hearsay (13)
38:7,9,11,13,13;
39:6,8,24,25;40:1,3,
6,7
heart (2)
64:15;100:18
heavier (1)
57:9
hedge (5)
16:12;17:7;86:12;
91:5;92:20
held (4)
14:15;68:14;
69:16;100:5
help (1)
95:18
helpful (4)
52:17;77:10;90:9;
107:21
hereby (3)

12:19;37:21;40:22
herring (2)
58:14;99:18
high (2)
44:4;47:14
higher (2)
87:10,12
Highland (53)
9:3,5;10:7;13:19,
21;24:9,24;25:1,22,
25;26:10;28:10,24;
29:5,7,13,16;30:10,
15,23;34:13;44:8;
48:4;49:25;50:1;
51:13,25,25;55:1,2;
57:25;60:23;66:22;
67:13,15;68:11,12,
15,17,18,23,25;
69:13;72:24;74:10;
76:7;77:1;93:24;
103:3,12,16;104:19,
23
Highland- (1)
72:24
Highland's (10)
25:4,16;27:23;
29:13;52:23;64:18;
65:24;66:10;67:10;
104:1
highlight (1)
51:7
highlights (1)
80:1
highly (7)
17:15;50:23;51:1;
53:4;57:14,21;
109:18
Hills (1)
13:8
hinted (1)
105:14
hire (1)
89:1
hired (1)
21:9
history (6)
52:23;53:11;54:7;
58:15,17;79:8
hit (2)
49:2;70:21
hitting (1)
111:1
hold (3)
22:1;24:17,19
Holding (1)
81:15
holdings (1)
81:12
holds (1)
15:19
holistic (1)
96:7
home (2)

56:7;78:16
Homes (1)
13:8
Hon (1)
40:21
honestly (1)
34:15
Honor (276)
10:4,8,14,19;11:1,
5,9,13,14,16,20,25;
12:11,13,15,22;19:3,
7,19;21:4,15,23;
23:6,12,19;25:6,12;
27:11;31:16,21;32:5,
17;36:3,9,15,18;
37:5,12,17,23;38:1,
9,11;39:17;40:24;
41:7,12,14,18,22;
42:6,11,14;43:3,6,
17,19,21;44:7,15,22,
25;45:15,17,20,25;
46:20,22;47:8,12,17;
48:7,18;49:1,2,5,8,
12,15,16,23;50:14,
23;51:3,9,18;52:3,8,
17,20,22;53:10,13,
17,18,22;54:4,9,24;
55:3,6,23;56:1,18,
20;57:7,11,12,22;
58:1,10,15,20,23,25;
59:7,8,12,15,17;
60:2,8,20,25;61:7,
10,11,15,19,20,21;
62:12,21,24;63:4,15,
16,19,24,25;64:5,20;
65:1,22;66:6,13,16;
67:4,12,24;68:2,7,
12;69:10,15,23;70:3,
9,21,23;71:4,21,22;
72:3,9,13;73:1,7,15;
74:12,13,24;75:2,21;
76:5,7,14;77:2,6,9,
18,23;78:2,12,13,17;
79:6,21;80:10,15;
81:8,19,23;82:21;
83:16;84:4,11;85:13,
21;86:2;87:5;88:11,
23;89:15,20,24;
90:10,11,14,25;91:2,
6,8,22,22,23;93:8,
14;94:1,11,24,25,25;
95:1,2,16,18,25;
96:7,8;97:10,21,22;
98:9,11,24,25;99:1,
3,6,8,13,18,24;100:2,
3,7,9,13,17;101:4,7,
13,20,21,23;102:5,
10,25;103:11,13,21;
104:2,5,21,25;
111:14,15;112:9,11,
13,14,16;113:8,15;
114:1
Honorable (1)

72:12

**Honor's (7)**
11:4;61:11;64:3;
76:3;100:18;102:12;
112:23

**hope (4)**
70:6,6;78:7;98:23

**hopefully (2)**
86:25;111:11

**hopes (1)**
18:7

**horse (1)**
101:11

**hours (4)**
14:4;20:9;74:16,
16

**Houser (3)**
46:24;102:19,22

**HUANG (1)**
7:18

**Human (2)**
28:8;108:12

**hundred (2)**
20:9;25:20

**hundreds (6)**
14:4;63:5;69:20;
74:16,16;96:1

**hurt (1)**
36:25

**I**

**idea (5)**
50:14;51:25;70:2;
100:14;105:21

**identified (1)**
32:9

**identifies (1)**
68:11

**identify (1)**
40:17

**ignore (3)**
90:17;100:25;
101:5

**immaterial (1)**
85:7

**impact (2)**
45:9;49:4

**impartial (1)**
73:21

**impeccable (1)**
98:17

**implication (2)**
73:17;74:8

**importance (1)**
92:16

**important (13)**
44:7;50:21;63:15;
70:19;79:9;85:9,12;
86:1;87:7,18;89:11,
11;90:9

**importantly (3)**
42:21;63:14;79:9

**improper (1)**
90:24

**impropriety (1)**
18:24

**improve (1)**
83:21

**inappropriate (2)**
106:22;108:13

**Inc (5)**
9:8,9;13:1;25:5,17

**include (2)**
31:5;86:10

**included (2)**
64:24;106:12

**including (10)**
13:6;14:20;15:4,9,
14;17:7,16;80:18;
81:1;109:13

**incorporation (2)**
64:6;71:5

**increased (1)**
79:4

**increases (1)**
14:3

**Indeed (3)**
82:23;84:11;
103:17

**indenture (1)**
101:2

**indicated (1)**
94:6

**indicating (1)**
62:23

**indication (1)**
106:24

**indicator (1)**
52:24

**Indiscernible (1)**
37:5

**individual (1)**
106:8

**industries (1)**
13:4

**inform (3)**
48:3;110:13;
113:23

**information (4)**
14:7;18:21;85:19;
95:25

**informed (2)**
16:9;53:13

**infrastructure (1)**
67:7

**initial (2)**
44:18,20

**initially (2)**
13:17;47:20

**injunction (5)**
69:8,8,9,10,10

**injunctions (1)**
69:5

**inquiring (1)**
38:22

**inside (1)**
104:11

**insider (3)**
17:25;84:19;112:4

**installed (1)**
98:16

**instance (1)**
42:17

**instead (2)**
18:11;101:16

**instrument (1)**
82:14

**instruments (3)**
86:10;91:7;100:10

**insufficient (1)**
79:21

**integrated (1)**
113:7

**intended (2)**
32:21;77:24

**intends (3)**
18:6;77:25;86:24

**intention (2)**
84:7,8

**intercompany (2)**
48:14;97:25

**interest (15)**
25:22;47:25;
53:21;55:15;64:9;
68:19,22,23;70:22,
22;71:1,6;74:20;
78:18;80:25

**interested (1)**
56:5

**interesting (2)**
90:16;101:20

**interest-of-justice (1)**
61:25

**interests (9)**
14:19;15:14,17;
52:3;78:9;80:7;
86:12;100:10,16

**international (1)**
15:8

**internationally (1)**
105:17

**interpretation (1)**
91:14

**interrupt (1)**
45:18

**Intertrust (1)**
8:13

**intertwined (1)**
112:17

**intimately (1)**
72:22

**into (14)**
11:16;12:19;
21:18;37:21;40:22;
42:18;43:24;48:11;
73:12;90:21;101:9;
104:22;107:6,24

**introduced (1)**

13:21

**invariably (1)**
73:11

**invested (1)**
52:5

**investment (7)**
15:5;65:13,18;
66:7,10,15;67:1

**investments (5)**
15:17;16:4;86:11;
93:6,6

**investors' (1)**
17:1

**invited (1)**
64:12

**involun (1)**
60:9

**involuntary (6)**
17:20;60:10;66:4;
76:9,9;91:25

**involve (3)**
72:24;86:6;107:18

**involved (6)**
17:15;58:11;66:7;
93:23;97:24;106:21

**involvement (2)**
13:19;85:6

**involves (1)**
65:3;106:22

**involving (4)**
49:18;57:16;
80:17;112:4

**Ira (2)**
10:9;111:14

**ironed (1)**
41:10

**irrelevant (3)**
89:6;107:9,9

**ISAAC (2)**
9:3;10:11

**issue (23)**
48:24,24;50:9,19;
53:5;54:6;58:14;
60:9;61:20;62:23,
25;64:3;65:10,11;
68:24;71:22;73:13;
77:2;82:12;105:7;
110:14;112:15;
113:2

**issued (10)**
60:9,11;69:5;
91:21;94:13;103:14,
15,16,17;108:6

**issues (14)**
21:2,2;49:18;
50:19;61:8;65:23;
69:1;94:16;96:20;
97:5,25;103:4;
107:10;108:8

**item (2)**
10:15;68:10

**iterations (1)**
94:18

**13:21**

**J**

**JAMES (3)**
8:14;10:6;25:1

**Janeiro (1)**
15:9

**January (3)**
60:19,20;61:5

**JEFF (4)**
7:16;10:8;11:14;
75:22

**Jefferies (9)**
6:10,21;15:20,22;
43:14;68:5;82:9;
109:18,21

**JENNER (1)**
7:7

**JEREMY (1)**
8:4

**Jernigan (52)**
38:21;39:1;45:25;
46:1,2,6,8;47:15,20;
48:23;66:9,13,19,20;
67:9,22,25;69:1,13;
73:18;74:11;76:17,
25;77:22;78:2,12;
90:8;91:10,20;93:3,
11;94:13;95:6,12,17,
21;96:3,12;97:14,18;
100:25;103:3,6,7;
104:3,16;110:11,17,
21;111:9;112:24;
113:9

**Jernigan's (3)**
40:21;90:17;92:23

**Jim (1)**
27:7

**job (2)**
18:16;84:25

**JOHN (4)**
6:16;10:9;21:19;
59:12

**join (1)**
63:8

**joinders (1)**
77:7

**joined (5)**
29:4,7;43:2;60:4;
75:1

**joining (1)**
98:15

**jointly (3)**
48:5,13;78:19

**Jones (6)**
10:7;11:15;13:14,
22;21:20;75:22

**JOSE (1)**
6:17

**Josh (1)**
83:1

**Judge (97)**
13:7,7,8,9;22:3;

32:24;38:21;39:1,4,
25;44:3;45:25;46:2,
5,8,24;47:10,11,15,
20,22,23,23;48:10,
22,23;66:9,13,18,20;
67:9,22,25;69:1,13;
70:17;72:12,14,14,
19,21;73:3,5,18;
74:10;76:2,17,25;
77:22;78:2,11;
79:15;81:4,7,14;
83:19;88:3;89:15;
90:8,16;91:10,20;
92:23;93:3,11;
94:12;95:6,12,17,20;
96:2,5,12;97:13,18;
100:24;102:8,9,11,
15,19,19,20,22;
103:3,5,7;104:3,16;
106:8;108:5;110:11,
17,20;111:9;112:24;
113:9
**judges (9)**
46:23;47:7;48:1;
49:2;91:2,3;106:8;
108:12,12
**judge's (1)**
108:11
**judgment (2)**
81:22;111:18
**judgments (1)**
108:12
**judicial (8)**
39:12;41:19;46:6;
49:23;67:25;81:17;
101:1;102:21
**jurisdiction (2)**
55:16;107:20
**jurisdictions (4)**
41:24;44:22;52:1;
88:21
**jurist (1)**
97:19
**justice (8)**
52:3;53:16,18,21;
64:9;78:10;80:25;
99:20
**justify (1)**
95:19

**K**

**keep (4)**
61:1;69:23;
101:14,23
**keeping (1)**
98:8
**KEIP (1)**
95:11
**KEIPs (1)**
95:17
**KERP (1)**
95:11

**KERPs (1)**
95:17
**KEVIN (2)**
6:5;23:19
**key (3)**
51:16;66:22;112:3
**Kharasch (3)**
10:9;111:14,14
**KIMBERLY (1)**
7:19
**kind (12)**
62:13,19;64:12;
65:2;66:19;73:12,
24;74:5;90:15;
102:7;105:15;
108:24
**kinds (2)**
112:2,3
**Klos (1)**
31:5
**knowledge (13)**
14:2;27:1;46:6,8;
84:23,25;85:19;91:9,
9;93:4;95:13,19;
96:5
**knows (1)**
69:24
**Korea (3)**
15:11;20:16;86:15
**Korean (3)**
93:5;104:3,7
**KUAN (1)**
7:18

**L**

**LA (2)**
88:10,11
**lack (1)**
55:12
**laid (1)**
11:4
**large (5)**
51:18;91:4;
100:19,22;109:24
**largely (3)**
42:8;50:25;76:15
**largest (5)**
51:19;69:19;83:5,
13,16
**last (11)**
19:15;27:4;41:1;
66:6;69:14;87:5;
89:2,25;94:17;
103:11;104:2
**Lastly (3)**
18:16;76:14;83:16
**late (2)**
38:2;60:19
**later (4)**
60:24;68:21;93:9;
97:8
**LATHAM (2)**

7:13;83:15
**Latin (2)**
86:15;93:5
**latter (1)**
109:9
**Laughter (1)**
59:6
**laundry (1)**
107:8
**LAUREN (1)**
6:22
**law (12)**
14:13;50:25;
70:25;71:8;76:11;
82:20;102:15;
105:15;106:6,7,20;
110:17
**laws (1)**
14:11
**lawsuits (3)**
99:19,21,22
**lawyer (1)**
47:23
**lawyers (1)**
108:13
**lay (2)**
51:9;53:23
**layer (2)**
69:22;72:20
**laying (3)**
25:9,11;31:14
**leading (1)**
85:19
**learned (4)**
76:25;77:1;90:19;
91:15
**learning (13)**
14:1;49:14;50:17;
52:6;66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**least (5)**
48:8;56:9;61:3;
62:1;69:14
**leave (1)**
111:9
**leaves (1)**
47:7
**leeway (3)**
31:12;33:24,25
**legal (4)**
29:21;62:7;67:7;
81:16
**legal-compliance (1)**
28:10
**legitimacy (1)**
101:17
**lenders (1)**
68:5
**lengthy (1)**
91:21
**less (2)**
17:13;99:9

**level (1)**
106:13
**LEVENTON (2)**
9:3;10:11
**leveraged (1)**
65:4
**liabilities (3)**
77:3;78:5;84:24
**life (3)**
52:17;57:4;98:1
**likely (8)**
53:1,4;66:10;
83:12;85:7;91:7;
93:8;98:20
**limited (12)**
14:10,15;33:5;
34:4;40:20,23;52:9;
53:11;55:21;90:18;
100:10;111:10
**limited-partnership (1)**
25:22
**line (4)**
21:21;65:6,8,12
**lines (3)**
64:22;65:2,12
**liquid (3)**
15:19;18:13;86:16
**liquidated (1)**
92:15
**liquidation (3)**
16:25;57:19;70:5
**list (6)**
36:11;50:24;
51:19;67:17,18;
107:8
**listed (2)**
82:18;83:11
**litigating (1)**
78:16
**litigation (19)**
17:15;54:4;55:3,5;
78:14;80:17;83:7,10,
14,15;84:1;85:18;
88:19;99:17;103:23;
108:1,2,22;110:1
**litigious (3)**
50:23;51:1;52:24
**little (15)**
24:5;37:2;48:19;
54:2;60:24;63:18,
21;67:14,14,21;
68:20;77:7;79:19;
91:12;99:9
**Litvak (1)**
10:10
**lived (2)**
61:4;63:11
**living (1)**
61:8
**LLC (2)**
6:10;7:14
**LLP (8)**
6:2,14,20;7:2,13,

22;8:2,12
**loan (3)**
16:4;65:15;92:9
**loathe (1)**
60:5
**local (8)**
13:16;59:13;
70:22;73:8;86:7,21;
88:14;89:23
**locales (1)**
15:8
**locally (1)**
89:5
**located (15)**
15:17,20;41:25;
46:23;51:16,18,21;
58:7;86:14;100:13;
107:12,13,13,14;
108:4
**location (12)**
29:4,6,10,16;30:7,
15;31:22;86:2,5,
99:20;100:9;106:18
**locations (1)**
30:22
**logical (3)**
42:16;55:19,22
**London (1)**
7:14
**long (3)**
52:23;106:5;
108:14
**longer (5)**
16:23;50:6;61:9;
91:16,18
**Look (24)**
12:6;19:22;46:22;
51:19;57:24;64:2;
65:12,17;67:3,12;
68:19;72:20;74:1;
79:15;82:17;86:5,9;
87:13;88:15;90:25;
96:11;101:2;105:24;
110:21
**looking (5)**
50:16;69:19;
104:14,15;107:19
**looks (3)**
82:4,5;96:7
**Los (1)**
13:11
**losing (1)**
45:24
**lost (2)**
73:23;85:20
**lot (16)**
18:21;33:24;
62:22;65:11,19;
93:13;94:25;95:21;
105:17;106:2;
109:17;110:16;
111:24,25;112:5;
113:20

**loud (1)**
    55:11
**LP (6)**
    24:10;25:2;30:23;
    60:3;80:6,7
**LUCIAN (6)**
    6:16;59:12,12,20,
    23,25
**lunch (2)**
    105:5;110:12

# M

**machinery (2)**
    110:8;113:24
**MACKSOUD (1)**
    6:22
**mail (1)**
    110:25
**maintain (2)**
    15:7;98:9
**Maintenance (1)**
    75:12
**majority (5)**
    43:9,11;51:21;
    80:4;86:15
**makes (12)**
    42:4;43:9;55:15;
    64:19;70:14,14;
    81:5;86:3;89:25;
    90:13;101:6;106:13
**making (4)**
    31:23;48:25;
    68:23;90:17
**manage (3)**
    15:14;28:4;57:18
**managed (6)**
    15:3;55:2;57:25;
    65:20;96:15;112:22
**Management (45)**
    6:15;8:8,18;9:4,6;
    10:8;13:20;14:20,
    25;15:1;16:3;18:10;
    21:5;22:9;24:10;
    25:2;28:1;30:23;
    35:13;50:13;54:15;
    58:5;60:3,14;65:13,
    18,24;66:8,10,15;
    68:11,16,17,23,25;
    78:7;79:17;92:14;
    93:12;95:4,21;96:10,
    12;103:18;110:2
**manager (8)**
    14:13;16:23;
    25:25;26:5,6,7,9;
    51:12
**managers (1)**
    21:13
**manages (4)**
    14:17;15:10;
    16:12;50:8
**managing (1)**
    17:6

**many (12)**
    15:8;18:12,21;
    80:10;88:10;89:12,
    12;91:2,7,20;97:24,
    24
**MARC (1)**
    7:9
**margin (1)**
    15:22
**marginally (1)**
    92:25
**markedly (1)**
    93:18
**market (2)**
    92:13;94:9
**marketplace (1)**
    67:3
**Marsal (2)**
    7:3;8:3
**MASCHERIN (1)**
    7:10
**massive (1)**
    53:2
**material (3)**
    45:2;88:6,24
**materially (1)**
    45:8
**matter (9)**
    18:3;39:11,23;
    44:18,20;56:13;
    102:18,25;111:15
**matters (8)**
    10:14;17:16;
    80:17;94:1;102:19,
    20,24;110:17
**Matthew (3)**
    10:21;41:12;
    112:11
**Max (1)**
    10:9
**MAXCY (1)**
    6:23
**maximize (3)**
    18:4,12;87:1
**maximum (1)**
    50:22
**may (38)**
    12:20;21:6;22:2;
    23:7,18;24:6;31:21;
    35:1;36:5,24;37:23;
    41:11,25;42:1;
    43:10;49:4;52:1;
    54:24;55:6;59:9;
    63:12;76:4,4,12,12;
    78:21;81:8;85:5;
    90:19;91:4,5;95:11;
    96:25;97:15;98:5;
    101:8;102:16;108:9
**maybe (5)**
    27:7;56:3;90:20;
    91:3;107:24
**mean (14)**
    24:22;31:13;

**35:18;39:3;40:9,12;**
    47:22;48:5;54:7;
    55:25;56:2,24;
    87:24;109:2
**means (4)**
    54:8,9;96:2;
    103:19
**meet (5)**
    29:23;32:8,9;
    62:17;80:23
**meeting (2)**
    14:4;81:24
**meetings (2)**
    30:1;31:8
**meets (1)**
    40:6
**member (2)**
    43:17;83:11
**Members (5)**
    29:21;31:5;78:6;
    80:18;88:16
**memorized (2)**
    35:9,22
**mention (1)**
    110:21
**mentioned (12)**
    30:7;44:23;57:22;
    58:9;78:17;79:6;
    87:11;89:16;97:22;
    98:13;99:25;112:15
**mentioning (1)**
    77:19
**mess (1)**
    37:1
**message (1)**
    55:11
**met (3)**
    18:20;20:3,20
**Meta-e (1)**
    83:17
**metropolitan (1)**
    87:15
**MICHAEL (2)**
    6:6;7:4
**microcosm (2)**
    67:14,23
**microcosms (1)**
    67:21
**microphone (3)**
    19:23;21:17;24:4
**middle- (1)**
    67:5
**Midwest (2)**
    87:11,13
**might (9)**
    47:16;48:3,10,11;
    91:23;96:20;107:20;
    108:15;111:8
**Mike (1)**
    10:24
**mileage (1)**
    87:17
**mile-and-a- (1)**

**52:13**
**MILLER (1)**
    7:24
**million (6)**
    15:22;16:1;17:13;
    43:15,16;68:13
**millions (2)**
    63:5;69:20
**mind (3)**
    60:19;61:14;69:23
**minimum (1)**
    29:23
**minutes (2)**
    34:1;90:2
**miscommunication (1)**
    36:20
**misstated (1)**
    71:5
**mistake (1)**
    103:21
**misunderstood (1)**
    33:14
**model (1)**
    104:19
**modern (2)**
    97:25;105:16
**modifications (1)**
    16:18
**modified (1)**
    112:1
**modifying (1)**
    112:5
**modus (1)**
    67:11
**mom (1)**
    89:3
**mom-and- (1)**
    100:17
**mom-and-pop (3)**
    88:22,23;89:4
**moment (2)**
    45:18;100:8
**moments (1)**
    80:15
**monetization (1)**
    92:21
**monetizing (1)**
    16:25
**money (3)**
    65:4,4;111:12
**money-management (1)**
    14:18
**month (1)**
    111:24
**month-and-a-half (2)**
    18:17;88:15
**months (3)**
    43:21;60:24;108:3
**more (27)**
    38:17;40:13;
    41:19;51:9;52:24;
    62:7;63:9,13;65:11;
    67:10;73:15;81:13;

**83:25;84:12;85:23;**
    87:4;89:23;90:1,3;
    94:25;96:13;99:3;
    101:22;103:25;
    107:18,20;111:25
**morning (11)**
    10:4,5,19,20;11:5,
    14;19:19,21;21:4;
    23:18;99:24
**MORRIS (21)**
    7:22;10:9;21:15,
    19,19;23:6;25:6,10;
    26:2;27:11;31:21;
    32:23;34:19,22,25;
    36:3;37:17;38:9;
    39:17,19;59:16
**most (14)**
    39:25;42:16,21;
    55:9,19;81:2;85:11;
    87:7,20,22;88:13;
    98:3,20;105:21
**motion (66)**
    10:16;11:1,4,20;
    15:12;18:18;23:11,
    14;31:13;33:1,4,5,
    19;39:20;40:19;
    41:21;42:9,19;54:1;
    55:11;60:4;61:18;
    62:25;63:7,8;64:14,
    16;71:23,25;73:10;
    75:4;77:7,14,24,25;
    78:1,3,12;79:22;
    82:15;90:19;94:13;
    95:10;96:16;97:6;
    98:15,15,23,23;99:1;
    100:1;101:11,14;
    104:24;105:7,12;
    106:15;107:3,4,6;
    109:13,23;110:7;
    111:17;112:18;
    113:12
**motion-by-motion (1)**
    108:10
**motions (7)**
    28:2;39:2;64:16;
    100:2;105:15;
    112:16;113:8
**motivation (2)**
    75:14;97:14
**motive (2)**
    98:14,15
**movant (3)**
    62:17;80:23;81:5
**movants (2)**
    41:5;88:9
**move (5)**
    11:16;36:12;
    37:13;42:18;49:9;
    64:8;85:16;109:8;
    110:5
**moved (1)**
    109:11
**moving (5)**

12:9;21:22;61:11,
12;63:20
**much (9)**
19:1;58:10;66:11;
83:24;87:21;93:21;
96:1,3;113:25
**multi (1)**
97:24
**multi- (1)**
101:20
**multiple (3)**
17:16;43:10;67:17
**multiples (1)**
43:17
**multi-strat (4)**
93:4;104:4,8,12
**multitude (1)**
15:1
**must (4)**
44:25;45:1;80:20;
83:21
**mutual (1)**
17:8
**myriad (2)**
13:4;93:7
**myself (1)**
57:23

**N**

**name (7)**
19:13,15;23:23;
30:11,13;46:24;
68:15
**narrow (1)**
57:16
**national (3)**
13:10;87:14,19
**nature (4)**
35:19;42:22;
52:24;110:1
**nauseum (1)**
61:23
**necessarily (5)**
32:25;56:4;60:25;
61:16;62:15
**necessary (3)**
50:15;105:1,2
**need (14)**
11:19;13:16;
21:17;51:19;59:4;
76:18;85:15;88:14;
101:2,15;106:4;
110:8,17;111:3
**needed (1)**
83:4
**needs (3)**
50:24;83:3;110:19
**negative (2)**
78:6;106:19
**negatives (1)**
64:10
**negotiate (2)**

113:21,22
**neither (2)**
66:11;82:15
**nerve (4)**
42:5;43:5;51:11;
58:8
**NESTOR (2)**
6:6;10:25
**neutral (4)**
64:4;65:9;68:8;
104:18
**New (25)**
15:20;20:14;
21:12;25:8;30:6,7,7,
10,15;42:1;47:6,11;
82:10;83:10,14,14;
86:16;92:13;99:17,
21;103:13,13,16,19;
107:13
**next (6)**
65:12;68:10;84:4;
85:21;90:2;110:22
**nexus (1)**
76:22
**NICHOLS (1)**
7:22
**nine (1)**
21:9
**nine-and-a-half (1)**
68:13
**nineteen (1)**
83:12
**ninety (1)**
17:5
**ninety- (1)**
92:1
**ninety-nine (1)**
14:14
**nobody (2)**
46:8;88:24
**nonaffiliates (3)**
22:17;35:14;94:4
**non-CLO (1)**
93:19
**noncustodial (1)**
15:17
**nondebtor (3)**
41:24;45:5;53:2
**nondebtor-entity (1)**
30:13
**non-Delaware (1)**
80:11
**none (3)**
23:4;82:23;109:12
**nonetheless (1)**
50:21
**nonparty (2)**
52:25;53:4
**nonpublic (2)**
86:12;92:19
**non-venue (1)**
21:2
**normal (2)**

46:4;92:16
**Northeast (1)**
84:2
**Northern (13)**
22:23;39:1;40:10;
45:23;46:5;53:1;
76:2;102:13,23;
103:1,8;108:4,5
**Nos (1)**
37:20
**note (8)**
62:1;63:25;68:12,
13,14;72:16;73:25;
82:12
**noted (1)**
63:16
**notes (1)**
45:24
**notice (4)**
41:19;49:23;
82:23;97:4
**notices (2)**
88:16,17
**notwithstanding (1)**
94:21
**number (16)**
10:14,16;43:11;
51:18;53:2;57:18;
60:11,13,16;67:20;
69:11;74:1;82:5;
83:11;108:6,7
**numbered (1)**
36:22
**Numbers (1)**
37:11
**numerous (2)**
39:2;54:19
**Nutro (4)**
44:14,15,17;45:4
**Nutro's (1)**
44:15

**O**

**object (1)**
25:6
**objected (4)**
37:3,10,12,13
**objection (20)**
12:12,15,17;
21:15;25:15;26:2;
27:11,11;32:23;
34:19;37:14,16,19;
38:2,7;39:8;40:5;
57:15;59:16;113:13
**objections (4)**
11:24;39:13;
53:25;62:22
**obligations (5)**
15:22;16:4;65:15;
91:8;92:3
**obligor (1)**
68:13

**obtain (1)**
38:19
**obvious (2)**
40:13;42:21
**Obviously (11)**
22:9;26:14;40:19;
42:24;46:24;56:6;
57:24;61:21;100:4;
101:9;111:4
**occasions (1)**
18:21
**occur (1)**
53:1
**occurred (2)**
53:12;74:4
**occurrence (1)**
45:2
**occurring (1)**
97:1
**October (2)**
13:18;29:7
**off (4)**
17:1;75:16;88:21;
103:20
**offended (2)**
74:7;75:17
**offensive (1)**
73:16
**offer (2)**
39:14;84:20
**offered (3)**
31:17;38:18;39:23
**office (14)**
20:14,21;29:1,2,2,
4,8,14,19;30:1,10;
55:18;83:15;86:5
**officed (1)**
30:6
**officer (7)**
12:24;13:3,6,25;
24:14,24;79:1
**officers (1)**
66:1
**offices (18)**
13:15;15:8;20:7,9;
29:9,11,21;30:4,19,
25,25;31:3;41:25;
42:1;52:1,2;85:13;
86:18
**Official (5)**
6:3;10:22;42:25;
43:12;109:14
**often (1)**
81:2
**of-venue (1)**
71:25
**Oklahoma (2)**
15:25;82:11
**old (2)**
26:19;110:5
**once (5)**
20:3;29:23;44:18;
73:3;110:23

**one (49)**
11:18;12:13;16:2;
21:18;22:15;28:4,
21;37:12;39:11,12;
40:3;43:16;46:23;
47:16;49:4;50:23;
52:10;56:3,8;60:15,
16;62:12,21;63:2,25;
67:16;69:24;71:18,
25;72:18,20;76:3;
77:13;80:11;82:1;
86:2;88:18;94:1;
97:5;98:2;101:21;
103:11,14,20;104:2;
109:1,11,17;111:15
**one-hundred-percent (1)**
51:13
**O'NEILL (4)**
10:4,6,6,14
**ones (3)**
36:14;59:18;105:2
**one's (1)**
68:5
**ongoing (1)**
110:1
**only (32)**
14:2;16:24;20:3;
22:7;23:11;26:20;
29:16;32:11;36:15;
49:25;50:24;51:25;
52:9;53:3,14;57:16;
66:1;72:9;73:22;
74:9;76:8;80:16;
81:11;82:4;85:7;
88:17;91:8;92:17,
25;93:13,23;109:11
**opaque (1)**
54:12
**open (1)**
61:17
**open-ended (1)**
17:8
**operandi (1)**
67:11
**operated (4)**
49:25;54:11;55:2;
57:20
**operates (1)**
79:6
**operating (3)**
22:10;88:21;112:7
**operation (2)**
65:14,20
**operational (3)**
70:2,4,6
**Operations (9)**
28:7,8;32:3;41:23;
77:4;79:2;84:24;
90:6;92:7
**opinion (11)**
60:9,11;81:4,15;
88:4;91:25,25,25;
94:12,15;99:13

**opinions (14)**
41:17;49:22;
54:14,19,22;64:3;
66:17;73:25;74:16;
76:21;81:1;91:21,
23;108:7
**opportunity (2)**
11:7;112:24
**opposed (5)**
56:11;88:11;95:6;
109:12,23
**opposing (1)**
37:8
**opposite (1)**
109:15
**opposition (2)**
33:5;56:11
**options (1)**
18:7
**oral (1)**
105:7
**oranges (1)**
93:25
**order (12)**
15:14;45:6;53:19;
60:14;80:23;83:20;
97:6;99:22;105:1;
110:8,9;113:17
**orders (1)**
17:19
**ordinary (3)**
79:7,11;101:18
**ordinary-course (5)**
95:10;96:17;
101:14;112:4,18
**organization (1)**
51:22
**organizational (5)**
25:13;27:23;
31:19;32:3;91:17
**organized (4)**
14:11,13;70:25;
99:9
**others (4)**
14:4;50:12;53:3;
59:9
**otherwise (4)**
84:3;96:8;104:17;
106:17
**out (22)**
11:4;18:18;29:13;
41:10;43:3;46:13;
51:9;52:19,19;
53:24;54:13;56:19;
64:5;72:17;83:23,
23;88:24;90:8;
108:19;110:12,13;
111:8
**outcome (3)**
18:9;45:11;63:18
**outlined (1)**
40:4
**out-of-court (1)**

**outside (2)**
30:19,25
**outstanding (1)**
17:12
**over (26)**
13:2;14:14,19,24;
15:18;17:2,4;18:17;
20:9;29:13;41:6;
44:5;60:24;74:18,
19;77:10;78:7;
79:15;90:2;92:12;
95:14;103:17;
108:12;110:22;
112:3;113:13
**overall (1)**
51:22
**overblown (1)**
77:5
**overcome (2)**
83:20;106:14
**overnight (1)**
52:16
**overrule (1)**
40:5
**overruled (4)**
25:15;26:3;27:13;
35:4
**oversecured (2)**
68:7;100:21
**oversee (2)**
65:7;79:1
**overseeing (1)**
46:25
**overstated (1)**
91:13
**overturn (2)**
44:11;79:22
**overturned (1)**
45:6
**owed (3)**
15:25;43:14,16
**owes (1)**
15:21
**own (6)**
14:20;36:1;43:1;
53:11;66:1;95:12
**owned (2)**
44:15;80:7
**owner (1)**
51:14
**ownership (1)**
80:14
**owns (6)**
14:17;15:10;25:4,
16,20;91:17

**P**

**PA (1)**
6:9
**Pachulski (8)**
10:6;11:15;13:14,

21;21:19;75:22;
111:5,14
**pages (4)**
74:16,18;88:9;
96:2
**paid (9)**
70:7;89:7;98:6;
99:22;111:12;
112:14,14,20;113:2
**painstaking (1)**
77:8
**painted (1)**
63:2
**paper (1)**
100:16
**papers (10)**
42:23;44:9;51:6,9;
52:19;53:24;55:9;
61:11,12;95:20
**pare (1)**
77:15
**Parking's (1)**
52:15
**part (7)**
22:22;50:8;65:18;
69:12;91:15,16;
112:17
**parte (1)**
69:8
**participate (1)**
89:13
**particular (8)**
45:9;47:11;49:4,6;
51:8;64:16;94:10;
106:7
**particularly (5)**
43:6;86:22;
107:10,16;110:1
**parties (15)**
14:22;15:7;16:17;
21:22;51:10;56:22;
64:9;67:17;78:9;
80:24;82:7;84:6;
92:21;108:13;
110:18
**Partner (9)**
9:5;14:12;24:19,
21;25:4,17;51:14;
80:8,9
**partnership (2)**
14:11;55:21
**partnerships (2)**
14:15;100:11
**parts (2)**
22:15;105:18
**party (5)**
16:16;18:23;
23:10;55:7,12
**party-in-interest (1)**
42:23
**Pass (2)**
23:2;35:24
**past (8)**

35:2;50:20;51:19;
55:14;58:10,18;
70:24;111:22
**PATEL (27)**
8:19;36:9,15,18,
22,24;37:2,5,8,23;
38:1;59:15;60:2,3,
20,23;62:10;71:4,8,
11,13,16,18,21;73:7,
15;102:5
**PATRICK (2)**
6:23;83:6
**Pause (1)**
12:8
**pay (2)**
111:10,11
**paying (1)**
17:1
**payment (1)**
101:3
**PC (2)**
8:7,17
**pending (14)**
15:13,15;17:17,
19;43:22;52:8;
72:23;80:19;83:7,10,
14;88:15;90:4;108:3
**Penny (2)**
10:24;19:19
**pension (1)**
89:10
**people (7)**
30:22;32:8;52:12;
86:4,17;87:19;109:2
**percent (8)**
14:14;17:3,6;
25:20;80:7;92:2,11,
17
**Perfect (1)**
60:1
**perhaps (8)**
42:21;47:8;52:16;
63:18;69:16;70:4;
103:7;106:8
**period (2)**
26:19;111:10
**person (2)**
85:8;90:20
**personal-services (1)**
54:23
**personnel (3)**
15:8;51:16;85:6
**perspective (6)**
49:3,17;50:17;
70:15,16;72:16
**petition (7)**
16:1,20;17:20;
18:24;21:10;22:8;
82:18
**PetroCap (1)**
93:6
**ph (3)**
44:14;48:17;56:4

**Philly (1)**
109:2
**phone (1)**
46:11
**phrase (1)**
65:25
**physically (1)**
13:11
**pick (1)**
46:11
**piece (4)**
65:14,22;66:6;
104:1
**pieces (1)**
36:10
**pillars (1)**
112:21
**place (6)**
34:2;64:8;89:12;
110:3,9;113:24
**places (4)**
41:25;53:17,20;
80:3
**plan (13)**
17:21;44:1,12,13;
60:12,21;69:10,10;
70:11;74:5;76:8;
91:16,24
**planes (2)**
52:13;109:2
**play (1)**
104:22
**players (1)**
108:8
**playing (1)**
104:14
**pleadings (1)**
73:17
**Please (14)**
10:3;19:8,10,13;
23:16,18,21,23;24:3,
4;36:25;49:10;
75:10;105:10
**ploy (1)**
78:14
**pm (3)**
75:8;105:8,8;
114:3
**podium (2)**
10:17;93:13
**point (29)**
34:14;35:2;38:18;
44:7;49:11;52:19;
54:10,13;55:3,23;
56:21;57:17;60:12;
62:12,21;76:3;86:3,
17;87:6;93:10;
94:11;95:18;96:4;
97:21;101:19;102:7;
103:11;109:9;113:3
**pointed (2)**
64:5;77:18
**points (5)**

73:16;75:24;87:7;
99:10;107:20
**Pomerantz (23)**
10:9;11:14,15,23,
25;12:3,5,11,22;
59:11;75:14,21,22;
88:3,6;89:15,19,22;
90:25;99:3,6;
101:20;102:8
**pool (1)**
47:16
**pop (1)**
100:18
**poring (1)**
74:17
**portfolio (7)**
25:25;26:5,6,7,8;
51:12;92:9
**portion (1)**
17:2
**POSIN (1)**
7:19
**position (4)**
68:6;95:13;96:3;
109:22
**positions (1)**
92:19
**possibility (2)**
45:2,8
**possible (1)**
110:10
**possibly (1)**
61:16
**post- (1)**
18:23
**Post-bankruptcy (2)**
27:10,15
**post-confirmation (1)**
94:12
**post-petition (3)**
22:8;79:17;84:18
**potentially (1)**
55:16
**POTTER (1)**
8:2
**power (1)**
27:17
**powers (2)**
79:1;98:17
**practice (14)**
13:10;46:18;73:2,
3,6,7;85:14;87:15,
19;88:1;89:5;
102:14;105:17;
106:20
**practiced (1)**
102:14
**pre- (1)**
22:7
**preceded (1)**
83:9
**predetermination (2)**
54:7,8

**predetermine (1)**
44:3
**predominant (1)**
108:23
**preference (1)**
106:8
**pre-judge (1)**
101:5
**prejudice (2)**
54:6,8
**prejudicial (1)**
97:17
**preliminary (1)**
69:9
**prepared (4)**
38:3,3;75:23;
105:12
**pre-petition (2)**
78:24;83:7
**preponderance (4)**
61:22;62:18;
107:4;110:6
**Pres (1)**
9:7
**presen (1)**
60:15
**PRESENT (1)**
9:2
**presentation (3)**
60:17;77:6;98:14
**presented (1)**
50:19
**presents (2)**
42:12;59:1
**preside (1)**
79:15
**president (5)**
12:25;25:1,19;
26:10,13
**presumption (5)**
83:20;105:22;
106:10,14;107:5
**pretext (1)**
78:10
**pretty (1)**
93:21
**previous (3)**
79:18;87:8;109:10
**previously (4)**
16:5;34:10;56:13;
68:14
**primarily (3)**
22:21;84:6;102:14
**primary (2)**
94:15;97:9
**prime (2)**
15:18,23
**principal (4)**
15:16,24;50:12;
110:3
**principals (1)**
13:20
**prior (11)**

13:18,19;18:2;
21:13;32:21;43:25;
62:2;64:3;92:23;
97:15;110:11
**private (4)**
16:11;17:7;86:13;
91:5
**Private-equity (3)**
28:17;92:20;93:5
**privilege (1)**
73:20
**proactively (1)**
78:25
**probability (2)**
44:4;47:14
**probably (7)**
40:14;57:3;61:12;
64:4,16;65:6;71:4
**probative (1)**
38:17
**problem (2)**
111:5;113:6
**problematic (1)**
106:23
**procedurally (1)**
33:14
**procedures (2)**
46:4;89:12
**proceed (11)**
10:15;11:6,8,11;
12:20;21:6;22:2;
24:6;41:11;78:15;
100:7
**proceeding (11)**
42:22;45:14;
46:25;49:6,19;
50:10;51:2;58:16;
83:9;90:23;107:21
**proceedings (3)**
15:15;102:22;
114:3
**process (5)**
16:25;27:5;58:17;
81:18;106:12
**produced (1)**
96:21
**professional (3)**
13:2;112:19,20
**professionals (8)**
50:25;52:18;
82:21,22;87:12,14;
111:5;113:5
**proffer (15)**
11:6;12:21;18:25;
22:11,13;30:18;
31:16,22,25;33:10,
11;41:22;42:6;
44:10;53:7
**proffered (1)**
75:1
**promise (2)**
34:3;61:1
**promoted (2)**

24:14;26:10
**promotion (1)**
26:12
**proof (3)**
61:22;62:16,17
**proofs (1)**
89:11
**proper (5)**
39:8;44:10;78:13;
80:2,21
**proponent (1)**
38:19
**proposed (3)**
10:22;12:24;20:23
**proprietary (3)**
14:21;65:3,6
**propriety (1)**
84:18
**prosecuted (1)**
98:4
**protecting (1)**
71:1
**protocol (1)**
79:4
**protocols (5)**
18:18;96:17;
112:2,5,17
**provide (8)**
18:14;49:24;53:7;
67:8;84:15;86:24;
92:22;93:16
**provided (7)**
16:5;18:15;34:10;
36:11;66:21;92:21;
96:20
**provides (5)**
15:2;17:3;35:14;
38:13;91:18
**providing (2)**
39:3;67:6
**provision (4)**
22:11,16;94:16,20
**provisions (1)**
94:14
**proximity (3)**
82:1;84:4;85:21
**prudent (1)**
100:6
**public (3)**
39:6;86:11;92:18
**Public-relations (1)**
28:15
**published (5)**
41:17;43:24;
54:14,19,22
**Puerto (1)**
46:25
**purely (1)**
93:21
**purportedly (1)**
48:10
**purposes (3)**
40:20,23;62:14

**pursing (1)**
17:25
**pursuant (3)**
16:6;64:8;66:22
**pursue (1)**
84:18
**put (16)**
17:21;31:13,15;
33:3,4,6,22;38:25;
40:9;43:24;49:3;
68:8;95:5,13;
101:11;113:20
**PWS (1)**
81:15

**Q**

**qualify (1)**
35:3
**quick (6)**
62:12,21;63:25;
73:16;91:11;103:11
**quickly (6)**
61:19;73:1;75:15;
99:10;110:10,23
**quite (2)**
50:10;104:11

**R**

**Raise (2)**
19:11;23:21
**raised (1)**
54:1;75:25;111:19
**RAKHEE (2)**
8:19;60:3
**random (4)**
46:4;47:13;
102:12,16
**randomly (2)**
46:19,21
**rate (1)**
94:9
**rather (6)**
78:13;87:3;98:22;
104:15;110:20,23
**re (4)**
13:6,7,8,8
**read (5)**
61:12;64:2;73:16;
23;94:15
**ready (1)**
113:22
**Real (11)**
32:17;52:20;
62:15;67:6;76:22;
77:2,21;89:8;92:6;
97:14;108:17
**real-estate (3)**
17:8;86:7,22
**reality (5)**
63:5;88:2;89:4;
105:16;106:20

**realized (1)**
40:18
**really (35)**
33:25;48:3;62:2,
19;63:1,8,20;64:3,
10,15;65:5,9,11;
67:13;68:8;69:22;
70:2;73:12;76:12;
77:6,20;87:23,25;
90:1;95:22,24;96:9;
104:11;105:16,18;
106:11;107:21;
108:18;111:5;
112:20
**reason (9)**
22:23;39:7;70:8;
77:12,21;78:13;
87:3;97:1,20
**reasonable (1)**
38:19
**reasoned (2)**
81:21;83:19
**reasons (8)**
11:3;39:13;47:18;
75:1;87:8;98:25;
111:19;113:19
**rebuts (1)**
32:2
**rebuttal (4)**
25:7;31:16;42:6;
50:11
**rebutted (2)**
42:2,10
**rebutting (3)**
25:8;33:6,21
**recall (3)**
26:7;30:20;34:15
**received (3)**
12:19;37:21;40:22
**receives (1)**
14:25
**recess (6)**
41:4,6,8;75:6,8;
105:8
**recognized (1)**
78:23
**recognizes (1)**
50:18
**recommendation (2)**
94:7,8
**recommended (1)**
26:12
**record (29)**
19:14;23:24;25:7;
39:6;41:2,16,17,19;
42:7,8;43:24;46:15;
49:16,24,25;51:2;
54:13;59:12;60:2;
74:18;82:13;90:18,
23;93:22;96:1,5,7;
99:15;113:19
**records (1)**
14:6

**record's (1)**
41:3
**recusal (1)**
48:24
**red (2)**
58:14;99:18
**Redeemer (4)**
7:8,23;83:6,9
**redirect (1)**
23:4
**reduce (1)**
92:12
**reducing (1)**
22:22
**refer (3)**
11:18,19;64:23
**reference (6)**
43:14,15;60:4,15;
62:14;82:11
**referenced (6)**
36:9;61:20;66:17;
68:3;69:25;70:24
**references (1)**
68:18
**referred (4)**
44:10;52:6;54:18;
101:20
**reflect (4)**
88:1;93:22;
105:16,18
**regard (6)**
18:8;34:7;40:7,19;
90:20;109:13
**regarding (11)**
18:23;22:11;38:8;
55:5;56:21;78:6;
84:23;94:14;99:17;
100:4,24
**regional (1)**
86:8
**registered (1)**
15:5
**Reid (6)**
10:24;19:7,19,19;
20:2;21:1
**relate (1)**
112:6
**related (11)**
14:22;15:7;31:19;
44:9;65:19;72:25;
76:11;80:12;83:1;
85:21;94:22
**relationship (4)**
18:2;64:2;77:1;
92:4
**relative (1)**
49:14
**relatively (2)**
66:24;71:23
**Relevance (7)**
38:9;39:9;40:8,8;
50:21;53:12;91:15
**relevant (13)**

34:20;39:22;40:9,
10;57:14,21;76:13;
88:8;92:25;94:10;
95:23;96:11;99:20
**reliability (1)**
40:7
**relied (1)**
77:11
**relief (2)**
52:9;84:22
**rely (4)**
41:14;80:10,22;
95:24
**remain (3)**
19:9;23:17;24:4
**remaining (1)**
17:1
**remarks (2)**
57:14;75:24
**remember (5)**
22:4,12;24:22;
25:18;30:8
**remind (1)**
100:3
**remiss (1)**
101:13
**remote (1)**
45:9
**remotely (1)**
61:16
**rendered (1)**
17:14
**reorganization (3)**
44:12;84:9;109:7
**repeat (3)**
57:22;61:10;102:6
**repeated (1)**
67:15
**repeating (1)**
61:13
**replies (1)**
62:23
**reply (5)**
31:24;39:16;
42:20;54:13;99:7
**report (8)**
20:23;26:15,22,
25;27:10,15;28:21;
97:7
**reported (2)**
26:20;84:11
**reporting (1)**
97:2
**reports (3)**
28:25;58:4,7
**represent (2)**
66:8;92:11
**representative (3)**
15:13;82:3;84:13
**representatives (2)**
84:16;85:9
**represented (3)**
37:15;43:12;63:6

**representing (2)**
10:10;63:1
**reprimand (1)**
31:11
**request (2)**
43:2;98:25
**requested (2)**
14:8;84:22
**requesting (1)**
38:21
**require (1)**
50:15
**required (3)**
48:23,23;84:15
**requirement (1)**
76:4
**reserve (1)**
21:1
**reserved (2)**
21:24;33:11
**residual (1)**
38:12
**resignation (1)**
66:3
**Resources (5)**
28:8;45:4,11;52:5;
103:4
**respect (43)**
16:22;17:25;18:3;
20:19;22:9;38:3,3;
41:20,22;42:8;
49:21;53:19;54:5;
57:21;58:24;59:5;
63:8,13;64:1,4,11;
65:8;66:12,14,18;
67:6,22,23,24;68:6,
6,8,19;70:17,19;
72:14;83:22;86:22;
94:13;102:8;103:12;
104:10,17
**respectfully (2)**
59:1;98:25
**respond (1)**
40:1
**responding (1)**
108:1
**responses (1)**
62:22
**responsibility (2)**
17:25;97:9
**rest (1)**
113:4
**restaurant (2)**
89:22;99:12
**Restaurants (3)**
81:4;83:19;89:16
**restructure (6)**
18:11;70:4,7;
104:23;105:2,3
**restructuring (11)**
12:24;13:2,3,5,25;
18:1;70:2;79:1;87:2,
4;92:22

**result (5)**
45:6;53:17,19;
91:16;109:5
**retail (2)**
17:8;28:8
**retain (3)**
13:16;88:14;
111:10
**retained (3)**
84:7;85:17;113:5
**retaining (1)**
112:19
**retention (3)**
21:12;68:20;
113:11
**retire (1)**
47:5
**retreads (1)**
87:8
**return (1)**
44:12
**returned (1)**
44:16
**revenue (5)**
17:4,6;65:18,19;
92:12
**revenues (2)**
17:2;92:18
**reversed (1)**
74:15
**review (2)**
50:16,24
**reviewed (2)**
34:12,14
**reviewing (1)**
14:5
**Rican (1)**
46:25
**right (71)**
12:16,20;19:1,11;
21:24;22:8,17,20;
23:7,15,21;24:12,17,
19;25:2,5,20;26:1,
11,15,20,23;27:2,10,
18;28:2,8,13,17;
29:1,8,11,14,21;
30:1,4,23,24;31:3,6,
9,10;32:7,13;33:12,
13,21;34:5,12;35:14;
36:4,23;37:14;40:5;
41:1,3;47:16;48:14;
71:16;75:5,20;88:5;
92:17;101:10;105:5,
7,21;110:11,12;
113:11;114:2
**rights (2)**
21:1;109:7
**Rio (1)**
15:9
**rise (3)**
10:2;75:9;105:9
**risk-management (3)**
28:24,25;30:5

**robe (1)**
75:16
**rocket (1)**
67:6
**ROGGE (1)**
8:7
**role (2)**
13:25;85:18
**ROME (2)**
6:14;59:13
**room (1)**
86:25
**ROSENTHAL (1)**
7:4
**ROTH (1)**
8:12
**routinely (1)**
87:15
**Rule (13)**
38:12,13;39:6,7;
44:1,4;46:16;52:25;
73:8;78:3,12;
105:12;111:16
**ruled (3)**
56:13;94:20;
113:14
**rules (6)**
48:1;90:17;
100:24,25;101:5;
108:14
**ruling (4)**
45:12;56:21;
60:16;112:23
**rulings (4)**
56:6,7;62:2;74:9
**run (5)**
32:4;51:15;78:11;
99:9;107:24
**run-up (1)**
58:12
**RYAN (1)**
8:4

**S**

**sales (1)**
70:1
**Same (8)**
27:11;29:6,9;50:3,
12;91:9;93:21;
104:25
**satisfying (1)**
98:12
**save (2)**
59:18;110:20
**saying (6)**
40:18,19;70:12;
76:14;83:24;96:1
**scattered (2)**
108:25,25
**scenario (3)**
72:3;74:9,15
**schedules (2)**

43:7;69:21
**SCHULTE (1)**
8:12
**science (1)**
67:6
**scope (4)**
21:15,21;27:12;
32:33
**scorecard (1)**
62:3
**scrutiny (1)**
96:14
**seal (1)**
11:19
**SEAN (2)**
6:4;10:25
**seated (5)**
10:3;24:3;41:9;
75:10;105:10
**SEC (1)**
67:2
**Second (7)**
43:21;44:15;
54:12;55:6;69:8;
76:7;107:11
**secured (6)**
15:23,24;68:4;
82:9,12,14
**Securities (3)**
7:14;15:23;92:19
**seeing (1)**
107:19
**seek (2)**
94:13;95:11
**seeking (3)**
25:10;44:11;45:3
**seeks (1)**
53:16
**seems (2)**
45:21;55:19
**sees (1)**
74:11
**send (1)**
110:25
**senior (2)**
13:20;24:12
**sense (3)**
33:17;46:21;64:19
**sent (3)**
55:10;57:3;74:2
**Seoul (1)**
15:9
**separate (3)**
65:21,22;85:15
**separateness (1)**
98:9
**series (2)**
77:11;109:24
**serves (2)**
16:23;17:23
**service (1)**
92:21
**services (26)**

15:3;16:3,6;17:13;
22:12,16,16;34:9,9,
17;35:19,21;54:15;
65:13;66:7,10,15,16,
19,22;67:4;86:12;
91:4,19;92:14;93:19
**set (6)**
18:18;39:3;42:12;
68:3,20;113:19
**sets (1)**
80:22
**setting (2)**
62:13;112:21
**seven (3)**
35:13;82:18;
103:17
**seventy (1)**
29:13
**several (6)**
26:6;49:22;51:22;
53:22;91:21;110:22
**Shannon (2)**
13:7,8
**shared (12)**
15:3;16:6;18:21;
22:12,16;34:9;
35:21;66:7,16,19;
67:4;86:12
**shared- (1)**
34:16
**shared-service (4)**
16:10,15;93:11,17
**shared-services (5)**
34:12;35:12;
66:23,24;94:4
**SHARP (32)**
9:7;10:12;11:25;
12:23;19:8,15,22;
20:3;21:9;27:10,17;
31:17;41:22;44:10;
50:6,11;53:6,15;
54:17;78:25;79:3;
84:7,9,17,21;85:1;
93:16;94:2,7;95:3;
97:1;113:1
**S-H-A-R-P (1)**
19:16
**Sharp's (4)**
18:25;42:10;50:5;
84:13
**SHAW (21)**
8:9;21:4,4,6,8;
22:3,4;23:2;32:17,
19,24;33:2,9,20,23;
34:3,6,20;35:24;
61:8;63:11
**sheer (1)**
95:24
**sheet (2)**
18:12;93:7
**shifts (1)**
62:18
**shopping (2)**

56:11;106:19
**short (6)**
11:6;41:4,6;58:14;
75:5,6
**shortly (3)**
45:4;66:3,4
**shot (4)**
33:17;98:23,24;
109:6
**show (1)**
77:4
**showed (1)**
57:17
**shown (1)**
55:14
**shows (2)**
53:11;57:17
**shrink (1)**
17:4
**sic (13)**
25:13;41:16;42:9,
20;43:13;47:23;
49:19;59:11;60:8;
68:21;75:23;96:6;
101:23
**side (3)**
62:1;64:11;109:17
**sides (2)**
56:5;64:5
**Sidley (3)**
10:21;41:13;113:4
**sign (1)**
113:13
**signed (4)**
63:17,18;110:9;
113:23
**significant (22)**
43:7,19;57:18;
63:21;70:3,8,9,16;
74:20;78:20;80:17;
85:1;86:8,17;97:21;
98:3;102:20;103:22;
104:1,21;109:13,18
**significantly (4)**
22:10;77:5;85:18;
96:22
**silence (1)**
109:17
**silent (1)**
109:13
**silly (1)**
88:12
**similar (3)**
35:23;54:20;104:2
**similarly (5)**
71:24;78:15;81:7;
85:17;104:17
**simpler (1)**
113:18
**simply (9)**
46:10;54:10;63:4;
84:2;100:8,15;
103:19;109:12;

112:19
**Singapore (8)**
15:9,11;20:18,20;
86:15;93:5;104:4,7
**single (5)**
26:7;42:22;43:16;
72:18;99:15
**single-asset (1)**
86:7
**sit (5)**
32:5;33:25;45:19;
59:8;101:25
**sits (4)**
34:23;35:1;83:23,
23
**sitting (1)**
100:20
**situated (2)**
71:24;104:18
**situation (4)**
48:4,10;51:8;
108:17
**situations (1)**
49:3
**six (6)**
27:22;56:8;81:2;
84:24;107:12;
111:23
**sliver (1)**
92:24
**small (2)**
86:7;92:24
**smart (2)**
89:18;100:5
**sole (2)**
26:7;55:7
**solution (1)**
109:6
**somebody (1)**
47:21
**somehow (4)**
73:18;74:8;
105:22;106:22
**someone (1)**
75:12
**someone's (1)**
48:3
**sometimes (1)**
73:10
**somewhat (1)**
104:2
**soon (2)**
110:9;113:22
**sophisticated (3)**
14:18;91:7;105:25
**sorry (11)**
12:3,13;41:9;
45:23;46:1;60:9;
71:4,11;73:23;
89:19;103:9
**sort (16)**
46:16;48:25;55:4;
62:16;63:21;65:4;

67:8,12;68:8,18;
70:21,22;73:11;74:5,
14;77:7
**sought (1)**
18:19
**sources (1)**
15:1
**South (2)**
14:22;15:11
**speak (1)**
35:22
**SPEAKER (4)**
19:3,5;41:7;
109:20
**speaking (1)**
91:1
**special (2)**
46:8;95:12
**specialist (1)**
27:6
**Specialists (3)**
9:7,9;12:25
**specific (8)**
40:19;73:8;90:19,
23;96:4,5;104:15;
107:20
**specifically (1)**
35:10
**specifics (1)**
54:25
**speculating (1)**
45:1
**speed (2)**
49:15;91:12
**spell (2)**
19:13;23:23
**spend (4)**
54:11,12;58:22;
90:1
**spent (4)**
14:4;76:22;88:9;
103:3
**sponte (1)**
69:7
**stack (5)**
63:22;68:2,10;
69:12,14
**stacks (1)**
60:6
**staff (2)**
103:8,9
**staff's (1)**
74:17
**Stamford (1)**
83:18
**stand (6)**
19:9,10;23:13,16;
48:9;63:11
**standard (4)**
35:20;80:23;
81:24;110:6
**standards (1)**
87:24

**standing (4)**
19:9;23:17;31:8;
61:3
**standpoint (1)**
106:23
**Stang (5)**
10:6;11:15;13:14,
21;21:19;75:22
**STARGATT (1)**
6:2
**start (5)**
41:4;50:15;78:23;
97:11;113:23
**started (3)**
24:12;29:8;76:14
**State (11)**
15:25;19:13;
23:23;64:6;70:25;
71:5,10;81:16,17,18;
95:6
**stated (2)**
40:23;81:7
**statement (7)**
38:13,14,17;
39:22;76:1;102:9,11
**statements (5)**
43:8;84:1;90:7,7;
104:6
**States (4)**
14:22;15:16;
30:20;86:14
**state's (1)**
71:8
**status (2)**
52:10;53:13
**statute (1)**
64:12
**statutory (1)**
79:24
**stay (2)**
19:23;111:6
**stayed (1)**
109:13
**stemmed (1)**
72:17
**step (4)**
19:10;23:7;36:5;
106:21
**steps (1)**
55:18
**stick (2)**
33:21;108:14
**still (8)**
26:22;32:4;50:8;
57:19;58:6;66:11;
69:19;97:2
**stock (1)**
86:11
**stood (1)**
93:20
**Stoops (1)**
31:6
**Strand (7)**

14:12,13;25:5,17,
20;51:14;80:8
**Strand's (1)**
51:14
**strategic (1)**
18:7
**strategy (1)**
101:21
**strayed (2)**
77:7,12
**stress (1)**
95:20
**strike (1)**
51:4
**strikes (1)**
74:11
**striking (1)**
109:10
**strong (6)**
47:19;56:23;
83:20;105:22;
106:10;107:5
**stronger (1)**
57:5
**strongly (2)**
81:6,20
**structure (15)**
16:10;25:14;
31:19;32:3;54:12;
64:12;66:20;67:13;
80:14;91:17;95:4,4,
15;97:3;100:21
**structured (1)**
92:9
**structured-credit (1)**
103:15
**stuck (1)**
109:3
**study (1)**
91:11
**stuff (4)**
67:1,5;92:2;
111:24
**sua (1)**
69:7
**subadvises (1)**
16:24
**subadvisory (12)**
16:6,10,15;22:12,
16;34:9,13,17;35:12;
54:16;66:23,25
**subcontracted (1)**
54:15
**subject (9)**
11:19;17:16,23;
44:18,19;46:3;79:4;
103:22;111:8
**submanager (1)**
16:5
**submit (6)**
66:13;74:24;
81:23;103:25;104:4;
113:17

**submitted (1)**
28:2
**subpieces (1)**
66:8
**sub-plans (1)**
74:6
**subpoenaed (1)**
85:25
**subscribe (1)**
81:8
**subset (1)**
50:4
**subsidiary (2)**
30:25;31:1
**substantial (4)**
17:11;81:9;84:23;
96:21
**substantially (3)**
18:14;83:21;85:23
**substantive (1)**
73:13
**subsumed (1)**
62:16
**subtopics (1)**
64:21
**succeed (1)**
98:4
**succeeded (2)**
76:10;87:20
**success (1)**
78:16
**successful (3)**
44:21;105:1,3
**sufficient (2)**
38:14;39:2
**suggested (1)**
100:19
**suite (3)**
108:20;110:2;
113:8
**suited (1)**
65:7
**suites (1)**
107:15
**sum (1)**
58:23
**summarize (1)**
66:20
**support (13)**
33:4;46:16;52:3;
53:24;56:21;59:9;
77:13;81:25;82:7;
84:22;87:22;98:7;
100:1
**supported (4)**
38:14;42:25;57:2;
99:14
**supporters (1)**
41:5
**supporting (6)**
17:19;42:23;
55:12;77:9;99:15,16
**supports (4)**

38:23;43:18;
51:10;98:8
**suppose (1)**
44:3
**supposed (1)**
25:7
**sure (9)**
25:11;27:21;
34:14;56:12;57:9;
58:25;68:23;82:21;
91:22
**surprising (1)**
43:2
**surrounding (2)**
79:8;93:4
**survive (1)**
94:20
**survived (1)**
94:17
**switch (1)**
59:25
**switching (1)**
106:17

**T**

**table (3)**
10:8;62:13;79:10
**talk (7)**
21:18;42:17,19;
46:10,11;64:21;
101:13
**talked (1)**
53:18
**talking (5)**
40:17;55:22;
88:10;101:1,4
**tangentially (2)**
40:9;61:17
**targeted (1)**
15:10
**tasked (1)**
112:1
**tax (1)**
28:7
**TAYLOR (1)**
6:2
**team (23)**
14:8;20:7,14,16,
16,18;28:6,10,13,15,
17,19,24,25,25;
29:21;30:5;31:5;
32:8;50:13;61:11;
111:23;112:8
**teams (2)**
28:4,10
**teasing (1)**
46:13
**technicalities (1)**
22:1
**technology (1)**
88:7
**TELEPHONICALLY (8)**

6:22,23;7:15,16,
17,18,19;8:14
**telling (2)**
60:6;70:17
**template (4)**
35:20;67:14,23;
93:20
**ten (4)**
17:3;72:18;92:11,
17
**tenet (2)**
62:7;81:16
**terminate (4)**
17:24;27:2,17;
97:3
**terminated (1)**
16:7
**terminates (1)**
97:4
**terms (8)**
43:9;54:24;57:25;
101:3,10;102:12;
103:24;112:22
**TERRI (1)**
7:10
**Terry (3)**
17:22;44:13;83:1
**test (3)**
62:7;80:23;105:18
**testified (8)**
22:11;27:3;34:22,
25;50:10,11;85:2;
93:17
**testify (42)**
12:1,1,23,23;13:1,
5,10,13,17,20,23;
14:3,6,10,14,17,24;
15:2,6,10,12,15,21;
16:2,9,13,20;17:5,
10,14,18,23;18:4,13,
16,19,22;23:13;53:6;
84:12;85:5,8
**testimonies (1)**
55:7
**testimony (22)**
18:14,25;42:2,10;
50:5;53:8;57:17;
58:4,6;84:13,15,21;
90:22;93:13,14,16;
95:2,2,21,23;101:8;
104:9
**Texas (59)**
11:3;17:18,20;
18:3;22:24;29:1,3,6,
12;32:4;39:1;40:10;
43:1;45:14,23;46:5,
9,17;51:21;53:1;
56:6,8;57:2,3;63:9,
10,11,17;70:13,18;
72:4,9;73:6;76:2;
82:19,25;85:3,7,23,
25;86:4,4,5;87:3,11,
13;89:25;90:3,4;

98:20,24;102:13,23;
103:1,8;107:12;
108:4,5;109:8
**Texas-based (2)**
89:17,22
**thankfully (1)**
57:3
**that'll (2)**
94:9;113:20
**theoretically (1)**
27:8
**theories (1)**
78:18
**therefore (5)**
44:16;45:7;57:20,
24;67:24
**thinking (3)**
65:7;67:1;111:6
**third (5)**
16:17;44:7;53:14;
69:8;92:21
**thirty (1)**
43:14
**though (4)**
49:2;57:5;65:11;
98:16
**thought (3)**
23:15;55:4;109:18
**thousand (1)**
51:23
**three (13)**
24:21,23;32:5;
46:23;53:12;62:3,3,
7;65:2;72:22,23;
74:6;77:10
**throughout (4)**
67:15;69:2;86:14;
100:14
**throw (1)**
56:19
**thrown (1)**
67:20
**thus (1)**
96:17
**tie (1)**
110:2
**times (1)**
87:25
**title (3)**
24:17,19;25:18
**today (27)**
10:7,15,23;15:13;
18:19;24:17;33:11;
34:7;35:1;45:19;
48:9;58:19;61:6;
68:21;75:13;82:20;
85:6,11,19;89:6;
94:24;101:10;
110:18,19,20;
111:16;112:9
**today's (1)**
84:20
**told (3)**

69:18;77:21,25
**took (2)**
85:18;98:23
**top (2)**
83:5;100:21
**top-twenty (1)**
50:24
**total (1)**
17:13
**totality (1)**
38:15
**touch (4)**
53:25;57:12;73:1,
15
**touching (1)**
61:19
**tough (1)**
52:15
**trades (1)**
67:2
**trading (6)**
28:19,25;65:3,4,6;
92:18
**traditional (3)**
21:16,22;53:23
**transaction (1)**
101:21
**transactions (8)**
18:1;58:11;69:12;
79:4;84:18;101:17;
112:4,5
**transfer (47)**
11:2;39:10;42:13,
25;43:2;51:10;52:4,
7;53:24;55:11;
56:23;59:2;61:18;
62:11,25;63:20;64:8,
16,16;68:24,25;69:4;
71:23;73:10;76:5;
78:13;80:24;81:6,20,
25;82:8,16;83:21,21;
90:13;95:19;98:8,
19;102:21;103:23;
104:24;105:12,15;
106:16;107:3;
109:11;110:9
**transfer- (1)**
71:24
**transferee (1)**
39:10
**transfer-of-venue (1)**
77:14
**transferred (16)**
13:15;40:11;
45:22;47:20;68:12,
15;72:18;74:22,25;
76:5;77:17;85:20;
102:25;103:5;
110:24;113:19
**transferring (2)**
51:5;97:13
**transfers (3)**
69:12;87:22;92:4

**transition (1)**
26:19
**transparency (2)**
79:5;101:17
**transparent (3)**
18:19;78:14;79:11
**transpired (1)**
63:13
**trash (1)**
37:2
**travel (7)**
13:12,13;53:15;
83:3;85:3,10;88:8
**treasurer (1)**
66:2
**tremendous (4)**
49:16;54:5;108:6;
111:22
**trial (1)**
60:11
**trials (1)**
108:7
**tries (1)**
57:15
**trip (1)**
52:16
**trouble (2)**
88:25;113:21
**true (10)**
22:19,19;28:19,
22;29:19;30:11;
85:14;89:10;97:23;
100:15
**truly (1)**
51:7
**trustee (9)**
13:3;66:5;77:24;
78:1,11;96:11,13;
98:19,22
**Trustee's (1)**
97:6
**trustworthiness (1)**
38:15
**trustworthy (1)**
38:25
**truth (1)**
39:23
**try (2)**
24:3;60:25
**trying (8)**
45:10;48:9;54:2,3;
75:11,12;96:6;
101:16
**TUNNELL (1)**
7:22
**turn (3)**
18:10;41:5;68:17
**turning (2)**
68:2;107:5
**twenty (5)**
51:19;57:4;69:19;
82:18;83:5
**twenty-five (1)**

13:2
**two (28)**
17:19;47:7,24;
53:12;62:4;65:12;
66:1,22;68:4,7;
69:17;72:2,24;
73:10;78:18;82:9,20,
25;83:5;88:9,17;
93:23,24;97:22;
101:7;103:17;
108:18,23
**two-and-a- (1)**
14:24
**Twomey (1)**
10:23
**type (8)**
54:3,3;67:5;91:1;
93:17,18;101:4,16
**types (2)**
16:11;89:13
**typical (3)**
35:16;61:18;67:5
**typically (2)**
86:6;88:20

**U**

**UBS (5)**
7:14,14;83:11;
107:12,13
**ultimately (4)**
72:18;74:4;94:20;
104:22
**umbrage (2)**
105:20,20
**Um-hum (1)**
47:1
**unaffiliated (2)**
15:4;16:17
**unanimously (1)**
42:25
**unclear (1)**
40:20
**uncontested (1)**
41:15
**uncontroverted (6)**
41:15;42:8,13;
84:14;92:10;100:1
**un-cooperation (1)**
96:24
**under (22)**
14:11,13,20,25;
20:23;35:13;38:16;
39:5;44:1,13;46:4;
52:25;67:21;70:25;
71:8;98:13;103:17,
18;106:6;112:1,1;
113:17
**underlying (1)**
17:1
**underneath (2)**
44:16;75:17
**understood (2)**

33:12,20

**unduly (1)**
97:16

**unfortunately (2)**
58:1,10

**unheard (1)**
102:17

**UNIDENTIFIED (4)**
19:3,5;41:7;
109:20

**unique (18)**
42:12,17;49:3;
51:4;52:23;53:22;
59:2;61:13,14,14;
63:16;70:14,15;
71:22;78:10;106:2;
107:23;110:1

**United (4)**
14:22;15:16;
30:20;86:14

**Unless (2)**
59:7;101:25

**unliquidated (2)**
17:11;83:12

**unobjected-to (2)**
36:10,12

**unrelated (2)**
82:12;88:18

**Unsecured (9)**
6:3;10:22;43:12;
51:20;82:17;83:5;
98:5;100:20,22

**unsecureds (2)**
69:15,17

**unsophisticated (1)**
83:2

**untold (1)**
74:16

**up (24)**
19:10;28:6,21,25;
43:9;46:11;47:14;
49:15;50:24;57:3;
58:23;59:15,17;60:6,
7;67:17,19;72:20;
85:19;93:20;94:7;
101:9;109:9;113:3

**upload (1)**
113:22

**upon (2)**
33:10;39:5

**upped (2)**
49:14;50:16

**up-to- (1)**
91:11

**upwards (1)**
69:17

**use (2)**
45:10;86:24

**used (4)**
30:5,5;83:15;
110:25

**useless (1)**
62:8

**Usually (6)**
30:1;71:22;73:11;
75:14;82:22;107:24

**utmost (1)**
58:24

**V**

**valuable (1)**
103:22

**Valuation (2)**
28:7;86:23

**value (3)**
18:5,12;87:1

**Variant (1)**
13:6

**variety (4)**
15:4;86:11;91:22;
92:19

**various (9)**
14:5,21;16:4;
17:11;34:18;56:21;
72:4;77:9;95:3

**varying (1)**
50:20

**vast (3)**
43:9,11;80:4

**vastly (1)**
68:7

**venture (3)**
61:15;74:14,21

**venue (71)**
10:16;11:1,2,2,20;
23:11,14;39:20;
41:15,20;42:9,13,16,
24,25;43:4,18;44:2,
5,19,20,24;45:9;
51:5,11;52:4,7;
53:24;54:1;55:12,
20;56:22;57:2;58:2,
3;59:3;61:18;62:16,
25;63:20;64:6;
71:23;76:13;77:9,
17;78:13;79:22;
80:2,21,24;81:20;
82:4,8,16;83:20;
95:19;98:8,13,23;
99:14,16;100:23;
101:11,24;105:12,
16;106:5,16;107:3;
110:11,16

**venue-transfer (2)**
76:19;100:1

**veracity (1)**
97:12

**version (1)**
94:17

**versus (2)**
62:3,4

**veteran (1)**
19:22

**view (6)**
53:9;55:14;64:10;

96:7;99:19;113:11

**views (2)**
78:6;112:22

**virtually (3)**
73:19;80:13;81:12

**vital (1)**
111:15

**volume (2)**
70:16;95:24

**voluminous (1)**
74:18

**voted (1)**
104:24

**votes (1)**
70:18

**voting (2)**
70:10;110:4

**W**

**walk (3)**
46:10;51:5;79:24

**Walsh (1)**
81:15

**wants (1)**
78:15

**warmer (2)**
75:11,11

**warrant (1)**
42:13

**warring (1)**
47:24

**WATERHOUSE (24)**
9:5;10:11;23:13,
15,25;24:9;25:16;
27:22;32:12,20;
33:12;36:5;42:2;
50:10;51:11;54:17;
64:25;66:2;68:4,11,
17;69:15;85:5;93:15

**W-A-T-E-R-H-O-U-S-E (1)**
24:1

**Waterhouse's (2)**
65:1;104:9

**WATKINS (1)**
7:13

**Watkins' (1)**
83:15

**way (16)**
11:11;31:18;40:9;
55:2,2,6;77:16;
86:25;87:17,17;
95:9;102:24;107:21;
109:1,3;110:15

**weakness (1)**
80:1

**wealth (1)**
14:7

**week (2)**
27:4;29:23

**weekly (1)**
31:8

**weeks (5)**

72:1;84:24;96:19;
110:23;111:23

**weigh (3)**
81:6,20;112:25

**weighed (1)**
82:15

**weighs (2)**
56:23;62:19

**weight (1)**
57:11

**Welcome (4)**
10:13;36:7;75:3;
105:4

**well-founded (1)**
39:14

**Wells (1)**
107:13

**what's (10)**
55:22;60:7;65:8;
68:9;71:2;79:16;
97:16;104:11,20;
105:18

**whatsoever (1)**
106:24

**Whereupon (1)**
114:3

**whole (3)**
62:23;83:23;98:2

**wholly (1)**
44:15

**who's (2)**
70:17;75:12

**wide (2)**
62:10;86:11

**widely (1)**
35:17

**WILLIAM (1)**
6:11

**willingness (1)**
89:1

**wind (1)**
47:14

**WINSTEAD (1)**
8:17

**wish (2)**
19:2;57:10

**withheld (1)**
14:9

**within (5)**
39:7;72:1,2;
102:21;111:18

**without (7)**
12:16;37:18;54:6;
60:6;79:17;89:13;
91:12

**withstand (1)**
96:14

**witness (18)**
19:2,12,15,24;
22:5;23:2,9,22,25;
25:7;32:14,24;34:22,
25;35:24;36:1,6;
108:16

**witness-and-exhibit (1)**
36:11

**witnesses (10)**
21:23,25;85:11,22,
23,25;91:22;96:21;
97:13;99:24

**WL (1)**
13:8

**Woodbridge (1)**
13:7

**word (2)**
105:21;106:18

**words (2)**
90:5;102:23

**work (8)**
18:7;29:13,17;
30:22;108:6,7;
111:22;112:5

**worked (5)**
20:9;24:9;50:3;
55:5;79:3

**working (2)**
75:13;95:5

**world (4)**
14:19;15:2;32:2;
87:19

**worry (2)**
59:4;83:3

**wrestle (2)**
49:18;55:1

**wrestling (1)**
54:11

**written (4)**
40:16;49:22;
76:21;81:1

**wrong (3)**
46:24;71:9,14

**wrote (1)**
91:23

**Y**

**years (5)**
13:2;24:21,23;
56:3;57:4

**yield (1)**
10:17

**yields (2)**
53:17,19

**York (16)**
15:20;20:14;30:6,
7,7,10,15;42:1;
82:10;83:10,14,15;
86:16;99:17,21;
107:13

**YOUNG (6)**
6:2;10:24;85:17;
100:4;111:6;112:15

**Z**

**ZABEL (1)**
8:12

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                                                    December 2, 2019

**Ziehl (6)**
    10:6;11:15;13:14,
    21;21:19;75:22

## 1

**1 (7)**
    37:9,9,20;53:3;
    59:17;60:8;66:17
**1:45 (3)**
    105:5,6,6
**1:47 (1)**
    105:8
**10:48 (1)**
    41:8
**100,000 (1)**
    74:18
**1014 (1)**
    44:1
**11 (10)**
    17:21;45:13;
    78:23;80:3;86:24;
    97:10;98:19;105:16,
    19,25
**11:05 (1)**
    41:8
**11:50 (1)**
    75:8
**12 (2)**
    10:16;74:1
**12:00 (1)**
    75:8
**12:39 (1)**
    105:8
**1408 (1)**
    80:3
**1412 (3)**
    64:8;80:22;98:13
**15th (1)**
    60:21
**17 (2)**
    60:13;69:11
**18 (2)**
    37:9,20
**1979 (2)**
    81:3;87:25
**1998 (1)**
    81:15

## 2

**2 (5)**
    38:17;60:8,11;
    66:18;101:3
**2,000 (4)**
    51:24;53:3;67:18,
    20
**2:02 (1)**
    114:3
**2006 (3)**
    24:10;29:7,8
**2009 (3)**
    92:13;103:13,14

**2011 (2)**
    24:15;26:11
**2016 (1)**
    81:4
**2017 (1)**
    103:14
**2018 (5)**
    16:8,21;61:5;
    65:16;74:4
**2019 (4)**
    13:18;60:20,21;
    88:2
**24 (2)**
    37:11,21
**25 (2)**
    37:11,21
**26 (4)**
    39:15;40:23;
    59:17,25

## 3

**3 (2)**
    37:10,20
**30 (1)**
    15:21
**30th (1)**
    61:5
**31st (1)**
    60:20

## 4

**45 (1)**
    52:25

## 5

**5.2 (1)**
    16:1

## 7

**7 (1)**
    13:18
**7.5 (1)**
    15:3

## 8

**807 (1)**
    38:12

## 9

**9 (2)**
    37:10,21
**99.94 (1)**
    80:7